IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| BENEFYTT TECHNOLOGIES, INC., *et al.*,[1] | ) ) ) | Case No. 23-90566 (CML) |
| Debtors. | ) ) ) | (Joint Administration Requested) |

**DECLARATION OF RICHARD W. MORGNER
IN SUPPORT OF THE DEBTORS' <u>EMERGENCY</u>
MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING
LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED
PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

I, Richard W. Morgner, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that:

1. I am a Managing Director and Joint Global Head of Debt Advisory & Restructuring at Jefferies LLC ("<u>Jefferies</u>"), an investment banking and financial advisory firm with principal offices located at 520 Madison Avenue, New York, New York 10022, as well as other locations worldwide.

2. Jefferies is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Boston Stock Exchange, the International Stock Exchange, the Financial Industry Regulatory Authority, the Pacific Stock Exchange, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Benefytt Technologies, Inc. (2634); American Service Insurance Agency LLC (9115); Benefytt Reinsurance Solutions, LLC (4601); BimSym-HPIH, LLC (4626); Dawn Acquisition Company, LLC (0909); Daylight Beta Parent Corp. (6788); Health Insurance Innovations Holdings, Inc. (1994); Health Plan Intermediaries Holdings, LLC (0972); Healthinsurance.com, LLC (9525); HealthPocket, Inc. (3710); Insurance Center for Excellence, LLC (4618); RxHelpline, LLC (9940); Sunrise Health Plans, LLC (3872); TogetherHealth Insurance, LLC (9503); TogetherHealth PAP, LLC (8439); and Total Insurance Brokers, LLC (7975). The location of the Debtors' service address is: 3450 Buschwood Park Drive, Suite 200, Tampa, Florida 33618.

Philadelphia Stock Exchange, and the Securities Investor Protection Corporation. Jefferies, together with its investment banking advisory affiliates, has approximately 4,800 employees located in more than 30 offices around the world. Jefferies and its senior professionals have extensive expertise providing investment banking services to financially distressed companies, creditors, committees, equity holders, asset purchasers, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court. Jefferies is the proposed investment banker for the above-captioned debtors and debtors in possession (collectively, the "Debtors").

3. I submit this declaration (the "Declaration") in support of the relief requested in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "Motion").[2]

4. Except as otherwise indicated, all statements in this Declaration are based on (a) my personal knowledge of the Debtors' operations and finances, (b) my review of relevant documents, (c) information provided to me by Jefferies employees working under my supervision, (d) information provided to me by, or in discussions with, the members of the Debtors' management team or their other advisors, and (e) my views based upon my experience as a restructuring professional. If called to testify, I could, and would, testify to each of the facts set forth herein on foregoing bases.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

5. I am not being specifically compensated for this testimony other than through payments received by Jefferies as a professional retained by the Debtors.

## Professional Background and Qualifications

6. I am a Managing Director and Joint Global Head of Debt Advisory & Restructuring at Jefferies. I have approximately 30 years of investment banking and restructuring experience. Since joining Jefferies in 2009, I have provided investment banking expertise, and distressed mergers and acquisition and financing advice to companies, lenders, and investors in both in- and out-of-court restructurings. I have been involved in numerous restructurings, including those of Nautical Solutions, L.L.C., Vewd Software AS, CarbonLite Recycling LLC, Bouchard Transportation Co., Inc., Endologix, Inc., OGGUSA, Inc., *f/k/a* GenCanna Global USA, Inc., Clover Technologies Group LLC, Dura Automotive Systems, LLC, ERP Iron Ore, LLC, Hanjin Shipping Co., Logan's Roadhouse, Inc., Warren Resources Inc., Penn Virginia Co., Aspect Software Parent, Inc., Sundevil Power Holdings, LLC, EveryWare Global, Inc., Genco Shipping & Trading Company. Prior to joining Jefferies, I was a Managing Director and Co-Head of the mergers and acquisitions group at Miller Buckfire & Co., where my primary responsibilities included advising companies and investors in restructuring, distressed mergers and acquisitions, distressed financing, and special situations. I was also previously a Managing Director at Chanin Capital Partners and Prudential Securities. I received an A.B. from Dartmouth College. I am principally responsible for overseeing the day-to-day activities of the Jefferies deal team in this engagement.

## Retention of Jefferies

7. On April 25, 2023, the Debtors engaged Jefferies as their investment banker to assist with the Debtors' evaluation of strategic and capital structure alternatives. Since then, Jefferies has worked closely with the Debtors' management, board of directors, creditors, and other

3

professionals and advisors to analyze the Debtors' business affairs, assets and liabilities, capital structure, and financial position, and to explore various proposed strategic transactions and otherwise assist in the Debtors' restructuring efforts. I have been the lead member of the Jefferies team during this engagement. In the lead up to these chapter 11 cases, Jefferies, and myself personally, also assisted the Debtors with soliciting and negotiating postpetition debtor-in-possession financing. As a result of the foregoing, I have become familiar with the Debtors' capital structure, liquidity needs, and business operations.

### The Debtors' Need for Postpetition Financing

8. As noted in the Motion, the Debtors have an urgent need for significant and immediate liquidity. Specifically, as noted in the Gallagher Declaration, without immediate financing, the Debtors project that they will be unable to make payments essential to continued going concern operations, resulting in immediate and irreparable harm to the Debtors' businesses. As a result, the proposed $35 million priming superpriority senior secured delayed draw debtor-in-possession term loan credit facility (the "DIP Facility") is critical to the Debtors' ability to administer these chapter 11 cases and pursue the restructuring contemplated by the Debtors' plan of reorganization (the "Plan") and restructuring support agreement (including all exhibits and schedules attached thereto, and amended, restated, and supplemented from time to time, the "Restructuring Support Agreement" or the "RSA").

### The RSA and the Debtors' Efforts to Secure Postpetition Financing

9. Prior to the commencement of these Chapter 11 Cases, the Debtors, certain funds affiliated and/or managed by the Debtors' sponsor, Madison Dearborn Capital Partners (the "Sponsor"), the ad hoc group of term lenders (the "Ad Hoc Group") the revolving lenders (the "Revolving Lenders" and together with the Debtors, the Sponsor, and the Ad Hoc Group, the "DIP Parties") engaged in discussions to structure and achieve consensus on a comprehensive

restructuring transaction while ensuring the Debtors maintained liquidity to operate their business in the ordinary course. These efforts resulted in the DIP Parties entering into the Restructuring Support Agreement.

10. As part of the Restructuring Support Agreement and the transactions contemplated thereby, the Sponsor agreed to provide a proposal for postpetition financing to the Debtors. The Sponsor, however, also agreed to permit the Debtors to explore potentially better financing opportunities from other parties.

11. Accordingly, in early May 2023, Jefferies began the process of soliciting interest from third-party financing sources.[3] Specifically, Jefferies contacted ten potential financing candidates which included various institutions that routinely provide debtor-in-possession financing, including both well-known commercial banks and specialty lenders. Of these potential third-party lenders, one executed a confidentiality agreement with the Debtors, received access to non-public information, and conducted due diligence.

12. Notwithstanding these efforts, no third party provided a term sheet or indication of interest, whether on a priming or non-priming basis. Nor did any party within the Debtors' capital structure, aside from the Sponsor, make a debtor-in-possession financing proposal. Accordingly, the Debtors, with the assistance of their advisors, concluded that their best path to financing these chapter 11 cases was through the Sponsor's debtor-in-possession financing proposal. Over the course of multiple weeks, the Debtors and their advisors engaged in various good faith, arm's length negotiations with the Sponsor concerning the economics, milestones, covenants, and other provisions typical in debtor-in-possession financings and ultimately reached agreement on the

---

[3] Prior to Jefferies' engagement by the Debtors, I understand that the Debtors asked their existing lenders for postpetition financing. I understand, however, that the Debtors' existing lenders were not willing to offer any such postpetition financing.

terms of the DIP Facility.

## Terms of the DIP Financing

13. As described in the Motion, the DIP Facility is a $35 million priming superpriority senior secured delayed draw debtor-in-possession term loan credit facility. Through the DIP Facility, the Debtors seek authority to withdraw $25.0 million on an interim basis (the "Initial Draw"), with $10.0 million available upon entry of the Final Order. As described more fully in the Motion, the DIP Facility has customary fees, terms, and other conditions. The DIP Facility, moreover, also has certain milestones that the Debtors must meet throughout their chapter 11 cases. Based on my personal participation in the negotiations, these milestones were negotiated at arm's length between the Debtors, the Sponsor, and the Ad Hoc Group, and are an integral component of the DIP Facility and the broader set of transactions contemplated by the RSA. Finally, as discussed in the Motion, the DIP Facility provides for certain DIP Subordination Events, the occurrence of any of which would result in the DIP Facility being subordinated to the certain claims of the Prepetition Secured Parties.

14. The following table sets forth the key economic features of the DIP Financing:[4]

| KEY ECONOMIC TERMS OF PROPOSED DIP FINANCING ||
|---|---|
| *Commitment Amount* | $25 million available upon entry of the Interim Order, including the $4 million DIP Letter of Credit Facility. $10 million available upon entry of the Final Order. |
| *Interest Rate* | The DIP Facility will bear interest at a rate equal to 12.00%. <br><br> Upon any default, the interest rate increases to 14.00%. |
| *Agent Fees* | The DIP Agent fees are set forth in that certain Fee Letter, dated as of the Closing Date, by and between the Administrative Borrower and the Administrative Agent (as defined therein). |

---

[4] Capitalized terms used in the following chart but not defined have the meanings ascribed to them in the DIP Term Loan Credit Agreement.

| KEY ECONOMIC TERMS OF PROPOSED DIP FINANCING ||
|---|---|
| **Letter of Credit Commitment Fees** | If the Restructuring Transactions are not consummated, then, on the earliest to occur of (i) the Maturity Date and (ii) the date the Letter of Credit Commitments are terminated, 3.00% of the Letter of Credit Commitments. |

**The DIP Term Loan Facility is the Best DIP Financing Currently Available to the Debtors**

15. Based on my experience with debtor-in-possession financing transactions, as well as my involvement in the above-mentioned solicitation of the potential financing alternatives, I believe that the proposed DIP Facility is the Debtors' best and only available source of postpetition funding under the circumstances.

16. *First*, the DIP Facility will provide the Debtors with access to the amount of capital that the Debtors, in consultation with their advisors, believe is necessary to effectively and efficiently administer these chapter 11 cases and pursue the transactions set forth in the RSA.

17. *Second*, as described above, the Debtors, with the assistance of Jefferies, solicited various other sources of postpetition financing to determine whether the Debtors could obtain postpetition financing on better terms. In the course of this solicitation process, however, the Debtors did not receive any proposals for postpetition financing. Based on the foregoing, in addition to the fact that the vast majority of the Debtors' assets are encumbered, I do not believe that any alternative sources of financing with terms as favorable as those contained in the DIP Facility are currently available to the Debtors.

18. *Third*, I believe that the principal economic terms proposed under the DIP Facility are uniquely favorable to the Debtors and reflect the particular circumstances of these chapter 11 cases. Specifically, the economic terms (such as the contemplated pricing, fees, interest rate, and default rate) were all negotiated at arm's length and are, in aggregate, generally consistent with—and in some cases better than—the cost of debtor-in-possession financings in comparable circumstances. In particular, because the facility is sourced from the Sponsor, the only fees

7

payable under the DIP Facility are (i) a contingent fee related to the letter of credit subfacility and (ii) fees and expenses of the DIP Agent. The Debtors, moreover, are not paying upfront fees, commitment fees, exit fees, or other customary costs typically required by debtor-in-possession lenders. Further, interest accruing on the DIP is not payable during the pendency of these chapter 11 cases—rather, such interest will be paid only upon consummation of the restructuring contemplated by the RSA or upon a third-party sale transaction.

19. *Finally*, the negotiations around the Debtors' proposed DIP Facility extended for over three months and, from my participation, were hard fought. In my view, based on my experience negotiating other debtor-in-possession financings, these negotiations were conducted at arm's length and in good faith.

## Conclusion

20. Based on my experience with debtor in possession financing transactions, as well as my involvement in the above-mentioned solicitation of the potential financing alternatives, I believe that the proposed DIP Facility is the Debtors' best and only available source of postpetition funding and that the terms of the DIP Facility are reasonable and appropriate under the circumstances. The proposed DIP Facility, together with the RSA and the Plan, moreover, provide a potential path to an expeditious exit from chapter 11.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

May 23, 2023

By:
*/s/ Richard W. Morgner*
Richard W. Morgner
Managing Director and Joint Global Head of the
Debt Advisory & Restructuring Group
Jefferies LLC