## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BENEFYTT TECHNOLOGIES, INC., *et al.*,[1] | ) Case No. 23-90566 (CML) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) (Emergency Hearing Requested) |

### DEBTORS' EMERGENCY MOTION FOR
### ENTRY OF AN ORDER (I) AUTHORIZING THE
### DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER
### COMPENSATION, AND REIMBURSABLE EXPENSES, (B) CONTINUE
### EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF

**Emergency relief has been requested. Relief is requested not later than 2:00 p.m. (prevailing Central Time) on May 23, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on May 23, 2023, at 2:00 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's homepage. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance"**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Benefytt Technologies, Inc. (2634); American Service Insurance Agency LLC (9115); Benefytt Reinsurance Solutions, LLC (4601); BimSym-HPIH, LLC (4626); Dawn Acquisition Company, LLC (0909); Daylight Beta Intermediate Corp. (7248); Daylight Beta Intermediate II Corp. (8842); Daylight Beta Parent Corp. (6788); Health Insurance Innovations Holdings, Inc. (1994); Health Plan Intermediaries Holdings, LLC (0972); Healthinsurance.com, LLC (9525); HealthPocket, Inc. (3710); Insurance Center for Excellence, LLC (4618); RxHelpline, LLC (9940); Sunrise Health Plans, LLC (3872); TogetherHealth Insurance, LLC (9503); TogetherHealth PAP, LLC (8439); and Total Insurance Brokers, LLC (7975). The location of the Debtors' service address is: 3450 Buschwood Park Drive, Suite 200, Tampa, Florida 33618.

> **link on Judge Lopez's homepage.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state the following in support of this motion (this "<u>Motion</u>"):[2]

### Relief Requested

1.     The Debtors seek entry of an order, substantially in the attached form (the "<u>Order</u>"), (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course, including payment of certain related prepetition obligations; and (b) granting related relief.

### Jurisdiction and Venue

2.     The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to entry of a final order by the Court in connection with this Motion.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and rule 9013-1(a) of the Bankruptcy Local Rules for the Southern District of Texas (the "<u>Bankruptcy Local Rules</u>").

---

[2]     A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Michael DeVries, Chief Financial Officer of Benefytt Technologies, Inc. in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>"), filed contemporaneously herewith on May 23, 2023 (the "<u>Petition Date</u>").  Capitalized terms used but not defined in this Motion have the meanings ascribed to them in the First Day Declaration.

**Background**

5.      The Debtors are a technology-driven distributor of insurance products covering Medicare-related insurance plans as well as other types of health insurance and supplemental products that operate in 44 states including Texas, New York, California, and Florida. Headquartered in Tampa, Florida and employing approximately 855 people, the Debtors develop and operate Medicare and private health insurance online marketplaces, insurance agent technology systems, and insurance policy administration platforms, as well as conduct marketing and lead generation for insurance providers.  The Debtors provide self-guided online tools for individuals to compare Medicare, private, and supplemental health insurance products; an extensive network of licensed insurance agents empowered by a technology platform to facilitate enrollments; and other insurance technology allowing agents and brokers to service their customers and manage their business seamlessly.

6.      On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated as of the date hereof.

36285069v.1

**The Debtors' Workforce**

7.      As of the Petition Date, the Debtors employ approximately 855 employees, nearly all of which are employed on a full-time basis (the "<u>Full-Time Employees</u>").[3]  The Employees include personnel who are intimately familiar with the Debtors' business, processes, and systems, and possess unique skills and experience with respect to the Debtors' core business segments. Without the continued, uninterrupted services of the Employees, the Debtors' business operations will be halted and the administration of the estates materially impaired.  In addition to the Employees, the Debtors' workforce also includes a limited number of independent contractors (approximately fifty-five as of the Petition Date) (the "<u>Independent Contractors</u>") who provide the Debtors' workforce additional support, all of which are employed indirectly through certain third-parties (the "<u>Agencies</u>"), such as contracting agencies.

8.      The vast majority of the Employees rely on their compensation and benefits to pay their daily living expenses.  Similarly, the vast majority of Employees rely on health and other benefits provided by the Debtors to meet their and their families' health and other daily needs. These workers will be unfairly harmed if the Debtors are not permitted to continue paying compensation and providing health and other benefits during these chapter 11 cases. Consequently, the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

---

[3]    The Debtors also employ a small number of individuals on a part-time basis (the "<u>Part-Time Employees</u>").  The Debtors occasionally employ temporary Employees to supplement the workforce or to assist in the completion of certain projects (the "<u>Temporary Employees</u>" and, together with the Full-Time Employees and the Part-Time Employees, the "<u>Employees</u>").  As of Petition Date, the Debtors have no Temporary Employees.

**Compensation and Benefits**

9.      To minimize the personal hardship that Employees could suffer if prepetition Employee-related obligations remain unpaid during these chapter 11 cases, the Debtors seek authority to:  (a) pay and honor certain prepetition claims relating to, among other things, Employee Compensation, Independent Contractor Obligations, Withholding Obligations, Unpaid Payroll Processing Fees, Reimbursable Expenses, Health and Welfare Coverage and Benefits, the Workers' Compensation Program, Disability Benefits, the 401(k) Plan (including the 401(k) Matching Contributions), Paid Leave Benefits, Non-Insider Employee Incentive Benefits, and certain other benefits that the Debtors have provided in the ordinary course (each as defined herein and, collectively, the "Compensation and Benefits"); and (b) pay all costs related to or on account of the Compensation and Benefits.

10.      The Debtors seek to continue their prepetition Compensation and Benefits in the ordinary course of business.  Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, and/or discontinue any of their Compensation and Benefits and/or to implement new programs, policies, and benefits in the Debtors' sole discretion and in the ordinary course during these chapter 11 cases (subject in all respects to the terms of the Order) and without the need for further Court approval, subject to applicable law.

11.     The Debtors seek authority to make the following payments related to prepetition amounts owed on account of the Compensation and Benefits:

| Relief Sought | Amount |
|---|---|
| ***Compensation and Withholding Obligations*** | **$3,330,000** |
| Employee Compensation | $1,400,000 |
| Independent Contractor Obligations | $1,200,000 |
| Withholding Obligations | $600,000 |
| Payroll Processing | $100,000 |
| Reimbursable Expenses | $30,000 |
| ***Health and Welfare Coverage and Benefits*** | **$454,600** |
| Medical and Prescription Coverage | $408,000 |
| Life Insurance Coverage | $3,600 |
| Dental Insurance Coverage | $37,000 |
| Vision Insurance Coverage | $6,000 |
| ***Workers' Compensation*** | **$0** |
| ***Disability Benefits*** | **$43,000** |
| ***401(k) Plan*** | **$502,000** |
| ***Paid Leave Benefits*** | **$500,000** |
| ***Additional Benefit Programs*** | **$10,000** |
| ***Non-Insider Employee Incentive Program*** | **$0** |
| ***Sales Commissions*** | **$190,000** |
| ***Non-Insider Severance Program*** | **$14,000** |
| **TOTAL** | **$5,043,600** |

12.     In addition, out of an abundance of caution, the Debtors seek authority, but not direction, to continue to honor the Compensation and Benefits provided to Employees on a postpetition basis in the ordinary course of business and pay all necessary costs related thereto.

**I.      Compensation, Withholding Obligations, Payroll Processing, and Reimbursable Expenses.**

      **A.      Employee Compensation.**

13.     In the ordinary course of business, the Debtors incur obligations to their Employees for wages, overtime, and similar obligations (the "Employee Compensation"). Because Employees are generally paid in arrears, certain Employees are owed accrued but unpaid Employee Compensation as of the Petition Date (the "Unpaid Employee Compensation"). Employee Compensation may also be due and owing as of the Petition Date because of, among

6

other things, potential discrepancies between the amounts paid and the amounts that Employees believe they should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees, or as a result of Employees holding uncashed paper paychecks as of the Petition Date.

14.     The majority of the Debtors' payroll is made by direct deposit through electronic transfer of funds to the Employees' bank accounts or other electronic means on a weekly or bi-weekly calendar depending on the Employees' role, and Employee Compensation accrues on either a salaried or hourly basis.  In 2022, the Debtors incurred a monthly average of approximately $5.2 million on account of Unpaid Employee Compensation.  As of the Petition Date, the Debtors estimate that they owe approximately $1.4 million on account of accrued but Unpaid Employee Compensation.

15.     Accordingly, the Debtors request authority to continue to honor the Unpaid Employee Compensation and to pay any prepetition claims with respect thereto in the ordinary course of business.

        **B.      Independent Contractors.**

16.     The Debtors make payments to Independent Contractors (the "Independent Contractor Obligations") all of which are employed indirectly through the Agencies, for the performance of certain services important to the Debtors' operations, such as providing support on public relations, reinsurance, software, IT and compliance.  The Debtors rely on the support of Independent Contractors to complete discrete projects in furtherance of the Debtors' business and to fill short-term positions.  The Debtors pay the Independent Contractors on either a weekly or monthly basis at an agreed rate, depending on the terms of the Debtors' agreement with the contracting Agency, as well the Independent Contractor's role listed on the contracting Agency's

invoice. The Debtors believe the authority to continue paying the Independent Contractor Obligations is critical to minimizing disruption to the Debtors' business operations.

17. Through May 2023, the Debtors have incurred approximately $400,000 per month on average on Independent Contractor Obligations. As of the Petition Date, the Debtors estimate that they owe approximately $1.2 million in accrued but unpaid Independent Contractor Obligations. The Debtors seek authority to pay any outstanding Independent Contractor Obligations and to continue paying the Independent Contractor Obligations in the ordinary course of business on a postpetition basis consistent with past practices.

**C. Withholding Obligations.**

18. In the ordinary course of business, the Debtors incur obligations on account of Payroll Deductions and Payroll Taxes (each as defined below and collectively, the "Withholding Obligations"). During the 2022 calendar year, the Debtors incurred a monthly average of approximately $2.24 million of Withholding Obligations. As of the Petition Date, the Debtors estimate that they owe approximately $600,000 on account of outstanding Withholding Obligations.[4] The Debtors request authority to continue to honor their Withholding Obligations and to pay any prepetition claims with respect thereto in the ordinary course of business.

**i. Payroll Deductions.**

19. During each applicable payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance

---

[4] For the avoidance of doubt, this estimate includes obligations related the Health and Welfare Coverage and Benefits to the extent of the Employee's obligations related thereto.

premiums, 401(k) contributions, FSA and HSA contributions, legally ordered deductions, and miscellaneous deductions (collectively, the "Payroll Deductions"), and forward the Payroll Deductions to various third-party recipients.  The Debtors retain only those Payroll Deductions related to the Employees' share of health care benefits and insurance premiums.  In 2022, the Debtors incurred a monthly average of approximately $740,000 on account of Payroll Deductions.

> **ii.    Payroll Taxes.**

20.    In addition to the Payroll Deductions, certain federal and state laws require that the Debtors withhold amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "Employee Payroll Taxes").  The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (collectively, the "Employer Payroll Taxes" and, together with the Employee Payroll Taxes, the "Payroll Taxes").  The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities in accordance with remittance intervals and deadlines established by those taxing authorities.  In 2022, the Debtors incurred a monthly average of approximately $1.5 million on account of Payroll Taxes.

> **C.    Payroll Processing.**

21.    Certain Withholding Obligations for the Debtors' Employees are processed and administered by UKG, Inc.  The Debtors' recent monthly run-rate is approximately $50,000 on account of these payroll processing and application hosting services.  Additionally, as of the Petition Date, the Debtors estimate they owe approximately $100,000 on account of prepetition payroll processing services (the "Unpaid Payroll Processing Fees").  Accordingly, the Debtors

request authority to continue to honor their Unpaid Payroll Processing Fees and to pay any prepetition claims with respect thereto in the ordinary course of business.

        **D.**      **Reimbursable Expenses.**

22.     Prior to the Petition Date and in the ordinary course of business, the Debtors reimbursed certain Employees for pre-approved expenses incurred on behalf of the Debtors within the scope of their employment (the "Reimbursable Expenses"). Reimbursable Expenses include, among other expenses, travel-related expenses such as air travel, meal allowances, car mileage allowances, and business-related entertainment expenses.[5] Employees who pay for their own Reimbursable Expenses up-front (*i.e.*, not via a credit card issued by the Debtors) apply for reimbursement of such expenses by submitting an expense report to the Debtors. Once the Debtors determine that the charges are for allowable reimbursable business expenses, the Debtors reimburse such Employees for any such expenses.

23.     The Debtors' inability to reimburse the Reimbursable Expenses could impose a hardship on the Employees where such individuals incurred obligations for the Debtors' benefit. Employees incurred the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed.

24.     During the most recent 12-month period, the Debtors incurred a monthly average of approximately $45,000 on account of Reimbursable Expenses. As of the Petition Date, the Debtors estimate that they owe approximately $30,000 on account of Reimbursable Expenses. The

---

[5]    The Reimbursable Expenses also include certain credit card expenses. The *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue to (A) Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief* (the "Cash Management Motion"), filed contemporaneously herewith, describes the Debtors' Credit Card Program (as defined in the Cash Management Motion).

36285069v.1

Debtors will not seek to pay any outstanding Reimbursable Expenses or fees related thereto in advance of the date they come due.  Accordingly, the Debtors request authority to continue to honor their Reimbursable Expenses and to pay any prepetition claims with respect thereto in the ordinary course of business.

**II.     Health and Welfare Coverage and Benefits.**

25.     The Debtors have offered their Employees the ability to participate in a number of health, insurance, and benefits programs, including, among other programs, medical and prescription, life and disability insurance, dental insurance, vision insurance, and savings and spending account programs and other employee benefit plans (collectively, the "Health and Welfare Coverage and Benefits").  The Health and Welfare Coverage and Benefits are available to eligible full-time Employees who work thirty hours or more per week (the "Eligible Employees").

26.     The Debtors' Health and Welfare Coverage and Benefits include:

(a)     **Medical and Prescription Coverage**:  The Debtors provide Eligible Employees with self-insured medical and prescription coverage programs through carriers UnitedHealthcare ("United Health" and such coverage, the "Medical and Prescription Coverage"), respectively and Kaiser Permanente ("Kaiser"). The Debtors accrue all payments to United Health and Kaiser in advance on a monthly basis.  Employees have the option to waive coverage if they are covered under another insurance plan. Employees can choose to participate in high-deductible health plans with a Health Savings Account, or alternatively, health plans with differing deductibles and premiums, each of which include more favorable coverage terms from providers in-network providers, with options to seek care outside of the network.    Moreover, under the Medical and Prescription Coverage, the Debtors bear the full cost of the insurance plans other than the amounts deducted from Employee paychecks on account of insurance and amounts paid by Employees on account of any co-pays under the Medical and Prescription Coverage.  For 2023 costs, on average, the Debtors cover $510 of monthly premiums across all health plans, while the

11

Employees cover the remaining amount (other than one plan with a monthly premium of $476 that is fully covered by the Debtors). Legal spouses, domestic partners, and children are eligible dependents. Nearly all Employees enroll in Medical and Prescription Coverage. The average monthly cost of the Medical and Prescription Coverage to the Debtors is approximately $415,000, which includes $5,000 to Kaiser. As of the Petition Date, the Debtors estimate they owe approximately $408,000 on account of incurred but unpaid (a) Medical and Prescription Coverage premiums and (b) medical claims, pharmacy claims, and medical stop loss claims.

(b)     **Life Insurance Coverage**:   The Debtors, through United Health, provide basic life, accidental death, and dismemberment insurance in the amount of $25,000 (subject to a reduction in coverage for Employees starting at age 65) to all full-time Employees at no cost, with options for Employees to pay certain amounts to increase such coverage (capped at a maximum benefit not to exceed 5 times an Employee's annual salary) (the "Life Insurance Coverage").  Life Insurance Coverage is paid in advance on a monthly basis, indirectly through SelectSource, Inc. ("SelectSource").  The average monthly cost of the Life Insurance Coverage to the Debtors is approximately $2,000. As of the Petition Date, the Debtors estimate they owe approximately $3,600 on account of unpaid Life Insurance Coverage.

(c)     **Dental Insurance Coverage**:   The Debtors offer Eligible Employees two types of dental PPO plans administered by United Health: (a) a base PPO plan (the "Base PPO Plan"); and (b) an enhanced "buy-up" PPO plan (the "Enhanced PPO Plan" and, with the Basic PPO Plan, the "Dental Insurance Coverage").  The Dental Insurance Coverage allows the freedom to use providers in and out of the network.  Unlike the Base PPO Plan, the Enhanced PPO Plan covers orthodontia.  One hundred percent of the vision premium is employee-paid.  One hundred percent of the Enhanced PPO Plan premium is employer-paid, with some fluctuation in percentage depending on whether an Employee elects an individual versus a family plan.  The average monthly cost of the Dental Insurance Coverage to the Debtors is approximately $50,000.  As of the Petition Date, the Debtors estimate they owe approximately $37,000 on account of unpaid Dental Insurance Coverage.

(d)     **Vision Insurance Coverage**:   The Debtors offer vision insurance plans provided by United Health

12

(the "<u>Vision Insurance Coverage</u>") that are not subsidized by the Debtors.  The average monthly cost to the Debtors for the ability to offer the Vision Insurance Coverage is approximately $7,000. As of the Petition Date, the Debtors estimate they owe approximately $6,000 on account of unpaid Vision Insurance Coverage.

(e)  **Flex Spending Accounts and Health Savings Accounts**: The Debtors provide Employees with the opportunity to contribute to two types of flexible spending accounts:  the FSA and the Dependent Care FSA administered by MedCom (each, an "<u>FSA</u>"), or to a health savings account (for those who enroll in the health savings account medical plan) (the "<u>HSA</u>") administered by HSA Bank, to make pre-tax contributions through payroll deductions to pay for certain health and welfare needs.  The Debtors do not contribute to Employees' FSAs and believe the FSA amounts are generally held in trust by the Debtors and are not property of their estates.  The Debtors contribute either $187.50 or $250 to each HSA on a quarterly basis, depending on the Employee's healthcare plan, totaling approximately $750 or $1,000 per year.  The Debtors deduct an average of $106 from each participating U.S. Employee's wage obligations on account of the U.S. Employee contributions to the FSA and the HSA on a monthly basis.  Currently, approximately 90 Employees contribute to the FSAs, and approximately 80 Employees contribute to the HSA.   The Debtors pay approximately $500 per month to MedCom (indirectly through SelectSource) in FSA administrative fees.  As a result, the Debtors seek authority to pay and/or remit the unpaid costs in connection with the FSA and the HSA programs and to continue to operate such programs in the ordinary course of business on a postpetition basis.

27.    As described above, failure to continue the Health and Welfare Coverage and Benefits could cause Employees to experience severe hardship and make it difficult to retain the Debtors' workforce.  Accordingly, the Debtors request authority to continue to honor their Health and Welfare Coverage and Benefits and to pay any prepetition claims with respect thereto in the ordinary course of business.

### III.     Workers' Compensation.[6]

28.     The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each state in which they have Employees (collectively, and as described herein, the "Workers' Compensation Program").  As part of the Workers' Compensation Program, the Debtors maintain a workers' compensation insurance policy administered by AmTrust Financial Services, Inc., with Stahl & Associates Insurance operating as the broker (the "Workers' Compensation Insurance Policy").

29.     The Debtors must continue claim assessment, determination, adjudication, and payment pursuant to the Workers' Compensation Program, without regard to whether such liabilities are outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[7]  There are currently nine active open claims under the Workers' Compensation Program.[8]  To the extent any Employees assert claims arising under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with such claims.  This requested modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

---

[6]     In addition to the Workers' Compensation Insurance Policy (as defined below), the Debtors maintain numerous other insurance policies, which are described in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered Into Prepetition and Pay Related Prepetition Obligations, and (B) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage, and (II) Granting Related Relief*, filed contemporaneously herewith and incorporated herein by reference.

[7]     The Debtors' Workers' Compensation Program may change postpetition in the ordinary course due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.  By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any necessary modifications thereto in order to comply with applicable law.

[8]     For the avoidance of doubt, the Debtors have no deductible or self-insured retention in force on the Workers' Compensation Insurance Policy for Health Plan Intermediaries Holdings, Inc.

30.     Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that potentially could disrupt the reorganization process.  As of the Petition Date, the Debtors believe they owe no amounts on account of accrued but unpaid premiums for the Workers' Compensation Program obligations.  The Debtors request authority to (a) pay prepetition amounts due on account of the Workers' Compensation Program consistent with past practice, (b) continue the Workers' Compensation Program in the ordinary course of business, and (c) to the extent applicable, modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program.

**IV.     Disability Benefits.**

31.     The Debtors provide Employees with short-term disability benefits (the "Short-Term Disability Benefits") and long-term disability benefits (the "Long-Term Disability Benefits" and, together with the Short-Term Disability Benefits, the "Disability Benefits"), which are each administered by Mutual of Omaha ("Omaha") and AllState Benefits ("AllState").  Disability Benefits are offered to all active Employees who are working thirty or more hours per week, as well as supplemental, spouse, and child life products offered on a voluntary, Employee-paid basis.  The Debtors accrue payments for Omaha and AllState's services in advance on a monthly basis, through SelectSource.

32.     In the event of a short-term disability due to an illness, injury, or accident, eligible Employees are eligible to receive up to 60% of their monthly pay (capped at $2,000 per week) for up to six months.  The Short-Term Disability Benefits begin on the fifteenth day after an Employee is absent from work following a covered accident or illness.  To receive Short-Term Disability Benefits, Employees must file a claim on the third day of becoming unable to work.

33.     Following expiration of the Short-Term Disability Benefits, Employees are eligible to receive Long-Term Disability Benefits.  With regard to the Long-Term Disability Benefits, eligible Employees are entitled to receive up to sixty percent of their monthly pay until the later of: (a) the age of sixty-five, or (b) the Social Security Normal Retirement Age.  The Long-Term Disability Benefits begin after an Employee is absent from work for six months following a covered disability, and the benefit is capped at $10,000 per month.

34.     Employees are also eligible to receive a supplemental individual disability insurance (the "Supplemental Individual Disability Benefits"), administered by Unum Group ("Unum") with Provident Life & Accident Insurance Company operating as the underwriter ("Provident Life").  On average, the Debtors incur approximately $27,900 per month on account of premiums for the Disability Benefits, which includes $20,000 for Short-Term Disability Benefits to Omaha and Disability Benefits to AllState, $4,400 for Long-Term Disability Benefits, and $3,500 for Supplemental Individual Disability Benefits to Unum and Provident Life.

35.     As of the Petition Date, approximately $43,000 has accrued on account of Disability Benefits.  The Debtors seek authority to pay all outstanding prepetition amounts owed on account of the Disability Benefits and to continue honoring their obligations on account of the Disability Benefits on a postpetition basis in the ordinary course of business consistent with their prepetition practices in the event such costs are incurred.

**V.     The 401(k) Plan.[9]**

36.     The Debtors maintain a retirement savings plan for the benefit of their Employees that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan").

---

[9]     In addition, the Debtors maintain a non-qualified deferred compensation plan (the "Deferred Compensation Plan").  Under the Deferred Compensation Plan, certain executives defer a portion of their income and invest it in the same investment opportunities available under the 401(k) Plan.  Currently two employees participate in the

The 401(k) Plan is administered by Fidelity and allows for automatic pre-tax salary deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.  The Debtors operate with Adcock Financial Group ("Adcock Financial") for the administration and retirement financial advisement of the 401(k) Plan.

37.     Under the 401(k) Plan, the Debtors match one hundred percent of the contributions of the participating Employee up to a maximum of three percent of the Employee's base salary (the "401(k) Matching Contributions").  The Employee is entitled to receive the 401(k) Matching Contributions after three years of service with the Debtors.  The 401(k) Matching Contributions are paid out on an annual basis.

38.     During the 2022 calendar year, the Debtors incurred approximately $980,000 on account of 401(k) Matching Contributions, and $1,625 on a quarterly basis to Adcock Financial. As of the Petition Date, the Debtors estimate that they owe approximately $500,000 on account of 401(k) Matching Contributions, accrued during the 2023 calendar year, and $2,000 to Adcock Financial.  Accordingly, the Debtors request authority to continue to honor their 401(k) Matching Contributions and to pay any prepetition claims with respect thereto in the ordinary course of business.

**VI.     Paid Leave Benefits.**

39.     The Debtors have, in the past, provided paid time off to certain eligible Employees as a benefit (the "Paid Leave Benefits")[10].  The Debtors' Paid Leave Benefits program combines

---

Deferred Compensation Plan. For the avoidance of doubt, by this motion, the Debtors are not seeking authority to make any disbursements under the Deferred Compensation Plan during these chapter 11 cases.

[10]     Beginning at the vice president level, Employees can receive Paid Leave Benefits at any time.  Employees at the vice president level and above typically do not accrue Paid Leave Benefits, nor do the Debtors accrue Paid Leave Benefits for them.

flexible parental leave (up to two weeks following 180 days of continuous employment with the Debtors), bereavement leave (up to five days), but also time off, vacation, sick, disability, holiday, voting, domestic violence leave, jury duty, and military service.  When an Employee elects to use Paid Leave Benefits, that Employee is paid his or her regular hourly or salaried rate.  Paid Leave Benefits generally accrue at specified rates up to a maximum amount based on the Employee's level, area of employment, and years of service.  Sixteen hours of paid leave is automatically granted to all full-time Employees at the beginning of the year, as well as to all eligible new hires. Employees then accrue hours depending on their tenure and hours worked.  Upon an Employee's termination, the Debtors will cash out the Employee's Paid Leave Benefits to the extent required by applicable law.  Employees typically have until March to use up to one week of their Paid Leave Benefits remaining from the prior year.

40.     The Debtors believe that the continuation of the Paid Leave Benefits policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases.  Further, the policies are broad-based programs upon which all Employees have come to depend.  In 2022, the Debtors incurred a monthly average of approximately $310,000 on account of Paid Leave Benefits.  As of the Petition Date, the Debtors estimate that there is approximately $500,000 in accrued but unpaid Paid Leave Benefits, all of which is related to accrued vacation time.  The Debtors request authority to continue to honor their obligations on account of Paid Leave Benefits, including to cash out accrued benefits at termination, if and when they come due in the ordinary course of business, to the extent required by applicable law or consistent with internal policy.

**VII.    Additional Benefit Programs.**

41.    In addition to the foregoing, the Debtors offer Employees the opportunity to participate in certain training courses.  The Debtors also directly provide cell phone service to four Employees under a corporate AT&T plan.  Approximately 40 Employees submit their cell phone expenses via reimbursable expense process.  Additionally, one Employee has a company-provided vehicle, and certain Employees receive relocation bonuses based on certain criteria (collectively with the training courses, the cell phones, the vehicles, and other miscellaneous programs, the "Additional Benefit Programs").[11]  During the 2022 calendar year, the Debtors spent approximately $79,000 on account of the Additional Benefit Programs.  In 2022, the Debtors incurred a monthly average of approximately $6,600 on account of Additional Benefit Programs.  As of the Petition Date, approximately $10,000 is accrued and outstanding under the Additional Benefit Programs.  The Debtors request authority to continue honoring the Additional Benefit Programs and to pay any prepetition claims with respect thereto in the ordinary course of business.

**VIII.   Non-Insider Employee Incentive Program.**

42.    In the ordinary course of business, to encourage and reward outstanding performance, the Debtors incur obligations to their Employees for quarterly bonuses, which are targeted at a range between fifteen and one-hundred percent of annual bonus eligible earnings, pro-rated based on the Employee's hire date (the "Non-Insider Employee Incentive Program"). The Non-Insider Employee Incentive Program is based on metrics that are set each year by the Debtors depending on an Employee's role and are funded only when the Debtors achieve the

---

[11]    For the avoidance of doubt, the Debtors also incur several administrative expenses for, *inter alia*:  (i) retirement planning recordkeeping, (ii) paying the Debtors' retirement plan fiduciary; and (iii) paying the Debtors' benefits broker.  Because the amounts accrued and outstanding for such expenses are *de minimis*, the Debtors request authority to continue to pay these expenses postpetition.  As such, these expenses are included in the amounts accrued and outstanding as of the Petition Date under the Additional Benefit Programs.

36285069v.1

overall financial performance threshold.  In 2023, the Debtors have determined that Employees would be eligible to participate in the quarterly bonuses program if they are not participating in any other incentive or sales commission plan, and are classified as active, regular employees on or before the first business day of the quarter and at the time of payment (the "Non-Insider Employee Incentive Benefits").  The Debtors believe the Non-Insider Employee Incentive Programs are necessary to properly motivate Employees to outperform and drive value for all stakeholders.  The Debtors further believe that the authority to continue to maintain the Non-Insider Employee Incentive Programs and pay all obligations thereunder is critical to maintaining Employee morale and to avoid disruption to their workforce.

43.     As of the Petition Date, the Debtors believe they owe no amounts on account of accrued but unpaid Non-Insider Employee Incentive Benefits.  The Debtors request authority to pay any prepetition amounts due on account of the Non-Insider Employee Incentive Program consistent with past practice and continue the Non-Insider Employee Incentive Program in the ordinary course of business.  The Debtors are not seeking relief to pay any Employee that is an insider, as such term is defined in section 101(31) of the Bankruptcy Code, under the Non-Insider Employee Incentive Program.

**IX.     Commissions.**

44.     In the ordinary course of business, the Debtors pay certain commissions for their frontline sales and customer service agents, supervisors, managers, and directors working in the contact centers based on certain metrics.  Such commissions are only applicable to Non-Insider Employees who are ineligible for Non-Insider Employee Incentive Program.  The metrics for the commissions earned by Employees who provide sale services (the "Sales Commissions") are generally based on the number of calls converted to a sale.  The metrics for the commissions earned

20

by Employees who provide customer service (the "<u>Service Commissions</u>" and, together with the Sales Commissions, the "<u>Commissions</u>") are generally based on the number of calls taken, call quality, and adherence to certain company policies, such as attendance. The Commissions motivate the eligible Employees to meet defined targets and constitute part of their ordinary course compensation on which they depend, and the Commissions are paid in each Employee's regular compensation. Notably, the vast majority of the Debtors' Employees who receive Commissions are paid hourly wages rather than a salary.

45.     As of the Petition Date, approximately $190,000 is accrued and outstanding on account of the Sales Commissions. The Debtors therefore seek authority to pay any prepetition amounts owed on account of the Sales Commissions and to continue honoring and paying the Sales Commissions on a postpetition basis in the ordinary course of business consistent with past practices.

**X.      Non-Insider Severance Program.**

46.     In the ordinary course of business, the Debtors maintain an informal severance program and provide certain COBRA benefits for the benefit of certain non-insider Employees (together, the "<u>Non-Insider Severance Program</u>"). Under the Non-Insider Severance Program, certain full-time and part-time Employees may be eligible for payment of severance if their employment is terminated due to a workforce adjustment or any not-for-cause employer-initiated termination. Such severance payments (the "<u>Non-Insider Severance Benefits</u>") are calculated by reference to a terminated Employee's compensation level (based on the Employee's job position) in accordance with standard Debtor-instituted guidelines. These guidelines provide that non-insider Employees accrue Non-Insider Severance Benefits based on length of service, typically two-week base pay for every completed year of service with a minimum of two years of service.

A full year of service will be awarded to an employee that is two weeks or less from their anniversary date.

47.     The Debtors' maintenance of the Non-Insider Severance Program and payment of Non-Insider Severance Benefits are critical to maintaining Employee morale and loyalty.  Failure to maintain the Non-Insider Severance Program will result in increased instability in the Debtors' workforce, which will undermine the Debtors' ability to strengthen their financial and operational foundation, generate growth, and position themselves for long-term success.

48.     As of the Petition Date, the Debtors believe that approximately 11 former Employees are entitled to Non-Insider Severance Benefits.  The Debtors estimate that, as of the Petition Date, there is approximately $14,000 outstanding under the Non-Insider Severance Program, all of which is comprised of COBRA benefits.  The Debtors request authority to continue to pay amounts on account of the Non-Insider Severance Program if and when they come due in the ordinary course of business.

### Basis for Relief

**I.      Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits Obligations.**

**A.      Certain Compensation and Benefits Are Entitled to Priority Treatment.**

49.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Compensation and Benefits owed to the Employees to priority treatment to the extent such payments do not exceed $15,150 for each individual as provided for under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan.  11 U.S.C. § 1129(a)(9)(b).  Granting the relief sought herein should only affect the timing of certain payments to the Employees and should not negatively affect recoveries for general unsecured creditors.  Payment of the Compensation and Benefits at

22

this time enhances value for the benefit of all interested parties. *See In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("The need to pay [employee wage] claims in an ordinary course of business time frame is simple common sense. Employees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted."). Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Compensation and Benefits to priority treatment to the extent such payments do not exceed $15,150 for each individual as provided for under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. See U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for (a) wages, salaries or commissions, including vacation, severance, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan). To the extent that an Employee receives no more than $15,150 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors. To the extent an Employee is owed more than $15,150 on account of certain Compensation and Benefits, the Debtors submit that the full payment of such obligations in the ordinary course is warranted under section 363(b)(1) of the Bankruptcy Code and the doctrine of necessity.

50.     The Debtors' Employees are essential to the Debtors' business, and payment of the Compensation and Benefits at this time is necessary to avoid potential material disruption to the Debtors' ordinary-course operations. Finding, attracting, and training new qualified talent would be extremely difficult, particularly given current labor market conditions. In particular, Employees

23

are required to follow a four-week licensure education funded by the Debtors, followed by a two-week waiting period prior to start their employment, which is the nesting period between training and becoming 100% productive on the Contact Center floor.  Such recruitment efforts would most likely require, among other things, higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

**B.    Payment of Certain Compensation and Benefits Is Required by Law.**

51.    The Debtors seek authority to pay the applicable Withholding Obligations to the appropriate third-party entities.   These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks.  Certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf.  *See* 11 U.S.C. §§ 541(b)(1), (d); *see also In re Equalnet Commc'ns*, 258 B.R. at 370 (noting that, for tax obligations where funds are held by the debtor in trust, "the legal right to payment of such claims at any time appears irrefutable.") (citing *In re Al Copeland Enter., Inc.*, 991 F.2d 233 (5th Cir. 1993)).

52.    Federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes).  Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

53.     State laws also require the Debtors to maintain the Workers' Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states.  Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

## II.     Payment of the Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code.

54.     Payment of prepetition obligations is appropriate where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. at 369–70 (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").  Several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

55.     Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).  Under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate,

25

including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. at 497). Under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." 11 U.S.C. § 105(a); *In re CoServ, L.L.C.*, 273 B.R. at 497 (finding that sections 105 and 1107 of the Bankruptcy Code provide the authority for a debtor-in-possession to pay prepetition claims). The above-referenced sections of the Bankruptcy Code therefore authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here.

56.      Payment of the Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees exclusively rely on the Compensation and Benefits to satisfy their daily living expenses. Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Compensation and Benefits. Continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

57.      Employees are critical to the ordinary course operations of the Debtors. The Debtors believe that absent the payment of the Compensation and Benefits owed to the Employees the Debtors may experience workforce turnover and instability at this critical time in these chapter 11 cases. Without these payments, the workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees may face. Such individuals may then elect to seek alternative employment opportunities. A significant portion of the value of the Debtors' business is tied to their workforce,

which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

58. The Debtors request that the Court authorize the Debtors to pay and continue the Compensation and Benefits in the ordinary course of business and consistent with past practices on a final basis from the outset of these cases.

### III. A Limited Waiver of the Automatic Stay for the Debtors' Workers' Compensation Program Is Appropriate in this Case.

59. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

Section 362(d) of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

60. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims against the Workers' Compensation Program in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Employees' workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the

27

departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders. In addition, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. The Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

## Emergency Consideration

61.     Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." Failure to receive the requested relief during the first twenty-one days of these chapter 11 cases would imperil the Debtors' restructuring and cause irreparable harm. The Debtors have satisfied the "immediate and irreparable harm" standard and request that the Court approve the Motion on an emergency basis.

## Processing of Checks and Electronic Fund Transfers Should Be Authorized

62.     The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral and debtor in possession financing. Under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein. Checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently. The Debtors request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested herein.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

63.    The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

64.    Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended, and should not be construed as, an admission as to the validity of

any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## **<u>Notice</u>**

65.     The Debtors have provided notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Consenting Term Lenders; (d) counsel to the Consenting Revolving Lenders; (e) counsel to the DIP Lender; (f) counsel to the agents under the Debtors' postpetition credit facilities and DIP credit facility; (g) the state attorneys general for each of the states in which the Debtors operate; (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k)  other governmental agencies having a regulatory or statutory interest in these cases; (l) the Debtors' employee benefit providers listed herein; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d).  In light of the nature of the relief requested, no other or further notice is required.

The Debtors request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
Dated:  May 23, 2023

/s/  Matthew D. Cavenaugh

| | |
|---|---|
| **JACKSON WALKER LLP** | **KIRKLAND & ELLIS LLP** |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Jennifer F. Wertz (TX Bar No. 24072822) | Patrick J. Nash, P.C. (*pro hac vice* pending) |
| J. Machir Stull (TX Bar No. 24070697) | John R. Luze (*pro hac vice* pending) |
| Victoria N. Argeroplos (TX Bar No. 24105799) | Jeffrey T. Michalik (*pro hac vice* pending) |
| 1401 McKinney Street, Suite 1900 | Yusuf Salloum (*pro hac vice* pending) |
| Houston, TX 77010 | 300 North LaSalle Street |
| Telephone: (713) 752-4200 | Chicago, Illinois 60654 |
| Facsimile: (713) 752-4221 | Telephone:    (312) 862-2000 |
| Email:mcavenaugh@jw.com | Facsimile:    (312) 862-2200 |
|         jwertz@jw.com | Email:         patrick.nash@kirkland.com |
|         mstull@jw.com |                 john.luze@kirkland.com |
|         vargeroplos@jw.com |                 jeff.michalik@kirkland.com |
| |                 yusuf.salloum@kirkland.com |

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

36285069v.1

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ Matthew D. Cavenaugh
Matthew D. Cavenaugh

**Certificate of Service**

I certify that on  May 23, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Matthew D. Cavenaugh
Matthew D. Cavenaugh