# **Exhibit 2**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BENEFYTT TECHNOLOGIES, INC., *et al.*,[1] | ) Case No. 23-90566 (CML) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF ROY GALLAGHER, SENIOR MANAGING DIRECTOR
OF ANKURA CONSULTING GROUP, LLC, IN SUPPORT OF (I) THE DEBTORS' FIRST
DAY MOTIONS AND (II) THE DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY
OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION FINANCING, (B) AUTHORIZING THE DEBTORS TO UTILIZE CASH
COLLATERAL, (C) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (D) GRANTING ADEQUATE PROTECTION TO THE PREPETITION
SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY, AND (F) GRANTING
RELATED RELIEF**

I, Roy Gallagher, declare as follows under penalty of perjury that if called to testify, I would testify competently to the facts and opinions set forth in this Declaration.

1. I am over the age of 18 and I am authorized to submit this declaration on behalf of the Debtors.

2. I submit this declaration in support of the above-captioned debtors' and debtors-in-possession (collectively, the "<u>Debtors</u>"), first day motions, including the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Benefytt Technologies, Inc. (2634); American Service Insurance Agency LLC (9115); Benefytt Reinsurance Solutions, LLC (4601); BimSym-HPIH, LLC (4626); Dawn Acquisition Company, LLC (0909); Daylight Beta Intermediate Corp. (7248); Daylight Beta Intermediate II Corp. (8842); Daylight Beta Parent Corp. (6788); Health Insurance Innovations Holdings, Inc. (1994); Health Plan Intermediaries Holdings, LLC (0972); Healthinsurance.com, LLC (9525); HealthPocket, Inc. (3710); Insurance Center for Excellence, LLC (4618); RxHelpline, LLC (9940); Sunrise Health Plans, LLC (3872); TogetherHealth Insurance, LLC (9503); TogetherHealth PAP, LLC (8439); and Total Insurance Brokers, LLC (7975). The location of the Debtors' service address is: 3450 Buschwood Park Drive, Suite 200, Tampa, Florida 33618.

*Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*, filed contemporaneously herewith.

3. On May 23, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of Texas (the "Court"). A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Michael DeVries, Chief Financial Officer of Benefytt Technologies, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "DeVries Declaration").

4. Unless otherwise indicated, the statements set forth in this declaration (the "Declaration") are based upon (a) my personal knowledge of the Debtors' business, (b) information learned from my review of relevant documents, (c) information I received from the team at Ankura Consulting Group, LLC ("Ankura") working under my supervision or the Debtors' management team and other advisors, or (d) my experience as a restructuring professional. I am not being specifically compensated for this testimony other than through payments that are proposed to be received by Ankura as a professional retained by the Debtors, subject to this Court's approval.

**Professional Background**

5. I am a Senior Managing Director and the co-leader of Ankura's Turnaround and Restructuring Practice. Ankura is an independent global expert services and advisory firm and the proposed financial advisor to the Debtors, with its principal office located at 485 Lexington Avenue, New York, New York 10017, and other locations worldwide. Ankura, together with its

advisor affiliates, has approximately 1,700 professionals serving over 3,000 clients across 55 countries.

6. Ankura's Turnaround and Restructuring Practice helps distressed companies, governments, and creditors in a variety of reorganization proceedings and complex financial restructurings, both in and out of court. Ankura is known for its ability to work alongside company management and key constituents during chapter 11 restructurings to develop a feasible and executable plan of reorganization.

7. Since the Debtors engaged Ankura in February 2023, Ankura has worked closely with the Debtors' management and other professionals with respect to the Debtors' restructuring efforts, including assisting the Debtors in preparing cash flow projections, budgets, and other financial information. I am the senior leader of the Ankura team advising the Debtors.

8. I have more than 24 years of experience in providing strategic financial restructuring advice as both an advisor and as an investor. Prior to joining Ankura, I had over a decade of experience as an investor in the leveraged loan and distressed debt markets with a focus on debt for equity transactions. Since joining Ankura, I now focus on advising both companies and lender groups as they navigate through complex restructurings across various industries.

9. I earned a Bachelor's Degree in Accounting from the University of Notre Dame and I am a Certified Public Accountant (inactive).

10. This Declaration sets forth the relevant facts in support of each of the Debtors' first day motions (collectively, the "<u>First Day Motions</u>"), including the DIP Motion (defined below).

**First Day Motions**[2]

11. The Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases. The First Day Motions include the following:

- **DIP Motion.** Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief (the "DIP Motion");

- **Joint Administration Motion.** Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion");

- **Claims, Noticing, and Solicitation Agent Retention.** Debtors' Emergency *Ex Parte* Application for Entry of an Order Authorizing the Employment and Retention of Stretto, Inc. as Claims, Noticing, and Solicitation Agent (the "Notice & Claims Agent Application");

- **Creditor Matrix Motion.** Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (III) Granting Related Relief (the "Creditor Matrix Motion");

- **Rejection Procedures Motion.** Debtors' Motion for Entry of an Order Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases (the "Rejection Procedures Motion");

- **Cash Management Motion.** Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records, and (II) Granting Related Relief (the "Cash Management Motion");

- **Wages Motion.** Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and

---

[2] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the DeVries Declaration or the corresponding First Day Motion, as applicable.

- Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief (the "Wages Motion");

- **Insurance Motion.** Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Supplement, Amend, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees, and (D) Maintain the Surety Bonds, and (II) Granting Related Relief (the "Insurance Motion");

- **NOL Motion.** Debtors' Emergency Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief (the "NOL Motion");

- **Taxes Motion.** Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees, and (II) Granting Related Relief (the "Taxes Motion");

- **Utilities Motion.** Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion");

- **Trade Motion.** Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, and (II) Granting Related Relief (the "Trade Motion");

- **Customer Programs Motion.** Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain and Administer Their Existing Customer and Partner Programs and (B) Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief (the "Customer Programs Motion"); and

- **Contract Rejection Motion.** Debtors' First Omnibus Motion for Entry of an Order (I) Authorizing, Effective as of the Petition Date, (A) the Rejection of Certain Executory Contracts and Unexpired Leases and (B) Abandonment of Certain Personal Property and (II) Granting Related Relief (the "Rejection Motion").

12. The First Day Motions seek authority to, among other things, honor employee-related wages and benefits obligations, pay claims of certain vendors and suppliers to ensure that the Debtors' business operations are not disrupted by these chapter 11 cases, and

5

continue the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible. I believe the Debtors have tailored their requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates. An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and any delay in granting the relief described in the First Day Motions would hinder the Debtors' operations and cause irreparable harm. It is my view that the failure to receive the requested relief during the first approximately 30 days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture.

13. I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element of the Debtors' successful reorganization, and (c) best serves the Debtors' estates.

**I.      DIP Motion.**

14. I believe that the Debtors' business immediately and critically needs to obtain DIP Financing and the authority to use Cash Collateral throughout the chapter 11 process. During these chapter 11 cases, the Debtors will need access to cash to, among other things, satisfy payroll obligations, honor obligations under their customer contracts, maintain insurance coverage, pay taxes, make other payments integral to the continued management, operation, and preservation of the Debtors' business, and provide an avenue to exit these chapter 11 cases expeditiously. The Debtors will also need access to cash to fund the administration of these chapter 11 cases. Failure to do so would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders. As of the Petition Date, the Debtors have approximately $1.5 million of cash on hand.

6

15. My team at Ankura and I assisted the Debtors in developing a 13-week cash flow forecast for an initial DIP budget (the "Initial DIP Budget").[3] The Initial DIP Budget contains line items for cash flows anticipated to be received and disbursed during the Budget forecast period. Based on my experience and extensive discussions with the Debtors' management team and advisors, I believe the Budget presents a reasonable estimate of the Debtors' cash sources and needs during these chapter 11 cases.

16. To satisfy the Debtors' need for cash during these chapter 11 cases, the Debtors have worked to secure access to (i) DIP Financing and (ii) Cash Collateral.

17. As part of their efforts to obtain DIP Financing, and based on the Budget, the Debtors negotiated extensively with the Sponsor and the other parties to the RSA and were able to secure a proposed $35 million priming superpriority senior secured delayed draw debtor-in-possession term loan credit facility (the "DIP Facility"). Additionally, I understand that the Debtors' proposed investment banker, Jefferies, is running a market check process to seek alternative DIP financing proposals from third-party lenders. The DIP Facility will allow the Debtors to: (a) continue satisfying obligations to the Debtors' contract counterparties; (b) fund the Debtors' payroll obligations; and (c) fund the administrative costs of these chapter 11 cases, in each case in accordance with the Initial DIP Budget. I believe that the DIP Facility will provide the Debtors sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases.

18. The Debtors were also able to reach an agreement with the Prepetition Secured Parties regarding the consensual use of their Cash Collateral on the terms set forth in the proposed DIP Orders. I believe that utilizing Cash Collateral is fundamental to the preservation and

---

[3] The Budget is attached as Exhibit B to the proposed Interim DIP Order.

7

maintenance of the Debtors' going-concern value during these chapter 11 cases, is critical for the Debtors' successful reorganization, and is in the best interests of the Debtors and their estates.

19. In particular, the Debtors propose to provide the Prepetition Secured Parties with an adequate protection package including, among other things, replacement liens, superpriority administrative expense claims, delivery of certain reports and notices, monthly fees to the Prepetition Revolving Lenders (as defined in the Interim DIP Order) equal to non-default interest, and payment of certain fees and expenses, as applicable. I believe that each form of adequate protection is appropriate under the circumstances and will adequately protect the Prepetition Secured Parties against any actual diminution in value of their interest in the Cash Collateral.

20. Absent entry of the DIP Orders, the Debtors would be unable to generate revenue, operate their businesses, or pay the hundreds of individuals who report to work each day. Indeed, without access to sufficient cash, the Debtors would likely have to suspend operations, materially damaging the Debtors' business reputation and relationships with employees, vendors, and customers. In the competitive and complex insurance services industry, such a result would be disastrous for the Debtors' business and materially harm the Debtors' efforts to reorganize and preserve the value of their estates for their constituents. For these reasons, I believe the relief requested in the DIP Motion is a valid exercise of business judgement and is in the best interests of the Debtors, their creditors, and all other parties in interest.

## II. Procedural Motions.

### A. Joint Administration Motion.

21. The Debtors seek entry of an order directing procedural consolidation and joint administration of these chapter 11 cases. The Debtors request that one file and one docket be maintained for all of the jointly administered cases under the case of "Benefytt Technologies, Inc., *et al.*"

22.     Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each of the 18 Debtor entities.  Entry of the order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration will also allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

23.     I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**B.     Notice & Claims Agent Application.**

24.     The Debtors seek entry of an order granting their *ex parte* application to employ Stretto, Inc. ("<u>Stretto</u>") as claims, noticing, and solicitation agent in the Debtors' chapter 11 cases.

25.     Stretto's appointment as Claims and Noticing Agent is in the best interest of the Debtors' estates and their creditors because it will expedite the distribution of notices and the processing of claims.  Moreover, in my experience, Stretto's rates are competitive and reasonable, especially given Stretto's quality of services and expertise.

26.     I believe that the relief requested in the Notice & Claims Agent Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**C.     Creditor Matrix Motion.**

27.     The Debtors seek entry of an order authorizing them to redact certain personally identifiable information, and approving the form and manner of notifying creditors of the commencement of the chapter 11 cases and other information. Redaction of personally identifiable

9

information is appropriate under section 107(c)(1) of the Bankruptcy Code because such information can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, stalking, or phishing scams, and disclosure risks violating relevant laws.

28.     I believe that the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### D. Rejection Procedures Motion.

29.     Pursuant to the Rejection Procedures Motion, the Debtors seek entry of an order authorizing and approving procedures by which the Debtors may reject certain of their executory contracts and prepetition unexpired leases of nonresidential real property. The Debtors are party to thousands of Contracts and Leases, and absent the relief requested in the Rejection Procedures Motion, the Debtors would be required to file separate motions to assume each Contract or reject individual Contracts and Leases, resulting in substantial costs to, and administrative burdens on, the Debtors' estates.

30.     I believe that the relief requested in the Rejection Procedures Motion would minimize the costs and administrative burden on the Debtors' estates and foster judicial economy.

## III. Operational Motions.

### A. Cash Management Motion.

31.     The Debtors seek entry of interim and final orders to: operate their cash management system, as described herein and as illustrated on <u>Exhibit A</u> attached to the Cash Management Motion, and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto; continue intercompany transactions and funding consistent with the Debtors' historical practices; and maintain existing business forms and books and records in the ordinary course of business, subject to the terms described in the Cash Management Motion.

32. Given the economic and operational scale of the Debtors' businesses, any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' businesses and operations to the detriment of their estates and numerous stakeholders.

33. I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### B. Wages Motion.

34. Pursuant to the Wages Motion, the Debtors seek entry of an order authorizing the Debtors to pay prepetition amounts due to employees (the "Employees") on account of wages, salaries, other compensation, and reimbursable expenses and to continue employee benefits programs in the ordinary course, including payment of certain related prepetition obligations. Without the continued, uninterrupted services of the Debtors' workforce of over 850 employees, the ability of the Debtors to maintain and administer their estates will be materially impaired, and the Debtors' reorganization efforts will be jeopardized.

35. The Debtors' Employees include personnel who are intimately familiar with the Debtors' business, processes, and systems, and possess unique skills and experience with respect to the Debtors' core business segments. Without the continued, uninterrupted services of the Employees, the Debtors' business operations will be halted and the administration of the estates materially impaired. The vast majority of the Debtors' Employees rely on compensation and health and other benefits provided by the Debtors to pay their daily living expenses and to meet their and their families' health and other daily needs, and could experience significant hardship if the Court does not permit the Debtors to continue paying their compensation and providing health and other benefits in the ordinary course during these chapter 11 cases.

36. I believe that the Debtors' timely payment of workforce-related obligations is necessary for the Debtors to maintain ordinary-course operations and avoid personal financial hardship to the Employees. I believe that the relief requested in the Wages Motion is in the best interest of the Debtors' estates, the Debtors' creditors, and all other parties in interest. It will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**C.   Insurance Motion.**

37. The Debtors seek entry of an order authorizing the Debtors to continue their prepetition insurance coverage and satisfy related prepetition obligations; renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis; pay prepetition obligations on account of and continue to pay brokerage fees; and maintain the surety bond program and letters of credit on an uninterrupted basis.

38. Failure to maintain the Debtors' Insurance Policies, Surety Bonds, and Letters of Credit could have a detrimental impact on the Debtors' business, operations, and the value of their estates. Any interruption in insurance coverage would expose the Debtors to a number of risks, including potential (a) direct liability for the payment of claims that otherwise would have been covered under the Insurance Policies, (b) material costs and other losses that otherwise would have been reimbursed, (c) inability to obtain similar insurance coverage on terms as equally favorable as the present coverage, (d) higher costs for reestablishing lapsed Insurance Policies or obtaining new insurance coverage, and (e) regulatory exposure in the event the Debtors are required to maintain certain insurance and surety coverage to continue their operations. It is therefore essential to pay any amounts owed in connection with the Insurance Policies, Surety Bonds, and Letters of Credit and to continue to honor obligations thereunder as they come due on a postpetition basis in the ordinary course of business and consistent with past practice.

39. I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### D. NOL Motion.

40. Pursuant to the NOL Motion, the Debtors seek entry of an order approving certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to Debtor Daylight Beta Intermediate Corp.'s existing classes (or series) of common stock or any Beneficial Ownership therein and existing classes (or series) of preferred stock or any Beneficial Ownership therein, and directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock in violation of such procedures shall be null and void *ab initio*.

41. The Tax Attributes are of significant value to the Debtors and their estates because the Debtors may be able to utilize the Tax Attributes to offset any taxable income, including any taxable income generated by transactions consummated during these chapter 11 cases (including with respect to any taxable disposition of some or all of the Debtors' assets). Depending on the structure utilized in the Debtors' chapter 11 plan, in the event any of the Debtors' Tax Attributes were to survive, the Debtors may be able to carry forward certain of those Tax Attributes to offset federal taxable income or federal tax liability in future years. An ownership change of Common Stock may negatively impact the Debtors' utilization of the Tax Attributes. The relief requested in the NOL Motion is expected to preserve the value of the Tax Attributes to the benefit of the Debtors' stakeholders. Conversely, a premature limitation of the Debtors' Tax Attributes could cause substantial deterioration of value and significantly reduce recoveries to the Debtors' stakeholders.

42.     For all of these reasons, I believe the relief in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**E.     Taxes Motion.**

43.     Pursuant to the Taxes Motion, the Debtors seek entry of an order authorizing the Debtors to remit and pay (or use tax credits to offset) Taxes and Fees in the ordinary course of business that are payable or become payable during these chapter 11 cases (including any obligations subsequently determined upon Audit or otherwise to be owed for periods prior to, including, or following the Petition Date).

44.     I believe that the relief requested in the Taxes and Fees Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**F.     Utilities Motion.**

45.     Pursuant to the Utilities Motion, the Debtors seek entry of an order determining that the Adequate Assurance Procedures provide the Utility Providers with adequate assurance of payment; prohibiting the Utility Providers from altering, refusing, or discontinuing services; and approving procedures for resolving any dispute concerning adequate assurance in the event that a Utility Provider is not satisfied with the Proposed Adequate Assurance.

46.     In connection with the operation of their businesses, the Debtors obtain, either directly or indirectly, electricity, natural gas, water and sewage, telephone, internet, garbage, recycling, cable, and other similar services that are essential to the Debtors' ongoing operations and their ability to maintain their business. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations will be severely disrupted, which would impair the Debtors' ability to manage their reorganization efforts and jeopardize the

Debtors' revenue-generating capability to the detriment of all stakeholders in these chapter 11 cases.

47. I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**G. Trade Motion.**

48. The Debtors seek entry of interim and final orders authorizing the Debtors to pay, in the ordinary course of business, certain prepetition claims of critical vendors (the "Critical Vendors Claims").

49. In the ordinary course of business, the Debtors engage a number of providers for many of the critical services the Debtors require to run their operations and service their businesses. Each of the Critical Vendors are irreplaceable due to providing specialized technical service with expertise specific to the Debtors' operations, equipment, and technological infrastructure. These Critical Vendors are essential to the Debtors' activities, which include, among other things, the operation and development of health insurance marketplaces, agent technology systems, and insurance policy administration platforms.

50. The Critical Vendors provide the Debtors with services on trade terms that create considerable liquidity for the Debtors' businesses and maintaining these trade terms is critical to the Debtors' success and ability to build their inventory in order to ensure sufficient supply to meet customer demand. Without these Critical Vendors' products and agreement to continue an ordinary course relationship, the Debtors cannot operate a profitable, successful business. Certain Critical Vendors could have the ability to sell leads of higher quality to the Debtors' competitors, thereby jeopardizing the Debtors' businesses and estates. Any interruption in these services, *however brief*, would disrupt the Debtors' operations and could potentially cause irreparable harm

to their businesses, goodwill, employees, customer base, and market share. In addition, certain Critical Vendors are small, family-owned or independent businesses whose liquidity could be highly impacted if the Debtors do not maintain an ordinary course relationship with them. After a thorough analysis of options, the Debtors believe that such harm likely would far outweigh the cost of payment of the Critical Vendor Claims. The requested relief will also allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise.

51. I believe that the relief requested in the Trade Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### H. Customer Programs Motion.

52. The Debtors seek entry of an order authorizing the Debtors to continue to maintain and administer their Customer and Partner Programs and to honor certain related prepetition obligations on account of the Customer and Partner Programs, each on a postpetition basis in the ordinary course of business.

53. The Debtors' Customer and Partner Programs include three main programs: (i) Refund Program; (ii) Marketing Arrangement with Carriers; and (iii) Collection Program. As part of the Refund Program, the Debtors process the cancellation and refund requests of individuals who purchase coverage products through Benefytt's A&H division within the first 30 days of purchase. I believe the Refund Program is critical to maintaining relationships with the Company's individual customers. If the Debtors were unable to administer Refunds or were required to materially alter their Refund Program, there is a likelihood that individuals would have less confidence in their transactions with the Debtors, which, in turn, would harm the Debtors' operations.

16

54. As part of the Marketing Arrangements with Carriers, typically the Debtors perform certain marketing services for Carriers in return for a quarterly fee. At the end of each quarter payments are subject to an informal reconciliation process. I believe that continuing to administer the Marketing Arrangements on a postpetition basis is critical to maintaining relationships with Carriers and, in turn, inures to the benefit of the Debtors' estates.

55. Pursuant to the Debtors' Collection Program, the Debtors collect payment from individuals who purchase an A&H insurance product on an "all-in" basis on account of the purchased policy, whether actually owing to the applicable Carrier or to the Debtors. The Debtors collect from the individuals the full amount of the applicable risk premiums on a monthly basis over the term of the applicable policy. The Debtors accrue certain earnings on account of the collection of such full amounts, in accordance with the terms of the Debtors' agreements with each A&H Carrier. The Debtors regularly remit the portion of the applicable premium owing to the applicable A&H Carrier on a monthly basis, with the remaining portion of the applicable premium representing the Debtors' earnings. I believe that continuing to administer the Collection Program on a postpetition basis is critical to maintaining relationships with A&H Carriers and, in turn, inures to the benefit of the Debtors' estates.

**I.      Rejection Motion.**

56. The Debtors seek entry of an order authorizing, effective as of the Petition Date, the rejection of certain executory contracts (the "<u>Contracts</u>") and unexpired nonresidential real property leases (the "<u>Leases</u>"), and the abandonment of certain equipment, fixtures, furniture, or other personal property (the "<u>Personal Property</u>") that may be located at the premises of each property subject to a rejected Lease (the "<u>Premises</u>").

57. As a part of their efforts leading up to these chapter 11 cases, the Debtors have examined their operational footprint and evaluated the necessity and cost-efficiency of their

17

executory contracts and unexpired leases. As part of this process, the Debtors, along with their advisors, have undertaken extensive review of their executory contracts and unexpired leases, including the ongoing costs and the effect on their business of rejecting such executory contracts and unexpired leases. Accordingly, the Debtors have determined that certain Contracts and Leases are unnecessary and burdensome to the Debtors' estates and should be rejected as soon as possible. The Debtors believe that the rejection of the Contracts and Leases as applicable, effective as of the Petition Date, is in the best interests of the Debtors, their estates, and all parties in interest.

58. To the extent that any Personal Property remains at the Premises as of the Rejection Date, the Debtors have evaluated such Personal Property and have determined either that (a) the Personal Property is of inconsequential value or (b) the cost of removing and storing the Personal Property for future use, marketing, or sale exceeds its value to the Debtors' estates. Because the Debtors have ceased or will cease operations at the Premises prior to or as of the Rejection Date, any Personal Property will no longer be necessary for the administration of the Debtors' estates. To reduce postpetition administrative costs and, in the exercise of the Debtors' sound business judgment, the Debtors believe that the abandonment of the Personal Property that may be located at each of the Premises, if any, is appropriate and in the best interests of the Debtors, their estates, and their creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: May 23, 2023　　　　　　　　　　　　/s/ *Roy Gallagher*

　　　　　　　　　　　　　　　　　　　　　Roy Gallagher
　　　　　　　　　　　　　　　　　　　　　Managing Director
　　　　　　　　　　　　　　　　　　　　　Ankura Consulting Group, LLC