## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BENEFYTT TECHNOLOGIES, INC., *et al.*,[1] | ) | Case No. 23-90566 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Re: Docket No. 8** |

**INTERIM ORDER
(I) AUTHORIZING THE DEBTORS (A) TO OBTAIN POSTPETITION
FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2),
364(c)(3), 364(d)(1) AND 364(e), AND (B) TO UTILIZE CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362,
363, 364, 503, 506(c) AND 507(b), (III) SCHEDULING FINAL HEARING PURSUANT
TO BANKRUPTCY RULES 4001(b) AND (c) AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of Benefytt Technologies, Inc. (the "Company" or

the "Borrower"), Daylight Beta Parent Corp. ("Holdings"), and the subsidiaries of the Company

that are debtors and debtors in possession (the "Subsidiary Guarantors," and, collectively, with the

Company and Holdings, the "Loan Parties" or the "Debtors") in the above-captioned cases

(the "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1),

364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United States Code

(the "Bankruptcy Code"), and Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Benefytt Technologies, Inc. (2634); American Service Insurance Agency LLC (9115); Benefytt Reinsurance Solutions, LLC (4601); BimSym-HPIH, LLC (4626); Dawn Acquisition Company, LLC (0909); Daylight Beta Intermediate Corp. (7248); Daylight Beta Intermediate II Corp. (8842); Daylight Beta Parent Corp. (6788); Health Insurance Innovations Holdings, Inc. (1994); Health Plan Intermediaries Holdings, LLC (0972); Healthinsurance.com, LLC (9525); HealthPocket, Inc. (3710); Insurance Center for Excellence, LLC (4618); RxHelpline, LLC (9940); Sunrise Health Plans, LLC (3872); TogetherHealth Insurance, LLC (9503); TogetherHealth PAP, LLC (8439); and Total Insurance Brokers, LLC (7975). The location of the Debtors' service address is: 3450 Buschwood Park Drive, Suite 200, Tampa, Florida 33618.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and the local bankruptcy rules for the Southern District of Texas (the "<u>Local Bankruptcy Rules</u>"), seeking entry of this interim order (this "<u>Interim Order</u>"):

a.   authorizing the Borrower to obtain senior secured postpetition financing on a superpriority basis (the "<u>DIP Financing</u>" or the "<u>DIP Facility</u>") and for Holdings and the Subsidiary Guarantors (the "<u>Guarantors</u>") to guarantee the Borrower's obligations in connection with the DIP Facility, consisting of: (i) a superpriority delayed draw term loan facility in an aggregate principal amount of up to $35.0 million (all amounts extended under the DIP Facility, the "<u>DIP Loans</u>"; and the commitments in respect thereof, the "<u>DIP Commitments</u>"), as contemplated by that certain Restructuring Support Agreement dated as of May 23, 2023 (including all exhibits and schedules attached thereto, and as may be amended, restated, or supplemented from time to time, the "<u>Restructuring Support Agreement</u>"); *provided* that (x) an initial draw in the principal amount of up to $25.0 million (the "<u>Initial DIP Loans</u>") shall be made available to the Debtors upon entry of this Interim Order, and (y) the remaining undrawn portion of the DIP Facility shall be made available to the Debtors upon entry of the Final Order (as defined herein), all on the terms and subject to satisfaction of the conditions set forth in the DIP Documents (as defined herein), this Interim Order, and the DIP Budget (subject to Permitted Variances); and (ii) a new money letter of credit subfacility (the "<u>DIP Letter of Credit Facility</u>") with aggregate commitments to issue up to $4.0 million of new letters of credit (the "<u>DIP Letters of Credit</u>") of which all will be available immediately upon entry of this Interim Order;

b.   authorizing the Loan Parties to execute and enter into the *Debtor-in-Possession Credit Agreement* dated as of May 24, 2023, among the Borrower, the Guarantors, Phoenix 2023 Merger Sub LLC (the "<u>DIP Lender</u>") and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (in such capacities, the "<u>DIP Agent</u>," and, collectively with the DIP Lender, the "<u>DIP Secured Parties</u>"), substantially in the form attached hereto as <u>Exhibit C</u> (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "<u>DIP Credit Agreement</u>" and, collectively with the schedules and exhibits attached thereto and all agreements, documents, instruments and/or amendments executed and delivered in connection therewith, the "<u>DIP Documents</u>") and to perform all such other and further acts as may be required in connection with the DIP Documents;

c.   authorizing the Loan Parties to use proceeds of the DIP Facility and Cash Collateral (as defined herein), in accordance with the terms of this Interim Order, the DIP Documents, and the DIP Budget (subject to Permitted Variances), (i) for working capital and general corporate

purposes of the Debtors, (ii) to pay obligations arising from or related to the Carve Out (as defined herein), (iii) to pay Allowed Professional Fees (as defined herein), (iv) to pay Adequate Protection Obligations (as defined herein), and (v) to pay fees and expenses incurred in connection with the transactions contemplated hereby in accordance with the DIP Documents;

d.      authorizing the DIP Lender guarantee of the issuance of the DIP Letter of Credit Facility (the "DIP L/C Guarantee");

e.      granting adequate protection, subject to the Carve Out, and to the extent set forth herein, to the Prepetition Secured Parties under the Prepetition Credit Agreement on account of the Prepetition Liens and for the use of their Cash Collateral and the Prepetition Collateral (all as defined herein) and to the extent of any Diminution in Value (as defined herein) of their respective interests in the Prepetition Collateral;

f.      subject to the terms of this Interim Order, authorizing the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, the Letter of Credit Commitment Fee, the Agent Fees (each as defined in the DIP Credit Agreement), any agency, audit fees, appraisal fees, valuation fees, administrative and collateral agents' fees and expenses, and (ii) prepetition and postpetition reasonable fees and disbursements of each of the DIP Secured Parties' attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, this Interim Order and the DIP Documents; *provided* that the fees and disbursements set forth in (ii) hereof shall by paid by the Debtors solely from the proceeds of the DIP Loans in accordance with this Interim Order and the DIP Documents (and this proviso will not be construed to limit the source of payment for any DIP Agent Fees (as defined herein));

g.      granting valid, enforceable, non-avoidable, and fully perfected liens and security interests pursuant to Bankruptcy Code section 364(c)(2) and priming liens pursuant to Bankruptcy Code section 364(d)(1) on the DIP Collateral and all proceeds thereof, including, any (subject to entry of the Final Order) Avoidance Proceeds (as defined herein), subject only to the Carve Out and any DIP Subordination Event, and the Permitted Liens (all as defined herein), if any, in each case on the terms and conditions set forth herein and in the DIP Documents, as applicable, to secure principal of, and accrued interest on, the DIP Loans, and all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, if any, additional interest, and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the DIP Facility (with respect to the aforementioned obligations the "DIP Obligations");

h.      granting superpriority administrative expense claims pursuant to Bankruptcy Code section 364(c)(1) against each of the Debtors' estates to the DIP Secured Parties, with respect to the DIP Obligations with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out and subject to any DIP Subordination Event, on the terms and conditions set forth herein and in the DIP Documents;

i.      (i) the waiver of the Debtors' and the estates' ability to surcharge the DIP Collateral pursuant to Bankruptcy Code section 506(c) with respect to the DIP Secured Parties, and (ii) the waiver of (x) the Debtors' and the estates' ability to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c) with respect to the Prepetition Secured Parties, effective as of the Petition Date, (y) the applicability of the "equities of the case" exception under Bankruptcy Code section 552(b) with respect to the proceeds, products, offspring or profits of the Prepetition Collateral, and (z) the doctrine of "marshaling" and any other similar equitable doctrine with respect to any of the Prepetition Collateral and the DIP Collateral;

j.      subject to the Remedies Notice Period and adjudication of a Stay Relief Hearing, authorization for the DIP Secured Parties to exercise remedies under the DIP Documents on the terms described herein and therein, upon the occurrence and during the continuation of a DIP Termination Date (as defined herein);

k.      waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order; and

l.      scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and entry of a final order authorizing and approving the relief requested in the Motion on a final basis (the "Final Order"), and approving the form of notice with respect to the Final Hearing.

Due and sufficient notice of the Motion and the Interim Hearing having been served by the Debtors, and such notice was the best available under the circumstances; and the Court having reviewed the Motion; and the Interim Hearing having been held by the Court on May 23, 2023; and the relief requested in the Motion being in the best interests of the Debtors, their creditors and their estates and all other parties in interest in these Chapter 11 Cases; and the Court having found and determined that the relief requested in the Motion is necessary to avoid immediate and irreparable loss and damage to the Debtors' estates; and the Court having determined that the legal

and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the record made by the DIP Declarations and the First Day Declaration (collectively, the "Declarations"), and at the Interim Hearing and after due deliberation and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.     *Disposition.*  The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

2.     *Jurisdiction.*  This Court has core jurisdiction over the Chapter 11 Cases, the relief requested in the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     *Relief Necessary to Avoid Immediate and Irreparable Harm.*  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

4.     *Debtors' Stipulations.*  Without prejudice to the rights of any party in interest (but subject in all respects to the limitations set forth in Paragraphs 30 and 33 herein) the Debtors admit, stipulate, acknowledge and agree that:

(a)     *Prepetition Credit Facilities.*

(i)     Pursuant to that certain Credit Agreement, dated as of August 12, 2021, by and among the Company, Holdings, the guarantors party thereto (the "Prepetition Guarantors"), Ares Capital Corporation, as administrative agent (the "Prepetition Administrative

Agent"), Truist Bank, as priority revolving agent and swing line lender (the "Prepetition Revolving Agent" and together with the Prepetition Administrative Agent, the "Prepetition Agents"), the lenders party thereto (the "Prepetition Term Loan Lenders," and, together with the Prepetition Agents, the "Prepetition Secured Parties") Ares Capital Management LLC, Truist Securities, Inc., as joint lead arrangers, and Ares Capital Management LLC, as lead bookrunner, (as amended, amended and restated, modified, or supplemented from time to time, including pursuant to that certain First Amendment, dated as of July 19, 2022, the "Prepetition Credit Agreement," and together with any "Credit Documents," as defined in the Prepetition Credit Agreement, and any guarantees, security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Prepetition Agents, for its benefit and for the benefit of the Prepetition Lenders, the "Prepetition Credit Documents"), which provided: (i) a $400 million term loan facility (collectively, the "Prepetition Term Loans"); (ii) a $100 million five-year revolving credit facility including a $10.0 million sublimit for the issuance of standby letters of credit and a $5.0 million sublimit for swingline loans (collectively, the "Prepetition Revolving Loans"); and (iii) a $100 million delayed draw term loan facility (the "Prepetition Delayed Draw Term Loans" and together with the Prepetition Term Loans and the Prepetition Revolving Loans, the "Prepetition Credit Facilities"). Each of the Prepetition Credit Documents is valid, binding, and enforceable in accordance with its terms.

(ii)     As of the Petition Date, the Company and the Prepetition Guarantors were justly and lawfully indebted and liable to the Prepetition Secured Parties, in respect of the Prepetition Credit Facilities in the aggregate outstanding amount of no less than $622,491,995.94, plus accrued and unpaid interest and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under

the Prepetition Credit Documents), charges, indemnities and other obligations incurred in connection therewith as provided in the Prepetition Credit Documents (collectively, the "Prepetition First Lien Obligations").

          (iii)    The Prepetition First Lien Obligations constitute legal, valid, and binding obligations of the Company and the Prepetition Guarantors.  No offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or priority of, the Prepetition First Lien Obligations exist.  No portion of the Prepetition First Lien Obligations is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity.  The Prepetition Credit Documents are valid and enforceable by each of the Prepetition Secured Parties against each of the Company and the Prepetition Guarantors.  The Prepetition First Lien Obligations constitute allowed claims against the Company's and the Prepetition Guarantors' estates.  As of the Petition Date, the Debtors or their estates have no claim or cause of action against any of the Prepetition Secured Parties or their agents, in such capacities, whether arising under applicable state, federal, or foreign law (including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Prepetition Credit Documents (or the transactions contemplated thereunder), the Prepetition First Lien Obligations, or the Prepetition Liens (as defined below).

          (b)    As of the Petition Date, the liens securing the Prepetition Credit Facilities (the "Prepetition Liens") on the Collateral (as defined in the Prepetition Credit Agreement, the

"Prepetition Collateral") as provided for in the Prepetition Credit Documents were valid, binding, enforceable, non-avoidable, and properly perfected, and were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain senior liens senior by operation of law (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date or were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b)) (such liens, "Permitted Liens").

(c)     Other than the Excluded Assets (as defined in the Prepetition Credit Documents), all cash, securities, cash equivalents and other property of the Company and the Prepetition Guarantors (and the proceeds therefrom) as of the Petition Date, including, without limitation, all cash proceeds of the Prepetition Collateral (including cash on deposit any depository institution (collectively, the "Depository Institutions") as of the Petition Date, securities or other property, whether subject to control agreements or otherwise, in each case that constitutes Prepetition Collateral) and all cash securities or other property (and the proceeds therefrom) and other amounts on deposit or maintained by such parties in any account or accounts with any Depository Institution, were (i) valid, perfected, enforceable, first priority liens under the Prepetition Credit Documents and applicable law and (ii) valid, perfected, enforceable, liens under the Prepetition Credit Documents and applicable law, as applicable, for the benefit of the Prepetition Secured Parties and are "cash collateral" of the Prepetition Secured Parties within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

(d)     None of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted, or are control persons or insiders of the Debtors by virtue of any of the actions

taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Documents, or the Prepetition Credit Documents.

5.      *Findings Regarding the DIP Financing and Cash Collateral.*

(a)      Good and sufficient cause has been shown for the entry of this Interim Order and to avoid immediate and irreparable loss or damage to the Debtors' estates.

(b)      The Debtors have an immediate need to obtain the DIP Financing (including the DIP Letters of Credit) and continue to use the Prepetition Collateral (including Cash Collateral) in order, among other things, to avoid the liquidation of their estates, to permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to pay adequate protection, and to satisfy other working capital and operational needs.  The ability of the Debtors to satisfy the foregoing and otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which, on an interim basis as contemplated hereunder, would immediately and irreparably harm the Debtors, their estates, and parties-in-interest.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses, maintain their properties in the ordinary course of business, and fund the Chapter 11 Cases without the authorization to use Cash Collateral and to borrow the Initial DIP Loans.

(c)      The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.  The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Documents and are unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors are also unable to obtain secured credit allowable under Bankruptcy Code sections

364(c)(1), 364(c)(2) and 364(c)(3) without granting to the DIP Agent and the DIP Lender, subject to the Carve Out, any DIP Subordination Event, and the Permitted Liens, the DIP Liens (as defined herein) and the DIP Superpriority Claims (as defined herein) and incurring the Adequate Protection Obligations (as defined herein), in each case, under the terms and conditions set forth in this Interim Order and in the DIP Documents.

(d)     Based on the Motion, the Declarations filed in support of the Motion, and the record presented to the Court at the Interim Hearing (including the First Day Declaration), the terms of the DIP Financing and the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP L/C Guarantee is necessary to the success of the DIP Financing and these Chapter 11 Cases and incurring obligations under the DIP Letters of Credit are an exercise of the Debtors' prudent business judgment consistent with their fiduciary duties.

(f)     The Prepetition Secured Parties have consented or are deemed to have consented to the Debtors' use of Cash Collateral and the other Prepetition Collateral (solely in accordance with the terms of this Interim Order and the DIP Documents), and the Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions set forth in this Interim Order and the DIP Documents (including Permitted Variances), including those provisions relating to the DIP Subordination Events.

(g)     The DIP Financing (including the DIP Letters of Credit) and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's-length among the Debtors, the DIP Agent, the DIP Lender, and the Prepetition Secured Parties and

10

all of the Loan Parties' obligations and indebtedness arising under, in respect of, or in connection

with, the DIP Financing (including the DIP Letters of Credit) and the DIP Documents, including,

without limitation: (i) all DIP Loans made to and guarantees issued by the Debtors pursuant to the

DIP Documents; and (ii) any other DIP Obligations, shall be deemed to have been extended by the

DIP Agent and the DIP Lender in good faith, as that term is used in Bankruptcy Code section

364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e),

and the DIP Agent and the DIP Lender (and the successors and assigns thereof) shall be entitled

to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any

provision hereof is vacated, reversed or modified, on appeal or otherwise.

(h)      The Prepetition Secured Parties have acted in good faith regarding the DIP

Financing (including the DIP Letters of Credit) and the Debtors' use of the Prepetition Collateral

(including the Cash Collateral) to fund the administration of the Debtors' estates and continued

operation of their businesses (including the incurrence and payment of the Adequate Protection

Obligations), in accordance with the terms hereof, and the Prepetition Secured Parties (and the

successors and assigns thereof), shall be entitled to the full protection of Bankruptcy Code section

363(m) in the event that this Interim Order or any provision hereof is vacated, reversed or modified,

on appeal or otherwise.

(i)      The Prepetition Secured Parties are entitled to the adequate protection

provided in this Interim Order as and to the extent set forth herein pursuant to Bankruptcy Code

sections 361, 362, 363 and 364, in an amount equal to any Diminution in Value, if any, of their

respective interests in the Prepetition Collateral (including the Cash Collateral).  Based on the

Motion, the Declarations and on the record presented to the Court, the terms of the proposed

adequate protection arrangements for the use of the Prepetition Collateral and Diminution of Value

of the Prepetition Collateral (including the Cash Collateral), if any, are fair and reasonable, and reflect the Debtors' prudent exercise of business judgment; *provided* that nothing in this Interim Order or the other DIP Documents shall (i) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral, other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order, (ii) be construed as consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior), or (iii) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, subject any applicable provisions of the Prepetition Credit Documents and the Restructuring Support Agreement, to seek new, different, or additional adequate protection or assert the interests of any of the Prepetition Secured Parties.

6.     *Authorization of the DIP Financing and the DIP Documents.*

(a)     The Loan Parties are hereby authorized to execute, enter into and perform all obligations under the DIP Documents.  The Borrower is hereby authorized pursuant to this Interim Order to forthwith borrow money pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to guarantee the Borrower's obligations with respect to such borrowings as described herein, subject to any conditions and limitations set forth in this Interim Order (including the DIP Budget (as defined below) (subject to Permitted Variances) and/or under the DIP Documents), and the proceeds of the DIP Facility shall be used only for the purposes set forth herein and under the DIP Documents, including, without limitation and as applicable, as described in the Restructuring Support Agreement, to provide working capital for the Debtors, to pay Adequate Protection Obligations, for general corporate purposes, to pay interest, fees and expenses in accordance with this Interim Order and the DIP Documents, to fund the Carve Out and to pay Allowed Professional Fees.

(b)      In furtherance of the foregoing and without further approval of this Court, each Loan Party is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all reasonable and actual fees required under the DIP Documents or that may otherwise be reasonably necessary for or in connection with the Loan Parties' performance of their obligations under the DIP Documents, subject to the terms of this Interim Order, including as applicable and, without limitation:

(i)      the execution and delivery of, and performance under, each of the DIP Documents;

(ii)      the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the requisite parties under the DIP Documents may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents, or other modifications to and under the DIP Documents that are non-material (and any fees and other expenses (including any attorneys', accountants', appraisers', and financial advisors' fees), amounts, charges, costs, indemnities, and other obligations paid in accordance and connection therewith, but excluding, for the avoidance of doubt, any amendment, consent, or waiver fee); *provided* that the Debtors shall provide prior written notice to the extent practicable (which may be provided through electronic mail) of any such authorizations, amendments, waivers, consents, or other modifications to and under the DIP Documents to counsel to the DIP Agent and the Ad Hoc Group.  In the event of any material amendments, waivers, consents or other modifications to the DIP Documents, the Debtors shall provide prior written notice (which may be provided through electronic mail) to counsel to the Ad Hoc Group (with a contemporaneous copy

to counsel to the DIP Agent), which shall have five (5) business days from the date of such notice within which to object, in writing, to such material amendment, waiver, consent or other modification.  If any such party timely objects to such material amendment, waiver, consent or other modification to the DIP Documents, such material amendment, waiver, consent or other modification shall only be permitted pursuant to an order of the Court.  The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material amendment, waiver, consent or other modification or an expedited basis;

(iii)     the non-refundable payment to the DIP Agent or the DIP Lender, as the case may be, of all fees (which fees shall be irrevocable, and shall be deemed to have been, approved upon entry of this Interim Order, whether or not such fees arose before or after the Petition Date (and to the extent paid prior to entry of the Interim Order, ratified in full), and upon payment thereof, in accordance with the terms of the DIP Documents and this Interim Order, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise), and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Documents (and in any separate letter agreements between any or all Debtors, on the one hand, and the DIP Agent and/or the DIP Lender, on the other, in connection with the DIP Financing), related costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained by the the DIP Lender, in each case, solely form the proceeds of the DIP Loans and solely as provided for in this Interim Oder and the DIP Documents, without the need to file retention motions or fee

applications or to provide notice to any party, and , if applicable, the DIP Termination Fee (as defined herein in Paragraph 46); and

(iv)    the performance of all other acts required under or in connection with the DIP Documents.

(c)    Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, interest and any fees payable to, or on behalf of, the DIP Lender that accrues pursuant to the DIP Documents, other than fees in respect of the DIP L/C Guarantee and fees and expenses of the professionals retained by the DIP Agent and the DIP Lender, shall not be payable unless the Debtors consummate a third-party sale of substantially all of the Debtors' assets acceptable to the Required Consenting Term Lenders.

(d)    In furtherance of the foregoing and without further approval of this Court, the DIP Lender is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees required under the DIP Documents or that may otherwise be reasonably necessary for or in connection with the DIP Lender's performance of their obligations under the DIP L/C Guarantee.

(e)    Upon execution and delivery thereof, the DIP Documents shall constitute valid, binding and unavoidable obligations of the Loan Parties, enforceable against each Loan Party thereto in accordance with the terms of the DIP Documents and this Interim Order.  Subject to the terms of this Interim Order, no obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order to the DIP Agent and/or the DIP Lender shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law

(including, without limitation, under Bankruptcy Code sections 502(d), 548 or 549), or subject to any defense, reduction, setoff, recoupment, claim or counterclaim.

(f)     As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility and authorization to use Cash Collateral, the Debtors, the DIP Agent, the other DIP Secured Parties, and the Prepetition Secured Parties have agreed that, as of and commencing on the date of the Interim Hearing, the Debtors shall utilize the proceeds of the DIP Collateral in accordance with this Interim Order and the DIP Budget (subject to Permitted Variances).

7.     *DIP Superpriority Claims.*  Subject in all respects to the Carve Out and any DIP Subordination Event, pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Loan Parties in each of the Chapter 11 Cases (without the need to file any proof of claim) with priority over any and all claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b) and any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b), and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Loan Parties and all proceeds thereof (excluding Avoidance Actions, but, effective upon entry of the Final Order, Avoidance Proceeds), subject only to the

Carve Out and subject to any DIP Subordination Event.  The DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

      8.    *DIP Subordination*.

      (a)    Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, upon the occurrence of a Termination Date (as defined in the Restructuring Support Agreement) under the Restructuring Support Agreement with respect to the Consenting Term Lenders (as defined in the Restructuring Support Agreement) for the following reasons, each after delivery of a termination notice by the Required Consenting Term Lenders (as defined in the Restructuring Support Agreement) as set forth in the Restructuring Support Agreement:

      (i)    the breach in any material respect by the Consenting Sponsor (as defined in the Restructuring Support Agreement) of any provision of the Restructuring Support Agreement that (a) is adverse to the Consenting Term Lenders and (b) remains uncured for seven (7) business days after such terminating Consenting Term Lenders transmit a written notice in accordance with the Restructuring Support Agreement;

      (ii)    the breach in any material respect by a Company Party of any provision of the Restructuring Support Agreement that (i) is adverse to the Consenting Term Lenders and (ii) remains uncured for seven (7) Business Days after such terminating Consenting Term Lenders transmit a written notice in accordance with the Restructuring Support Agreement;

      (iii)    upon (a) a filing by any of the Company Parties or the Consenting Sponsor of any motion, objection, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance, subordination, or recharacterization of, the Term Loan Claims (as defined in the Restructuring Support Agreement), the Revolving

Credit Facility Claims (as defined in the Restructuring Support Agreement), and/or the liens securing any such claims or asserting any other claim or cause of action against and/or with respect to any such claims, liens, any Consenting Term Lender or any Agent (as defined in the Restructuring Support Agreement) under any of the relevant debt documents (or if the Company Parties or Consenting Sponsor support any such motion, application, or adversary proceeding commenced by any third party) or (ii) the entry of an order by the Bankruptcy Court, if sought by any of the Company Parties or the Consenting Sponsor, providing relief adverse to the interests of any Consenting Term Lender or any Agent with respect to any of the foregoing claims, causes of action, or proceedings;

(iv)     in the event that (i) the DIP Lender becomes a "Defaulting Lender" pursuant to the DIP Credit Agreement or the DIP Lender otherwise fails to comply with its funding obligations under the DIP Credit Agreement (subject to any cure period under the DIP Credit Agreement), (ii) the Consenting Sponsor or DIP Lender fail to comply with its funding obligations provided in the Restructuring Support Agreement (including the Restructuring Term Sheet), or (iii) the DIP Credit Bid Amount at any time exceeds the amount of funding provided under the DIP Facility, and the DIP Lender (or Holdings (as defined in the Restructuring Support Agreement) on behalf of the DIP Lender) does not agree, within ten (10) business days of receiving notice of such condition, to provide funding necessary to pay additional costs that fall within the definition of the DIP Credit Bid Amount;

(v)     to the extent sought pursuant to a motion or application by any Company Party or the Consenting Sponsor, and solely to the extent not consented to by the Required Consenting Term Lenders, the entry of an order by the Court (a) dismissing any of the Chapter 11 Cases, (b) converting one or more of the Chapter 11 Cases of a Company Party to a

case under chapter 7 of the Bankruptcy Code, (c) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (d) terminating or shortening exclusivity under section 1121 of the Bankruptcy Code, (e) rejecting the Restructuring Support Agreement, or (f) vacating or modifying any order regarding the DIP Facility or cash collateral in manner that is not consistent with the Restructuring Support Agreement and the Restructuring Term Sheet, *provided* that such Termination Date may occur on the date the Consenting Sponsor files any motion or application seeking such relief without the prior consent of the Required Consenting Term Lenders;

(vi)    unless the Company Parties consummate a third-party sale of substantially all of the Company Parties' assets acceptable to the Required Consenting Term Lenders, any of the Company Parties (without the consent of the Required Consenting Term Lenders) (a) withdraws the Plan (as defined in the Restructuring Support Agreement), (b) publicly announces their intention not to support the Restructuring Transactions (as defined in the Restructuring Support Agreement), (c) files, publicly announces, or executes a definitive written agreement with respect to an Alternative Restructuring Proposal (as defined in the Restructuring Support Agreement), or (d) agrees or indicates a material commitment to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document from or to a Company Party) or publicly announces its intent to pursue an Alternative Restructuring Proposal;

(vii)    upon the occurrence of any Event of Default under the DIP Credit Agreement pursuant to which the DIP Lender has exercised remedies in accordance with the terms of the DIP Credit Agreement; or

(viii)   unless the Company Parties consummate a third-party sale of substantially all of the Company Parties' assets acceptable to the Required Consenting Term Lenders, following delivery of notice by the Company Parties pursuant to Section 8.02 of the Restructuring Support Agreement, the board of directors, board of managers, or such similar governing body of any Company Party determines, in good faith, after consulting with outside counsel, (a) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable law or (b) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal,

then the amount of DIP Obligations equal to the DIP Credit Bid Amount (as defined in the Restructuring Support Agreement) and all fees and interest accrued under the DIP Facility shall be fully subordinated to all Prepetition First Lien Obligations and the DIP Liens shall be fully subordinated to the liens securing the Prepetition First Lien Obligations; *provided* that the DIP Obligations constituting unpaid fees and expenses of the DIP Agent and its counsel including any indemnification to the DIP Agent in accordance with the DIP Documents (collectively, the "DIP Agent Fees") shall remain senior, and in no event subordinated, to the Prepetition First Lien Obligations and the DIP Liens notwithstanding the occurrence of a DIP Subordination Event (as defined below).

(b)   Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, upon the occurrence of a Termination Date under the Restructuring Support Agreement for the following reasons:

(i)   the Plan is not substantially consummated by the Restructuring Effective Date Milestone (unless such Milestone has been waived, modified, extended, or otherwise amended by the Company Parties and the Required Consenting Stakeholders in writing

(which may be via email from counsel)); *provided* that the right to terminate the Restructuring Support Agreement under Section 12.01(d) thereof shall not be available if the failure of such Milestone to be achieved is caused by, or resulted from, any act, omission, or delay, directly or indirectly, on the part of the Consenting Term Lenders in violation of their obligations under the Restructuring Support Agreement;

(ii)     the entry of an order by the Bankruptcy Court (i) dismissing the Chapter 11 Cases, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in a majority of the Chapter 11 Cases of the Company Parties;

(iii)    if any of the DIP Orders are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended in a manner not reasonably acceptable to the Required Consenting Term Lenders; or

(iv)    the Bankruptcy Court enters any order authorizing the use of cash collateral or postpetition financing that is not in form and substance reasonably acceptable to the Required Consenting Term Lenders;

then the amount of DIP Obligations equal to 50% of the DIP Credit Bid Amount and all fees and interest accrued under the DIP Facility (other than the DIP Agent Fees) shall be fully subordinated to all Prepetition First Lien Obligations and the DIP Liens securing such amount of DIP Obligations (other than the DIP Agent Fees) shall be subordinated to the liens securing the Prepetition First Lien Obligations, and the remaining amount of the DIP Obligations (other than the DIP Agent Fees) shall remain DIP Superpriority Claims secured by DIP Liens but will be reduced on a dollar-for-dollar basis by the amount of the Sponsor True-Up Obligation (as defined

in the Restructuring Support Agreement) outstanding at such time (each of the clauses (a)-(b), a "DIP Subordination Event").

(c)     For the avoidance of doubt, unless a DIP Subordination Event has occured, the DIP Obligations shall not be subject to subordination to the liens securing the Prepetition First Lien Obligations.

9.     *DIP Liens*.  As security for the DIP Obligations, subject and subordinate in all respects to the Carve Out and subject to any DIP Subordination Event, effective and perfected upon the entry of this Interim Order and without the necessity of the execution, recordation or filing by the Loan Parties, the DIP Agent (or its bailee or agent) or the DIP Lender of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent of, or over, any DIP Collateral, the following security interests and liens are hereby granted to the DIP Agent for their own respective benefit and the benefit of the DIP Lender, subject only to the Carve Out, any DIP Subordination Event and the Permitted Liens (all such liens and security interests granted to the DIP Agent, for their respective benefit and for the benefit of the DIP Lender, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

(a)     First Lien on Unencumbered Property.  Pursuant to Bankruptcy Code section 364(c)(2), and subject to any DIP Subordination Event and subject to and subordinate in all respects to the Carve Out, valid, binding, continuing, enforceable, fully-perfected first priority senior security interests in and liens upon all DIP Collateral, to the extent such DIP Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date or valid and non-avoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that are perfected as permitted by Bankruptcy Code section 546(b) ("Unencumbered

Property"), with the relative priorities among the DIP Obligations as set forth on **Exhibit A** attached hereto;

(b)     Liens Junior to Certain Other Liens.  Pursuant to Bankruptcy Code section 364(c)(3), and subject to any DIP Subordination Event and subject to and subordinate in all respects to the Carve Out, valid, binding, continuing, enforceable, fully-perfected junior security interests in and liens on the DIP Collateral, to the extent such DIP Collateral is subject to (i) valid, perfected and non-avoidable liens as of the Petition Date or (ii) valid and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that are perfected as permitted by Bankruptcy Code section 546(b), in each case other than the Prepetition Liens, with the relative priorities among the DIP Liens as set forth on **Exhibit A** attached hereto; and

(c)     Priming Liens.  Pursuant to Bankruptcy Code section 364(d)(1), and subject to any DIP Subordination Event and subject to and subordinate in all respects to the Carve Out, a valid, binding, continuing, enforceable, fully-perfected priming senior security interests in and liens upon the Prepetition Collateral, which security interests and liens shall prime the Prepetition Liens in accordance with the priorities shown on **Exhibit A** attached hereto.

10.     *Relative Priority of DIP Liens*.  The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to the Carve Out and any DIP Subordination Event in all respects and shall otherwise be junior only to the Permitted Liens.  In the event of an enforcement of remedies in respect of the DIP Facility and the application of the DIP Collateral, such DIP Collateral shall be applied as specified on **Exhibit A** attached hereto (subject to any DIP Subordination Event).

11.    *DIP Collateral*.  For purposes of this Interim Order, "DIP Collateral" shall mean all owned or hereafter acquired, whether first arising prior to, on, or following the Petition Date, assets and property, of any kind or nature whatsoever, wherever located, whether tangible or intangible, real, personal or mixed, owned, consigned, leased or arising in favor of, of the Loan Parties and their estates (including, without limitation, inventory, accounts receivable, equipment, property, plant, equipment, owned real property, investment property, insurance proceeds, deposit accounts, rights under leases and other contracts, patents, copyrights, trademarks, tradenames, and other intellectual property, and capital stock of subsidiaries) and the proceeds thereof including, subject to entry of the Final DIP Order, the Avoidance Proceeds (as defined herein), but not including the Excluded Assets (as defined herein).

12.    *Excluded Assets*.[3]  Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, the DIP Collateral shall not include (the "Excluded Assets") (a) any claims and causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, and 550 (collectively, the "Avoidance Actions") and, prior to entry of the Final Order, the proceeds of Avoidance Actions (it being understood that subject only to and effective upon entry of the Final Order, the DIP Collateral shall include any proceeds or property recovered, unencumbered or otherwise, from successful Avoidance Actions, whether by judgment, settlement or otherwise ("Avoidance Proceeds")); (b) governmental or regulatory licenses or state or local franchises, charters and authorizations to the extent that the DIP Agent may not (or is restricted from) validly possess a security interest therein under applicable Laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or the pledge or creation of a security

---

[3]    Terms capitalized in this Paragraph 12 but not otherwise defined in the Interim Order shall have such meaning ascribed to them in the DIP Credit Agreement.

interest in which would require governmental consent, approval, license or authorization (to the extent such consent, approval, license or authorization was not obtained (it being understood and agreed that the Loan Parties shall be under no obligation to obtain such consent, approval, license or authorization)), other than to the extent such prohibition, limitation or restriction is rendered ineffective under the UCC or other applicable Law; (c) any particular asset or right under contract, if the pledge thereof or the security interest therein is prohibited or restricted by applicable law (including any requirement to obtain the consent of any Governmental Authority or regulatory authority), other than to the extent such prohibition or restriction is rendered ineffective under the UCC or other applicable law; (d) (1) Margin Stock, (2) Equity Interests or Indebtedness treated as equity for U.S. federal income tax purposes of first tier Foreign Subsidiaries that are CFCs and first tier CFC Holdcos in excess of 65% of the issued and outstanding voting Equity Interests or Indebtedness treated as equity for U.S. federal income tax purposes thereof and (3) Equity Interests in any Broker-Dealer Regulated Subsidiary or Captive Insurance Subsidiary, in each case of this clause (3) that are not Guarantors; (f) any lease, license or agreement or any property subject to such lease, license or agreement or a purchase money security interest, capital lease obligation or similar arrangement, in each case, to the extent that a grant of a security interest therein (1) would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto (other than a Loan Party after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law) or (2) would require governmental, regulatory or third-party (other than a Loan Party) approval, consent or authorization pursuant to the terms thereof (in each case after giving effect to the applicable anti-assignment provisions of the UCC and other applicable Law) (other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition) not obtained

(without any requirement to obtain such approval, consent or authorization) (in each case of clauses (A) and (B), after giving effect to the applicable anti-assignment provisions of the UCC and other applicable Law); (g) intent-to-use trademark application prior to the filing, and acceptance by the U.S. Patent and Trademark Office, of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law; (h) segregated funds held in a fiduciary capacity for others (that are not Loan Parties); (i) assets that constitute minimum net assets as required for service contract issuers under state law; (j) Excluded Accounts; (k) property subject to a purchase money security interest, capitalized lease or similar arrangement, in each case, to the extent permitted under the Loan Documents, to the extent that a grant of a security interest in such property would (1) violate (including without limitation violation of any prohibition on the Loan Party granting any Lien in such property), breach, invalidate, result in the abandonment or unenforceability or otherwise terminate such arrangement or (2) create a right of termination in favor of any party thereto (other than a Loan Party or any of its Affiliates); and (l) funds held in a fiduciary capacity for others; *provided, however,* that Excluded Assets shall not include any Proceeds, substitutions or replacements of any Excluded Assets referred to in clause (a) through (l) (unless such Proceeds, substitutions or replacements would independently constitute Excluded Assets referred to in clauses (a) through (l)).

13.     *Carve Out.*

(a)     *Carve Out.*  As used in this Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory

rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $750,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     *Carve Out Reserves*.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall be deemed a draw

request and notice of borrowing by the Debtors for DIP Loans under the DIP Facility (each, as defined in the DIP Credit Agreement) (on a pro rata basis based on the then-outstanding DIP Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for DIP Loans under the DIP Facility (on a pro rata basis based on the then-outstanding DIP Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  On the first business day after the DIP Agent gives such notice to such DIP Lender (as defined in the DIP Credit Agreement), notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for DIP

Loans under the DIP Facility, any termination of the DIP Commitments following an Event of Default, or the occurrence of the DIP Termination Date, the DIP Lender with outstanding DIP Commitments (on a pro rata basis based on the then-outstanding DIP Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to any DIP Subordination Event, to pay the DIP Agent for the benefit of the DIP Secured Parties, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as set forth on **Exhibit A** hereto (subject to any DIP Subordination Event).  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to any DIP Subordination Event, to pay the DIP Agent for the benefit of the DIP Secured Parties, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as set forth on **Exhibit A** hereto (subject to any DIP Subordination Event).  Notwithstanding anything to the contrary in the DIP Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Paragraph 13, then, any excess funds in one of the Carve Out Reserves following the payment

of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this Paragraph 13, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or in any Prepetition Credit Document, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Prepetition First Lien Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition First Lien Obligations.

(c) *Payment of Allowed Professional Fees Prior to the Termination Declaration Date.* Any payment or reimbursement made prior to the occurrence of the

Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)  *No Direct Obligation To Pay Allowed Professional Fees*.  None of the DIP Agent, DIP Lender, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lender, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)  *Payment of Carve Out On or After the Termination Declaration Date*.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

(f)  Notwithstanding anything to the contrary in this Interim Order, the Debtors' obligations to the DIP Secured Parties and Prepetition Secured Parties and the liens, security interests, and superpriority claims granted herein, under the DIP Documents, and/or under the Existing Agreements, including, without limitation, the DIP Liens, the DIP Superpriority Claims, the Prepetition First Lien Adequate Protection Liens, the Prepetition Liens, the Prepetition First Lien Adequate Protection Claims, and the Prepetition First Lien Obligations, shall be subject in all respects and subordinate to the Carve Out.

14.     *Protection of DIP Lender's Rights.*

(a)     Until the indefeasible payment in full of all DIP Obligations and the termination of all remaining DIP Commitments under the DIP Facility, subject to any DIP Subordination Event, the Prepetition Secured Parties shall: (i) except in respect of any DIP Subordination Event pursuant to Paragraph 8(a) of this Interim Order, have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Credit Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against DIP Collateral, including in connection with the Prepetition Term Loan Adequate Protection Liens except to the extent authorized by an order of this Court; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, any DIP Collateral, to the extent such transfer, disposition, sale or release is authorized under the DIP Documents; (iii) deliver or cause to be delivered, at the Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lender or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of such Collateral subject to any sale or disposition; and (iv) not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral other than, solely as to this clause (iv), the Prepetition Agents' filing financing statements or other documents or instruments to perfect the liens granted pursuant to this Interim Order or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests existing as of the Petition Date.

(b)     To the extent the Prepetition Agents or any other Prepetition Secured Parties have possession of any Prepetition Collateral or DIP Collateral or have control with respect to any

Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or exercise such control as gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lender and shall comply with the instructions of the DIP Agent with respect to the exercise of such control, and the DIP Agent agrees, that such Prepetition Secured Parties shall be deemed, without incurring any liability or duty to any party, to maintain possession or control of any Prepetition Collateral or DIP Collateral in its possession or control as gratuitous bailee and/or gratuitous agent for perfection for the benefit of the Prepetition Secured Parties with respect to bank accounts.

(c)      No rights, protections or remedies of the DIP Agent or the DIP Lender granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

(d)      Subject to any DIP Subordination Event (and Prepetition Secured Parties' rights to assert that a DIP Subordination Event has occurred) and subject to the Prepetition Secured Parties' rights to dispute the occurrence of a DIP Termination Event, no Prepetition Secured Party may, directly or indirectly, (i) contest, or support any other Person in contesting, in any proceeding, the extent, validity, attachment, priority, or enforceability of any DIP Lien held by or on behalf of any of the DIP Secured Parties in the DIP Collateral (or the extent, validity, allowability, or enforceability of any DIP Obligations secured thereby or purported to be secured thereby) or the provisions of the DIP Documents or this Interim Order, (ii) take any action that would restrain,

hinder, limit, delay or otherwise interfere with the exercise of any rights or remedies by any of the DIP Secured Parties, or (iii) contest, object to, or support any other Person in contesting or objecting to, the manner in which any DIP Secured Party seeks to enforce or collect the DIP Obligations, the DIP Superpriority Claims or the DIP Liens or any amendment, waiver or modification of any DIP Document or this Interim Order.

15.     *Marshaling*.   None of the DIP Collateral, the DIP Lender, the DIP Agent, the Prepetition Collateral, the Prepetition First Lien Adequate Protection Liens or the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine, and all proceeds thereof shall be received and used in accordance with this Interim Order; *provided* that, notwithstanding anything to the contrary herein, and subject to the entry of the Final Order, prior to seeking payment of any DIP Superpriority Claims, DIP Liens, Prepetition First Lien Adequate Protection Claims, or First Lien Adequate Protection Liens, as applicable, from Avoidance Proceeds, the DIP Secured Parties and Prepetition Secured Parties, respectively, shall use reasonable best efforts to first satisfy such claims or liens from all other DIP Collateral or Prepetition Collateral, as applicable.   Subject to entry of the Final Order, in no event shall the "equities of the case" exception in Bankruptcy Code section 552(b) apply to the secured claims of the Prepetition Secured Parties.

16.     *Limitation on Charging Expenses*.   Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to Bankruptcy Code section 506(c) or any similar principle of law, as such pertains to the DIP Secured Parties or the DIP Obligations without the prior written consent of the DIP Agent and no such consent shall be

implied from any other action, inaction, or acquiescence by the DIP Agent or the DIP Lender, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent or the DIP Lender or the Prepetition Secured Parties to any charge, lien, assessment or claim against the DIP Collateral under Bankruptcy Code section 506(c) or otherwise.  Subject only to and effective upon entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral (including Cash Collateral) pursuant to Bankruptcy Code section 506(c) or any similar principle of law, without the prior written consent of the Prepetition Agents, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the Prepetition Secured Parties to any charge, lien, assessment or claim against the Prepetition Collateral under Bankruptcy Code section 506(c) or otherwise.

17.     *Payments Free and Clear*.  Subject in all respects to the Carve Out, any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Secured Parties or Prepetition Agents on behalf of the Prepetition Secured Parties pursuant to the provisions of this Interim Order or the DIP Documents shall be irrevocable and shall be received free and clear of any claim, charge, assessment or other liability including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code, whether asserted by, through, or on behalf of the Debtors.

18.     *Use of Cash Collateral*.  Subject to the terms and conditions of this Interim Order (including Paragraph 8 of this Interim Order) and the DIP Documents, and in accordance with the

DIP Budget (subject to the Permitted Variances (as defined in the DIP Documents)), the Debtors are authorized to use Cash Collateral until the expiration of the Remedies Notice Period (as defined herein) following the DIP Termination Date (as defined herein); *provided* that the Prepetition Secured Parties are granted adequate protection as hereinafter set forth.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted by this Interim Order and the DIP Documents, and in accordance with the DIP Budget (subject to the Permitted Variances), as applicable.

19.    *Use of DIP Collateral*.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Secured Parties, or from any order of this Court), except as otherwise provided for in the DIP Documents or the Restructuring Support Agreement or otherwise ordered by the Court.

20.    *Adequate Protection for the Prepetition Secured Parties*.  The Prepetition Secured Parties are entitled, pursuant to Bankruptcy Code sections 361, 362, 363(e) and 364(d)(1), to adequate protection against the diminution in value, if any, of their interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any diminution in the value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral from and after the Petition Date, if any, resulting from, among other things, (i) subordination of the Prepetition Secured Parties' interests in the Prepetition Collateral to the Carve Out, (ii) the use of Cash Collateral, (iii) the sale, lease, or use of any of the Prepetition Collateral, (iv) the priming of the Prepetition Liens by the DIP Liens pursuant to the DIP Documents and this Interim Order, (v) the

imposition of the automatic stay pursuant to Bankruptcy Code section 362, and/or (v) for any other reason for which adequate protection may be granted under the Bankruptcy Code ("Diminution in Value") (such claim, the "Prepetition First Lien Adequate Protection Claim").  In consideration of the foregoing, the Prepetition Secured Parties are hereby granted the following (collectively, the "Adequate Protection Obligations"), in each case, subject in all respects to the Carve Out:

(a)      Prepetition First Lien 507(b) Claims.  The Prepetition Secured Parties, are hereby granted allowed superpriority administrative expense claims as provided for in Bankruptcy Code section 507(b) in the amount of the Prepetition First Lien Adequate Protection Claim (the "Prepetition First Lien 507(b) Claims"), which Prepetition First Lien 507(b) Claims shall have recourse to and be payable from all of the DIP Collateral, including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds.  The Prepetition First Lien 507(b) Claims shall be subject and subordinate to the Carve Out and, subject to a DIP Subordination Event, the DIP Superpriority Claims.

(b)      Prepetition First Lien Adequate Protection Liens.  The Prepetition Agents (for the benefit of the applicable Prepetition Secured Parties) are hereby granted valid, perfected replacement security interests in and liens (the "Prepetition First Lien Adequate Protection Liens") upon all of the DIP Collateral, including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds, in each case, subordinate to the Carve Out, the DIP Liens and any other liens that are senior to DIP Liens.

(c)      Reporting.  The Prepetition Secured Parties shall be entitled to delivery of all reports and notices deliverable to the DIP Secured Parties pursuant to section 6.01, 6.02, and 6.03 of the DIP Credit Agreement.

(d)  <u>Adequate Protection Payments</u>.  As further adequate protection, the Prepetition Revolving Agent, on behalf of the Prepetition Revolving Lenders, shall receive monthly adequate protection payments (the "<u>Adequate Protection Payments</u>"), payable in cash on the thirtieth day of each month equal to the interest on a current basis under the Prepetition Credit Documents on account of the Prepetition Revolving Loans until such time as the Prepetition Revolving Loans are indefeasibly paid in full, in cash; *provided* that, subject to the Final Order, interest shall be payable retroactive to the Petition Date at the applicable rate on the Prepetition Revolving Loans.

(e)  <u>Adequate Protection Fees and Expenses</u>.  As further adequate protection, the Debtors are authorized and directed to pay, in accordance with Paragraph 32 of this Interim Order, the reasonable and documented prepetition and postpetition fees and expenses (the "<u>Adequate Protection Fees and Expenses</u>") of the Prepetition Secured Parties as follows: (1)  the Prepetition Revolving Agent, including the reasonable and documented fees and disbursements of Moore & Van Allen, PLLC, one local counsel, and RPA Advisors LLC; and (2) the Ad Hoc Group (including, without limitation, Akin Gump Strauss Hauer & Feld LLP plus one local counsel and FTI Consulting, Inc.) (in each case in accordance with the terms of the engagement letters between such professionals and the Company).

21.  *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties.

22.     *Perfection of DIP Liens and the Prepetition First Lien Adequate Protection Liens.*

(a)     This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Prepetition First Lien Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or mortgage with respect to any ship or vessel) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or the Prepetition First Lien Adequate Protection Liens or to entitle the DIP Agent, the other DIP Secured Parties, and the Prepetition Secured Parties to the priorities granted herein.

(b)     The DIP Agent, on behalf of the DIP Lender, and the Prepetition Agents, on behalf of, or at the direction of, the applicable Prepetition Secured Parties are hereby authorized (unless otherwise agreed between the Debtors and the DIP Lender or the Prepetition Secured Parties in the applicable DIP Documents or the Prepetition Credit Documents), but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder or to otherwise evidence such liens and security interests in all the relevant collateral.  Whether or not the DIP Agent, on behalf of the DIP Lender, or the Prepetition Agents, on behalf of, or at the direction of, the Prepetition Secured Parties, shall, in their sole discretion, choose to file such financing statements, trademark

filings, copyright filings, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order.  Upon the request of the DIP Agent, each of the Prepetition Secured Parties and the Loan Parties, without any further consent of any party, is authorized (in the case of the Prepetition Secured Parties) (unless otherwise agreed between the Debtors and the DIP Lender or the Prepetition Secured Parties in the applicable DIP Documents or Prepetition Credit Documents) and directed (in the case of the Loan Parties) to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Obligations and DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date notwithstanding the actual recordation and filing date.

(c)     A certified copy of this Interim Order may, in the discretion of the DIP Agent or the Prepetition Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and/or recording, as applicable.  The automatic stay of Bankruptcy Code section 362(a) shall be modified to the extent necessary to permit the DIP Agent or the Prepetition Agents to take all actions, as applicable, referenced in this subparagraph (c) and the immediately preceding subparagraph (b).

23.     *DIP Budget*.  Attached to this Interim Order as **Exhibit B** is an initial 13-week budget approved by the the Required DIP Lenders in accordance with the DIP Documents and by

the Required Consenting Stakeholders (as defined in the Restructuring Support Agreement) in accordance with the Restructuring Support Agreement (the "Initial DIP Budget"). The Initial DIP Budget reflects, among other things, on a line item, cumulative and aggregate basis, the Debtors' anticipated operating receipts, anticipated operating disbursements, anticipated non-operating disbursements, net operating cash flow and liquidity for each calendar week during the period set forth therein. The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Documents and the Restructuring Support Agreement and once approved by the Required DIP Lenders in accordance with the DIP Documents and by the Required Consenting Stakeholders in accordance with the Restructuring Support Agreement, shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget, and each subsequent approved budget shall constitute, without duplication, a "DIP Budget"). The Initial DIP Budget has been thoroughly reviewed by the Debtors, their management, and their advisors. The Debtors, their management, and their advisors believe the Initial DIP Budget and the estimate of administrative expenses due or accruing during the period covered by the Initial DIP Budget were developed using reasonable assumptions, and based on those assumptions, the Debtors believe there should be sufficient available assets to pay all administrative expenses due or accruing during the period covered by the Initial DIP Budget. The Initial DIP Budget is an integral part of this Interim Order, and the DIP Secured Parties and the Prepetition Secured Parties are relying, in part, upon the Debtors' agreement to comply with the Initial DIP Budget (subject to Permitted Variances), in determining to enter into the DIP Facility and to allow the Debtors' use of Cash Collateral in accordance with the terms of this Interim Order and the DIP Documents.

24.     *DIP Termination Date*.  For the purposes of this Interim Order, the "DIP Termination Date" shall be earliest to occur of (a) the date that is six (6) months after the Court's entry of this Interim Order and satisfaction of all of the applicable conditions precedent (the "Closing Date"); (b) the date that is 45 days after the Petition Date if the Final Order has not been entered prior to the expiration of such 45-day period, unless otherwise extended by the Required DIP Lenders; (c) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; (d) the acceleration of the Loans and the termination of the DIP Commitments with respect to the DIP Facility in accordance with the DIP Credit Agreement; and (e) the consummation of a sale of all or substantially all of the assets of the Borrower (or the Borrower and the Guarantors) pursuant to section 363 of the Bankruptcy Code.

25.     *Remedies upon Event of Default*.  The Debtors shall promptly provide notice to the DIP Agent and the Prepetition Agents (with a copy to counsel of the Ad Hoc Group) upon obtaining knowledge of the occurrence of any DIP Termination Date.  Upon the occurrence and during the continuation of any DIP Termination Date, the DIP Agent (at the direction of the Required DIP Lenders in accordance with the applicable DIP Documents) shall be required to provide five (5) business days' written notice (such period, the "Remedies Notice Period" and such notice, a "Termination Declaration") to the Debtors, counsel to any Creditors' Committee, counsel to the Prepetition Agents, counsel to the Ad Hoc Group, and the U.S. Trustee of the DIP Agent's intent to exercise its rights and remedies, prior to the exercise of any of the following rights, subject in all respects to any DIP Subordination Event: (1) declaring all DIP Obligations, including any and all accrued interest, premiums, fees and expenses constituting the DIP Obligations owing

under the DIP Documents, to be immediately due and payable; (2) declaring the commitment of

the DIP Lender to make DIP Loans to be terminated, whereupon such commitments and obligation

shall be terminated to the extent any such commitment remains under the DIP Facility; (3) the

termination of the DIP Facility and the DIP Documents as to any future liability or obligation of

the DIP Secured Parties, but without affecting any of the DIP Liens or the DIP Obligations; (4)

termination and/or revocation of the Debtors' right, if any, under this Interim Order and the DIP

Documents to use any Cash Collateral; (5) charging of interest at the default rate under the DIP

Facility; (6) freezing of monies or balances in the DIP Proceeds Account;[4] (7) enforcing any and

all rights against the DIP Collateral in possession of the DIP Agent, including, without limitation,

disposition of the DIP Collateral, solely for the application towards the Carve Out and the DIP

Obligations in accordance with their respective priorities; and (8) taking any other actions or

exercise any other rights or remedies permitted under this Interim Order, the DIP Documents, or

applicable law; *provided* that other than in respect of the Carve Out, the DIP Lender shall not be

obligated to make any DIP Loans or advances under the DIP Facility during any Remedies Notice

Period.  The DIP Agent may provide a Termination Declaration, notwithstanding the provisions

of Bankruptcy Code section 362, without any application, motion or notice to, hearing before, or

order from the Court.

26.      *Emergency Hearing.*  Upon delivery of a Termination Declaration, each of the DIP

Agent, the DIP Lender, the Debtors, the Creditors' Committee, and the applicable Prepetition

Secured Parties consents to a hearing on an expedited basis to consider (a) whether a DIP

---

[4]   "DIP Proceeds Account" has the meaning ascribed to it in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Maintain Existing Bank Accounts and Business Forms and Books and Records, and (C) Continue Using the Investment Account and the Investment Policy, (II) Authorizing Continued Intercompany Transactions, (III) Granting Administrative Expenses Status to Postpetition Intercompany Transactions, and (IV) Granting Related Relief* (the "Cash Management Motion") filed contemporaneously herewith.

Termination Date has occurred, (b) any appropriate relief (including, without limitation, the Debtors' non-consensual use of Cash Collateral), and (c) the occurrence of any DIP Subordination Event. Until such matters have been adjudicated by the Court, notwithstanding anything to the contrary set forth in Paragraph 24, the Debtors shall continue to have the right to (i) use Cash Collateral in accordance with the terms of this Interim Order, to pay necessary expenses set forth in the DIP Budget to avoid immediate and irreparable harm to the Debtors' estates, (ii) contest or cure any alleged occurrence of a DIP Termination Date, and (iii) seek other relief. Upon a determination by the Court that a DIP Termination Date has occurred, subject to the Court's determination with respect to the occurrence of any DIP Subordination Event, the Debtors' right to use any Cash Collateral shall immediately cease, unless otherwise provided herein, and the DIP Agent and DIP Lender shall have the rights set forth immediately below, subject to any DIP Subordination Event.

27. *Certain Rights and Remedies Following DIP Termination Date*. During the Remedies Notice Period, prior to the exercise or enforcement of any rights against the DIP Collateral (other than as set forth in Paragraph 26 hereof), the DIP Agent (at the direction of the Required DIP Lenders and subject to satisfactory indemnification in accordance with the applicable DIP Documents) shall be required to file an emergency motion with the Court or file the appropriate written notice in accordance with the applicable Court procedures on five (5) business days' notice (the "Stay Relief Hearing") to determine whether (i) a DIP Termination Event has occurred or (ii) any DIP Subordination Event has occurred (and the Loan Parties and the Creditors' Committee, if any, shall not object to the shortened notice with respect to such Stay Relief Hearing). In the event the Court determines during a Stay Relief Hearing that a DIP Termination Date has occurred, the Court may fashion an appropriate remedy, which may include,

inter alia, the exercise of any and all rights or remedies available to the DIP Secured Parties under this Interim Order, the DIP Documents or applicable law against the DIP Collateral; *provided* that the rights of the Debtors to contest such relief are expressly preserved; *provided, further*, that in the event that a party challenges the applicable DIP Agent's assertion that a DIP Termination Event has occurred or has occurred and is continuing and the Court is unavailable for a hearing during the Remedies Notice Period, the automatic stay pursuant to Bankruptcy Code section 362 shall remain in effect as to all actions other than those expressly identified in Paragraph 26 until the Court has an opportunity to rule on such challenge.

28.     *Preservation of Rights Granted Under This Interim Order.*  Subject in all respects to Paragraph 28(d) hereof:

(a)     Subject to any DIP Subordination Event, other than the Carve Out, the Permitted Liens, and other claims and liens expressly granted by this Interim Order or as permitted pursuant to the DIP Documents, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Agent and the DIP Lender, or the Prepetition Secured Parties, respectively, shall be granted or allowed while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding.  Except as otherwise expressly provided in the DIP Documents or this Interim Order (including Paragraph 8 of this Interim Order) and set forth in **Exhibit A** hereto (subject to any DIP Subordination Event), and subject to the Carve Out in all respects, the DIP Liens and the Prepetition First Lien Adequate Protection Liens shall not be: (i) subject or subordinate to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under Bankruptcy Code section 364(d) or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date

including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; and (iv) subject or subordinate to any intercompany or affiliate liens or security interests against the Debtors; *provided* that, in each case, the DIP Liens may be subordinated should an applicable DIP Subordination Event occur.

(b)     Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise is at any time entered: (i) the DIP Superpriority Claims, the Prepetition First Lien 507(b) Claims, the DIP Liens, the Prepetition First Lien Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations, and Adequate Protection Obligations shall have been indefeasibly paid in full in cash (and that such DIP Superpriority Claims, Prepetition First Lien 507(b) Claims, DIP Liens, Prepetition First Lien Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this Paragraph 28 and otherwise in this Interim Order.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the validity, priority or enforceability of the Carve Out, any DIP Obligations (except in the case of priority to the extent provided in Paragraph 8 of this Interim Order), or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent, the Prepetition Agents, and the Ad Hoc Group, as applicable, of the effective date of such reversal, modification, vacation or stay; or (ii) the validity, priority or enforceability of the DIP Liens (except to the extent

provided in Paragraph 8 of this Interim Order), the Prepetition First Lien Adequate Protection Liens. Notwithstanding any such reversal, modification, vacation or stay of any use of Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors to the DIP Agent, the DIP Lender, and the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent, the Prepetition Agents, and the Ad Hoc Group, as applicable, of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lender, the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in Bankruptcy Code section 364(e), this Interim Order and the DIP Documents.

(d)     Except as expressly provided in this Interim Order (including Paragraph 8 of this Interim Order) or in the DIP Documents, the Carve Out, the DIP Liens, the DIP Superpriority Claims, the Prepetition First Lien Adequate Protection Liens, the Prepetition First Lien 507(b) Claims and the other Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lender, the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to Bankruptcy Code section 363(b) (except to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection

Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the Carve Out, the DIP Liens, the DIP Superpriority Claims, the Prepetition First Lien Adequate Protection Liens, the Prepetition First Lien 507(b) Claims, all of the other Adequate Protection Obligations, and all other rights and remedies of the DIP Agent, the DIP Lender, and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the commitments under the DIP Facility have been terminated.  Any successor to the Debtors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors or any other estate representative appointed in the Chapter 11 Cases or any successor cases) shall be bound by the terms of the Interim Order and the Final Order to the same extent as the Debtors, including with respect to the Stipulations.

29.    *Releases*.  Subject to the rights and limitations set forth in Paragraph 31, effective upon entry of the Interim Order, each of the Debtors, and the Debtors' estates, on their own behalf and on behalf of each of their predecessors, their successors, and assigns shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lender, the DIP Agent, the Prepetition Secured Parties, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, predecessors and predecessors in interest, each solely in their capacities as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and

obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract (under U.S. laws), of every nature and description that exist on the date hereof arising out of, relating to, or in connection with any of (a) this Interim Order, the Prepetition Credit Documents, the DIP Documents, or the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, or any other related claim or cause of action with respect to the validity, enforceability, priority, scope, extent or perfection of the DIP Liens, the DIP Obligations, the DIP Documents, the Prepetition Credit Facilities, the Prepetition Liens, or the Prepetition Credit Agreement (as relevant).

30.     *Effect of Stipulations on Third Parties*.

(a)     The Debtors' acknowledgments, stipulations, and releases set forth in Paragraphs 4 and 29 of this Interim Order (collectively, the "Stipulations") shall be binding on the Debtors, the Debtors' estates, and their respective representatives, successors, and assigns in all circumstances.  The Stipulations contained in this Interim Order, shall be binding upon all other parties in interest and all of their respective successors and assigns, including any chapter 7 or chapter 11 trustee (a "Trustee") and any statutory or non-statutory committees appointed or formed

49

in the Chapter 11 Cases, including the Creditors' Committee (if any) and any other person or entity acting or seeking to act on behalf of the Debtors' estates in all circumstances and for all purposes, unless (a) the Creditors' Committee, if any, or any other party in interest (including any Trustee), in each case, with requisite standing (in each case to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the Challenge Deadline and subject in all respects to any agreement or applicable law that may limit or affect such entity's right to ability to commence such proceeding), has duly and timely filed an adversary proceeding or contested matter (each, a "Challenge") challenging the validity, perfection, enforceability, allowability, priority or extent of the obligations in respect of the Prepetition First Lien Obligations or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses against the Prepetition Secured Parties in connection with any matter related to the Prepetition First Lien Obligations or the Prepetition Credit Documents (collectively, the "Claims and Defenses") by no later than the earlier of: (1) the objection deadline to a hearing to consider confirmation of a chapter 11 plan; and (2)(i) as to the Committee, sixty (60) days from the date of the formation of the Committee (if appointed within 30 days of the Petition Date) and (ii) as to any other party in interest, sixty (60) days following the entry of this Interim Order; *provided* that the Challenge Period may be extended (x) in writing prior to the expiration of the Challenge Period (which writing may be in the form of email by counsel) from time to time in the sole discretion of the Required Consenting Term Loan Lenders, or (y) by this Court for good cause shown pursuant to an application filed and served by a party in interest prior to the expiration of the Challenge Period (the "Challenge Period"); *provided further,* that if the Chapter 11 Cases are converted to chapter 7 or a chapter 7 or chapter 11 trustee is appointed or elected prior to the expiration of the Challenge Period, any such estate representative or trustee

shall receive the full benefit of any remaining time before expiration of the Challenge Period, which shall be extended by a period of days equal to the shorter of (x) thirty (30) calendar days and (y) the difference between the date of appointment of such estate representative or trustee and the date of entry of this Interim Order; and (b) there is entered a final, non-appealable order in favor of the plaintiff in any such timely filed Challenge sustaining such Challenge.  Any pleadings filed in any Challenge Proceeding shall set forth with specificity the basis for such Challenge (and any Challenge not so specified prior to the Challenge Deadline shall be deemed forever waived, released and barred).  The Court may fashion any appropriate remedy following a successful Challenge.

(b)      If no Challenge is timely and properly filed prior to the expiration of the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding, then without further order of this Court (x) the obligations in respect of the Prepetition First Lien Obligations shall constitute allowed claims, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law), for all purposes in these Chapter 11 Cases and any subsequent chapter 7 case; (y) the Prepetition Liens shall not be subject to any other or further Challenge, including, without limitation, any Claims and Defenses, which shall be deemed to be forever waived and barred, and all parties in interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or

following the expiration of the Challenge Period); and (z) the Stipulations shall be of full force and effect and forever binding upon the applicable Debtor's estate and all creditors, interest holders, and other parties in interest in these Chapter 11 Cases and any successor cases.

(c)     If any Challenge is timely filed prior to the expiration of the Challenge Period, (i) the Stipulations contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on the Creditors' Committee, if any, any other statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, any other person or party in these cases, including any Trustee and any other person or entity acting or seeking to act on behalf of the Debtors' estates, except as to any such findings and admissions that were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction, and (ii) any Claims and Defenses not brought in a timely filed Challenge shall be forever barred; *provided* that, if and to the extent any Challenges to a particular Stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such Stipulation also shall be binding on the Debtors' estates and all parties in interest.  Nothing in this Interim Order vests or confers on any person, including a Creditors' Committee (if any), standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Stipulations, and all rights to object to such standing are expressly reserved.

31.     *Expenses and Indemnification of DIP Agent and the DIP Lender.*

(a)     In addition to amounts, fees, expenses, reimbursements to the DIP Agent and its counsel under the DIP Documents, all reasonable and documented out-of-pocket expenses regardless of whether incurred before or after the Petition Date and administrative fees and "seasoning fees," to the extent applicable, for each of the DIP Agent and the DIP Lender (as set

forth below), in connection with (i) the preparation, negotiation, and execution of the DIP Documents; (ii) the funding of the DIP Loans; (iii) the creation, perfection or protection of the liens under the DIP Documents (including all search, filing, and recording fees), if any; and (iv) the ongoing administration of the DIP Documents (including the preparation, negotiation, and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto), are to be paid by the Loan Parties in accordance with Paragraph 32, including, but solely from the proceeds of the DIP Loans, any professional fees and expenses incurred by the advisors to the DIP Lender, including Paul, Weiss, Rifkind, Wharton & Garrison LLP and the DIP Lender's local counsel.

(b)     In addition, the Loan Parties will indemnify the DIP Lender, the DIP Agent and their respective affiliates, and hold them harmless from and against all reasonable and documented out-of-pocket costs, expenses (with respect to legal fees and expenses, limited to the reasonable and documented out-of-pocket legal fees and expenses of one primary counsel and local counsel for the DIP Agent) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility in accordance with, and subject to the limitations of, the DIP Documents, including any professional fees and expenses incurred by advisors to the DIP Lender.

32.     *Payment of Fees and Expenses*.   The payment of the fees, expenses and disbursements pursuant to this Interim Order (to the extent incurred after the Petition Date) shall be made within ten (10) business days (the "Review Period") (which time period may be extended by the applicable professional) after the receipt by: (i) the Debtors, (ii) counsel for the Debtors, (iii) counsel for the Ad Hoc Group, (iv)  the Creditors' Committee, if any, (v) the U.S. Trustee, (vi) counsel for the DIP Agent, (vii) counsel for the DIP Lender, and (viii) counsel to the

Prepetition Revolving Agent  (collectively, the "Fee Notice Parties") of invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications with the Court, including such amounts arising before, on or after the Petition Date.  The invoices for such Invoiced Fees shall include the number of hours billed (except for financial advisors compensated on other than an hourly basis) and the expenses incurred by the applicable professional; *provided*, however, that any such invoice: (i) may be redacted to protect privileged, confidential or proprietary information and (ii) shall not be required to contain individual time detail (provided, that such invoice shall contain (except for financial advisors compensated on other than an hourly basis), summary data regarding hours worked by each timekeeper for the applicable professional and such timekeepers' hourly rates); *provided further,* that the Debtors, the U.S. Trustee, and any statutory committee appointed in the Chapter 11 Cases reserve their rights to request additional detail regarding the services rendered and expenses incurred by such professionals, subject to redaction for privilege.  The Fee Notice Parties may object to any portion of the Invoiced Fees (the "Disputed Invoiced Fees") within the Review Period by filing with the Court a motion or other pleading, on at least ten (10) days' prior written notice of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees in reasonable narrative detail and the bases for such objections; *provided* that only the Disputed Invoiced Fees shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court; *provided*, *further*, that payment of any undisputed portion of Invoiced Fees shall be promptly paid within five (5) business days following the expiration of the Review Period.  If no objection is filed to the Invoiced Fees is filed with the Review period, then such Invoiced Fees shall be promptly paid, without further of, or application to, the Court or notice to any other party, and, in any case, within five (5) business days following the expiration of the Review Period and

shall not be subject any further review, challenge, or disgorgement.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors (i) to the DIP Agent or the other DIP Secured Parties, or (ii) to the Prepetition Secured Parties, in each case, in connection with the Chapter 11 Cases are hereby approved in full.

33.     *Limitation on Use of the DIP Facility, the DIP Collateral, and the Prepetition Collateral (Including the Cash Collateral).*

(a)     Notwithstanding anything herein or in any other order of this Court to the contrary, none of the DIP Facility, the Prepetition Collateral, any Cash Collateral or the Carve Out (other than the Investigation Budget (as defined herein)) may be used to (a) investigate, analyze, commence, prosecute, threaten, litigate, object to, contest, or challenge in any manner or raise any defenses to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the Prepetition Credit Documents or the liens or claims granted under this Interim Order, the DIP Documents or the Prepetition Credit Documents, including the Prepetition Liens, the Prepetition First Lien Adequate Protection Liens and the DIP Liens, or any mortgage, security interest, or lien with respect thereto, or any other rights or interests or replacement liens with respect thereto or any other rights or interests of any of the DIP Agent, the other DIP Secured Parties, the Prepetition Term Loan Agent, the Prepetition Secured Parties, (b) assert any Claims and Defenses, including any Avoidance Actions, or any other causes of action against the DIP Agent, the DIP Lender, the Prepetition Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder, or otherwise delay the DIP Agent's or the Prepetition Agents' assertion, enforcement, or realization on the Prepetition Collateral or the DIP Collateral, in accordance with the DIP Documents, the Prepetition Credit Documents or this Interim Order, the exercise of rights by the DIP Agent or the

Prepetition Secured Parties once an Event of Default has occurred and is continuing, or any other rights or interest of any of the DIP Agent, the DIP Lender, the Prepetition Secured Parties following the occurrence of a DIP Termination Date and after the Remedies Notice Period, subject to any DIP Subordination Event and subject to adjudication of any Stay Relief Hearing, (d) seek to subordinate (other than to the Carve-Out or as set forth in this Interim Order, including with respect to any DIP Subordination Event) or recharacterize the DIP Obligations or any of the Prepetition First Lien Obligations, or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or payment thereunder, (e) seek to modify any of the rights granted to the DIP Agent, the DIP Lender, or any of the Prepetition Agents hereunder or under the DIP Documents or the Prepetition Credit Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent, (f) pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved by an order of this Court or otherwise permitted under the DIP Documents, (g) file any motion seeking approval of a sale of any DIP Collateral without the consent of the Required DIP Lenders, other than a sale that indefeasibly satisfies the DIP Obligations in full in cash, or (h)  pay Allowed Professional Fees, disbursements, costs or expenses incurred by any person, including, without limitation, the Creditors' Committee (if any), in connection with any of the foregoing.  The "Investigation Budget" means a cap of $100,000 with respect to Allowed Professional Fees to be incurred by the Creditors' Committee under the investigation budget.

(b)     For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Documents, the Debtors shall not be authorized to use the DIP Facility or the DIP Collateral to pay fees or expenses for the Creditors' Committee, if any, in excess of the Investigation Budget to investigate Claims and Defenses against the Prepetition Secured Parties or

to initiate or prosecute proceedings or actions on account of any Claims and Defenses against the Prepetition Secured Parties; *provided further* that nothing contained in this Paragraph 33 shall prohibit the Debtors from responding or objecting to or complying with discovery requests of any Creditors' Committee, in whatever form, made in connection with such investigation or the payment from the DIP Collateral of professional fees of Debtor Professionals related thereto or from contesting or challenging whether a DIP Termination Event has in fact occurred.  Except to the extent expressly permitted by the terms of the DIP Documents and this Interim Order or the Restructuring Support Agreement, none of the Debtors, any Creditors' Committee (if appointed), or any trustee or other estate representative appointed in the Chapter 11 Cases or in any other proceedings superseding or relating to any of the foregoing and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "Successor Cases") or any other person or entity may use or seek to use Cash Collateral or, to sell, or otherwise dispose of DIP Collateral or Prepetition Collateral, in each case, without the consent of the Required Lenders (as defined in the DIP Credit Agreement) (collectively, the "Required DIP Lenders").

34.    *Loss or Damage to Collateral.*  Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lender, the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.  So long as the DIP Agent, the DIP Lender and the Prepetition Secured Parties comply with their obligations under the DIP Documents and this Interim Order and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agent, the DIP Lender, and the Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of

the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the DIP Collateral shall be borne by the Debtors.

35.    *Reservation of Rights Under the Prepetition Credit Documents*.  Pursuant to Bankruptcy Code section 510, any applicable intercreditor or subordination provisions contained in any of the Prepetition Credit Documents (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights and remedies of such parties with respect to the replacement liens and administrative expense claims and superpriority administrative expense claims granted, or amounts payable, by the Debtors under this Interim Order or otherwise and the modifications of the automatic stay), and (iii) shall not be deemed to be amended, altered, or modified by the terms of this Interim Order or the DIP Documents, unless expressly set forth herein or therein.

36.    *Interim Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern.

37.    *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Lender, the Prepetition Secured Parties, the Creditors' Committee (if any), any non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the

property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lender, the Prepetition Secured Parties, and the Debtors and their respective successors and assigns; *provided, however*, that the DIP Agent, the DIP Lender, and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) or to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

38.    *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, none of the DIP Agent, the DIP Lender, and the Prepetition Secured Parties shall (i) be deemed to be in "control" of the operations or participating in the management of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; and (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

39.    *Master Proof of Claim*.

(a)    The DIP Agent, the DIP Lender, and the Prepetition Secured Parties will not be required to file proofs of claim in any of the Chapter 11 Cases or any successor cases for any claim allowed herein, including claims arising under the Prepetition Credit Documents.  The Stipulations shall be deemed to constitute a timely filed proof of claim for each of the DIP Agent, the DIP Lender, and the Prepetition Secured Parties, and such parties shall be treated under section 502(a) of the Bankruptcy Code as if they had timely filed a proof of claim.  Any order entered by

the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in any of the Chapter 11 Cases or any successor cases shall not apply to (i) the DIP Agent or the DIP Lender, or (ii) the Prepetition Secured Parties with respect to the Prepetition First Lien Obligations or any claims arising under the Prepetition Credit Documents.

(b)    In order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each of the Prepetition Agents is authorized, but not directed, in their sole discretion, to file in the Debtors' lead chapter 11 case *In re Benefytt Technologies, Inc., et al.,* Case No. 23-90566 (CML), a single, master proof of claim on behalf of the Prepetition Agents**,** as applicable, on account of any and all of their respective claims arising under the applicable Prepetition Credit Documents and hereunder (each, a "Master Proof of Claim") against each applicable Debtor.   Upon the filing of a Master Proof of Claim against each of the Debtors, the Prepetition Agents, as applicable, and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable Prepetition Credit Documents, and the claim of each Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of these Chapter 11 Cases.   The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amend to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.   The provisions of this Paragraph 39 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each

Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the Prepetition Agents, as applicable.

40.    *Information and Other Covenants*.  The Loan Parties shall comply in all material respects with the reporting requirements set forth in the DIP Documents.  The Debtors shall maintain their cash management arrangements in a manner consistent with that described in the Debtors' cash management motion and any successor or final orders with respect thereto.

41.    *Insurance*.  The DIP Agent, for the benefit of the DIP Secured Parties, shall be deemed to be and shall continue to be, without any further action or notice, named as an additional insured and loss payee under each of the Debtors' insurance policies that in any way relate to the DIP Collateral and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, <u>first</u>, to the payment in full of the DIP Obligations subject to the priority set forth on **<u>Exhibit A</u>** hereto (subject to any DIP Subordination Event) (other than contingent indemnification obligations as to which no claim has been asserted), and <u>second</u>, to the payment of the Prepetition First Lien Obligations.

42.    *Maintenance of DIP Collateral*.  Until the payment in full of all DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted) and the termination of the DIP Lender's obligations to extend credit under the DIP Facility, the Debtors shall continue to maintain and insure the DIP Collateral as required under the DIP Documents.

43.    *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately

upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

44.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

45.     *Payments Held in Trust*.  Except as expressly permitted in this Interim Order (including Paragraph 8 of this Interim Order) or the DIP Documents and subject to the Carve Out in all respects, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lender based on the priorities set forth on **Exhibit A** hereto (subject to any DIP Subordination Event) and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order based on the priorities set forth on **Exhibit A** hereto (subject to any DIP Subordination Event).

46.     *DIP Termination Fee*.  If the Required Consenting Term Lenders (as defined in the Restructuring Support Agreement) terminate the Restructuring Support Agreement with respect to the Consenting Term Lenders (as defined in the Restructuring Support Agreement) pursuant to section 12.01(m) thereof, the DIP Lender shall be entitled to a fee equal to $1,500,000 and expense

reimbursement of reasonable and documented expenses equal to $1,500,000 (collectively, the "DIP Termination Fee").

47.    *Credit Bidding*.  Upon entry of this Interim Order and subject to the terms of the DIP Documents and the lien priorities set forth herein, the DIP Agent and the DIP Lender shall have the right to credit bid as part of any plan confirmation or asset sale process and shall have the right to credit bid up to the DIP Credit Bid Amount during any sale of the Loan Parties' assets (in whole or in part), including without limitation, sales occurring pursuant to sections 363, 725, or 1123 of the Bankruptcy Code, subject to confirmation under Bankruptcy Code section 1129(b)(2)(A), as applicable.  The DIP Agent and the DIP Lender shall each be considered a qualified bidder or receive any such equivalent designation in connection with any sale process conducted by the Debtors with respect to the DIP Agent and DIP Lender's right to acquire any or all of the assets of the Debtors pursuant to a credit bid.  The DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Agents (at the direction of the requisite lenders or holders under the applicable Prepetition Credit Documents), shall each have the absolute right to assign, transfer, sell, or otherwise dispose of its rights to credit bid, except as may be set forth in the DIP Documents.

48.    *No Waiver by Failure to Seek Relief*.  The failure of the DIP Agent, DIP Lender, or Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Credit Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, DIP Lender, or Prepetition Secured Parties.

49.    *Necessary Action*.  The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Interim Order.

50. *Retention of Jurisdiction*. The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

51. *Final Hearing*. The Final Hearing is scheduled for [●], 2023, at [●].m., prevailing Central time before this Court.

52. *Objections*. Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon (a) co-counsel to the Debtors, (i) Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654 Attn: Patrick J. Nash, Jr., P.C. (patrick.nash@kirkland.com), John R. Luze (john.luze@kirkland.com), and Jeffrey T. Michalik (jeff.michalik@kirkland.com), and (ii) Jackson Walker LLP, 1401 McKinney Street, Suite 1900, Houston, Texas 77010, Attn: Matthew D. Cavenaugh (mcavenaugh@jw.com), Jennifer F. Wertz (jwertz@jw.com), J. Machir Stull (mstull@jw.com), and Victoria N. Argeroplos (vargeroplos@jw.com); (b) counsel to the DIP Lender, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas New York, NY 10019-6064, Attn: Paul M. Basta (pbasta@paulweiss.com), Joseph M. Graham (jgraham@paulweiss.com), Leslie E. Liberman (lliberman@paulweiss.com), and Lucian Wang (lwang@paulweiss.com); (c) counsel to the Ad Hoc Group, Akin Gump Strauss Hauer & Feld LLP, 2001 K St NW, Washington, DC 20006, Attn: Scott L. Alberino (salberino@akingump.com) and Benjamin L. Taylor (taylorb@akingump.com); (d) counsel to the Prepetition Revolving Agent, Moore & Van Allen, PLLC, 100 N Tryon St# 4700, Charlotte, NC 28202, Attn: Jim Langdon (jimlangdon@mvalaw.com); and (e) counsel to the DIP Agent, Ropes & Gray LLP, 1211 Avenue of the Americas, Attn: Mark L. Somerstein (mark.somerstein@ropesgray.com) and

64

Regina Gromen  (regina.gromen@ropesgray.com),in  each  case  to  allow  actual  receipt  by  the foregoing no later than [●], 2023 at 5:00 p.m. prevailing Central time.

53.      *Notice of Entry of Interim Order*.  The Debtors shall promptly serve copies of this Interim Order to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to the Creditors' Committee after the same has been appointed, or such Creditors' Committee's counsel, if the same shall have been appointed.

Dated:  _____, 2023
      Houston, Texas

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

### Lien Priorities on DIP Collateral[5]

| 1st | • Carve Out |
|-----|-------------|
| 2nd | • Permitted Liens |
| 3rd | • DIP Liens |
| 4th | • Prepetition First Lien Adequate Protection Liens |
| 5th | • Prepetition Liens |

---

[5] For the avoidance of doubt, such priorities shall be subject in all respects to any DIP Subordination Event.

**<u>Exhibit B</u>**

**Initial DIP Budget**

Benefytt Technologies, Inc., et al.
DIP Budget
$mm

| | Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Ended | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | 7/24 | 7/31 | 8/7 | 8/14 | 8/21 | 8/28 | 9/4 | 9/11 | |
| 1 | **Cash Flow Budget** | | | | | | | | | | | | | | | | | |
| 2 | **Cash Receipts** | **1.7** | **1.4** | **2.1** | **2.4** | **3.6** | **2.5** | **3.4** | **3.7** | **1.8** | **3.3** | **1.9** | **2.6** | **1.9** | **2.7** | **9.4** | **10.2** | **54.8** |
| 3 | Payroll & Benefits | (1.6) | (2.0) | (1.6) | (1.3) | (1.6) | (1.7) | (1.6) | (1.4) | (1.6) | (0.8) | (2.5) | (0.8) | (3.1) | (0.8) | (2.5) | (0.8) | (26.0) |
| 4 | Demand Generation | (1.7) | (0.9) | (0.4) | (0.4) | (0.4) | (0.4) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | (0.6) | (0.6) | (12.4) |
| 5 | Commissions | (0.0) | – | (0.3) | – | (0.0) | – | (0.3) | – | (0.0) | – | – | (0.3) | – | (0.0) | – | (0.3) | (1.1) |
| 6 | Other Operating | (0.3) | (1.1) | (0.7) | (0.7) | (0.8) | (0.9) | (0.9) | (0.7) | (0.5) | (0.6) | (0.6) | (0.6) | (0.3) | (0.4) | (0.7) | (0.3) | (10.2) |
| 7 | Unrestricted Op. Disbursements | (3.6) | (4.0) | (3.0) | (2.4) | (2.8) | (2.9) | (3.8) | (3.0) | (3.0) | (2.3) | (4.0) | (2.6) | (4.4) | (2.2) | (3.8) | (2.0) | (49.8) |
| 8 | Restricted Disbursements | (0.0) | – | (0.7) | (0.0) | (0.0) | (0.0) | (0.8) | (0.0) | (0.0) | (0.0) | (0.0) | (1.2) | (0.0) | (0.0) | (0.0) | (0.8) | (3.7) |
| 9 | Operating Disbursements | (3.6) | (4.0) | (3.7) | (2.4) | (2.8) | (2.9) | (4.6) | (3.0) | (3.0) | (2.3) | (4.1) | (3.8) | (4.4) | (2.2) | (3.9) | (2.8) | (53.5) |
| 10 | Revolver Interest | – | (0.3) | – | – | (1.6) | – | – | – | – | – | (0.4) | – | – | (0.4) | – | (1.6) | (4.4) |
| 11 | Restructuring Professionals[1] | (2.9) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (0.9) | (0.9) | (0.9) | (0.9) | (0.8) | (0.8) | (0.8) | (0.8) | (1.9) | (1.4) | (17.9) |
| 12 | Other Non-Operating | (1.7) | – | – | – | – | – | (0.9) | – | – | (0.3) | – | – | – | – | – | (0.3) | (3.1) |
| 13 | Non-Operating Disbursements | (4.6) | (1.3) | (1.0) | (1.0) | (2.6) | (1.0) | (1.7) | (0.9) | (0.9) | (1.1) | (1.2) | (0.8) | (0.8) | (1.2) | (1.9) | (3.3) | (25.3) |
| 14 | **Total Disbursements** | **(8.3)** | **(5.3)** | **(4.6)** | **(3.3)** | **(5.4)** | **(3.9)** | **(6.3)** | **(3.9)** | **(3.9)** | **(3.5)** | **(5.3)** | **(4.7)** | **(5.2)** | **(3.4)** | **(5.8)** | **(6.1)** | **(78.8)** |
| 15 | Cash Transfers From Non-Debtors | – | | | | | | | | | | | 2.5 | | | | | 2.5 |
| 16 | **Cash Flow Pre-DIP Funding** | **(6.5)** | **(3.8)** | **(2.5)** | **(0.9)** | **(1.9)** | **(1.4)** | **(2.9)** | **(0.2)** | **(2.1)** | **(0.1)** | **(3.4)** | **0.5** | **(3.4)** | **(0.7)** | **3.6** | **4.1** | **(21.5)** |
| 17 | DIP Funding | 25.0 | | | | | | 10.0 | | | | | | | | | | 35.0 |
| 18 | **Net Cash Flow** | **18.5** | **(3.8)** | **(2.5)** | **(0.9)** | **(1.9)** | **(1.4)** | **7.1** | **(0.2)** | **(2.1)** | **(0.1)** | **(3.4)** | **0.5** | **(3.4)** | **(0.7)** | **3.6** | **4.1** | **13.5** |
| 19 | **Cash Balances** | | | | | | | | | | | | | | | | | |
| 20 | Total Cash Balance | 20.8 | 17.0 | 14.5 | 13.6 | 11.7 | 10.3 | 17.4 | 17.2 | 15.2 | 15.0 | 11.7 | 12.1 | 8.8 | 8.1 | 11.7 | 15.8 | 15.8 |
| 21 | Less Restricted Cash Balance | (1.2) | (1.4) | (0.8) | (1.0) | (1.2) | (1.4) | (0.8) | (1.0) | (1.3) | (1.5) | (1.7) | (0.7) | (1.0) | (1.2) | (1.3) | (0.6) | (0.6) |
| 22 | Unrestricted Cash Balance | 19.6 | 15.6 | 13.6 | 12.5 | 10.5 | 8.9 | 16.6 | 16.2 | 13.9 | 13.5 | 10.0 | 11.4 | 7.8 | 6.9 | 10.4 | 15.2 | 15.2 |
| 23 | **Memo Items** | | | | | | | | | | | | | | | | | |
| 24 | Outstanding DIP Liability | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 |
| 25 | Restricted Collections | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 3.4 |
| 26 | Operating Cash Flow | (1.9) | (2.5) | (1.6) | 0.0 | 0.7 | (0.4) | (1.2) | 0.7 | (1.2) | 1.0 | (2.2) | (1.2) | (2.5) | 0.5 | 5.6 | 7.4 | 1.3 |
| 27 | Covenant Disbursements[2] | (8.2) | (5.3) | (3.6) | (3.3) | (5.4) | (3.9) | (5.2) | (3.9) | (3.9) | (3.5) | (5.2) | (3.2) | (5.2) | (3.4) | (5.8) | (5.0) | (74.0) |

[1] For fees accrued during post-petition period, reflects disbursements to escrow account on weekly basis.
[2] Reflects total disbursements less Commissions and Restricted Disbursements

## Exhibit C

**DIP Credit Agreement**

*EXECUTION VERSION*

---

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of May 24, 2023

Among

DAYLIGHT BETA PARENT CORP.,
as Holdings,

BENEFYTT TECHNOLOGIES, INC.,
as the Borrower,

Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

THE GUARANTORS PARTY HERETO FROM TIME TO TIME,

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Administrative Agent,

and

THE OTHER LENDERS PARTY HERETO FROM TIME TO TIME

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS AND ACCOUNTING TERMS ...................................................... 1

Section 1.01    Defined Terms................................................................................................. 1
Section 1.02    Other Interpretive Provisions ...................................................................... 78
Section 1.03    Accounting Terms ......................................................................................... 79
Section 1.04    Rounding ....................................................................................................... 79
Section 1.05    References to Agreements, Laws, Etc. .......................................................... 80
Section 1.06    Times of Day ................................................................................................. 80
Section 1.07    Timing of Payment or Performance ............................................................. 80
Section 1.08    Pro Forma Calculations ............................................................................... 80
Section 1.09    Currency Generally ...................................................................................... 83
Section 1.10    Letters of Credit ........................................................................................... 84
Section 1.11    Rules of Interpretation with Respect to Captive Insurance Subsidiaries .................... 84

ARTICLE II. THE COMMITMENTS AND CREDIT EXTENSIONS.................................... 84

Section 2.01    The Loans....................................................................................................... 84
Section 2.02    Borrowings, Conversions and Continuations of Loans.............................. 85
Section 2.03    Letters of Credit ........................................................................................... 88
Section 2.04    [Reserved] ..................................................................................................... 97
Section 2.05    Prepayments ............................................................................................... 101
Section 2.06    Termination or Reduction of Commitments .............................................. 112
Section 2.07    Repayment of Loans ................................................................................... 113
Section 2.08    Interest......................................................................................................... 114
Section 2.09    Fees .............................................................................................................. 114
Section 2.10    Computation of Interest and Fees ............................................................. 115
Section 2.11    Evidence of Indebtedness........................................................................... 116
Section 2.12    Payments Generally ................................................................................... 116
Section 2.13    Sharing of Payments .................................................................................. 119
Section 2.14    [Reserved] ................................................................................................... 119
Section 2.15    [Reserved] ................................................................................................... 127
Section 2.16    Extension of Term Loans ........................................................................... 134
Section 2.17    Defaulting Lenders..................................................................................... 138
Section 2.18    Co-Borrowers ............................................................................................. 139

ARTICLE III. TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY ......................... 141

Section 3.01    Taxes ........................................................................................................... 141
Section 3.02    Illegality ...................................................................................................... 145
Section 3.03    Inability to Determine Rates ...................................................................... 145
Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; SOFR Loan Reserves ...... 147
Section 3.05    Funding Losses ........................................................................................... 148
Section 3.06    Matters Applicable to All Requests for Compensation............................. 149
Section 3.07    Replacement of Lenders under Certain Circumstances ............................ 150
Section 3.08    Survival ....................................................................................................... 152

ARTICLE IV. CONDITIONS PRECEDENT TO CREDIT EXTENSIONS........................... 152

Page

Section 4.01      Conditions to Initial Credit Extension ........................................................... 152
Section 4.02      Conditions to All Credit Extensions after the Closing Date. .................... 154

ARTICLE V. REPRESENTATIONS AND WARRANTIES ........................................ 155

Section 5.01      Existence, Qualification and Power; Compliance with Laws .................... 156
Section 5.02      Authorization; No Contravention ................................................................. 157
Section 5.03      Governmental Authorization; Other Consents ........................................... 157
Section 5.04      Binding Effect ................................................................................................. 157
Section 5.05      No Material Adverse Effect ........................................................................... 158
Section 5.06      Litigation ......................................................................................................... 158
Section 5.07      Ownership of Property; Liens ....................................................................... 158
Section 5.08      Environmental Matters .................................................................................. 158
Section 5.09      Taxes ............................................................................................................... 159
Section 5.10      ERISA Compliance ........................................................................................ 159
Section 5.11      Subsidiaries; Equity Interests ....................................................................... 159
Section 5.12      Margin Regulations; Investment Company Act .......................................... 160
Section 5.13      Disclosure ....................................................................................................... 160
Section 5.14      Labor Matters ................................................................................................. 160
Section 5.15      Intellectual Property; Licenses, Etc. ............................................................ 160
Section 5.16      [Reserved] ...................................................................................................... 161
Section 5.17      [Reserved] ...................................................................................................... 161
Section 5.18      USA Patriot Act, FCPA and OFAC ............................................................. 161
Section 5.19      Cases; Orders .................................................................................................. 161

ARTICLE VI. AFFIRMATIVE COVENANTS ......................................................... 162

Section 6.01      Financial Statements ...................................................................................... 162
Section 6.02      Certificates; Other Information .................................................................... 164
Section 6.03      Notices ............................................................................................................ 166
Section 6.04      Payment of Taxes ........................................................................................... 166
Section 6.05      Preservation of Existence, Etc. ..................................................................... 166
Section 6.06      Maintenance of Properties ............................................................................. 167
Section 6.07      Maintenance of Insurance .............................................................................. 167
Section 6.08      Compliance with Laws .................................................................................. 167
Section 6.09      Books and Records ......................................................................................... 167
Section 6.10      Inspection Rights ............................................................................................ 168
Section 6.11      Additional Collateral; Additional Guarantors ........................................... 168
Section 6.12      Compliance with Environmental Laws ....................................................... 170
Section 6.13      Further Assurances ........................................................................................ 170
Section 6.14      Designation of Subsidiaries .......................................................................... 171
Section 6.15      Milestones ....................................................................................................... 171
Section 6.16      Use of Proceeds ............................................................................................. 171
Section 6.17      Post-Closing Matters ..................................................................................... 172
Section 6.18      Lender Calls .................................................................................................... 172
Section 6.19      Fiscal Year ...................................................................................................... 172
Section 6.20      Transactions with Affiliates ......................................................................... 172
Section 6.21      Bankruptcy-Related Matters ......................................................................... 172

ARTICLE VII. NEGATIVE COVENANTS ............................................................. 176

Page

Section 7.01     Liens ...................................................................................................... 176
Section 7.02     [Reserved] ............................................................................................. 182
Section 7.03     Indebtedness and Disqualified Equity Interests ................................... 182
Section 7.04     Fundamental Changes ........................................................................... 187
Section 7.05     Dispositions ........................................................................................... 189
Section 7.06     Restricted Payments .............................................................................. 192
Section 7.07     Change in Nature of Business ............................................................... 201
Section 7.08     [Reserved] ............................................................................................. 202
Section 7.09     Burdensome Agreements ....................................................................... 202
Section 7.10     Additional Bankruptcy Matters ............................................................ 203
Section 7.11     Budget Variance .................................................................................... 203
Section 7.12     [Reserved] ............................................................................................. 204
Section 7.13     Modifications of Terms of Junior Financing ........................................ 204

ARTICLE VIII. EVENTS OF DEFAULT AND REMEDIES ...................................... 205

Section 8.01     Events of Default .................................................................................. 205
Section 8.02     Remedies Upon Event of Default ......................................................... 208
Section 8.03     Application of Funds ............................................................................. 209
Section 8.04     [Reserved] ............................................................................................. 211

ARTICLE IX. ADMINISTRATIVE AGENT AND OTHER AGENTS ....................... 212

Section 9.01     Appointment and Authority .................................................................. 212
Section 9.02     Rights as a Lender ................................................................................. 213
Section 9.03     Exculpatory Provisions ......................................................................... 214
Section 9.04     Reliance by Agents ............................................................................... 215
Section 9.05     Delegation of Duties ............................................................................. 215
Section 9.06     Resignation of Agent ............................................................................ 215
Section 9.07     Non-Reliance on Agents and Other Lenders......................................... 216
Section 9.08     No Other Duties, Etc. ............................................................................ 217
Section 9.09     Administrative Agent May File Proofs of Claim; Credit Bidding .......................... 217
Section 9.10     Collateral and Guaranty Matters .......................................................... 218
Section 9.11     [Reserved] ............................................................................................. 220
Section 9.12     Withholding Tax Indemnity .................................................................. 220
Section 9.13     Indemnification by the Lenders ............................................................ 220
Section 9.14     Certain ERISA Matters. ........................................................................ 221
Section 9.15     Erroneous Payments............................................................................. 223

ARTICLE X. MISCELLANEOUS........................................................................... 225

Section 10.01    Amendments, Etc. ................................................................................. 225
Section 10.02    Notices and Other Communications; Facsimile Copies......................... 230
Section 10.03    No Waiver; Cumulative Remedies........................................................ 232
Section 10.04    Attorney Costs and Expenses................................................................ 233
Section 10.05    Indemnification by the Borrowers ........................................................ 233
Section 10.06    Payments Set Aside .............................................................................. 235
Section 10.07    Successors and Assigns......................................................................... 236
Section 10.08    Confidentiality ...................................................................................... 245
Section 10.09    Setoff ..................................................................................................... 246
Section 10.10    Interest Rate Limitation........................................................................ 247

Section 10.11    Counterparts; Electronic Execution of Assignments and Certain Other
                 Documents ...................................................................................................247
Section 10.12    Integration .................................................................................................247
Section 10.13    Survival of Representations and Warranties ..............................................248
Section 10.14    Severability ................................................................................................248
Section 10.15    GOVERNING LAW ...................................................................................248
Section 10.16    WAIVER OF RIGHT TO TRIAL BY JURY .............................................249
Section 10.17    Binding Effect ...........................................................................................249
Section 10.18    USA Patriot Act .........................................................................................250
Section 10.19    No Advisory or Fiduciary Responsibility ..................................................250
Section 10.20    [Reserved] ..................................................................................................250
Section 10.21    Acknowledgment and Consent to Bail-In of EEA Financial Institutions ................251
Section 10.22    Acknowledgement Regarding Any Supported QFCs ................................251

ARTICLE XI. GUARANTEE .............................................................................................252

Section 11.01    The Guarantee ............................................................................................252
Section 11.02    Obligations Unconditional .........................................................................253
Section 11.03    Reinstatement ............................................................................................254
Section 11.04    Subrogation; Subordination ......................................................................254
Section 11.05    Remedies ....................................................................................................254
Section 11.06    Instrument for the Payment of Money .......................................................254
Section 11.07    Continuing Guarantee ................................................................................255
Section 11.08    General Limitation on Guarantee Obligations ...........................................255
Section 11.09    Release of Guarantors ................................................................................255
Section 11.10    Right of Contribution .................................................................................256
Section 11.11    Keepwell ....................................................................................................256
Section 11.12    Independent Obligation ..............................................................................256

SCHEDULES
I           Guarantors
M           Material Adverse Effect
1.01A       Commitments
1.01E       Existing Investments
4.01        Collateral Documents
5.06        Litigation
5.07(a)     Ownership of Property, Liens
5.09        Taxes
5.11        Subsidiaries and Other Equity Investments
6.17        Post-Closing Matters
6.20        Existing Agreements
7.01(b)     Existing Liens
7.03(b)     Existing Indebtedness
7.05        Dispositions
7.09        Existing Restrictions
10.02       Administrative Agent's Office, Certain Addresses for Notices

EXHIBITS

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B | Interim Order |
| C-1 | Term B Note |
| C-2 | Delayed Draw Term Note |
| D-1 | [Reserved] |
| D-2 | [Reserved] |
| E-1 | Assignment and Assumption |
| E-2 | Affiliated Lender Notice |
| E-3 | Acceptance and Prepayment Notice |
| F | Security Agreement |
| G | Intercompany Note |
| H-1 | Guarantor Joinder Agreement |
| H-2 | Borrower Joinder Agreement |
| I | United States Tax Compliance Certificate |
| M | Letter of Credit Report |

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This DEBTOR-IN-POSSESSION CREDIT AGREEMENT is entered into as of May 24, 2023, among Daylight Beta Parent Corp., a Delaware corporation ("**Holdings**"), Benefytt Technologies, Inc., a Delaware corporation (the "**Administrative Borrower**"), the other Borrowers party hereto from time to time, the Guarantors party hereto from time to time, Wilmington Savings Fund Society, FSB, as the Administrative Agent, and each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**").

## PRELIMINARY STATEMENTS

On May 23, 2023 (the "**Petition Date**"), the Borrower and certain other subsidiaries of Holdings (each a "**Debtor**" and collectively, the "**Debtors**") filed voluntary petitions with the Bankruptcy Court commencing their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each case of the Borrower and each other Debtor, a "**Case**" and collectively, the "**Cases**") and have continued in the possession of their assets and management of their business pursuant to sections 1107(a) and 1108 of the Bankruptcy Code (as this and other capitalized terms used in these preliminary statements are defined in Section 1.01 below).

To consummate certain of the transactions contemplated by the Restructuring Support Agreement (as defined below), the Borrowers have requested that the Lenders extend credit to the Borrowers (i) in the form of Term B Loans on the Closing Date in an initial aggregate principal amount of $25,000,000, (ii) in the form of Delayed Draw Term Loans in an initial aggregate principal amount of $10,000,000 and (iii) in the form of Letter of Credit Commitments in an initial principal amount of $4,000,000.

The proceeds of the Term B Loans will be used on the Closing Date by the Borrower (a) to consummate the Restructuring Transactions, (b) to finance upfront fees and expenses with respect to the Restructuring Transactions, (c) to pay certain fees and expenses incurred in connection with the Restructuring Transactions and (d) to pay operating expenses, in each case as permitted by the Budget (subject to Permitted Variances).

The Lenders have indicated their willingness to lend and the L/C Issuer has indicated its willingness to so issue Letters of Credit, in each case, on the terms and subject to the conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I.
## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01        Defined Terms.

As used in this Agreement, the following terms shall have the meanings set forth below:

"**Administrative Agent**" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent and collateral agent under any of the Loan Documents, or any successor administrative agent and collateral agent.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Administrative Borrower and the Lenders.

"**Administrative Borrower**" means initially (i) Benefytt Technologies, Inc. and (ii) upon the consent of the Required Lenders, any other Borrower as selected by the Borrowers from time to time to act as the Administrative Borrower.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by or acceptable to the Administrative Agent.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  "**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "**Controlling**" and "**Controlled**" have meanings correlative thereto.  For the avoidance of doubt, none of the Administrative Agent or its lending affiliates or any entity acting as an L/C Issuer hereunder shall be deemed to be an Affiliate of Holdings, any Borrower or any of their respective Subsidiaries.

"**Agent Parties**" has the meaning specified in Section 10.02(b).

"**Agent-Related Persons**" means the Administrative Agent and its Related Parties.

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Agreement**" means this Debtor-in-Possession Credit Agreement.

"**AHYDO Payment**" means any mandatory prepayment or redemption pursuant to the terms of any Indebtedness that is intended or designed to cause such Indebtedness not to be treated as an "applicable high yield discount obligation" within the meaning of Section 163(i) of the Code.

"**Applicable Rate**" means a percentage per annum equal to 12.00%.

"**Appropriate Lender**" means, at any time, (a) with respect to Loans of any Class, the Lenders of such Class of Loans and (b) with respect to Letters of Credit, the relevant L/C Issuer(s).

"**Approved Bank**" has the meaning specified in clause (c) of the definition of "Cash Equivalents."

"**Approved Budget**" means the Initial Budget or then most current Budget prepared by the Borrower and approved by (or deemed approved by, as applicable) the Required Lenders pursuant to Section 6.01(d), as applicable.

"**Approved Fund**" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"**Assignees**" has the meaning specified in Section 10.07(b).

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit E-1 hereto or such other form as approved by the Required Lenders and the Administrative Borrower, and acceptable to the Administrative Agent.

"**Assignment Taxes**" has the meaning specified in <u>Section 3.01(b)</u>.

"**Attorney Costs**" means all reasonable and documented fees, expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease Obligation of any Person, the amount thereof that would appear as a liability on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Auto-Extension Letter of Credit**" has the meaning specified in <u>Section 2.03(b)(iii)</u>.

"**Available Currency**" means Dollars.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", now and hereafter in effect, or any applicable successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas, or any appellate court having jurisdiction over the Cases from time to time.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Cases.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code that is subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Board of Directors**" means, for any Person, the board of directors or other governing body of such Person or, if such Person does not have such a board of directors or other governing body and is owned or managed by a single entity, the Board of Directors of such entity, or, in either case, any committee thereof duly authorized to act on behalf of such Board of Directors.

"**Borrower**" and "**Borrowers**" shall mean Benefytt Technologies, Inc. and any Domestic Subsidiary thereof, that, after the Closing Date becomes a Borrower by executing a Borrower Joinder Agreement and in accordance with the terms hereof and meeting the condition in Section 4.01(e) ); *provided* that any Subsidiary that is or has become a Borrower (a "**Subsidiary Borrower**") may have its status as a Borrower terminated by delivering a written notice to the Administrative Agent from the Administrative Borrower and such Subsidiary Borrower electing to terminate such Subsidiary's status as a Borrower, *provided further* that no such termination shall affect (and such notice shall expressly provide that): (x) any obligation of such Subsidiary as a Guarantor or as a grantor or pledgor under any Loan Document or (y) any Lien granted by such Subsidiary which Liens shall continue in full force and effect after giving effect to such termination.

"**Borrower Joinder Agreement**" means a joinder agreement substantially in the form of the Borrower Joinder Agreement attached as Exhibit H-2 hereto or in such other form agreed by the Required Lenders and the Administrative Borrower.

"**Borrower Materials**" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein.

"**Borrower Parties**" means the collective reference to Holdings, the Borrowers and their Restricted Subsidiaries, and "Borrower Party" means any one of them.

"**Borrowing**" means a Term Borrowing.

"**Broker-Dealer Regulated Subsidiary**" means any Subsidiary of a Borrower that is registered as a broker-dealer under the Exchange Act or any other applicable Laws requiring such registration.

"**Budget**" means a rolling 13-week cash flow forecast delivered to the Administrative Agent and the Lenders on or prior to the Closing Date and attached hereto as Annex A and thereafter delivered in accordance with the provisions of Section 6.01(e), setting forth the forecasted receipts and disbursements of the Debtors on a weekly basis during such 13-week period, (i) initially, covering the period commencing on or about the Petition Date and (ii) thereafter, covering the period commencing on the first Business Day of the week in which it is delivered.

"**Budget Reporting Period**" has the meaning specified in Section 6.01(e).

"**Budget Variance Report**" means, collectively, (a) reports showing actual cash receipts and disbursements through the prior four-week period, in the format of the Budget and (b) a variance report for the immediately preceding four-week period then ended (each such period, a "**Budget Variance Reporting Period**"), detailing the following: (i) the aggregate disbursements of the Debtors and aggregate receipts during such Budget Variance Reporting Period; (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Budget Variance Reporting Period by the Debtors against the aggregate disbursements in such Budget Variance Reporting Period as set forth in (x) the Approved Budget and (y) the Budget most recently delivered pursuant to Section 6.01(d); (iii) any variance (whether positive or negative, expressed as a percentage) between the aggregate receipts by the Debtors during such Budget Variance Reporting Period against the aggregate receipts for the Budget Variance Reporting Period as set forth in (x) the Approved Budget and (y) the Budget most recently delivered pursuant to Section 6.01(d), and (iv) a reasonably detailed explanation for any variance in excess of 10% in actual receipts or actual operating disbursements during the Budget Variance Reporting Period (unless the dollar amount corresponding to such percentage variance is less than $100,000 as compared to

projections for such corresponding line items as set forth in (x) the Approved Budget and (y) the Budget most recently delivered pursuant to Section 6.01(d).

"**Budget Variance Reporting Period**" has the meaning specified in the definition of "Budget Variance Report".

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized by law or other governmental action to close under the Laws of, or are in fact closed in, New York, New York or the jurisdiction where the Administrative Agent's Office is located.

"**Canadian Dollars**" means the lawful currency of Canada.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capitalized Leases) by the Borrowers and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Borrowers and their Restricted Subsidiaries.

"**Capitalized Lease Obligation**" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP; *provided* that, for the avoidance of doubt, all obligations of any Person that are or would be characterized as operating lease obligations in accordance with GAAP on the Closing Date (whether or not such operating lease obligations were in effect on such date) shall continue to be accounted for as operating lease obligations (and not as Capitalized Lease Obligations) for purposes of this Agreement regardless of any change in GAAP following the Closing Date that would otherwise require such obligations to be recharacterized (on a prospective or retroactive basis or otherwise) as Capitalized Lease Obligations.

"**Capitalized Leases**" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; *provided* that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"**Capitalized Software Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by the Borrowers and the Restricted Subsidiaries during such period in respect of licensed or purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of the Borrowers and the Restricted Subsidiaries.

"**Captive Insurance Subsidiary**" means any Subsidiary of a Borrower that is subject to regulation as an insurance company and provides insurance to a Borrower and its Restricted Subsidiaries.  For the avoidance of doubt, Benefytt, LLC, an Arkansas limited liability company, shall be deemed a Captive Insurance Subsidiary.

"**Carve Out**" has the meaning assigned to such term in the Interim Order.

"**Cash Collateralize**" has the meaning specified in Section 2.03(g).

"**Case**" and "**Cases**" has the meaning set forth in the recitals to this Agreement.

"**Cash Collateral Account**" means a blocked account, established for the purposes of Section 2.05(c)(ii), at the Administrative Agent (or another commercial bank selected by the Administrative Agent and acceptable to the Required Lenders) in the name of the Administrative Agent and under the sole dominion and control of the Administrative Agent, and otherwise established in a manner reasonably satisfactory to the Administrative Agent.

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by any Borrower or any of its Restricted Subsidiaries:

(a)      (1) Yen, Dollars, Pounds Sterling, Canadian Dollars, Euros or the national currency of any participating member state of the European Union; and (2) in the case of any Foreign Subsidiary or any jurisdiction in which any Borrower or any of its Restricted Subsidiaries conducts business, such local currencies held by it from time to time in the ordinary course of business and not for speculation;

(b)      readily marketable obligations issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition;

(c)      time deposits, eurodollar time deposits or demand deposits with, insured certificates of deposit, bankers' acceptances or overnight bank deposits of, or letters of credit issued by, any commercial bank that (i) is a Lender or (ii) (A) is organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development or is the principal banking Subsidiary of a bank holding company organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development and is a member of the Federal Reserve System, and (B) has combined capital and surplus of at least $250,000,000 (any such bank in the foregoing clauses (i) or (ii) being an "**Approved Bank**"), in each case with maturities not exceeding 24 months from the date of acquisition thereof;

(d)      commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation (other than structured investment vehicles and other than corporations used in structured financing transactions) rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrowers), in each case with average maturities of not more than 24 months from the date of acquisition thereof;

(e)      marketable short-term money market and similar funds having a rating of at least P-2 (or the equivalent thereof) or A-2 (or the equivalent thereof) from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrowers);

(f)      repurchase obligations for underlying securities of the types described in clauses (b), (c) and (e) above entered into with any Approved Bank;

(g)      securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed  (i) by any state, commonwealth or territory of the United States, by any

political subdivision or taxing authority of any such state, commonwealth or territory or by (ii) any foreign government, in each case, having an investment grade rating from either S&P or Moody's (or the equivalent thereof) (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrowers);

(h)     Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrowers);

(i)     securities with maturities of 12 months or less from the date of acquisition backed by standby letters of credit issued by any Approved Bank;

(j)     instruments equivalent to those referred to in clauses (a) through (i) above denominated in euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Borrower or any of its Restricted Subsidiaries;

(k)     Investments, classified in accordance with GAAP as Current Assets of any Borrower or any of its Restricted Subsidiaries, in money market investment programs which are registered under the Investment Company Act of 1940 or which are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such Investments are of the character, quality and maturity described in clauses (a) through (j) of this definition; and

(l)     investment funds investing substantially all of their assets in securities of the types described in clauses (a) through (k) above.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those specified in clause (a) above; *provided* that, except for amounts used to pay non-Dollar-denominated obligations of the Borrowers or any of their Restricted Subsidiaries in the ordinary course of business, such amounts are converted into any currency listed in clause (a) above as promptly as practicable and in any event within ten (10) Business Days following the receipt of such amounts.

"**Cash Management Obligations**" means obligations owed by any Borrower or any of its Restricted Subsidiaries in respect of any overdraft and related liabilities arising from treasury, depository and cash management services or any automated clearing house transfers of funds.

"**Casualty Event**" means any event that gives rise to the receipt by any Borrower or any of its Restricted Subsidiaries of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or Real Property (including any improvements thereon) to replace or repair such equipment, fixed assets or Real Property.

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

"**CFC Holdco**" means any Domestic Subsidiary if it has no material assets other than the Equity Interests (including any Indebtedness treated as equity for U.S. federal income tax purposes) and, if

applicable, Indebtedness (and any cash or Cash Equivalents related thereto) of one or more Foreign Subsidiaries that is a CFC.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty (excluding the taking effect after the date of this Agreement of a law, rule, regulation or treaty adopted prior to the date of this Agreement), (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.  It is understood and agreed that (i) the Dodd–Frank Wall Street Reform and Consumer Protection Act (Pub.L. 111-203, H.R. 4173), all Laws relating thereto, all interpretations and applications thereof and any compliance by a Lender with any request or directive relating thereto and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III (collectively, "**Basel III**"), shall, in each case, for the purposes of this Agreement, be deemed to be adopted and taking effect subsequent to the Closing Date, *provided* that a Lender shall be entitled to compensation with respect to any such adoption taking effect, making or issuance becoming effective after the date of the this Agreement only if it is the applicable Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements.

"**Change of Control**" shall be deemed to occur if:

(a)       (I) the Permitted Holders cease to own beneficially (within the meaning of Rule 13(d)-5 of the Exchange Act as in effect on the Closing Date) in the aggregate, directly or indirectly, Equity Interests representing at least a majority of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings; or

(II) at any time upon or after the consummation of a Qualified IPO, (1) any Person (other than a Permitted Holder) or (2) Persons (other than one or more Permitted Holders) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act as in effect on the Closing Date), but excluding any underwriters in connection with such Qualified IPO, any employee benefit plan of such person and its Subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, becomes the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act as in effect on the Closing Date), directly or indirectly, of Equity Interests representing more than thirty-five percent (35%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings (it being understood that to the extent any Permitted Holders are members of such group, any Equity Interests held by such Permitted Holders will be disregarded in calculating such beneficial ownership) and the percentage of aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests of Holdings beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders; or

(III) unless, and so long as, in the case of clause (a)(I) or (a)(II) above, the Permitted Holders have the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the Board of Directors of Holdings; or

(b)       except pursuant to a transaction permitted by Section 7.04(d) and (e), as applicable, Holdings shall cease to own, directly or indirectly, 100% of the Equity Interests of the Borrower.

"**Class**" means (i) with respect to Commitments or Loans, those of such Commitments or Loans that have the same terms and conditions, and (ii) with respect to Lenders, those of such Lenders that have Commitments or Loans of a particular Class.

"**Claim**" means all claims, demands, rights, actions, causes of action, liabilities, duties, damages, losses, obligations, diminution in value, judgments, decrees, suits, liens, undertakings, rights to property or information, and controversies of any kind or nature whatsoever, whether absolute or contingent, due or to become due, accrued or unaccrued, disclosed or undisclosed, foreseen or unforeseen, apparent or not apparent, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown, and whether existing, accrued or arising on, before or after the Petition Date, including all claims arising under state, federal or foreign laws, common law, statutes, rules, regulations or agreements.  Without limiting the generality of the foregoing, the term "Claim" shall include the items described in the definition of "Claim" in 11 U.S.C. § 101(5), all claims or causes of action under Chapter 5 of the Bankruptcy Code (including sections 542, 544, 545, 546, 547, 548, 549 and 550 of the Bankruptcy Code), all claims or causes of action under sections 105 or 362 of the Bankruptcy Code, all claims or causes of action under any other Bankruptcy Law, all claims or causes of action arising under the Uniform Fraudulent Conveyance Act, Uniform Fraudulent Transfer Act, or Uniform Voidable Transactions Act as in effect in any state, and all rights of contribution, subrogation, exoneration or indemnity.

"**Closing Date**" means May 24, 2023.

"**Co-Investor**" means (a) any Person (other than the Sponsor or any Management Stockholder) who has been identified in writing to the Administrative Agent prior to the Closing Date and who is a holder of Equity Interests in Holdings (or any direct or indirect parent company of Holdings) on the Closing Date and (b) an Affiliate (other than portfolio companies) of any such Person.

"**Code**" means the U.S. Internal Revenue Code of 1986, and the United States Treasury Department regulations promulgated thereunder, as amended from time to time.

"**Collateral**" means the "Collateral" as defined in the Security Agreement and all the "Collateral" or "Pledged Collateral" (or equivalent term) as defined in any other Collateral Document and any other assets pledged pursuant to any Collateral Document, excluding in all cases, any Excluded Assets.

"**Collateral and Guarantee Requirement**" means, at any time, in all cases subject to the Orders, the requirement that:

(a) the Administrative Agent shall have received each Collateral Document required to be delivered (i) on the Closing Date, pursuant to Section 4.01(a)(v) and (ii) at such time as may be designated therein, pursuant to the Collateral Documents in Section 2.18 or Section 6.11 or 6.13, subject, in each case, to the limitations and exceptions of this Agreement and the Collateral Documents, duly executed by each Loan Party that is a party thereto;

(b) all Obligations shall have been unconditionally guaranteed by Holdings, each Borrower (other than with respect to its own Obligations) and each Restricted Subsidiary of a Borrower that is a wholly-owned Subsidiary (other than any Excluded Subsidiary), including those that are listed on Schedule I hereto;

(c) the Obligations and the Guaranty shall have been secured by a first-priority security interest (subject to Liens permitted by Section 7.01) in (i) all the Equity Interests of each Borrower, (ii) all Equity Interests of each wholly-owned Restricted Subsidiary (other than a Restricted Subsidiary described in the following clauses (iii)(A) or (B)) that is directly owned by

any Borrower or any Subsidiary Guarantor and (iii) 65% of the issued and outstanding voting Equity Interests and 100% of the issued and outstanding non-voting Equity Interests of (A) each wholly-owned Restricted Subsidiary that is a CFC Holdco and (B) each wholly-owned Restricted Subsidiary that is a CFC if such Subsidiary is directly owned by any Borrower or by any Subsidiary Guarantor;

(d)     except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Obligations and the Guaranty shall have been secured by a perfected first-priority security interest in substantially all tangible and intangible assets of the Borrowers and each Guarantor (including accounts receivable, inventory, equipment, investment property, contract rights, applications and registrations of material intellectual property filed in the United States, other general intangibles, intercompany notes and proceeds of the foregoing), in each case subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents; and

(e)     [reserved];

*provided*, *however*, that the foregoing definition shall not require and the Loan Documents shall not contain any requirements as to the creation or perfection of pledges of, security interests in, mortgages on, or the obtaining of title insurance, surveys, abstracts or appraisals or taking other actions with respect to any Excluded Assets.

The Required Lenders may grant extensions of time for the perfection of security interests in particular assets and the delivery of assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) where they reasonably determines, in consultation with the Administrative Borrower, that perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

No actions in any non-U.S. jurisdiction or required by the Laws of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located or titled outside of the U.S. or to perfect such security interests, including any intellectual property registered in any non-U.S. jurisdiction (it being understood that there shall be no security agreements or pledge agreements governed under the Laws of any non-U.S. jurisdiction or any requirement to make any filings in any foreign jurisdiction, including with respect to foreign intellectual property, unless otherwise elected by the Borrowers in their sole discretion). The Borrowers and the Guarantors shall not be required, nor shall the Administrative Agent be authorized (unless otherwise approved by the Borrowers), (i) to perfect the above-described pledges, security interests and mortgages by any means other than by (A) filings pursuant to the Uniform Commercial Code in the office of the secretary of state (or equivalent filing office) of the relevant State of the respective jurisdiction of organization of Holdings, any Borrower or any Guarantor, (B) filings in United States government offices with respect to intellectual property as expressly required herein and under the other Loan Documents, (C) delivery to the Administrative Agent, for its possession (or the lenders or agents under the Existing Credit Agreement as bailee for the Administrative Agent in accordance with the Orders), of all Collateral consisting of material intercompany notes and stock (or similar) certificates of the Borrower and its Restricted Subsidiaries, and (D) such other actions as required pursuant to Section 6.11, (ii) to take any action in any non-U.S. jurisdiction or pursuant to the requirements of the laws of any non-U.S. jurisdiction in order to create any security interests (for the avoidance of doubt, other than the execution of documents by individuals located outside of the U.S.) or to perfect any security interests, including with respect to any intellectual property registered outside of the United States, (iv) to provide any notice to obtain the consent of governmental authorities under the Federal Assignment of Claims Act (or any state equivalent thereof) or (v) to enter into any source code escrow arrangement (or to register intellectual property).

-10-

Notwithstanding any of the foregoing, but subject to the last sentence of the definition of Guarantor, the Borrowers may cause any Subsidiary that is a Restricted Subsidiary and is not otherwise required to be a Guarantor to, Guarantee the Obligations, in which case such entity shall be treated as a Guarantor hereunder for all purposes.

"**Collateral Documents**" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, the Orders, collateral assignments, Security Agreement Supplements, security agreements, pledge agreements, intellectual property security agreements or other similar agreements delivered to the Administrative Agent pursuant to <u>Section 4.01(a)(v)</u>, <u>Section 6.11</u> or <u>Section 6.13</u> and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Commitment**" means the Term B Commitment and the Delayed Draw Term Commitment.

"**Committed Loan Notice**" means a written notice of a Borrowing pursuant to <u>Section 2.02(a)</u>, which shall be substantially in the form of <u>Exhibit A</u> hereto or such other form as may be approved by the Required Lenders and agreed by the Administrative Agent and the Administrative Borrower (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent and agreed by the Administrative Borrower), appropriately completed and signed by a Responsible Officer of the Administrative Borrower.

"**Committee**" means the official committee of unsecured creditors, if any, appointed in the Cases.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Compensation Period**" has the meaning specified in <u>Section 2.12(b)(ii)</u>.

"**Consolidated Debt**" means, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrowers and the Restricted Subsidiaries outstanding on such date, in an amount that would be reflected on a balance sheet (but excluding the notes thereto) prepared as of such date on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting or recapitalization accounting in connection with the Transactions or any acquisition permitted under this Agreement) consisting only of Indebtedness for (a) borrowed money or evidenced by bonds, notes or debentures, (b) Capitalized Lease Obligations and purchase money debt as reflected on the balance sheet of the Borrower and its Restricted Subsidiaries in accordance with GAAP, (c) earned earn-outs payable in the next four fiscal quarters, (d) legal settlement liabilities due in the following fiscal quarter (other than liabilities related to the Specified Settlement that are paid within seven (7) Business Days of becoming due), (e) standby letters of credit that have been drawn and not reimbursed within two (2) Business Days after the date of such drawing, (f) Disqualified Equity Interests to the extent reflected as a liability on the balance sheet of the Borrower and its Restricted Subsidiaries in accordance with GAAP and (g) guarantees of the foregoing types of Indebtedness.

"**Consolidated Working Capital**" means, with respect to the Borrowers and the Restricted Subsidiaries on a consolidated basis at any date of determination, Current Assets at such date of determination minus Current Liabilities at such date of determination; *provided* that increases or decreases in Consolidated Working Capital shall be calculated without regard to any changes in Current Assets or Current Liabilities as a result of (a) any reclassification in accordance with GAAP of assets or liabilities, as applicable, between current and noncurrent and (b) the effects of purchase accounting or recapitalization accounting.

"**Contingent Obligations**" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent,

(a)    to purchase any such primary obligation or any property constituting direct or indirect security therefor;

(b)    to advance or supply funds:

(i)    for the purchase or payment of any such primary obligation, or

(ii)    to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(c)    to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**", "**Controlled**" and "**Controlling**" have the meaning specified in the definition of "Affiliate."

"**Controlled Investment Affiliate**" means, as to any Person, any other Person, other than the Sponsor, which directly or indirectly is in Control of, is Controlled by, or is under common Control with such Person and is organized by such Person (or any Person Controlling such Person) primarily for making direct or indirect equity or debt investments in a Borrower and/or other companies.

"**Credit Extension**" means each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"**Debtor**" and "**Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Declined Proceeds**" has the meaning specified in Section 2.05(b)(vii).

"**Default**" means any event that is, or with the passage of time or the giving of notice or both, in each case, as set forth under Section 8.01, without cure or waiver, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (a) the Applicable Rate plus (b) 2.00% per annum.

"**Defaulting Lender**" means, subject to Section 2.17(b), any Lender that (a) has refused (which refusal may be given verbally or in writing and has not been retracted) or failed to perform any of its funding obligations hereunder, including in respect of its Loans or participations in respect of L/C Obligations or any other amounts required to be paid by it, which refusal or failure is not cured within two (2) Business

Days after the date of such refusal or failure, (b) has notified the Borrowers or Administrative Agent in writing (which notification has not been withdrawn in writing) that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit, (c) has failed, within three (3) Business Days after request by the Administrative Agent or the Borrowers, to confirm that it will comply with its funding obligations; *provided* that a Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such confirmation by the Administrative Agent or the Borrowers, or (d) has, or has a direct or indirect parent company that has, after the date of this Agreement, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender or (iii) become the subject of a Bail-In Action.

"**Delayed Draw Term Commitment**" means, as to each Term Lender, its obligation to make a Delayed Draw Term Loan to the Borrowers pursuant to Section 2.01(a) in an aggregate amount not to exceed the amount set forth opposite such Lender's name on Schedule 1.01A under the caption "Delayed Draw Term Commitment" or in the Assignment and Assumption pursuant to which such Term Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement (including Section 2.06).  The initial aggregate amount of the Delayed Draw Term Commitments is $10,000,000.

"**Delayed Draw Term Lender**" means, at any time, any Lender that has a Delayed Draw Term Commitment or a Delayed Draw Term Loan at such time.

"**Delayed Draw Term Loan Availability Period**" means the period commencing on the date of the entry of the Final Order and ending on the earlier of (x) date as of which the Delayed Draw Term Commitment has been fully utilized in accordance with the terms of Section 2.01(a), and (y) the termination of the Delayed Draw Term Commitment in accordance with the terms of this Agreement.

"**Delayed Draw Term Loans**" means the delayed draw term loans made available by the Lenders on or after the Closing Date to the Borrowers pursuant to Section 2.01(a); *provided*, that, upon funding, Delayed Draw Term Loans shall become part of the same Class of Term Loans as the Term B Loans.

"**Delayed Draw Term Note**" means a promissory note of the Borrowers payable to any Term Lender or its registered assigns, in substantially the form of Exhibit C-2 hereto, evidencing the Indebtedness of the Borrowers to such Term Lender resulting from the Delayed Draw Term Loans made by such Term Lender.

"**DIP Agent Fees**" has the meaning assigned to such term in the Interim Order.

"**DIP Credit Bid Amount**" has the meaning assigned to such term in the Restructuring Support Agreement.

"**DIP Subordination Event**" has the meaning assigned to such term in Section 11.14(a).

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction, any sale or issuance of Equity Interests in a Restricted Subsidiary and any sale of Total 606 Commission Receivables) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, whether in a single transaction or a series of related transactions; *provided* that "Disposition" and "Dispose" shall not include any issuance by a Borrower of any of its Equity Interests to another Person.

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than contingent indemnification obligations as to which no claim has been asserted and the termination of all outstanding Letters of Credit (unless the Outstanding Amount of the L/C Obligations related thereto has been Cash Collateralized, back-stopped by a letter of credit reasonably satisfactory to the applicable L/C Issuer or deemed reissued under another agreement reasonably acceptable to the applicable L/C Issuer (including, for the avoidance of doubt, the assumption of by New OpCo (as defined in the Restructuring Support Agreement) in accordance with the Restructuring Support Agreement))), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests and other than as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and the termination of the Commitments and the termination of all outstanding Letters of Credit (unless the Outstanding Amount of the L/C Obligations related thereto has been Cash Collateralized, back-stopped by a letter of credit reasonably satisfactory to the applicable L/C Issuer or deemed reissued under another agreement reasonably acceptable to the applicable L/C Issuer (including, for the avoidance of doubt, the assumption of by New OpCo (as defined in the Restructuring Support Agreement) in accordance with the Restructuring Support Agreement))), in whole or in part, (c) provides for the scheduled payments of dividends or distributions (other than in the form of Qualified Equity Interests), or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in the case of each of clauses (a), (b), (c) and (d), prior to the date that is ninety-one (91) days after the Latest Maturity Date at the time of issuance of such Equity Interests; *provided* that any Equity Interests held by any future, current or former employee, director, officer, member of management, independent contractor, advisor, partner or consultant (or their respective Controlled Investment Affiliates and Immediate Family Members) of any Borrower, any of its Subsidiaries, any direct or indirect parent companies of a Borrower or any other entity in which a Borrower or any of its Restricted Subsidiaries has an Investment and is designated in good faith as an "affiliate" by the Board of Directors (or the compensation committee thereof) of the applicable Borrower, in each case pursuant to any co-invest agreement, equity subscription or shareholders' agreement, any management, shareholder, director or employee equity plan, any stock option plan or any other management or employee benefit plan or agreement shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by a Borrower (or any direct or indirect parent thereof) or a Subsidiary in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's, independent contractor's, advisor's, partner's or consultant's termination of employment or service, as applicable, death or disability.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Dollar Amount**" means with respect to any L/C Obligation (or any risk participation therein), the amount denominated in Dollars thereof.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" has the meaning specified in Section 10.07(a)(i).

"**EMU**" means the economic and monetary union as contemplated in the Treaty on European Union.

"**Environment**" means indoor air, ambient air, surface water, groundwater, drinking water, land surface, subsurface strata, and natural resources such as wetlands, flora and fauna.

"**Environmental Laws**" means any applicable Law (including common law) relating to the prevention of pollution or the protection of the Environment and natural resources, and the protection of human health and safety as it relates to Hazardous Materials, including any applicable provisions of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq*., the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq*., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq*., the Clean Water Act, 33 U.S.C. § 1251 *et seq*., the Clean Air Act, 42 U.S.C. § 7401 *et seq*., the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq*., the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq*., and the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq*., and all analogous state or local statutes, and the regulations promulgated pursuant thereto.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of investigation and remediation, fines, penalties or indemnities), of the Loan Parties or any Restricted Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit

interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities), excluding from the foregoing any debt securities convertible into Equity Interests, whether or not such debt securities include any right of participation with Equity Interests, until any such conversion.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with a Loan Party within the meaning of Section 414(b) or (c) of the Code or Section 4001 of ERISA (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by a Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Loan Party or any ERISA Affiliate from a Multiemployer Plan or written notification to a Loan Party or any ERISA Affiliate that a Multiemployer Plan is insolvent (within the meaning of Section 4245 of ERISA) or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (d) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 430(i)(4) of the Code or Section 303(i)(4) of ERISA); (e) the filing of a written notice of intent to terminate, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the receipt of written notice by a Loan Party or any ERISA Affiliate regarding the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for, and that could reasonably be expected to result in, the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) with respect to a Pension Plan, the failure to satisfy the minimum funding standard of Section 412 of the Code or Section 302 of ERISA, whether or not waived; (h) the failure by a Loan Party or any ERISA Affiliate to make when due any required contribution to a Multiemployer Plan, (i) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in liability to a Loan Party (other than any nonexempt prohibited transaction resulting from a Lender's failure to comply with the representations in Section 9.14); or (j) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Loan Party or any ERISA Affiliate.

"**Erroneous Payment**" has the meaning assigned to it in Section 9.15(a).

"**Erroneous Payment Deficiency Assignment**" has the meaning assigned to it in Section 9.15(d).

"**Erroneous Payment Impacted Class**" has the meaning assigned to it in Section 9.15(d).

"**Erroneous Payment Return Deficiency**" has the meaning assigned to it in Section 9.15(d).

"**Erroneous Payment Subrogation Rights**" has the meaning assigned to it in Section 9.15(d).

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Euro**" means the lawful single currency of the EMU.

"**Event of Default**" has the meaning specified in <u>Section 8.01</u>.

"**Event of Default Occurrence**" has the meaning specified in <u>Section 8.02</u>.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Account**" shall mean (a) any deposit account, securities account or other account of any Loan Party (and all cash, cash equivalents and other securities or investments held therein) to the extent used for (i) payment of payroll, employee wages and benefits and withholding Taxes, (ii) health-savings accounts and worker's compensation accounts or (iii) trust or fiduciary purposes (to the extent no funds are held therein other than amounts held therein in trust in the ordinary course of business on behalf of third parties that are not Loan Parties), (b) any deposit account, securities account, commodities account or other account of any Loan Party used to hold any cash or Cash Equivalents pledged as collateral for a Lien permitted by <u>Section 7.01(b)</u>, <u>(f)</u>, <u>(k)</u>, <u>(l)</u>, <u>(n)</u>, <u>(s)</u> or <u>(ff)</u>.

"**Excluded Affiliate**" means, with respect to any Person, any of such Person's Affiliates that are engaged as principals primarily in private equity or any of such Affiliate's officers, directors, employees, legal counsel, independent auditors, professionals and other experts or agents, other than a limited number of senior employees who are required, in accordance with industry regulations or such Person's internal policies and procedures to act in a supervisory capacity and such Person's internal legal, compliance, risk management, credit or investment committee members.

"**Excluded Assets**" means (i) [reserved], (ii) [reserved], (iii) [reserved], (iv) any governmental or regulatory licenses or state or local franchises, charters and authorizations to the extent that the Administrative Agent may not (or is restricted from) validly possess a security interest therein under applicable Laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or the pledge or creation of a security interest in which would require governmental consent, approval, license or authorization (to the extent such consent, approval, license or authorization was not obtained (it being understood and agreed that the Loan Parties shall be under no obligation to obtain such consent, approval, license or authorization)), other than to the extent such prohibition, limitation or restriction is rendered ineffective under the UCC or other applicable Law, (v) any particular asset or right under contract, if the pledge thereof or the security interest therein is prohibited or restricted by applicable Law (including any requirement to obtain the consent of any Governmental Authority or regulatory authority), other than to the extent such prohibition or restriction is rendered ineffective under the UCC or other applicable Law, (vi) (A) Margin Stock, (B) [reserved], (C) Equity Interests or Indebtedness treated as equity for U.S. federal income tax purposes of first tier Foreign Subsidiaries that are CFCs and first tier CFC Holdcos in excess of 65% of the issued and outstanding voting Equity Interests or Indebtedness treated as equity for U.S. federal income tax purposes thereof and (D) Equity Interests in any Broker-Dealer Regulated Subsidiary or Captive Insurance Subsidiary, in each case of this clause (D) that are not Guarantors, (vii) any lease, license or agreement or any property subject to such lease, license or agreement or a purchase money security interest, capital lease obligation or similar arrangement, in each case, to the extent that a grant of a security interest therein (A) would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto (other than a Loan Party after giving effect to the applicable anti-assignment provisions of the UCC or other applicable Law) or (B) would require governmental, regulatory or third-party (other than a Loan Party) approval, consent or authorization pursuant to the terms thereof (in each case after giving effect to the applicable anti-assignment provisions of the UCC and other applicable Law) (other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition) not obtained (without any requirement to obtain such approval, consent or authorization) (in each case of clauses (A) and (B), after giving effect to the applicable anti-assignment provisions of the UCC and other applicable Law), (viii) [reserved], (ix) any intent-to-use trademark application prior to the filing, and acceptance by

the U.S. Patent and Trademark Office, of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law, (x) [reserved]; (xi) segregated funds held in a fiduciary capacity for others (that are not Loan Parties); (xii) assets that constitute minimum net assets as required for service contract issuers under state law; (xiii) Excluded Accounts; (xiv) any property subject to a purchase money security interest, Capitalized Lease or similar arrangement, in each case, to the extent permitted under the Loan Documents, to the extent that a grant of a security interest in such property would (A) violate (including without limitation violation of any prohibition on the Loan Party granting any Lien in such property), breach, invalidate, result in the abandonment or unenforceability or otherwise terminate such arrangement or (B) create a right of termination in favor of any party thereto (other than a Loan Party or any of its Affiliates); and (xv) funds held in a fiduciary capacity for others; *provided*, *however*, that Excluded Assets shall not include any Proceeds, substitutions or replacements of any Excluded Assets referred to in clause (i) through (xv) (unless such Proceeds, substitutions or replacements would independently constitute Excluded Assets referred to in clauses (i) through (xv)).

"**Excluded Information**" means information regarding the Borrowers, the Sponsor or their respective affiliates not known to such Lender and that may be material to a decision by such Lender to participate in such applicable transaction (including Material Non-Public Information).

"**Excluded Subsidiary**" means (a) any Foreign Subsidiary, (b) any Domestic Subsidiary that is (i) a Subsidiary of a Foreign Subsidiary that is a CFC or (ii) a CFC Holdco, (c) any not-for-profit Subsidiaries, (d) any Captive Insurance Subsidiary, (e) any Specialty Insurance Subsidiary and (f) any Broker Dealer Regulated Subsidiary; *provided* that no Borrower shall constitute an Excluded Subsidiary.

"**Existing Credit Agreement**" means that certain Credit Agreement, dated as of August 12, 2021, as amended by that certain First Amendment, dated as of July 19, 2022, among Daylight Beta Parent Corp., as Holdings, Benefytt Technologies, Inc., as the Borrower, Ares Capital Corporation, as administrative agent, Truist Bank, as Priority Revolving Agent and Swing Line Lender, the lenders from time to time party thereto, Ares Capital Management LLC, Truist Securities, Inc., as Joint Lead Arrangers, and Ares Capital Management LLC, as Lead Bookrunner (as amended, restated, supplemented or otherwise modified from time to time).

"**Existing Credit Agreement Obligations**" means the "Obligations" as defined in the Existing Credit Agreement.

"**Facility**" means a given Class of Term Loans or Letter of Credit Commitments, as the context may require, and "**Facilities**" means each Class of Term Loans and Letter of Credit Commitments, collectively.

"**fair market value**" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Administrative Borrower in good faith.

"**FATCA**" means current Sections 1471 through 1474 of the Code (or any amended or successor version thereof that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant thereto, including any intergovernmental agreements and any rules or guidance implementing such intergovernmental agreements.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System on such day,

as published by the Federal Reserve Bank on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1.00%) charged on such day on such transactions as determined by the Administrative Agent.

"**Fee Letter**" means that certain Fee Letter, dated as of the Closing Date, by and between the Administrative Borrower and the Administrative Agent, as amended, restated, supplemented, or otherwise modified from time to time.

"**Final Order**" means an order of the Bankruptcy Court authorizing and approving on a final basis, among other things, the Facilities and the transactions contemplated by this Agreement in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are satisfactory to the Required Lenders and the Administrative Agent (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders and the Administrative Agent) as to which no stay has been entered.

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**First Day Orders**" has the meaning specified in Section 4.01(e).

"**Financial Officer**" means the chief financial officer, controller, treasurer, chief accounting officer or such other financial officer with equivalent duties, as appropriate, of the applicable Borrower or Borrowers.

"**Foreign Subsidiary**" means any direct or indirect Restricted Subsidiary of a Borrower that is not a Domestic Subsidiary.

"**Fronting Exposure**" means, at any time there is a Defaulting Lender,  with respect to an L/C Issuer, such Defaulting Lender's Pro Rata Share or other applicable share provided under this Agreement of the outstanding L/C Obligations other than L/C Obligations, as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof.

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time; *provided*, *however*, that if the Administrative Borrower notifies the Administrative Agent in writing that the Administrative Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Administrative Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or European Central Bank).

"**Granting Lender**" has the meaning specified in Section 10.07(h).

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning specified in Section 11.01.

"**Guarantor Joinder Agreement**" means a joinder agreement substantially in the form of the Guarantor Joinder Agreement attached as Exhibit H-1 hereto or in such other form agreed by the Required Lenders and the Administrative Borrower.

"**Guarantors**" means those Persons required to guarantee the Obligations pursuant to clause (b) of the definition of "Collateral and Guarantee Requirement", including Holdings, each Borrower (other than with respect to its own Obligations) and each Restricted Subsidiary of a Borrower that shall have become a Guarantor pursuant to Section 6.11.  For avoidance of doubt, the Borrowers in their sole discretion may cause any Restricted Subsidiary that is not a Guarantor (in the case of any non-wholly-owned Restricted Subsidiary, with the consent of the Required Lenders, such consent not to be unreasonably withheld) to become a Guarantor; *provided*, that the Required Lenders may prohibit a Foreign Subsidiary from becoming an elective Guarantor if they determines, in their reasonable credit judgment but after consultation with the Administrative Borrower, that such Foreign Subsidiary would not provide customary credit support for the Obligations.

"**Guaranty**" means, collectively, the guaranty of the Obligations by the Guarantors pursuant to this Agreement.

"**Hazardous Materials**" means all materials, pollutants, contaminants, chemicals, compounds, constituents, substances or wastes, in any form, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, mold, electromagnetic radio frequency or microwave emissions that are regulated pursuant to, or which could give rise to liability under, applicable Environmental Law.

"**Healthcare Laws**" means all requirements of Law applicable to the business of the Borrowers and their Subsidiaries relating to (a) health or healthcare related fraud and abuse (including the following statutes, as amended, modified or supplemented from time to time and any successor statutes thereto and regulations promulgated from time to time thereunder: the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)); the Stark Law (42 U.S.C. § 1395nn and §1395(q)); the civil False Claims Act (31 U.S.C. § 3729 et seq.); Sections 1320a-7 and 1320a-7a and 1320a-7b of Title 42 of the United States Code; the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. No. 108-173)); (b) the provision of, or payment for, health care services, items or supplies; (c) the billing, coding or submission of claims or collection of accounts receivable or refund of overpayments; (d) HIPAA; (e) fee-splitting prohibitions; (f) certificates of operations and authority; (g) applicable state and federal insurance laws and regulations, and (h) any and all other applicable federal, state or local health care Laws, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto.

"**Healthcare Permits**" shall have the meaning set forth in Section 5.01(a).

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, and their implementing regulations set forth at 45 CFR Parts 160-164.

"**Honor Date**" has the meaning specified in Section 2.03(c)(i).

"**Immediate Family Members**" means with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, qualified domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including adoptive relationships) and any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)     net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property (other than (i) trade accounts and accrued expenses payable in the ordinary course of business, (ii) any earn-out obligations, including deferred or other contingent purchase price obligations (including

deferred performance incentives, whether or not a service component is required from the transferor or its related party), until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and is not paid after becoming due and payable and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business);

(e)        indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)        all Attributable Indebtedness;

(g)        all obligations of such Person in respect of Disqualified Equity Interests, if and to the extent that the foregoing would constitute indebtedness or a liability in accordance with GAAP; and

(h)        to the extent not otherwise included above, all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (A) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner, (B) in the case of the Borrowers and the Restricted Subsidiaries, exclude all intercompany Indebtedness in the ordinary course of business having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and (C) exclude (i) trade accounts and accrued expenses payable in the ordinary course of business, (ii) [reserved], (iii) accruals for payroll and other liabilities accrued in the ordinary course of business, (iv) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (v) contingent obligations incurred in the ordinary course of business, (vi) prepaid or deferred revenue arising in the ordinary course of business, and (vii) customary obligations under employment agreements and deferred compensation; *provided*, that Indebtedness of any direct or indirect parent company appearing upon the balance sheet of the Administrative Borrower solely by reason of push-down accounting under GAAP shall be excluded.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) that is expressly made non-recourse or limited recourse (limited solely to the assets securing such Indebtedness) to such Person shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Taxes**" means, with respect to the Administrative Agent or any Lender, all Taxes imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document, other than (i) any Taxes imposed on or measured by net income, however denominated, and franchise (and similar) Taxes imposed on it in lieu of net income Taxes, imposed by a jurisdiction as a result of such recipient being organized in or having its principal office or applicable lending office in such jurisdiction, or as a result of any connection between such Lender or Administrative Agent and such jurisdiction other than any connections arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, receiving payments under, or enforcing, any Loan Document, (ii) any Taxes (other than Taxes described in clause (i) above) imposed by a jurisdiction as a result of such recipient being organized in or having its principal office or applicable lending office in such jurisdiction, or as a result of any connection between such Lender or Administrative Agent and such jurisdiction other than any connections arising from executing, delivering, being a party to,

engaging in any transactions pursuant to, performing its obligations under, receiving payments under, or enforcing, any Loan Document, (iii) any Taxes attributable to the failure by or inability of Administrative Agent or such Lender to deliver the documentation required to be delivered pursuant to Section 3.01(d), (iv) any branch profits Taxes imposed by the United States under Section 884(a) of the Code, or any similar Tax, imposed by any other jurisdiction in which such Lender or Administrative Agent is located, (v) in the case of a Lender (other than an assignee pursuant to a request by a Borrower under Section 3.07(a)), any U.S. federal withholding Tax that is in effect and would apply to amounts payable with respect to an applicable interest in a Loan or Commitment under a law in effect at the time the Lender acquires such interest in the applicable Commitment or, to the extent a Lender acquires an interest in a Loan not funded pursuant to a prior Commitment, acquires such interest in such Loan, or designates a new Lending Office, except to the extent such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment or applicable acquisition), to receive additional amounts from the Borrowers or Guarantors with respect to such Tax pursuant to Section 3.01 and (vi) any U.S. federal withholding Taxes imposed under FATCA.

"**Indemnitees**" has the meaning specified in Section 10.05.

"**Independent Financial Advisor**" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Administrative Borrower, qualified to perform the task for which it has been engaged and that is independent of the Borrowers and their Affiliates.

"**Information**" has the meaning specified in Section 10.08.

"**Initial Budget**" means the Budget delivered to, and approved by, the Lenders prior to the Closing Date.

"**Intellectual Property Security Agreement**" has the meaning specified in the Security Agreement.

"**Interest Payment Date**" means, as to any Loan, and subject to Section 2.10(c), the earliest to occur of (a) the date of repayment of such Loan and (b) the applicable Maturity Date of such Loan.

"**Interest Period**" means, as to each Loan, the period commencing on the date such Loan is disbursed and ending on the date one month thereafter, and each successive one-month period thereafter prior to the applicable Maturity Date; *provided* that:

(i)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

(ii)     any Interest Period (other than an Interest Period having a duration of less than one month) that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(iii)     no Interest Period shall extend beyond the applicable Maturity Date.

"**Interim Order**" means an order of the Bankruptcy Court, in the form set forth in Exhibit B (Form of Interim Order), authorizing on an interim basis, among other things, the Facilities and the transactions

contemplated by this Agreement, with only such modifications as are satisfactory to the Required Lenders and the Administrative Agent (as the same may be amended, supplemented or modified from time to time after entry thereof with the consent of the Required Lenders and the Administrative Agent as to which no stay has been entered.

"**Interim Order Entry Date**" means the date on which the Interim Order is entered by the Bankruptcy Court.

"**Investment**" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, credit card and debit card receivables, trade credit, advances to customers, commission, travel and similar advances to any future, present or former employees, directors, officers, independent contractors, members of management, manufacturers and consultants, in each case made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business, book of business or division of such Person.

The amount of any Investment shall be the original cost of such Investment (or, with respect to assets that are distributed, the fair market value of the assets) as reduced by any dividend, distribution, interest payment, return of capital, repayment or other amount (including in respect of dispositions) received in cash by a Borrower or any of its Restricted Subsidiaries (or, for the purpose of the proviso to clauses (1), (3) and (27) of the definition of "Permitted Investment", received in cash or Cash Equivalents by any Borrower or any Subsidiary Guarantor) in respect of such Investment; *provided* that the aggregate amount of such dividend, distribution, interest payment, return of capital, repayment or other amount shall not exceed the original amount of such Investment.

"**Investment Grade Rating**" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating by any other nationally recognized statistical rating agency selected by the Administrative Borrower).

"**Investment Grade Securities**" means:

(a)      securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

(b)      debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or debt instruments constituting loans or advances among the Borrowers and the Subsidiaries and their respective equity holders;

(c)      investments in any fund that invests exclusively in investments of the type described in clauses (a) and (b) which fund may also hold immaterial amounts of cash pending investment or distribution; and

(d)      corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"**IP Rights**" has the meaning specified in Section 5.15.

-24-

"**ISP**" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be in effect at the time of issuance).

"**Issuer Documents**" means with respect to any Letter of Credit, the Letter of Credit Request, and any other document, agreement and instrument entered into by the L/C Issuer and a Borrower (or any Subsidiary) or in favor of the L/C Issuer and relating to such Letter of Credit.

"**Junior Financing**" means (i) any Subordinated Indebtedness having an aggregate amount outstanding in excess of the Threshold Amount, (ii) any unsecured Indebtedness and (iii) any junior lien Indebtedness, in each case incurred after the Petition Date.

"**Junior Financing Documentation**" means any documentation governing any Junior Financing.

"**Latest Maturity Date**" means, at any date of determination and with respect to the specified Loans or Commitments (or in the absence of any such specification, all outstanding Loans and Commitments hereunder), the latest Maturity Date applicable to any such Loans or Commitments hereunder at such time, including the latest maturity date of any Extended Term Loan as extended in accordance with this Agreement from time to time.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**L/C Advance**" means, with respect to each L/C Issuer, such L/C Issuer's funding of its participation in any L/C Borrowing in accordance with its Pro Rata Share or other applicable share provided for under this Agreement.

"**L/C Borrowing**" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced.

"**L/C Credit Extension**" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the renewal or increase of the amount thereof.

"**L/C Issuer**" means (i) a bank or other legally authorized Person designated by the Required Lenders (which Person may be the Administrative Agent or a Lender or an Affiliate thereof) and (ii) any other Lender that becomes an L/C Issuer in accordance with Section 2.03(k), in each case, in its capacity as an issuer of Letters of Credit hereunder, or any replacement or successor issuer of Letters of Credit hereunder. Any L/C Issuer may cause Letters of Credit to be issued by affiliated or unaffiliated financial institutions and such Letters of Credit shall be treated as issued by an L/C Issuer for all purposes hereunder. In the event that there is more than one L/C Issuer at any time, references herein and in the other Loan Documents to the L/C Issuer shall be deemed to refer to the L/C Issuer in respect of the applicable Letter of Credit or to all L/C Issuers, as the context requires.

"**L/C Obligations**" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all unpaid drawings under Letters of Credit, including all L/C Borrowings. For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.10. For all purposes of this Agreement, if on any date of determination a Letter of Credit has

expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"**Lender**" has the meaning specified in the introductory paragraph to this Agreement and, as the context requires, includes an L/C Issuer, and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender."

"**Lending Office**" means, as to any Lender, such office or offices as a Lender may from time to time notify in writing the Administrative Borrower and the Administrative Agent.

"**Letter of Credit**" means any letter of credit issued hereunder. A Letter of Credit must be a standby letter of credit.

"**Letter of Credit Commitment**" means, with respect to each L/C Issuer, the commitment of such L/C Issuer to issue Letters of Credit up to the amount set forth opposite the name of such L/C Issuer on Schedule 1.01A hereto. The aggregate amount of the Letter of Credit Commitment as of the Closing Date is $4,000,000.

"**Letter of Credit Expiration Date**" means the Latest Maturity Date then in effect for the Letter of Credit Commitments (taking into account the Maturity Date of any conditional Letter of Credit Commitment that will automatically go into effect on or prior to such Maturity Date (or, if such day is not a Business Day, the next preceding Business Day)) or such later date as may be specified by the applicable L/C Issuer.

"**Letter of Credit Request**" means an application and agreement for the issuance or amendment of a Letter of Credit substantially in such form from time to time in use and agreed by the relevant L/C Issuer and the Administrative Borrower.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); *provided* that in no event shall an operating lease in and of itself be deemed a Lien.

"**Loan**" means an extension of credit under Article II by a Lender to the Borrowers in the form of a Term Loan, a Delayed Draw Term Loan or a Letter of Credit.

"**Loan Documents**" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents, (iv) each Letter of Credit Request, (v) the Fee Letter, (vi) any other document or instrument designated by the Administrative Borrower and the Administrative Agent as a "Loan Document" and (ix) any amendment or joinder to this Agreement.

"**Loan Parties**" means, collectively, the Borrowers and each Guarantor.

"**LTM Period**" means, for any date of determination under this Agreement, the twelve consecutive fiscal months of the Borrowers most recently ended as of such date of determination for which financial statements are available.

"**Management Stockholders**" means any present or former members of management of Holdings, the Borrowers or any Restricted Subsidiary who are investors in Holdings or any direct or indirect parent thereof, including, for the avoidance of doubt any future members of management of Holdings, the Borrowers or any Restricted Subsidiary who are investors in Holdings or any direct or indirect parent thereof.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Master Agreement**" has the meaning specified in the definition of "Swap Contract."

"**Material Adverse Effect**" means (1) on the Closing Date, a material and adverse effect on (a) the business, financial condition or results of operations of the Borrowers and their Restricted Subsidiaries, taken as a whole, (b) the rights or remedies, taken as a whole, of the Administrative Agent or any Lender under the Loan Documents or (c) the ability of the Loan Parties, taken as a whole, to perform their material payment obligations under the Loan Documents, other than those events that (i) would reasonably be expected to result from the filing or commencement of the Cases or the announcement of the filing or commencement of the Cases or (ii) events leading up to the Cases and disclosed in Schedule M of the Disclosure Statement.

"**Material Intellectual Property**" means intellectual property (including exclusive intellectual property licenses) material to the business of the Borrowers and the Restricted Subsidiaries (taken as a whole).

"**Material Non-Public Information**" means information which is (a) not publicly available, (b) material with respect to Holdings and the Subsidiaries of such applicable Persons or their respective securities for purposes of United States federal and state securities laws or (c) of a type that would customarily be publicly disclosed (as reasonably determined by the Administrative Borrower) in connection with any issuance by Holdings and any Subsidiary of any debt or equity securities issued pursuant to a public offering, Rule 144A offering or other private placement where assisted by a placement agent.

"**Maturity Date**" means with respect to the Term B Loans, the Delayed Draw Term Loans and the Letter of Credit Commitment, November 24, 2023; *provided* that, in each case, if such day is not a Business Day, the Maturity Date shall be the Business Day immediately succeeding such day.

"**Maximum Rate**" has the meaning specified in Section 10.10.

"**Milestone**" has the meaning specified in Section 6.15.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA, to which a Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding six plan years, has made or been obligated to make contributions.

"**Net Income**" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"**Net Proceeds**" means:

(a)      100% of the cash proceeds actually received by any Borrower or any of the Restricted Subsidiaries (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but in each case only as and when received) from any Disposition or Casualty Event, net of (i) out-of-pocket fees and expenses actually incurred in connection therewith (including attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith), (ii) the principal amount of any Indebtedness (other than Indebtedness owed to a Borrower Party) that is secured by a Lien (other than a Lien that ranks *pari passu* with or is subordinated to the Liens securing the Obligations) on the asset subject to such Disposition or Casualty Event and that is required to be repaid in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents), together with any applicable premium, penalty, interest, breakage costs and other similar amounts, (iii) in the case of any Disposition or Casualty Event by a non-wholly-owned Restricted Subsidiary, the pro rata portion of the Net Proceeds thereof (calculated without regard to this clause (iii)) attributable to minority interests, (iv) Taxes (or distributions made pursuant to Section 7.06(b)(xiv)(b)) paid or reasonably estimated to be payable, directly or indirectly, as a result thereof (including Taxes that are or would be imposed on the distribution or repatriation of any such Net Proceeds), (v) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (iv) above) (x) related to any of the applicable assets and (y) retained by any Borrower or any of the Restricted Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities and other liabilities or against any indemnification obligations and (vi) any funded escrow established pursuant to the documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition (provided that to the extent that any amounts are released from such escrow to a Borrower or a Restricted Subsidiary, such amounts net of any related expenses shall constitute Net Proceeds); and

(b)      100% of the cash proceeds from the incurrence, issuance or sale by a Borrower or any of the Restricted Subsidiaries of any Indebtedness, or any sale or issuance of Qualified Equity Interests by a Borrower or any direct or indirect parent of a Borrower, net of all taxes paid or reasonably estimated to be payable as a result thereof and fees (including investment banking fees, underwriting fees and discounts), commissions, costs and other expenses, in each case incurred in connection with such incurrence, issuance or sale; *provided* that with respect to any sale or issuance of Qualified Equity Interests (other than in the form of Disqualified Equity Interests) by any direct or indirect parent of a Borrower, only the amount of cash from such sale or issuance of Qualified Equity Interests contributed to the capital of a Borrower shall constitute the Net Proceeds of such sale or issuance.

For purposes of calculating the amount of Net Proceeds, fees, commissions and other costs and expenses payable to a Borrower or any of its Restricted Subsidiaries shall be disregarded.

"**Non-Consenting Lender**" has the meaning specified in Section 3.07.

"**Non-Defaulting Lender**" means, at any time, a Lender that is not a Defaulting Lender.

"**Non-Loan Party**" means any Restricted Subsidiary that is not a Loan Party.

"**Note**" means a Term B Note or a Delayed Draw Term Note, as the context may require.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party and its Restricted Subsidiaries arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, premiums, fees and other amounts that accrue after the commencement by or against any Loan Party or Restricted Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees and other amounts are allowed claims in such proceeding.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and their Restricted Subsidiaries to the extent they have obligations under the Loan Documents) include (a) the obligation (including guarantee obligations) to pay principal, interest, Letter of Credit fees, reimbursement obligations, premiums, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document (including any reimbursement obligations in respect of any of the foregoing that the Administrative Agent has paid or advanced on behalf of such Loan Party pursuant to the terms of the Loan Documents).

"**OID**" means original issue discount.

"**Orders**" means the Interim Order and/or the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Applicable Indebtedness**" has the meaning specified in Section 2.05(b)(vi).

"**Other Taxes**" has the meaning specified in Section 3.01(b).

"**Outstanding Amount**" means (a) the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Term Loans occurring on such date and (b) with respect to any L/C Obligations on any date, the outstanding Dollar Amount thereof on such date after giving effect to any related L/C Credit Extension occurring on such date and any other changes thereto as of such date, including as a result of any reimbursements of outstanding Unreimbursed Amounts under related Letters of Credit or any reductions in the maximum amount available for drawing under related Letters of Credit taking effect on such date.

"**Overnight Rate**" means, for any day, (a) with respect to any amount denominated in Dollars, the greater of the Federal Funds Rate and an overnight rate determined by the Administrative Agent or an L/C Issuer, as applicable, in accordance with banking industry rules on interbank compensation (b) with respect to any amount denominated in any Available Currency other than Dollars, the rate of interest per annum at which overnight deposits in such Available Currency, in an amount approximately equal to the amount with respect to which such rate is being determined, would be offered for such day by a branch or Affiliate of the Administrative Agent or the L/C Issuer, as applicable, in the applicable offshore interbank market for such Available Currency to major banks in such interbank market.

"**Participant**" has the meaning specified in Section 10.07(e).

"**Participant Register**" has the meaning specified in Section 10.07(e).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five (5) plan years.

"**Permitted Holder**" means any of (i) the Sponsor, (ii) Co-Investors, (iii) any Management Stockholder, (iv) any Permitted Transferee of any of the foregoing Persons, and (v) any "group" (within the meaning of Section 13(d) or Section 14(d) of the Exchange Act as in effect on the Closing Date) of which any of the foregoing are members; *provided* that in the case of such "group" and without giving effect to the existence of such "group" or any other "group," such Persons specified in clauses (i), (ii), (iii) or (iv) above, collectively, have beneficial ownership, directly or indirectly, of more than 50% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings held by such "group".

"**Permitted Investments**" means:

(1)  [reserved];

(2)  any Investment in assets that were Cash Equivalents or Investment Grade Securities when such Investment was made;

(3)  [reserved];

(4)  any Investment in securities or other assets not constituting Cash Equivalents and received in connection with a Disposition made pursuant to Section 7.05 (other than Section 7.05(g)) hereof;

(5)  any Investment (a) made in connection with the Transactions or (b) existing or made on the Closing Date (i) not in excess of $1,000,000 or (ii) listed under Schedule 1.01E, or any modification, replacement, renewal, reinvestment or extension thereof and any modification, renewal, replacement, reinvestment or extension thereof, so long as the amount of any Investment subject to any such modification, replacement, renewal, reinvestment or extension (x) does not exceed the amount outstanding (plus any unused commitments, accrued interest, fees and expenses and premiums incurred in connection therewith) on the Closing Date or (y) is increased as required by the terms of such Investment as in existence on the Closing Date (including as a result of the accrual or accretion of interest or OID or the issuance of pay-in-kind securities);

(6)  any Investment acquired by any Borrower or any of its Restricted Subsidiaries:

(i)  in exchange for any other Investment, accounts receivable or endorsements for collection or deposit held by any such Borrower or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of, or settlement of delinquent accounts and disputes with or judgments

against, the issuer of such other Investment or accounts receivable (including any trade creditor or customer); or

(ii)    in satisfaction of judgments against other Persons; or

(iii)    as a result of a foreclosure by any Borrower or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default; or

(iv)    as a result of the settlement, compromise or resolution of litigation, arbitration or other disputes with Persons who are not Affiliates;

(7)    Swap Contracts permitted under Section 7.03(f);

(8)    [reserved];

(9)    [reserved];

(10)    guarantees of Indebtedness which guarantees are permitted under Section 7.03, performance guarantees and Contingent Obligations incurred in the ordinary course of business and the creation of Liens on the assets of any Borrower or any of its Restricted Subsidiaries in compliance with Section 7.01;

(11)    [reserved];

(12)    Investments consisting of purchases or other acquisitions of inventory, supplies, services, material or equipment or the licensing or contribution of intellectual property pursuant to customary joint marketing arrangements with other Persons;

(13)    Investments taken together with all other Investments made pursuant to this clause (13) not to exceed $10,000,000;

(14)    [reserved];

(15)    [reserved];

(16)    loans and advances to employees, directors, officers, independent contractors, members of management, managers, advisors, partners and consultants of any Borrower or any of its Restricted Subsidiaries for business-related travel expenses, entertainment expenses, moving expenses and other similar expenses or payroll advances, in each case incurred in the ordinary course of business and consistent with past practices;

(17)    advances, loans or extensions of trade credit in the ordinary course of business by any Borrower or any of its Restricted Subsidiaries;

(18)    [reserved];

(19)    Investments consisting of purchases and acquisitions of assets or services in the ordinary course of business;

(20)    Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client contacts;

-31-

(21)      Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers compensation, performance and similar deposits entered into as a result of the operations of the business in the ordinary course of business;

(22)      Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with industry practices;

(23)      any Investment by any Captive Insurance Subsidiary or Specialty Insurance Subsidiary, as applicable, in connection with its provision of insurance to any Borrower or any of its Restricted Subsidiaries, which Investment is made in the ordinary course of business of such Captive Insurance Subsidiary or Specialty Insurance Subsidiary, or by reason of applicable law, rule, regulation or order, or that is required or approved by any regulatory authority having jurisdiction over such Captive Insurance Subsidiary or Specialty Insurance Subsidiary or its respective business, as applicable, or in the ordinary course of business consistent with its investment policy, as amended or modified from time to time;

(24)      [reserved];

(25)      loans and advances to any direct or indirect parent of a Borrower in lieu of and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof) Restricted Payments to the extent permitted to be made in cash to such parent in accordance with <u>Section 7.06</u>, such Investment being treated for purposes of the applicable clause of <u>Section 7.06</u>, including any limitations, as if a Restricted Payment made pursuant to such clause;

(26)      [reserved];

(27)      any Investments permitted by the First Day Orders, the Second Day Orders, the Interim Order, the Final Order and/or Approved Budget (subject to Permitted Variances);

(28)      any Investments necessary to consummate the Restructuring Transactions; and

(29)      Investments made in connection with a Permitted Reorganization.

"**Permitted Reorganization**" means any re-organization or other similar activities among Holdings, the Administrative Borrower and its Restricted Subsidiaries related to Tax planning and re-organization, so long as, after giving effect thereto, (a) the Loan Parties are in compliance with the Collateral and Guarantee Requirement and <u>Sections 6.11</u> and <u>6.13</u>, (b) taken as a whole, the value of the Collateral securing the Obligations and the Guarantees by the Guarantors of the Obligations are not materially reduced (as determined by the Administrative Borrower in good faith) and (c) the Liens in favor of the Administrative Agent for the benefit of the Secured Parties under the Collateral Documents are not materially impaired (as determined by the Administrative Borrower in good faith).

"**Permitted Transferees**" means (a) in the case of the Sponsor, (i) the Sponsor, any Affiliate of the Sponsor (but excluding any portfolio company of any of the foregoing), (ii) any managing director, general partner, limited partner, director, officer or employee of the Sponsor or any of its Affiliates (collectively, the "**Sponsor Associates**"), (iii) the heirs, executors, administrators, testamentary trustees, legatees or beneficiaries of any Sponsor Associate and (iv) any trust, the beneficiaries of which, or a corporation or partnership, the stockholders or partners of which, include only a Sponsor Associate, his or her spouse (or former spouse), parents, siblings, members of his or her immediate family (including adopted children and step children) and/or direct lineal descendants and (b) in the case of any Management Stockholder, (i) his

or her executor, administrator, testamentary trustee, legatee or beneficiaries, (ii) his or her spouse (or former spouse), parents, siblings, members of his or her immediate family (including adopted children and step children) and/or direct lineal descendants or (iii) a trust, the beneficiaries of which, or a corporation or partnership, the stockholders or partners of which, include only a Management Stockholder and his or her spouse (or former spouse), parents, siblings, members of his or her immediate family (including adopted children) and/or direct lineal descendants.

"**Permitted Variances**" shall mean, with respect to any Variance Testing Period, (i) all variances that are favorable to the financial condition and the interests of the Debtors and the other Loan Parties and the interests of the Lenders, and (ii) any variance that is unfavorable to the financial condition and the interests of the Debtors and the other Loan Parties or the interests of the Lenders and does not exceed, with respect to the aggregate disbursements (excluding disbursements in respect of (x) amounts which corresponding to the figures across from the line items in the Approved Budget with the headings Carrier Payments, Vendor Payments and Commissions, in each case, during such Variance Testing Period and (y) fees payable to the Administrative Agent) made by the Debtors during such Variance Testing Period, 20% of the aggregate disbursements set forth in the Approved Budget for such Variance Testing Period (or such greater percentage as consented to in writing by the Required Lenders, which written consent of the Required Lenders may be provided in the form of an email delivered by counsel to the Lenders); provided, that the Lenders may carry forward budgeted but unused disbursements set forth in the Approved Budget for a Variance Testing Period for use during any subsequent Variance Testing Period and, to the extent that the Required Lenders do not approve the Budget in accordance with Section 6.01(d), any subsequent Variance Testing Period until the Budget has been approved in accordance with Section 6.01(d). additional variances, if any, from the Approved Budget shall be subject to the written consent of the Required Lenders. For the avoidance of doubt, any reference to "written consent" hereunder shall include consent granted by email.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Personal Information**" means (a) all information that could reveal the identity of any natural Person; and (b) all other information regarding natural Persons, the collection, use, or disclosure of which is subject to the requirements of HIPAA, including the security of electronic protected health information or "ePHI" (as such terms are defined under HIPAA).

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established or maintained by any Loan Party (for any current or former employee or other service provider to any Loan Party) or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"**Platform**" means IntraLinks, IntraAgency, SYNDTRAK or another similar electronic system.

"**Pledged Debt**" has the meaning specified in the Security Agreement.

"**Pledged Equity**" has the meaning specified in the Security Agreement.

"**Preferred Stock**" means any Equity Interest with preferential rights of payment of dividends upon liquidation, dissolution or winding up to shares of Equity Interests of any other class of such Person.

"**Pro Rata Share**" means, with respect to each Lender, at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments and, if applicable and without duplication, Term Loans of such Lender under the applicable Facility or Facilities at such time and the denominator of which is the amount of the Aggregate Commitments under the applicable Facility or Facilities and, if applicable and without duplication, Term Loans under the applicable Facility or Facilities at such time.

"**Proceeding**" has the meaning specified in Section 10.05.

"**Proceeds**" has the meaning specified in the Security Agreement.

"**Projections**" has the meaning specified in Section 6.01(d).

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Lender**" has the meaning specified in Section 6.02.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Register**" has the meaning specified in Section 10.07(d).

"**Registered Equivalent Notes**" means, with respect to any notes originally issued in an offering pursuant to Rule 144A under the Securities Act or other private placement transaction under the Securities Act of 1933, substantially identical notes (having the same guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"**Rejection Notice**" has the meaning specified in Section 2.05(b)(vii).

"**Related Indemnified Person**" of an Indemnitee means (1) any Controlling Person or Controlled Affiliate of such Person, (2) the respective directors, officers, or employees of such Indemnitee or any of its Controlling Persons or Controlled Affiliates and (3) the respective agents or representatives of such Indemnitee or any of its Controlling Persons or Controlled Affiliates, in the case of this clause (3), acting on behalf of or at the instructions of such Indemnitee, such Controlling Person or such Controlled Affiliate; *provided* that each reference to a Controlled Affiliate, director, officer or employee in this definition pertains to a Controlled Affiliate, director, officer or employee involved in the negotiation, syndication, administration or enforcement of this Agreement and the Facilities.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the respective partners, members, managers, directors, officers, employees, agents (including sub-agents and co-agents), trustees, shareholders, attorneys, attorneys-in-fact, representatives and advisors of such Person and of such Person's Affiliates.

"**Release**" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing or migrating in, into, onto or through the Environment.

"**Released Guarantor**" has the meaning specified in <u>Section 11.09</u>.

"**Relevant Governmental Body**" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the otherwise applicable notice period has been waived by regulation or otherwise by the PBGC.

"**Request for Credit Extension**" means (a) with respect to a Borrowing, continuation or conversion of Term B Loans or Delayed Draw Term Loans, a Committed Loan Notice, and (b) with respect to an L/C Credit Extension, a Letter of Credit Request.

"**Required Class Lenders**" means, as of any date of determination, with respect to one or more Facilities, Lenders having more than 50.0% of the sum of (a) the Total Outstandings under such Facility or Facilities (with the aggregate Dollar Amount as of such date of each Lender's risk participation and funded participation in L/C Obligations under such Facility or Facilities being deemed "held" by such Lender for purposes of this definition) and (b) the aggregate unused Commitments under such Facility or Facilities; *provided* that the unused Commitments of, and the portion of the Total Outstandings under such Facility or Facilities held, or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of the Required Class Lenders.

"**Required Consenting Revolving Credit Facility Lenders**" has the meaning assigned to such term in the Restructuring Support Agreement.

"**Required Consenting Term Lenders**" has the meaning assigned to such term in the Restructuring Support Agreement.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50.0% of the sum of the (a) Total Outstandings and funded participation in L/C Obligations being deemed "held" by such Lender for purposes of this definition, and (b) aggregate unused Term Commitments; *provided* that the unused Term Commitment of, and the portion of the Total Outstandings held, or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, chief operating officer, chief administrative officer, secretary or assistant secretary, controller, treasurer or assistant treasurer or other similar officer or Person performing similar functions of a Loan Party and, solely for purposes of notices given pursuant to Article II, any other officer or employee of the applicable Loan Party so designated by any of the foregoing officers in a written notice to the Administrative Agent or any other officer or employee of the applicable Loan Party designated in or pursuant to an agreement between the applicable Loan Party and the Required Lenders. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed

to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.  Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Administrative Borrower.

"**Restricted Investment**" means an Investment other than a Permitted Investment.

"**Restricted Payment**" has the meaning specified in Section 7.06(a).

"**Restricted Subsidiary**" means any Subsidiary of a Borrower.

"**Restructuring Effective Date**" has the meaning assigned to such term in the Restructuring Support Agreement.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of the date hereof, by and among (each as defined therein) the Company Parties, the Consenting Lenders, the Consenting Sponsor and the DIP Lender (as amended, amended and restated, modified or otherwise supplemented from time to time with the consent of the Required Lenders).

"**Restructuring Transactions**" means the transactions contemplated by the Restructuring Support Agreement.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Borrowers, Inc., and any successor thereto.

"**Same Day Funds**" means immediately available funds.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Second Day Orders**" has the meaning specified in Section 4.02(v).

"**Secured Parties**" means, collectively, the Administrative Agent, the Lenders, the L/C Issuers and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.05.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Agreement**" means a security agreement substantially in the form of Exhibit F hereto.

"**Security Agreement Supplement**" has the meaning specified in the Security Agreement.

"**SPC**" has the meaning specified in Section 10.07(h).

"**Specialty Insurance Subsidiary**" means any Subsidiary of a Borrower that is subject to regulation as a "specialty insurer" as defined in Section 628.4615(1) of the Florida Insurance Code.

"**Specified Junior Financing Obligations**" means any obligations in respect of any Junior Financing in respect of which any Loan Party is an obligor in a principal amount in excess of the Threshold Amount.

"**Specified Preferred Stock**" means that certain Preferred Stock of Daylight Beta Intermediate Corp. purchased pursuant to that certain Securities Purchase Agreement, dated as of August 21, 2020, by and among Daylight Beta Intermediate Corp. and the "Purchasers" party thereto.

"**Specified Settlement**" means that certain Stipulated Order for Permanent Injunction, Monetary Judgment, and Other Relief against Defendants Benefytt Technologies, Inc., Health Plan Intermediaries Holdings, LLC, And Healthpocket, Inc. by and among the Federal Trade Commission and Benefytt Technologies, Inc., Health Plan Intermediaries Holdings, LLC, and HealthPocket, Inc., as the defendants party thereto, as entered by the United States District Court for the Middle District of Florida.

"**Sponsor**" means Madison Dearborn Partners, LLC and any of its Affiliates and funds or partnerships managed or advised by it or any of its respective Affiliates, but not including, however, any of its portfolio company of any of the foregoing.

"**Sponsor Management Agreement**" means a management services agreement or similar agreement among the Sponsor or certain of the management companies associated with the Sponsor or its advisors, if applicable, and one or more Loan Parties (and/or any of their direct or indirect parent companies).

"**Stay Relief Hearing**" has the meaning specified in <u>Section 8.02</u>.

"**Subordinated Indebtedness**" means, with respect to the Obligations,

      (a)    any Indebtedness of any Borrower which is by its terms subordinated in right of payment to the Obligations, and

      (b)    any Indebtedness of any Guarantor which is by its terms subordinated in right of payment to the Guarantee of such entity of the Obligations.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, any charitable organizations and any other Person that meets the requirements of Section 501(c)(3) of the Code) of which (i) a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned or (ii) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrowers (or a Borrower, as the context may require).

"**Subsidiary Guarantor**" means any Guarantor other than Holdings.

"**Swap**" means any agreement, contract, or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the

foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Taxes**" means all present or future taxes, duties, levies, imposts, assessments or withholdings (including backup withholding) imposed by any Governmental Authority including interest, penalties and additions to tax.

"**Term B Lender**" means, at any time, any Lender that has a Term B Commitment or a Term B Loan at such time.

"**Term B Loans**" means the term loans made by the Lenders on the Closing Date to the Borrowers pursuant to Section 2.01(a).

"**Term B Note**" means a promissory note of the Borrowers payable to any Term Lender or its registered assigns, in substantially the form of Exhibit C-1 hereto, evidencing the aggregate Indebtedness of the Borrowers to such Term Lender resulting from the Term B Loans made by such Term Lender.

"**Term Borrowing**" means a borrowing consisting of Term Loans of the same Class.

"**Term Commitment**" means, as to each Term Lender, its obligation to make Term Loans to the Borrowers hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.06 and (b) reduced or increased from time to time pursuant to assignments by or to such Term Lender pursuant to an Assignment and Assumption.  The amount of each Term Lender's Commitment is set forth on Schedule 1.01A hereto under the caption "Term B Commitment", "Delayed Draw Term Commitment" or in the Assignment and Assumption pursuant to which such Lender shall have assumed, increased or decreased its Term Commitment, as the case may be. The aggregate amount of the Term Commitments as of the Closing Date is $35,000,000.

"**Termination Date**" has the meaning specified in Section 8.02.

"**Term Lenders**" means the Term B Lenders and the Delayed Draw Term Lenders.

"**Term Loan**" means any Term B Loan, Delayed Draw Term Loan or Extended Term Loan, as the context may require.

"**Threshold Amount**" means $15,000,000.

"**Total 606 Commission Receivables**" means (i) prior to the announcement of a Qualified IPO, the lower of (x) the total 606 commission receivables as calculated pursuant to GAAP, excluding any impacts of purchase accounting, and (y) the appraised value of the Borrower and its Restricted Subsidiaries' outstanding accounts receivable pursuant to the annual (or semi-annual, as applicable) actuarial review delivered pursuant to Section 6.02(e) (it being agreed that until the initial delivery thereof, the actuarial report delivered on or prior to the Closing Date shall apply) and (ii) after the announcement of a Qualified IPO, the total 606 commission receivables as calculated pursuant to GAAP, excluding any impacts of purchase accounting; *provided*, that to the extent the Borrowers object (in their reasonable business judgment) to the results of any such actuarial review, the Borrowers shall be entitled to either (i) seek an additional actuarial review from another firm (the "**Additional Review**") or (ii) contest the findings contained in such actuarial review, and pending receipt of the Additional Review and/or resolution of the dispute described in clause (ii) (in each case, which Additional Review or contest must be (x) concluded or resolved no later than the date that is sixty (60) Business Days after the delivery of the prior actuarial review and (y) reasonably satisfactory to the Required Lenders, which approval shall not be unreasonably withheld, delayed, denied or conditioned), the prior actuarial review shall remain in effect for purposes of calculating Total 606 Commission Receivables.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans and all L/C Obligations.

"**Transaction Expenses**" means any fees, premiums, expenses or other costs incurred or paid by any direct or indirect parent of the Borrower or any of its Subsidiaries in connection with the Transactions.

"**Transactions**" means, collectively, (a) the funding of the Term B Loans on the Closing Date and the execution and delivery of the Loan Documents to be entered into on the Closing Date, (b) the transactions set forth in the Restructuring Services Agreement, (c) the Cases and (d) the payment of Transaction Expenses.

"**Treasury Services Agreement**" means any agreement between any Borrower or any of its Restricted Subsidiaries and any hedge bank relating to treasury, depository, credit card, debit card, p-card and cash management services or automated clearinghouse transfer of funds, foreign exchange facilities, supply chain finance services or any similar services.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code (or similar code or statute) as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to perfect a security interest in or otherwise apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning specified in Section 3.01(d)(ii)(C) and is in substantially the form of Exhibit I hereto.

"**USA Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56.

"**Variance Testing Date**" means (i) Monday (or, if such Monday is not a Business Day, the immediately succeeding Business Day) of the fourth full calendar week after the Petition Date and (ii) the Monday (or, if such Monday is not a Business Day, the immediately succeeding Business Day) of the every calendar week thereafter.

"**Variance Testing Period**" means for each Variance Testing Date, the four full calendar week period ending immediately prior to such Variance Testing Date.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:  (i) the sum of the products obtained by multiplying (a) the amount of each then remaining scheduled installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final scheduled maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness; *provided* that the effects of any AHYDO payments, prepayments or amortization made on such Indebtedness shall be disregarded in making such calculation.

"**wholly-owned**" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly-owned Subsidiaries of such Person.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"**Yen**" means the lawful currency of Japan.

Section 1.02        Other Interpretive Provisions.

With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)        The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)      The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(c)      References in this Agreement to an Exhibit, Schedule, Article, Section, clause or subclause refer (A) to the appropriate Exhibit or Schedule to, or Article, Section, clause or subclause in this Agreement or (B) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears.

(d)      The term "including" is by way of example and not limitation.

(e)      The word "or" is not exclusive.

(f)      The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(g)      In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(h)      Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(i)      For purposes of determining compliance with any Section of <u>Article VI</u> or <u>Article VII</u> at any time, in the event that any Lien, Investment, Indebtedness (at the time of incurrence or upon application of all or a portion of the proceeds thereof as permitted under the Loan Documents), Disposition, Restricted Payment, Affiliate transaction, Contractual Obligation or prepayment of Indebtedness meets the criteria of one or more than one of the categories of transactions permitted pursuant to any clause of such Sections, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Administrative Borrower in its sole discretion at such time (or any later time from time to time, in each case, as determined by the Administrative Borrower in its sole discretion at such time and thereafter may be reclassified by the Administrative Borrower in any manner not expressly prohibited by this Agreement).

(j)      The words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(k)      All references to any Person shall be constructed to include such Person's successors and assigns (subject to any restriction on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(l)      The words "principal amount" shall include the liquidation preference of any Disqualified Equity Interests and Preferred Stock.

(m)      All references to "in the ordinary course of business" of any Borrower or any Subsidiary thereof means (i) in the ordinary course of business of, or in furtherance of an objective that is in the ordinary course of business of any Borrower or such Subsidiary, as applicable, (ii)

customary and usual in the industry or industries of the Borrowers and their Subsidiaries in the United States or any other jurisdiction in which the Borrowers or any Subsidiary does business, as applicable, or (iii) generally consistent with the past or current practice of the Borrowers or such Subsidiary, as applicable, or any similarly situated businesses in the United States or any other jurisdiction in which the Borrowers or any Subsidiary does business, as applicable.

(n)      All references to "knowledge" of any Loan Party or any Restricted Subsidiary means the actual knowledge of a Responsible Officer.

(o)      All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such person in his or her capacity solely as an officer or a representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity.

(p)      For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

Section 1.03      Accounting Terms.

All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  Notwithstanding anything to the contrary contained herein, all such financial statements shall be prepared, and all financial covenants contained herein or in any other Loan Document shall be calculated, in each case, without giving effect to any election under FASB ASC 825 (or any similar accounting principle) permitting a Person to value its financial liabilities at the fair value thereof.

Section 1.04      [Reserved].

Section 1.05      References to Agreements, Laws, Etc.

Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, refinancings, restructurings, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, refinancings, restructurings, extensions, supplements and other modifications are not prohibited by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06      Times of Day.

Unless otherwise specified, all references herein to times of day shall be references to New York, New York time (daylight or standard, as applicable).

Section 1.07        Timing of Payment or Performance.

When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

Section 1.08        [Reserved].

Section 1.09        Currency Generally.

For purposes of determining compliance with Sections 7.01, 7.03, 7.05, 7.06 and 7.13 and the definition of Permitted Investments with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder).

Section 1.10        Letters of Credit.

Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the Dollar Amount of the stated amount of such Letter of Credit in effect at such time; *provided, however*, that with respect to any Letter of Credit that, by its terms or the terms of any Issuer Document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the Dollar Amount of the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

Section 1.12        Rules of Interpretation with Respect to Captive Insurance Subsidiaries.

Should an applicable Governmental Authority notify any Loan Party of a potentially actionable issue or concern related to control of any Captive Insurance Subsidiary on the basis that the Administrative Agent or any Lender is potentially a control person or determine that the Administrative Agent or any Lender is acting as a control person, in each case as defined or used under applicable Laws, of such Captive Insurance Subsidiary due to one or more provisions of this Agreement, the parties agree to promptly further negotiate in good faith to modify this Agreement such that the Administrative Agent or such Lender is not considered by such Governmental Authority to be a control person of such Captive Insurance Subsidiary and to effect the original intent of the parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

**ARTICLE II.
THE COMMITMENTS AND CREDIT EXTENSIONS**

Section 2.01        The Loans.

(a)        *The Term Borrowings*.  (i) Subject to the terms and conditions set forth herein, each Term B Lender severally agrees to make to the Borrowers on the Closing Date one or more loans denominated in Dollars in an aggregate principal amount not to exceed the amount of such Term B Lender's Term B Commitment and (ii) subject to the terms and conditions set forth herein and in accordance with the Budget, each Delayed Draw Term Lender severally agrees to make to the Borrowers at any time during the Delayed Draw Term Loan Availability Period one or more loans denominated in Dollars in an aggregate principal amount not to exceed the amount of such Delayed Term Lender's Delayed Draw Commitment (*provided*,

that (x) the amount of the Delayed Draw Term Loans requested by the Borrower at such time shall not exceed the aggregate principal amount of unfunded Delayed Draw Term Commitments at such time and (y) no more than ten (10) Borrowings of Delayed Draw Term Loans shall be permitted hereunder unless the Term Lenders holding the Delayed Draw Term Commitments otherwise consent, and each Term Lender party thereto severally agrees to, as applicable, make, exchange, renew or replace Term Loans on the date specified therein in an aggregate principal amount not to exceed the amount of such Term Lender's applicable Term Commitment as set forth therein.  Amounts borrowed, exchanged, renewed or replaced under this Section 2.01(a) and repaid or prepaid may not be reborrowed.

Section 2.02        Borrowings, Conversions and Continuations of Loans.

(a)        Each Borrowing of Term B Loans and each Borrowing of Delayed Draw Term Loans shall be made upon the Administrative Borrower's irrevocable Committed Loan Notice to the Administrative Agent (in the case of Term Loans) not later than 11:00 a.m. (i) three (3) Business Days prior to the requested date of any Borrowing (other than a Borrowing of Delayed Draw Term Loans) or (ii) seven (7) Business Days prior to the requested date of any Borrowing of Delayed Draw Term Loans.  Each Borrowing of Loans shall be in a minimum principal amount of $500,000, or a whole multiple of $100,000 in excess thereof (*provided*, that any Delayed Draw Term Loan Borrowing shall be in a minimum principal amount of $5,000,000, or a whole multiple of $1,000,000 in excess thereof).  Each Committed Loan Notice shall specify (i) [reserved], (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Term Loans to be borrowed, (iv) the Class of Term Loans to be borrowed, (v) [reserved], (vi) [reserved], (vii) the applicable Borrower or Subsidiary Borrower to which such Loan shall be made and (viii) the wire instructions of the account(s) to which funds are to be disbursed (it being understood, for the avoidance of doubt, that the amount to be disbursed to any particular account may be less than the minimum or multiple limitations set forth above so long as the aggregate amount to be disbursed to all such accounts pursuant to such Borrowing meets such minimums and multiples).

(b)        Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share or other applicable share provided for under this Agreement of the applicable Class of Term Loans.  In the case of each Borrowing, each Appropriate Lender shall make the amount of its Term Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office in Dollars not later than 12:00 p.m. on the Business Day specified in the applicable Committed Loan Notice.  The Administrative Agent shall make all funds so received available to the Borrowers in like funds as received by the Administrative Agent by wire transfer of such funds, in each case in accordance with instructions provided by the Borrowers to (and acceptable to) the Administrative Agent. To the extent such wire transfer is to be made to an account of the Borrower not previously on the books of the Administrative Agent, such wire transfer shall be subject to receipt by the Administrative Agent, to the extent requested by the Administrative Agent, of information sufficient to satisfy applicable "know your customer" and anti-money-laundering rules and regulations and the Administrative Agent shall promptly complete such "know your customer" and anti-money-laundering process.

(c)        [Reserved].

(d)        [Reserved].

(e)        [Reserved].

(f)        The failure of any Lender to make the Term Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Term Loan on the date of

such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Term Loan to be made by such other Lender on the date of any Borrowing.

(g)     Unless the Administrative Agent shall have received written notice from a Lender prior to the date of any Borrowing, that such Lender will not make available to the Administrative Agent such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such Borrowing, the Administrative Agent may assume that such Lender has made such Pro Rata Share or other applicable share provided for under this Agreement available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (b) above, and the Administrative Agent may (but shall have no obligation to), in reliance upon such assumption, make available to the Borrowers on such date a corresponding amount.  If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and the Borrowers severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrowers until the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrowers, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the Overnight Rate plus any administrative, processing, or similar fees customarily charged by the Administrative Agent in accordance with the foregoing.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.02(g) shall be conclusive in the absence of manifest error.  If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Term Loan included in such Borrowing.  Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(h)     Notwithstanding anything to the contrary in this Agreement, any Lender may exchange, continue or rollover all of the portion of its Term Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Administrative Borrower, the Administrative Agent and such Lender.

Section 2.03     Letters of Credit.

(a)     *The Letter of Credit Commitment*.  (i) Subject to the terms and conditions set forth herein, (A) each L/C Issuer agrees, in reliance upon the agreements of the Lenders set forth in this Section 2.03, (1) from time to time on any Business Day during the period from and including the Closing Date until the Letter of Credit Expiration Date, to issue Letters of Credit at sight denominated in Dollars for the account of the Borrowers (*provided* that any Letter of Credit may be for the benefit of any subsidiary of a Borrower) and to amend or renew Letters of Credit previously issued by it, in accordance with Section 2.03(b), and (2) to honor drafts under the Letters of Credit and (B) the Letter of Credit Lenders severally agree to participate in Letters of Credit issued pursuant to this Section 2.03; *provided* that no L/C Issuer shall be obligated to make any L/C Credit Extension with respect to any Letter of Credit, and no Lender shall be obligated to participate in any Letter of Credit if as of the date of such L/C Credit Extension, (x) the Letter of Credit Exposure of any Letter of Credit Lender would exceed such Lender's Letter of Credit Commitment or (y) the Outstanding Amount of the L/C Obligation would exceed such L/C Issuer's Letter of Credit Commitment (unless waived by such L/C Issuer).  Within the foregoing limits, and subject to the terms and conditions hereof, the Borrowers' ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrowers may, with the consent of the L/C Issuers, during the foregoing period, obtain

Letters of Credit to replace Letters of Credit that have expired, terminated or that have been drawn upon and reimbursed.

(ii)     An L/C Issuer shall be under no obligation to issue any Letter of Credit if:

(A)                        any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such L/C Issuer from issuing such Letter of Credit, or any Law applicable to such L/C Issuer or any directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such L/C Issuer shall prohibit, or direct that such L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon such L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date (for which such L/C Issuer is not otherwise compensated hereunder);

(B)                        subject to Section 2.03(b)(iii), the expiry date of such requested Letter of Credit would occur more than twelve months after the date of issuance or last renewal, unless (1) each Appropriate Lender has approved of such expiration date or (2) the Outstanding Amount of L/C Obligations in respect of such requested Letter of Credit has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to such L/C Issuer;

(C)                        the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless (1) each Appropriate Lender has approved such expiry date or (2) the Outstanding Amount of L/C Obligations in respect of such requested Letter of Credit has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to such L/C Issuer and the Required Lenders, *provided*, that in no event shall a Letter of Credit have an expiry date later than one year after the Letter of Credit Expiration Date;

(D)                        the issuance of such Letter of Credit would violate any policies of the L/C Issuer applicable to letters of credit generally; or

(E)                        any Letter of Credit Lender is at that time a Defaulting Lender, unless such L/C Issuer has entered into arrangements reasonably satisfactory to it and the Borrowers to eliminate such L/C Issuer's actual or potential Fronting Exposure with respect to the participation in Letters of Credit by such Defaulting Lender, including by Cash Collateralizing such Defaulting Lender's Pro Rata Share or other applicable share provided for under this Agreement of the L/C Obligations.

(iii)     An L/C Issuer shall be under no obligation to amend any Letter of Credit if (A) such L/C Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(b)     Procedures for Issuance and Amendment of Letters of Credit; Auto-Extension Letters of Credit.  (i) Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Administrative Borrower delivered to an L/C Issuer (with copies to the Administrative Agent) in the form of a Letter of Credit Request, appropriately completed and signed by a Responsible Officer of the Administrative Borrower.  Such Letter of Credit Request must be received by the relevant L/C Issuer and the Administrative Agent not later than 12:30 p.m. at least fifteen (15) Business Days prior to the proposed issuance date or date of amendment, as the case may be; or, in each case, such earlier or later date and time as the relevant L/C Issuer may agree in a particular instance in its sole discretion.  In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Request shall specify in form and detail

reasonably satisfactory to the relevant L/C Issuer: (a) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (b) the amount thereof; (c) the expiry date thereof; (d) the name and address of the beneficiary thereof; (e) the documents to be presented by such beneficiary in case of any drawing thereunder; (f) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (g) that the requested Letter of Credit will be denominated in Dollars; and (h) such other matters as the relevant L/C Issuer may reasonably request. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Request shall specify in form and detail reasonably satisfactory to the relevant L/C Issuer (1) the Letter of Credit to be amended; (2) the proposed date of amendment thereof (which shall be a Business Day); (3) the nature of the proposed amendment; and (4) such other matters as the relevant L/C Issuer may reasonably request. Additionally, the Administrative Borrower shall furnish to the L/C Issuer (with a copy to the Administrative Agent) such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as the L/C Issuer may reasonably request.

(ii)     Promptly after receipt of any Letter of Credit Request, the relevant L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such Letter of Credit Request from the Administrative Borrower and, if not, such L/C Issuer will provide the Administrative Agent with a copy thereof. Upon receipt by the relevant L/C Issuer of confirmation from the Administrative Agent (acting at the direction of the Required Lenders) that the requested issuance or amendment is permitted in accordance with the terms hereof, then, subject to the terms and conditions hereof, such L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the Borrowers (and, if applicable, the applicable subsidiary of a Borrower) or enter into the applicable amendment, as the case may be. Immediately upon the issuance of each Letter of Credit, each Letter of Credit Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the relevant L/C Issuer a risk participation in such Letter of Credit in an amount equal to the product of such Lender's Pro Rata Share or other applicable share provided for under this Agreement times the amount of such Letter of Credit.

(iii)     If the Borrowers so request in any applicable Letter of Credit Request with respect to any standby Letter of Credit, and the Required Lenders and the relevant L/C Issuer consents to such request, such L/C Issuer shall agree to issue a Letter of Credit that has automatic extension provisions (each, an "**Auto-Extension Letter of Credit**"); *provided* that any such Auto-Extension Letter of Credit must permit the relevant L/C Issuer to prevent any such extension at least once in each twelve month period (commencing with the date of issuance of such Letter of Credit and in no event extending beyond the Letter of Credit Expiration Date unless Cash Collateralized or backstopped in a manner reasonably acceptable to the Administrative Borrower and the applicable L/C Issuer; *provided* that in no event shall a Letter of Credit extend beyond one year after the Letter of Credit Expiration Date) by giving prior notice to the beneficiary thereof not later than a day (the "**Non-Extension Notice Date**") in each such twelve month period to be agreed upon by the relevant L/C Issuer and the Administrative Borrower at the time such Letter of Credit is issued. Unless otherwise directed by the relevant L/C Issuer, the Borrowers shall not be required to make a specific request to the relevant L/C Issuer for any such extension. Once an Auto-Extension Letter of Credit has been issued, the Appropriate Lenders shall be deemed to have authorized (but may not require) the relevant L/C Issuer to permit the extension of such Letter of Credit at any time to an expiry date that is, unless the Outstanding Amount of L/C Obligations in respect of such requested Letter of Credit has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to the relevant L/C Issuer, not later than the applicable Letter of Credit Expiration Date; *provided* that the relevant L/C Issuer shall not permit any such extension if (A) the relevant L/C Issuer has determined that it would have no obligation at such time to issue such Letter of Credit in its extended form under the terms hereof (by reason of the provisions of <u>Section 2.03(a)(ii)</u> or otherwise), or (B) it has received notice (which may be by telephone or in writing) on or before the day that is seven (7) Business Days before the Non-Extension Notice Date from

the Administrative Agent, any Lender or the Borrowers that one or more of the applicable conditions specified in Section 4.02 is not then satisfied.

(iv)     Promptly after issuance of any Letter of Credit or any amendment to a Letter of Credit, the relevant L/C Issuer will also deliver to the Borrowers and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(c)     *Drawings and Reimbursements; Funding of Participations*.  (i) Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the relevant L/C Issuer shall promptly notify the Borrowers and the Administrative Agent thereof (such notice, a "**Draw Notice**").  Not later than 12:00 p.m. on the first Business Day immediately following receipt by the Borrowers of a Draw Notice (each such date, an "**Honor Date**"), the Borrowers shall reimburse such L/C Issuer through the Administrative Agent in an amount equal to the amount of such drawing in readily-available funds; *provided* that if such reimbursement is not made on the Honor Date, (i) the Borrower shall be deemed to have requested a Borrowing of Loans under the Letter of Credit Commitments to be disbursed on the Honor Date in an amount equal to the unreimbursed drawing under the applicable Letter of Credit (the "**Unreimbursed Amount**") without regard to the minimum and multiples specified in Section 2.02 for the principal amount of Loans but subject to the requirements for the amount of the unutilized portion of the Letter of Credit Commitments of the Appropriate Lenders and the conditions set forth in Section 4.02 (other than the delivery of a Committed Loan Notice), and (ii) the Borrowers shall pay interest to the relevant L/C Issuer on  the amount of such Borrowing of Loans under the Letter of Credit Commitments at the Applicable Rate.  The L/C Issuer shall notify the Borrowers and the Administrative Agent of the amount of such interest on the drawing promptly following the determination or revaluation thereof.  Any notice given by an L/C Issuer or the Administrative Agent pursuant to this Section 2.03(c)(i) may be given by telephone if immediately confirmed in writing; *provided* that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)     Each Appropriate Lender (including any Lender acting as an L/C Issuer) shall, upon any notice pursuant to Section 2.03(c)(i), make funds available to the Administrative Agent for the account of the relevant L/C Issuer in Dollars at the Administrative Agent's Office for payments in an amount equal to such Lender's Pro Rata Share or other applicable share provided for under this Agreement of the Unreimbursed Amount not later than 12:00 p.m. on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of Section 2.03(c)(iii), each Appropriate Lender that so makes funds available shall be deemed to have made a Loan in Dollars under the Letter of Credit Commitments to the Borrowers in such amount and the making of such Loan in an aggregate amount equal to such Unreimbursed Amount shall satisfy the Borrowers' reimbursement obligations with respect thereto.  The Administrative Agent shall remit the funds so received to the relevant L/C Issuer.  For the avoidance of doubt, the existence of an Unreimbursed Amount, the deemed request of a Borrowing under the Letter of Credit Commitments in accordance with  Section 2.03(c)(i) and the funding of the Unreimbursed Amount in accordance with this Section 2.03(c)(ii), in each case, shall not be deemed to be a Default or Event of Default.

(iii)     With respect to any Unreimbursed Amount that is not fully refinanced by a Borrowing of Loans under the Letter of Credit Commitments because the conditions set forth in Section 4.02 cannot be satisfied or for any other reason, the Borrowers shall be deemed to have incurred from the relevant L/C Issuer an L/C Borrowing in the amount of the Unreimbursed Amount in Dollars that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate.  In such event, each Appropriate Lender's payment to the Administrative Agent for the account of the relevant L/C Issuer pursuant to Section 2.03(c)(ii) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Lender in satisfaction of its participation obligation under this Section 2.03.

(iv)     Until each Appropriate Lender funds its Loan under the Letter of Credit Commitments or L/C Advance pursuant to this Section 2.03(c) to reimburse the relevant L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such amount shall be solely for the account of the relevant L/C Issuer.

(v)     Each Lender's obligation to make Loans or L/C Advances to reimburse an L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this Section 2.03(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the relevant L/C Issuer, the Borrowers or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Article IV; (C) any adverse change in the condition (financial or otherwise) of the Loan Parties; (D) any breach of this Agreement or any other Loan Document by the Borrowers, any other Loan Party or any other L/C Issuer or any reduction or termination of the Letter of Credit Commitment; or (E) any other circumstance, occurrence, event or condition, whether or not similar to any of the foregoing; *provided* that each Lender's obligation to make Loans pursuant to this Section 2.03(c) is subject to the conditions set forth in Section 4.02 (other than delivery by the Administrative Borrower of a Committed Loan Notice).  No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Borrowers to reimburse the relevant L/C Issuer for the amount of any payment made by such L/C Issuer under any Letter of Credit, together with interest as provided herein.

(vi)     If any Letter of Credit Lender fails to make available to the Administrative Agent for the account of the relevant L/C Issuer any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.03(c) by the time specified in Section 2.03(c)(ii), such L/C Issuer shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to such L/C Issuer at a rate per annum equal to the applicable Overnight Rate from time to time in effect.  A certificate of the relevant L/C Issuer submitted to any Letter of Credit Lender (through the Administrative Agent) with respect to any amounts owing under this Section 2.03(c)(vi) shall be conclusive absent manifest error.

(d)     Repayment of Participations.

(i)     If, at any time after an L/C Issuer has made a payment under any Letter of Credit and has received from any Lender such Lender's L/C Advance in respect of such payment in accordance with Section 2.03(c), the Administrative Agent receives for the account of such L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrowers or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Lender its Pro Rata Share or other applicable share provided for under this Agreement thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's L/C Advance was outstanding) of the amount received by the Administrative Agent.

(ii)     If any payment received by the Administrative Agent for the account of an L/C Issuer pursuant to Section 2.03(c)(i) is required to be returned under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by such L/C Issuer in its discretion), each Appropriate Lender shall pay to the Administrative Agent for the account of such L/C Issuer its Pro Rata Share or other applicable share provided for under this Agreement thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned by such Lender, at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

(e)     *Obligations Absolute*.  The obligation of the Borrowers to reimburse the relevant L/C Issuer for each drawing under each Letter of Credit issued by it and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)     any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other agreement or instrument relating thereto;

(ii)     the existence of any claim, counterclaim, setoff, defense or other right that any Loan Party may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the relevant L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)     any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)     any payment by the relevant L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the relevant L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v)     any exchange, release or non-perfection of any Collateral, or any release or amendment or waiver of or consent to departure from the Guaranty or any other guarantee, for all or any of the Obligations of any Loan Party in respect of such Letter of Credit; or

(vi)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Loan Party (other than the defense of payment or performance);

*provided* that the foregoing shall not excuse any L/C Issuer from liability to the Borrowers to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are waived by the Borrowers to the extent permitted by applicable Law) suffered by the Borrowers that are caused by acts or omissions by such L/C Issuer constituting bad faith, gross negligence or material breach of such L/C Issuer's obligations hereunder or under any Loan Document or willful misconduct on the part of such L/C Issuer, in each case, as determined in a final and non-appealable judgment by a court of competent jurisdiction when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.

(f)     *Role of L/C Issuers*.  Each Lender and the Borrowers agree that, in paying any drawing under a Letter of Credit, the relevant L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the L/C Issuers, any Agent-Related Person nor any of the respective correspondents, participants or assignees of any L/C Issuer shall be liable to any Lender for

(i) any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Lenders holding a majority of the Letter of Credit Commitments, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct as determined in a final and non-appealable judgment by a court of competent jurisdiction; or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Letter of Credit Request. The Borrowers hereby assume all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; *provided* that this assumption is not intended to, and shall not, preclude the Borrowers from pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the L/C Issuers, any Agent-Related Person, nor any of the respective correspondents, participants or assignees of any L/C Issuer, shall be liable or responsible for any of the matters described in clauses (i) through (vi) Section 2.03(e); *provided* that anything in such clauses to the contrary notwithstanding, the Borrowers may have a claim against an L/C Issuer, and such L/C Issuer may be liable to the Borrowers, to the extent, but only to the extent, of any direct, as opposed to consequential damages suffered by the Borrowers which the Borrowers proves were caused by such L/C Issuer's bad faith, gross negligence, material breach of such L/C Issuer's obligations hereunder or under any Loan Document or willful misconduct or such L/C Issuer's willful or grossly negligent failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit, in each case as determined in a final and non-appealable judgment by a court of competent jurisdiction.  In furtherance and not in limitation of the foregoing, each L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and no L/C Issuer shall be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(g)     *Cash Collateral*.  (i) If, as of any Letter of Credit Expiration Date, any applicable Letter of Credit for any reason remains outstanding and partially or wholly undrawn, (ii) if any Event of Default occurs and is continuing and the Administrative Agent, the Lenders holding a majority of the Letter of Credit Commitments or the Required Lenders, as applicable, require the Borrowers to Cash Collateralize the L/C Obligations pursuant to Section 8.02 or (iii) if an Event of Default set forth under Section 8.01(f) occurs and is continuing, the Borrowers shall Cash Collateralize the then Outstanding Amount of all of its (or, in the case of clause (i), the applicable) L/C Obligations (in an amount equal to such Outstanding Amount determined as of the date of such Event of Default or the applicable Letter of Credit Expiration Date, as the case may be), and shall do so not later than 12:00 p.m., on the Business Day immediately following the day that the Borrowers receive written notice of such requirement to Cash Collateralize.  At any time that there shall exist a Defaulting Lender, promptly upon the written request of the Administrative Agent, the L/C Issuer or the Lender, the Borrowers shall deliver to the Administrative Agent Cash Collateral in an amount sufficient to cover all Fronting Exposure (after giving effect to any Cash Collateral provided by the Defaulting Lender).  For purposes hereof, "**Cash Collateralize**" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the relevant L/C Issuer and the Appropriate Lenders, as collateral for the relevant L/C Obligations, cash or deposit account balances ("**Cash Collateral**") pursuant to documentation in form and substance reasonably satisfactory to the Required Lenders and the relevant L/C Issuer (which documents are hereby consented to by the Appropriate Lenders).  Derivatives of such term have corresponding meanings.  The Borrowers hereby grant to the Administrative Agent, for the benefit of the L/C Issuers and the Letter of Credit Lenders, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing.  Cash Collateral shall be maintained in blocked accounts at the Administrative Agent and may be invested in readily available Cash Equivalents.  If at any time the Administrative Agent reasonably determines or receives written notification that any funds held as Cash Collateral are expressly subject to any right or claim of any Person other than the Loan Parties or the Administrative Agent (on behalf of the Secured Parties) or non-consensual liens permitted under Section 7.01 or that the total amount of such funds is less than the

aggregate Outstanding Amount of all relevant L/C Obligations, the Borrowers will, forthwith upon written demand by the Administrative Agent, pay to the Administrative Agent, as additional funds to be deposited and held in the deposit accounts at the Administrative Agent as aforesaid, an amount equal to the excess of (a) such aggregate Outstanding Amount over (b) the total amount of funds, if any, then held as Cash Collateral that the Administrative Agent reasonably determines (acting at the direction of the Required Lenders) to be free and clear of any such right and claim.  Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Law, to reimburse the relevant L/C Issuer.  To the extent the amount of any Cash Collateral exceeds the then Outstanding Amount of such relevant L/C Obligations and so long as no Event of Default has occurred and is continuing, the excess shall be promptly refunded to the Borrowers.  To the extent any Event of Default giving rise to the requirement to Cash Collateralize any Letter of Credit pursuant to this Section 2.03(g) is cured or otherwise waived, then so long as no other Event of Default has occurred and is continuing, the Administrative Agent shall, upon receipt of written direction from the Required Lenders thereof, promptly refund to the Borrowers all Cash Collateral pledged to Cash Collateralize such Letter of Credit.  If at any time the Administrative Agent determines or receives written notice that Cash Collateral is subject to any right or claim of any Person other than the Administrative Agent as herein provided or Liens described above, or that the total amount of such Cash Collateral is less than the applicable Fronting Exposure and other obligations secured thereby, the Borrowers or the relevant Defaulting Lender will, promptly upon written demand by the Administrative Agent, pay or provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency.

(h)      *Letter of Credit Fees*.  The Borrowers shall pay to the Administrative Agent for the account of each Letter of Credit Lender in accordance with its Pro Rata Share or other applicable share provided for under this Agreement a Letter of Credit fee for each Letter of Credit issued pursuant to this Agreement equal to the Applicable Rate times the daily maximum amount then available to be drawn under such Letter of Credit (whether or not such maximum Dollar Amount is then in effect under such Letter of Credit if such maximum amount increases periodically pursuant to the terms of such Letter of Credit); *provided*, *however*, that (x) if any portion of a Defaulting Lender's Pro Rata Share of any Letter of Credit is Cash Collateralized by the Borrowers, then the Borrowers shall not be required to pay a Letter of Credit fee to such Defaulting Lender with respect to such portion of such Defaulting Lender's Pro Rata Share so long as it is Cash Collateralized by the Borrowers, and (y) if any portion of a Defaulting Lender's Pro Rata Share is not Cash Collateralized, then the Letter of Credit fee with respect to such Defaulting Lender's Pro Rata Share shall be payable to the applicable L/C Issuer until such Pro Rata Share is Cash Collateralized or reallocated or such Lender ceases to be a Defaulting Lender.  Such Letter of Credit fees shall be computed on a quarterly basis in arrears.  Such Letter of Credit fees shall be due and payable in Dollars on the earliest to occur of (i) the Maturity Date and (ii) the date on which the Letter of Credit Commitments are terminated.  If there is any change in the Applicable Rate during any quarter, the daily maximum amount of each Letter of Credit shall be computed and multiplied by the Applicable Rate separately for each period during such quarter that such Applicable Rate was in effect.

(i)      *Fronting Fee and Documentary and Processing Charges Payable to L/C Issuers*.  The Borrowers shall pay directly to each L/C Issuer for its own account a fronting fee with respect to each Letter of Credit issued by it in an amount as may be mutually agreed by the Borrowers and the applicable L/C Issuer of the maximum Dollar Amount available to be drawn under such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit if such maximum Dollar Amount increases periodically pursuant to the terms of such Letter of Credit).  Such fronting fees shall be computed on a quarterly basis in arrears.  Such fronting fees shall be due and payable in Dollars at the times and in the manner required by the applicable L/C Issuer.  In addition, the Borrowers shall pay directly to each L/C Issuer for its own account with respect to each Letter of Credit the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of such L/C Issuer relating to

letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable at the time and in the manner required by the applicable L/C Issuer and are nonrefundable.

(j)      *Conflict with Letter of Credit Request*.  Notwithstanding anything else to the contrary in this Agreement or any Letter of Credit Request, in the event of any conflict between the terms hereof and the terms of any Letter of Credit Request, (i) the terms hereof shall control and (ii) any grant of a security interest or Lien in any Letter of Credit application or any other Issuer Document shall be of no force or effect until the payment in full of the Obligations and the termination or expiration of the Commitments of the Lenders under this Agreement.

(k)      *Addition of an L/C Issuer*.  An L/C Issuer reasonably acceptable to the Required Lenders may become an additional L/C Issuer hereunder pursuant to a written agreement among the Borrowers, the Administrative Agent and such L/C Issuer.

(l)      *Provisions Related to Extended Letter of Credit Commitments*.  If the Maturity Date in respect of any Class of Letter of Credit Commitments occurs prior to the expiry date of any Letter of Credit, then (i) if one or more other Classes of Letter of Credit Commitments in respect of which the Maturity Date shall not have so occurred are then in effect (or will automatically be in effect upon the occurrence of such Maturity Date), such Letters of Credit shall automatically be deemed to have been issued (including for purposes of the obligations of the Letter of Credit Lenders to purchase participations therein and to make Letter of Credit Loans and payments in respect thereof pursuant to Sections 2.03(c) and (d)) under (and ratably participated in by Letter of Credit Lenders pursuant to) the non-terminating or new Classes of Letter of Credit Commitments up to an aggregate amount not to exceed the aggregate principal amount of the unutilized Letter of Credit Commitments continuing at such time (it being understood that no partial face amount of any Letter of Credit may be so reallocated) (provided that if any Letter of Credit Lender with a continuing Letter of Credit Commitment is a Defaulting Lender at the time of such reallocation, such Letters of Credit that are the subject of the reallocation would be able to be issued in compliance with the requirements of Section 2.03(a)(ii)(E)) (in each case, after giving effect to any repayments of Letter of Credit Loans as contemplated in Section 2.04(g)) and (ii) to the extent not reallocated pursuant to immediately preceding clause (i) and unless provisions reasonably satisfactory to the applicable L/C Issuer for the treatment of such Letter of Credit as a letter of credit under a successor credit facility have been agreed upon, the Borrowers shall, on or prior to the applicable Maturity Date, cause all such Letters of Credit to be replaced and returned to the applicable L/C Issuer undrawn and marked "cancelled" or to the extent that the Borrowers are unable to so replace and return any Letter(s) of Credit, such Letter(s) of Credit shall be backstopped by a "back to back" letter of credit reasonably satisfactory to the applicable L/C Issuer or the Borrowers shall Cash Collateralize any such Letter of Credit in accordance with Section 2.03(g). Commencing with the Maturity Date of any Class of Letter of Credit Commitments, the Letter of Credit Commitments shall be in an amount agreed solely with the L/C Issuer; *provided* that, at the request of the Borrowers, the Letter of Credit Commitments immediately following such Maturity Date shall be no less than the Letter of Credit Commitments immediately prior to such Maturity Date multiplied by a fraction, the numerator of which is the aggregate amount of the Letter of Credit Commitments immediately following such Maturity Date and the denominator of which is the aggregate amount of the Letter of Credit Commitments immediately prior to such Maturity Date.

(m)      *Letter of Credit Reports*.  For so long as any Letter of Credit issued by an L/C Issuer that is not the Administrative Agent is outstanding, such L/C Issuer shall deliver to the Administrative Agent on the last Business Day of each calendar month, and on each date that an L/C Credit Extension occurs with respect to any such Letter of Credit, a report in the form of Exhibit M hereto, appropriately completed with the information for every outstanding Letter of Credit issued by such L/C Issuer.

(n)     *Letters of Credit Issued for Subsidiaries*.  Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the benefit of, a subsidiary of a Borrower, the Borrowers shall be obligated to reimburse the applicable L/C Issuer hereunder for any and all drawings under such Letter of Credit.  The Borrowers hereby acknowledge that the issuance of Letters of Credit for the benefit of Subsidiaries of a Borrower inures to the benefit of the Borrowers, and that the Borrowers' business derives substantial benefits from the businesses of such Subsidiaries.

(o)     *Applicability of ISP*.  Unless otherwise expressly agreed by the L/C Issuer and the Borrowers when a Letter of Credit is issued, the rules of the ISP shall apply to each Letter of Credit. Notwithstanding the foregoing, the L/C Issuer shall not be responsible to the Borrowers for, and the L/C Issuer's rights and remedies against the Borrowers shall not be impaired by, any action or inaction of the L/C Issuer required or permitted under any law, order, or practice that is required or as a matter of international banking custom and practice, is to be applied to any Letter of Credit or this Agreement, including the Law or any order of a jurisdiction where the L/C Issuer or the beneficiary is located, the practice stated in the ISP or in the decisions, opinions, practice statements, or official commentary of the ICC Banking Commission, the Bankers Association for Finance and Trade – International Financial Services Association (BAFT-IFSA), or the Institute of International Banking Law & Practice, whether or not any Letter of Credit chooses such law or practice.

Section 2.04     [Reserved].

Section 2.05     [Reserved].

Section 2.06     [Reserved].

Section 2.07     Prepayments.

(a)     *Optional*.  (i) The Borrowers may, upon written notice to the Administrative Agent by the Borrowers, at any time or from time to time voluntarily prepay any Class or Classes of Term Loans in whole or in part without premium or penalty; *provided* that (1) such notice must be received by the Administrative Agent not later than 11:30 a.m. three (3) Business Days prior to any date of prepayment of Term Loans; and (2) any prepayment of Term Loans shall be in a minimum principal amount of $500,000, or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Class(es) of Term Loans to be prepaid.  The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such prepayment.  If such notice is given by the Borrowers, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  In the case of each prepayment of the Term Loans pursuant to this Section 2.05(a), the Borrowers may in their sole discretion select the Borrowing or Borrowings (and the order of maturity of principal payments) to be repaid, and such payment shall be paid to the Appropriate Lenders in accordance with their respective Pro Rata Shares or other applicable share provided for under this Agreement.

(ii)     [Reserved].

(iii)     Notwithstanding anything to the contrary contained in this Agreement, the Borrowers may rescind (or delay the date of prepayment identified in) by written notice to the Administrative Agent on or before the date of prepayment any notice of prepayment under Section 2.05(a)(i) or 2.05(a)(ii) if such prepayment would have resulted from a refinancing of all or a portion of the applicable Facility

or the occurrence of another event, which refinancing or other event shall not be consummated or shall otherwise be delayed.

(iv)    Voluntary prepayments (including contributions, assignments) of any Class of Term Loans permitted hereunder shall be applied to the remaining scheduled installments of principal thereof pursuant to Section 2.07(a) in a manner determined at the discretion of the Borrowers and specified in the written notice of prepayment (and absent such direction, in direct order of maturity); and, subject to the other limitations expressly set forth in this Agreement, the Borrowers may elect to apply voluntary prepayments of Term Loans to one or more Class or Classes of Term Loans selected by the Borrowers.

(b)    *Mandatory*.  Subject in all respects to the First Day Orders, the Second Day Orders, the Interim Order and/or the Final Order:

(i) [Reserved].

**(ii)**    If (1) any Borrower or any of its Restricted Subsidiaries Disposes of any property or assets, including Total 606 Commission Receivables (other than any Disposition of any property or assets permitted by Section 7.05(a), (b), (c), (d), (e),  (g), (h), (i), (k), (l), (n),  (p), (q), (r), (t),  (v), (w), (x), (y) or (z)), or (2) any Casualty Event occurs, which results in the receipt by any Borrower or any of its Restricted Subsidiaries of Net Proceeds, (a) if such Net Proceeds are received prior to the determination of whether a DIP Subordination Event (as defined in the Interim DIP Order) has occurred on or prior to any applicable Termination Date (as defined in the Restructuring Support Agreement) or if a DIP Subordination Event has occurred, than such Net Proceeds shall be placed in an escrow account controlled by the Administrative Agent to be applied upon the occurrence of a Termination Date and in accordance with the terms of the Restructuring Support Agreement and (b) if no DIP Subornation Event (as defined in the Interim DIP Order) has occurred on or prior to any applicable Termination Date (as defined in the Restructuring Support Agreement), then following all such applicable Termination Dates, the Borrowers shall cause to be prepaid on or prior to the date which is seven (7) Business Days after the date of the receipt by any Borrower or such Restricted Subsidiary of such Net Proceeds, subject to clause (b)(vii) of this Section 2.05, an aggregate principal amount of Term Loans in an amount equal to 100% of all such Net Proceeds received.

(iii)    [Reserved].

(iv)    [Reserved].

(v)    If for any reason the aggregate L/C Obligations at any time exceeds the aggregate Letter of Credit Commitments then in effect, the Borrowers shall promptly Cash Collateralize the L/C Obligations in an aggregate amount equal to such excess.  In addition, if for any reason the aggregate Outstanding Amount of L/C Obligations at any time exceeds the Letter of Credit Commitments then in effect, the Borrowers shall promptly Cash Collateralize the L/C Obligations in an aggregate amount equal to such excess.

(vi)    Each prepayment of Term Loans pursuant to this Section 2.07(b), (A) shall be applied either (x) ratably to each Class of Term Loans then outstanding or (y) as requested by the Borrowers in the notice delivered pursuant to clause (vii) below, to any Class or Classes of Term Loans with an earlier Maturity Date as compared with the remaining Classes of Term Loans then outstanding, (B) shall be applied, with respect to each such Class for which prepayments will be made, in a manner determined at the discretion of the Borrowers in the applicable notice and, if not specified, in direct order of maturity to repayments thereof required pursuant to Section 2.07(a) (for the avoidance of doubt, such application shall be unaffected by whether or not there are any Declined Proceeds resulting from such mandatory

prepayment) and (C) shall be paid to the Appropriate Lenders in accordance with their respective Pro Rata Share (or other applicable share provided by this Agreement) of each such Class of Term Loans, subject to clause (vii) of this Section 2.05(b).

(vii)    The Administrative Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made by it pursuant to clause (ii) of this Section 2.07(b) at least two (2) Business Days prior to the date of such prepayment (*provided* that in the case of clause (ii) of this Section 2.07(b), the Administrative Borrower may rescind (or delay the date of prepayment identified in) such notice if such prepayment would have resulted from a refinancing of all or any portion of the applicable Facility or other conditional event, which refinancing or other conditional event shall not be consummated or shall otherwise be delayed).  Each such notice shall specify the date of such prepayment and provide a reasonably-detailed, estimated calculation of the aggregate amount of such prepayment to be made by the Borrowers.  The Administrative Agent will promptly notify each Appropriate Lender of the contents of the Administrative Borrower's prepayment notice and of such Appropriate Lender's Pro Rata Share or other applicable share provided for in this Agreement of the prepayment.  Each Term Lender may reject all or a portion of its Pro Rata Share or other applicable share provided for in this Agreement of any mandatory prepayment (such declined amounts, the "**Declined Proceeds**") of Term Loans required to be made pursuant to clauses (i) and (ii) of this Section 2.07(b) by providing written notice (each, a "**Rejection Notice**") to the Administrative Agent and the Administrative Borrower no later than 5:00 p.m. one Business Day prior to such prepayment.  Each Rejection Notice from a given Lender shall specify the principal amount of the mandatory repayment of Term Loans to be rejected by such Lender.  If a Term Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Term Loans.  To the extent such non-declining Term Lenders elect to decline their Pro Rata Share of such Declined Proceeds, any Declined Proceeds remaining thereafter shall be retained by the Borrowers.

(viii)    *Interest Funding Losses, Etc*.  Except to the extent otherwise agreed by each Lender so being prepaid, all prepayments of Loans shall be accompanied by all accrued and unpaid interest thereon through but not including the date of such prepayment

Section 2.08    Termination or Reduction of Commitments.

(a)    *Optional*.  The Borrowers may, upon written notice to the Administrative Agent, terminate the unused Commitments of any Class, or from time to time permanently reduce the unused Commitments of any Class, in each case without premium or penalty; *provided* that (i) any such notice shall be received by the Administrative Agent at least 2:00 p.m. three (3) Business Days prior to the date of termination or reduction and (ii) any such partial reduction shall be in an aggregate amount of $500,000, or any whole multiple of $100,000 in excess thereof or, if less, the entire amount thereof.  Notwithstanding the foregoing, the Administrative Borrower may rescind or postpone any notice of termination of any Commitments prior to the effectiveness of such termination if such termination would have resulted from a refinancing of all or a portion of the applicable Facility or other conditional event, which refinancing or other conditional event shall not be consummated or otherwise shall be delayed.

(b)    *Mandatory*.  The Term B Commitment of each Term Lender shall be automatically and permanently reduced to $0 upon the funding of Term B Loans to be made by it on the Closing Date.  The Delayed Draw Term Loan Commitments of each Term Lender shall be automatically and permanently reduced by the amount of any Borrowing of Delayed Draw Term Loans upon the funding of the Delayed Draw Term Loans to be made by such Term Lender on such date.

(c)     *Application of Commitment Reductions; Payment of Fees*.  The Administrative Agent will promptly notify the Appropriate Lenders of any termination or reduction of unused portions of the Letter of Credit Commitments or the unused Commitments of any Class under this Section 2.08.  Upon any reduction of unused Commitments of any Class, the Commitment of each Lender of such Class shall be reduced by such Lender's Pro Rata Share of the amount by which such Commitments are reduced (other than the termination of the Commitment of any Lender as provided in Section 3.07).  All commitment fees accrued until the effective date of any termination of the Commitments of any Facility shall be paid on the effective date of such termination.

Section 2.09     Repayment of Loans.

Subject to the terms of the Restructuring Support Agreement and the Orders, the Borrowers shall repay to the Administrative Agent for the ratable account of the Appropriate Lenders on the Maturity Date, the aggregate principal amount of all Term B Loans and Delayed Draw Term Loans outstanding on such date.

Section 2.10     Interest.

(a)     Subject to the provisions of Section 2.10(b), (i) each Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Applicable Rate.

(b)     During the continuance of an Event of Default under Section 8.01(a), interest shall accrue on all amounts owing at a rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws; *provided* that no interest at the Default Rate shall accrue or be payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender.  Accrued and unpaid interest on such amounts (including interest on past due interest) shall be due and payable upon written demand.

(c)     Subject to the terms of the Restructuring Support Agreement and the Orders, Interest on each Loan shall accrue on the last day of each Interest Period and shall be due and payable in arrears unless the repayment or Maturity Date of such Loans occurs as a result of a transaction not permitted by an Acceptable Plan.

Section 2.11     Fees.

(a)     *Letter of Credit Commitment Fee*.  If the Restructuring Transactions are not consummated, then, on the earliest to occur of (i) the Maturity Date and (ii) the date the Letter of Credit Commitments are terminated, the Borrowers agree to pay to the Administrative Agent for the account of each Lender holding a Letter of Credit Commitment in accordance with its Pro Rata Share or other applicable share provided for under this Agreement, a commitment fee equal to the 3.00% of the amount of the Letter of Credit Commitments; *provided*, that no commitment fee shall accrue on any of the Commitments of a Defaulting Lender so long as such Lender shall be a Defaulting Lender.

(b)     *Agent Fees*.  The Borrowers shall pay to the Administrative Agent all fees and expenses owing to the Administrative Agent pursuant to Section 10.04, and such fees as shall have been separately agreed upon in the Fee Letter in the amounts and at the times so specified therein in immediately available funds.  Fees in the Fee Letter shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrowers and the Administrative Agent).

Section 2.12        Computation of Interest and Fees.

All computations of interest for Loans shall be made on the basis of a year of three hundred sixty-five (365) days, or three hundred sixty-six (366) days, as applicable, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a three hundred sixty (360) day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one (1) day.  In computing interest on any Loan, the day such Loan is made shall be included for purposes of calculating interest on a Loan and the date such Loan is repaid shall be excluded.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.13        Evidence of Indebtedness.

(a)        Except as expressly set forth herein, the Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent.  The entries made in the Register and the accounts or records maintained by the Administrative Agent and each Lender shall be *prima facie* evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent, as set forth in the Register, in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender, made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender a Note payable to such Lender, which, to the extent so reflected in the Register, shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

(b)        [Reserved].

(c)        Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.13(a), and by each Lender in its accounts or records pursuant to Section 2.13(a), shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrowers to, in the case of the Register, each Lender and, in the case of such accounts or records, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or record shall not limit or otherwise affect the obligations of the Borrowers under this Agreement and the other Loan Documents.

Section 2.14        Payments Generally.

(a)        All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in Same Day Funds not later than 12:00 p.m. on the date specified herein.  The Administrative Agent will promptly distribute to each Appropriate Lender its Pro Rata Share (or other applicable share provided for under this Agreement) of such payment in like funds as received by wire transfer to such Lender's

applicable Lending Office.  All payments received by the Administrative Agent after 12:00 p.m. may (in the sole discretion of the Administrative Agent) be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)      Unless the Borrowers or any Lender have notified the Administrative Agent in writing prior to the date, any payment is required to be made by it to the Administrative Agent hereunder (in the case of the Borrowers, for the account of any Lender or an L/C Issuer hereunder or, in the case of the Lenders, for the account of any L/C Issuer or Borrowers hereunder), that the Borrowers or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrowers or such Lender, as the case may be, has timely made such payment and may (but shall not be required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto.  If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(i)      if the Borrowers failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Overnight Rate from time to time in effect; and

(ii)      if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrowers to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the applicable Overnight Rate from time to time in effect.  When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing.  If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrowers, and the Borrowers shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing.  Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrowers may have against any Lender as a result of any default by such Lender hereunder.

A written notice (including documentation reasonably supporting such request) of the Administrative Agent to any Lender or the Borrowers with respect to any amount owing under this Section 2.14(b) shall be conclusive, absent manifest error.

(c)      If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrowers by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     The obligations of the Lenders hereunder to make Loans are several and not joint.  The failure of any Lender to make any Loan or to fund any such participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation.

(e)     Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)     Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03.  If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may (to the fullest extent permitted by mandatory provisions of applicable Law), but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such (a) Lender's Pro Rata Share or other applicable share provided for under this Agreement of the Outstanding Amount of all Loans outstanding at such time and (b) the Outstanding Amount of all L/C Obligations outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

Section 2.15     Sharing of Payments.

If, other than as expressly provided elsewhere herein or required by court order (including the Orders), any Lender shall obtain payment of any principal of or interest on account of the Loans made by it, or payment in respect of the participations in L/C Obligations held by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent in writing of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them and/or such sub-participations in the participations in L/C Obligations held by them, as the case may be, as shall be necessary to cause such purchasing Lender to share the excess payment in respect of any principal of or interest on such Loans or such participations, as the case may be, pro rata with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  For the avoidance of doubt, the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrowers or application of funds pursuant to and in accordance with the express terms of this Agreement as in effect from time to time (including the application of funds arising from the existence of a Defaulting Lender) or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder.  The Borrowers agree that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender was the direct creditor of the Borrowers in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest

error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.16     [Reserved].

Section 2.17     [Reserved].

Section 2.18     [Reserved].

Section 2.19     Defaulting Lenders.

(a)     *Adjustments*. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)     Waivers and Amendments.   That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

(ii)     Reallocation of Payments.   Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise), shall be applied at such time or times as may be determined by the Administrative Agent (acting at the direction of the Required Lenders) as follows: *first*, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment on a pro rata basis of any amounts owing by that Defaulting Lender to the L/C Issuer hereunder; *third*, if so requested by the L/C Issuer, to be held as Cash Collateral for future funding obligations of that Defaulting Lender of any participation in any Swing Line Loan or Letter of Credit; *fourth*, as the Borrowers may request (so long as no Default or Event of Default has occurred and is continuing), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent (acting at the direction of the Required Lenders); *fifth*, if so determined by the Administrative Agent (acting at the direction of the Required Lenders) and the Borrowers, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; *sixth*, to the payment of any amounts owing to the Lenders, the L/C Issuer as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the L/C Issuer against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default or Event of Default has occurred and is continuing, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans or L/C Borrowings in respect of which that Defaulting Lender has not fully funded its appropriate share and (y) such Loans or L/C Borrowings were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and L/C Borrowings owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or L/C Borrowings owed to, that Defaulting Lender. Any payments, prepayments or other amounts

-61-

paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this <u>Section 2.19(a)(ii)</u> shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    <u>Certain Fees</u>.  That Defaulting Lender (x) shall not be entitled to receive any commitment fee pursuant to <u>Section 2.09(a)</u> or ticking fee pursuant to <u>Section 2.09(c)</u> for any period during which that Lender is a Defaulting Lender (and the Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender) and (y) shall not be entitled to accrue interest at the Default Rate and (z) shall be limited in its right to receive Letter of Credit fees as provided in <u>Section 2.03(h)</u>.

(iv)    <u>Reallocation of Pro Rata Share to Reduce Fronting Exposure</u>.  During any period in which there is a Defaulting Lender, for purposes of computing the amount of the obligation of each Non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit pursuant to <u>Sections 2.03</u> and <u>2.04</u>, the "Pro Rata Share" of each Non-Defaulting Lender's L/C Obligations shall be computed without giving effect to the Letter of Credit Commitment of that Defaulting Lender; *provided* that the aggregate obligation of each Non-Defaulting Lender under a Letter of Credit Commitment to acquire, refinance or fund participations in Letters of Credit shall not exceed the positive difference, if any, of (1) the Letter of Credit Commitment under of that Non-Defaulting Lender <u>minus</u> (2) the aggregate Outstanding Amount of the Pro Rata Share or other applicable share provided under this Agreement (immediately prior to giving effect to such applicable reallocation) of the L/C Obligations.

(b)    *Defaulting Lender Cure*.  If the Administrative Borrower, the Administrative Agent (acting at the direction of the Required Lenders), and each L/C Issuer agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders at par (without giving effect to the reallocation of such Lender's participation pursuant to <u>Section 2.19(a)(iv)</u>), whereupon that Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.20    Co-Borrowers.

(a)    Each Borrower accepts joint and several liability hereunder in consideration of the financial accommodation to be provided by the Administrative Agent and the Lenders and the L/C Issuers under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of each Borrower to accept joint and several liability for the obligations of each Borrower.

(b)    Each Borrower shall be jointly and severally liable for the Obligations, regardless of which Borrower actually receives the Loans hereunder or the amount of the Obligations received or the manner in which the Administrative Agent or any Lender accounts for the Obligations on its books and records. Each Borrower's obligations with respect to Loans made to it, and each Borrower's obligations arising as a result of the joint and several liability of such Borrower hereunder, with respect to Loans or L/C Obligations made to and other Obligations owing by the Borrowers hereunder, shall be separate and distinct obligations, but all such obligations shall be primary obligations of each Borrower.

(c)        Each Borrower's obligations arising as a result of the joint and several liability of such Borrower hereunder with respect to Loans made to, Letters of Credit issued on behalf of, and other Obligations owing by, the Borrowers hereunder shall, to the fullest extent permitted by law, be unconditional irrespective of (A) the validity or enforceability, avoidance or subordination of the obligations of any other Borrower or of any promissory note or other document evidencing all or any part of the obligations of any other Borrower, (B) the absence of any attempt to collect the Obligations from any other Borrower, any other guarantor, or any other security therefor, or the absence of any other action to enforce the same, (C) the waiver, consent, extension, forbearance or granting of any indulgence by the Administrative Agent or any Lender with respect to any provision of any instrument evidencing the obligations of any other Borrower, or any part thereof, or any other agreement now or hereafter executed by any other Borrower and delivered to the Administrative Agent or any Lender, (D) the failure by the Administrative Agent or any Lender to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for the obligations of any other Borrower, (E) the Administrative Agent's or any Lender's election, in any proceeding instituted under the Bankruptcy Code of the United States, of the application of Section 1111(b)(2) of the Bankruptcy Code of the United States, (F) any borrowing or grant of a security interest by any other Borrower, as Debtor In Possession under Section 364 of the Bankruptcy Code of the United States, (G) the disallowance of all or any portion of the Administrative Agent's or any Lender's claim(s) for the repayment of the obligations of any other Borrower under Section 502 of the Bankruptcy Code of the United States, or (H) any other circumstances which might constitute a legal or equitable discharge or defense of a guarantor or of any other Borrower.  With respect to each Borrower's obligations arising as a result of the joint and several liability of such Borrower hereunder with respect to Loans made to the Borrowers hereunder, such Borrower waives, until the Obligations shall have been paid in full and this Agreement and the other Loan Documents shall have been terminated, any right to enforce any right of subrogation or any remedy which the Administrative Agent or any Lender now has or may hereafter have against such Borrower, any endorser or any guarantor of all or any part of the Obligations, and any benefit of, and any right to participate in, any security or collateral given to the Administrative Agent or any Lender to secure payment of the Obligations or any other liability of any Borrower to the Administrative Agent or any Lender.

(d)        Upon the occurrence and during the continuation of any Event of Default, the Administrative Agent and the Lenders may proceed directly and at once, without notice, against any Borrower to collect and recover the full amount, or any portion of the Obligations, without first proceeding against any other Borrower or any other Person, or against any security or collateral for the Obligations. Each Borrower consents and agrees that the Administrative Agent and the Lenders shall be under no obligation to marshal any assets in favor of any Borrower or against or in payment of any or all of the Obligations.

(e)        Each Borrower hereby irrevocably appoints the Administrative Borrower as the borrowing agent and attorney-in-fact for the Borrowers, which appointment shall remain in full force and effect unless and until the Administrative Agent shall have received prior written notice signed by all of the Borrowers that such appointment has been revoked and that another Borrower has been appointed in the place of the Administrative Borrower.  Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide to the Administrative Agent and receive from the Administrative Agent all notices with respect to Loans obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and the other Loan Documents and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  It is understood that the handling of the Collateral of the Borrowers in a combined fashion, as more fully set forth herein and in the Collateral Documents, is done solely as an accommodation to the Borrowers in order to utilize the collective borrowing powers of the Borrowers in the most efficient and economical manner and at their request, and that neither the Administrative Agent nor the Lenders shall incur liability to the Borrowers as a result hereof.

Each of the Borrowers expects to derive benefit, directly or indirectly, from the handling of the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group.

(f)     After the Closing Date, the Administrative Borrower may, at any time and from time to time, designate any Restricted Subsidiary that is a wholly-owned Domestic Subsidiary as a Borrower by delivery to the Administrative Agent of a Borrower Joinder Agreement executed by such Subsidiary and the Administrative Borrower, together with any documentation and other information with respect to such additional Borrower required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act requested by the Administrative Agent (and to the extent not theretofore delivered on the Closing Date or otherwise) and satisfied the Collateral and Guarantee Requirement (including without limitation the actions as specified in Section 6.11 with respect to newly formed Subsidiaries), and upon such delivery and satisfaction, such Subsidiary shall for all purposes of this Agreement and the other Loan Documents be a Borrower and a party to this Agreement.  As soon as practicable upon receipt of a Borrower Joinder Agreement, the Administrative Agent shall furnish a copy thereof to each Lender.

## ARTICLE III.
## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01          Taxes.

(a)     Except as provided in this Section 3.01, all payments made by or on account of the Borrowers or Guarantors to or for the account of the Administrative Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any Taxes, except as required by any Law.  If the Borrowers, any Guarantor or other applicable withholding agent shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to the Administrative Agent or any Lender, (i) if the Tax in question is an Indemnified Tax or Other Tax, the sum payable by the Borrowers or any Guarantor shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.01), each of such Lender (or where the Administrative Agent receives the payments for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions, (iii) the applicable withholding agent shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), if the Borrowers or any Guarantor is the applicable withholding agent, it shall furnish to the Administrative Agent or Lender (as the case may be) the original or a copy of a receipt evidencing payment thereof or other evidence acceptable to the Administrative Agent or Lender.

(b)     In addition, but without duplication of Section 3.01(a), the Borrowers agree to pay any and all present or future stamp, court or documentary Taxes and any other excise, property, intangible or mortgage recording Taxes, imposed by any Governmental Authority, which arise from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document excluding, in each case, any such Tax imposed as a result of the Administrative Agent or any Lender's Assignment and Assumption, grant of a participation, transfer or assignment to or designation of a new applicable Lending Office or other office for receiving payments under any Loan Document (collectively, "**Assignment Taxes**"), except for Assignment Taxes resulting from an assignment or participation that is requested or required in writing by the Borrowers (all such non-excluded taxes described in this Section 3.01(b) being hereinafter referred to as "**Other Taxes**").

(c)        The Borrowers and each Guarantor agree to promptly indemnify the Administrative Agent and each Lender for (i) the full amount of Indemnified Taxes and Other Taxes payable by the Administrative Agent or such Lender and (ii) any expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the Governmental Authority. A certificate as to the amount of such payment or liability prepared in good faith and delivered by the Administrative Agent or any Lender (or by the Administrative Agent on behalf of such Lender), accompanied by a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts shall be conclusive absent manifest error.

(d)        Each Lender and the Administrative Agent shall, at such times as are reasonably requested by the Borrowers or the Administrative Agent, provide the Borrowers and the Administrative Agent with any documentation prescribed by Law or reasonably requested by the Borrowers or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from, or reduction in, withholding Tax with respect to any payments to be made to such Lender under the Loan Documents. Each such Lender and the Administrative Agent shall, whenever a lapse in time or change in circumstances renders such documentation obsolete or inaccurate in any material respect, deliver promptly and on or before the date such documentation expires, becomes obsolete or inaccurate to the Borrowers and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrowers or the Administrative Agent) or promptly notify the Borrowers and the Administrative Agent in writing of its legal ineligibility to do so. Unless the applicable withholding agent has received forms or other documents satisfactory to it indicating that payments under any Loan Document to or for a Lender are not subject to withholding Tax or are subject to such Tax at a rate reduced by an applicable tax treaty, the applicable withholding agent shall withhold amounts required to be withheld by applicable Law from such payments at the applicable statutory rate. Notwithstanding any other provision of this clause (d), a Lender shall not be required to deliver any form pursuant to this clause (d) that such Lender is not legally eligible to deliver. Without limiting the foregoing:

(i)        Each Lender that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrowers and the Administrative Agent on or before the date on which it becomes a party to this Agreement two properly completed and duly signed original copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding.

(ii)        Each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrowers and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrowers or the Administrative Agent) whichever of the following is applicable:

(A)                two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms), claiming eligibility for the benefits of an income tax treaty to which the United States is a party,

(B)                two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)                in the case of a Lender claiming the benefits of the exemption for portfolio interest under Sections 871(h) or 881(c) of the Code, (A) a certificate substantially in the form of Exhibit I hereto (any such certificate a "**United States Tax Compliance Certificate**") and (B) two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms), or

(D)                   to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or is a Participant holding a participation granted by a participating Lender), two properly completed and duly signed original copies of Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a properly completed and duly signed Form W-8ECI, W-8BEN, W-8BEN-E, United States Tax Compliance Certificate, Form W-9 (or any successor form), Form W-8IMY or any other required information from each beneficial owner, as applicable (*provided* that, if such Lender is a partnership (and not a participating Lender) and one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such beneficial owner(s)).

(iii)     If the Administrative Agent is a United States person (as defined in Section 7701(a)(30) of the Code), it shall deliver to the Borrowers two properly completed and duly signed original copies of Internal Revenue Service Form W-9 (or any successor form) with respect to fees received on its own behalf, certifying that such Administrative Agent is exempt from U.S. federal backup withholding.  If the Administrative Agent is not a United States person (as defined in Section 7701(a)(30) of the Code), it shall deliver to the Borrowers two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI with respect to fees received on its own behalf.  If the Administrative Agent is not a United States person (as defined in Section 7701(a)(30) of the Code), it shall deliver to the Borrowers two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI with respect to fees received on its own behalf and an Internal Revenue Service Form W-8IMY certifying its status as a U.S. branch of a foreign bank described in U.S. Treasury Regulation Section 1.1441-1(b)(2)(iv)(A) that agrees to be treated for purposes of withholding tax as a United States person (as defined in Section 7701(a)(30) of the Code).

(e)      If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA, such Lender shall deliver to the Borrowers and the Administrative Agent at the time or times prescribed by Laws and at such time or times reasonably requested by the Borrowers or the Administrative Agent such documentation prescribed by applicable Laws and such additional documentation reasonably requested by the Borrowers or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender has or has not complied with such Lender's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment.

(f)      Each Lender hereby authorizes the Administrative Agent to deliver to the Loan Parties and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to Section 3.01(d) or (e) above.

(g)      Any Lender or the Administrative Agent claiming any additional amounts payable pursuant to this Section 3.01 shall use its reasonable efforts to mitigate or reduce the additional amounts payable, which reasonable efforts may include a change in the jurisdiction of its Lending Office (or any other measures reasonably requested by the Borrowers) if such a change or other measures would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the reasonable determination of such Lender, result in any material unreimbursed cost or expense or be otherwise disadvantageous to such Lender.

(h)      If any Lender or the Administrative Agent determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by a Loan Party pursuant to this Section 3.01, it shall promptly remit to such Loan Party an amount equal to the amount of such refund (but only to the

extent of indemnification or additional amounts paid by the Loan Party under this Section 3.01(h) with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including any Taxes) of the Lender or the Administrative Agent, as the case may be, and without interest (other than any interest paid by the relevant taxing authority with respect to such refund net of any Taxes payable by the Administrative Agent or Lender on such interest); *provided* that the Loan Parties, upon the request of the Lender or the Administrative Agent, as the case may be, shall promptly return such refund (plus any penalties, interest or other charges imposed by the relevant taxing authority) to such party in the event such party is required to repay such refund to the relevant taxing authority.  The Administrative Agent or such Lender, as the case may be, shall provide the Loan Party with a copy of any notice of assessment or other evidence reasonably available of the requirement to repay such refund received from the relevant taxing authority.   This Section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to Taxes that it deems confidential) to the Borrowers or any other person.

(i)   Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.07(e) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (i).

(j)   For the avoidance of doubt, a "Lender" shall, for purposes of this Section 3.01, include any L/C Issuer.

Section 3.02    Illegality.

If any Lender reasonably determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, in each case after the Closing Date, for such Lender or its applicable Lending Office to make, maintain or fund Loans, then, on notice thereof by such Lender to the Borrowers through the Administrative Agent, any obligation of such Lender to make Loans shall terminate. Upon receipt of such notice, the Borrowers shall, promptly following written demand from such Lender (with a copy to the Administrative Agent), prepay all applicable Loans of such Lender promptly.  Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment and conversion.

Section 3.03    [Reserved].

Section 3.04    Increased Cost and Reduced Return; Capital Adequacy.

(a)    If any Lender reasonably determines that as a result of a Change in Law, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining Loans or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (including any Taxes (other than (i) Indemnified Taxes or Other Taxes or (ii) Taxes imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan

Document that are excluded from the definition of Indemnified Taxes pursuant to clauses (i) through (vi) thereof), including by imposing, modifying or holding applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, and excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from reserve requirements contemplated by Section 3.04(c)), then from time to time within fifteen (15) days after written demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrowers shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.

(b)     If any Lender reasonably determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of any such Lender's holding companies, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by it to a level below that which such Lender or such Lender's holding companies could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding companies with respect to capital adequacy and liquidity), then from time to time upon demand of such Lender (with a copy of such demand to the Administrative Agent), the Borrowers will pay to such Lender, as the case may be, within fifteen (15) days after written demand by such Lender, such additional amount or amounts as will compensate such Lender or such Lender's holding companies for any such reduction suffered.

Section 3.05     [Reserved].

Section 3.06     Matters Applicable to All Requests for Compensation.

(a)     If any Lender requests compensation under Section 3.04, or the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or issuing Letters of Credit hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material economic, legal or regulatory respect; *provided* that nothing in this Section 3.06(a) shall affect or postpone any Obligations of the Borrowers or the rights of the Lenders under this Article III.

(b)     [Reserved].

(c)     Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of Section 3.01, 3.02, 3.03 or 3.04 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of Section 3.01, 3.02, 3.03 or 3.04 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrowers of the event giving rise to such claim and of such Lender's intention to claim compensation therefor (except that, if the circumstance giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

(d)     [Reserved].

(e)     [Reserved].

(f)     The Administrative Agent or any Lender claiming compensation under this Article III shall deliver a certificate to the Borrowers setting forth in reasonable detail the additional amount or amounts to be paid to it hereunder, which shall be conclusive on the absence of manifest error.  In determining such amounts, the Administrative Agent or such Lender may use any reasonable averaging and attribution methods.

Section 3.07     Replacement of Lenders under Certain Circumstances.

If (i) any Lender ceases to make Loans as a result of any condition described in Section 3.02 or Section 3.04, (ii) the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 or 3.04, (iii) any Lender is a Non-Consenting Lender, (iv) any Lender becomes a Defaulting Lender, or (v) any other circumstance exists hereunder that gives the Borrowers the right to replace a Lender as a party hereto, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, (x) require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.07), all of its interests, rights and obligations under this Agreement (or, with respect to clause (iii) above, all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver and amendment) and the related Loan Documents to one or more Eligible Assignees (*provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrowers to find a replacement Lender or other such Person) that shall assume such obligations (any of which assignee may be another Lender, if a Lender accepts such assignment); *provided* that:

(a)     the Borrowers or the Assignee shall have paid to the Administrative Agent the assignment fee specified in Section 10.07(b)(ii)(B) (unless otherwise waived by the Administrative Agent);

(b)     such Lender shall have received payment of an amount equal to the applicable outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers;

(c)     such Lender being replaced pursuant to this Section 3.07 shall (1) execute and deliver an Assignment and Assumption with respect to all, or a portion as applicable, of such Lender's Commitment and outstanding Loans and participations in L/C Obligations, and (2) deliver any Notes evidencing such Loans to the Borrowers or Administrative Agent (or a lost or destroyed note indemnity in lieu thereof); *provided* that the failure of any such Lender to execute an Assignment and Assumption or deliver such Notes shall not render such sale and purchase (and the corresponding assignment) invalid and such assignment may be recorded in the Register and the Notes shall be deemed to be canceled upon such failure;

(d)     upon such payment set forth in clauses (a) and (b) above and, if so requested by the assignee Lender, delivery to the assignee Lender of the appropriate Note or Notes executed by the Borrowers, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender;

(e)      in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(f)      such assignment does not conflict with applicable Laws;

(g)      any Lender that acts as an L/C Issuer may not be replaced in its capacity as an L/C Issuer hereunder at any time when it has any Letter of Credit outstanding hereunder unless arrangements reasonably satisfactory to such L/C Issuer (including the furnishing of a back-up standby letter of credit in form and substance, and issued by an issuer, reasonably satisfactory to such L/C Issuer or the depositing of cash collateral into a cash collateral account in amounts and pursuant to arrangements reasonably satisfactory to such L/C Issuer) have been made with respect to each such outstanding Letter of Credit; and

(h)      any Lender that acts as the Administrative Agent cannot be replaced in its capacity as Administrative Agent other than in accordance with Section 9.06,

or (y) terminate the Commitment of such Lender or L/C Issuer, as the case may be, and (a) in the case of a Lender (other than an L/C Issuer), repay all Obligations of the Borrowers owing to such Lender relating to the Loans and participations held by such Lender as of such termination date and (b) in the case of an L/C Issuer, repay all Obligations of the Borrowers owing to such L/C Issuer relating to the Loans and participations held by the L/C Issuer as of such termination date and Cash Collateralize, cancel or backstop, or provide for the deemed reissuance under another facility, on terms satisfactory to such L/C Issuer any Letters of Credit issued by it; *provided* that in the case of any such termination of the Commitment of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders) to cause the adoption of the applicable departure, waiver or amendment of the Loan Documents and such termination shall, with respect to clause (iii) above, be in respect of all of its interests, rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver and amendment.

In the event that (i) the Borrowers or the Administrative Agent have requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each affected Lender or all the Lenders with respect to a certain Class or Classes of the Loans and/or Commitments and (iii) the Required Lenders (or, in the case of a consent, waiver or amendment involving all affected Lenders or all Lenders of a certain Class or Classes (including to the extent such Classes constitute all outstanding Classes), in lieu of the Required Lenders, the Required Class Lenders) have agreed (but solely to the extent required by Section 10.01) to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

In connection with any such replacement, if any such Non-Consenting Lender or Defaulting Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within five (5) Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Non-Consenting Lender or Defaulting Lender, then such Non-Consenting Lender or Defaulting Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Non-Consenting Lender or Defaulting Lender.  By receiving such purchase price, the applicable Lenders shall automatically be deemed to have assigned such Loans or Commitments pursuant to the terms of an Assignment and Assumption and accordingly no other action by such Lenders shall be required in connection therewith.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

Section 3.08        Survival.

All of the Loan Parties' obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

**ARTICLE IV.**
**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

Section 4.01        Conditions to Initial Credit Extension.

The obligation of each Lender to make a Credit Extension hereunder on the Closing Date is subject to satisfaction (or waiver) of the following conditions precedent:

(a)        The Administrative Agent's receipt of the following, each of which shall be originals or pdf copies or other facsimiles unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party:

(i)        a Request for Credit Extension in accordance with the requirements hereof;

(ii)        executed counterparts of this Agreement;

(iii)        a Note executed by the Borrowers in favor of each Lender that has requested a Note at least one (1) Business Day in advance of the Closing Date;

(iv)        a copy of the charter or certificate of formation (or the equivalent thereof) of each Loan Party certified by the secretary of state of the state of formation, if applicable, of such Loan Party and the other Organization Documents of each Loan Party;

(v)        subject to Section 6.17, each Collateral Document and each other document set forth on Schedule 4.01 required to be executed on the Closing Date as indicated under such Schedule 4.01, in each case duly executed by each Loan Party thereto (as applicable), together with proper financing statements (Form UCC-1 or the equivalent) for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary to perfect the security interests purported to be created by the Security Agreement;

(vi)        such certificates of good standing (to the extent such concept exists) from the applicable secretary of state of the state of organization of each Loan Party, certificates of resolutions or other action and incumbency certificates evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date; and

(vii)        a closing certificate, executed by a Responsible Officer of the Administrative Borrower, on behalf of each Loan Party, certifying that the conditions set forth in Sections 4.01(g) and (h) have been met.

(b)        Payment of all fees and expenses required to be paid hereunder and due to the Administrative Agent, in the case of expenses, to the extent invoiced at least one (1) Business Day prior to the Closing Date (except as otherwise reasonably agreed by the Borrowers), required to be paid on the Closing Date.

(c)        The Administrative Agent shall have received the Initial Budget.

(d)        The Petition Date shall have occurred, and the Borrower and each Guarantor shall be a debtor and debtor-in-possession in the Cases.

(e)        Bankruptcy-Related Items.

(i)        The Cases of any of the Debtors shall have not been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(ii)        A motion, in form and substance reasonably satisfactory to the Lenders and the Administrative Agent (acting at the direction of the Required Lenders), seeking approval of the Facilities, shall have been filed in each of the Cases on the Petition Date.

(iii)        The Loan Parties shall have provided, to the extent reasonably practicable, the Lenders and the Administrative Agent (x) with a schedule of all expected "first day" motions and proposed orders and all related pleadings intended to be filed with the Bankruptcy Court on or prior to the Interim Order Entry Date (the "**First Day Orders**") and (y) draft copies of each of the First Day Orders at least one (1) calendar day prior to the filing thereof. All "first day" orders filed by the Debtors and entered by the Bankruptcy Court and shall be reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders).

(iv)        The Interim Order Entry Date shall have occurred not later than three (3) calendar days following the Petition Date, and the Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in a manner materially adverse to the Lenders without the prior written consent of the Required Lenders, and the Administrative Agent shall have received a certified copy of the Interim Order entered by the Bankruptcy Court.

(f)        No trustee, examiner or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking any such relief or seeking any other relief in the Bankruptcy Court to exercise control over any Collateral.

(g)        The representations and warranties of each Loan Party set forth in Article V and in each other Loan Document shall be true and correct in all material respects on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; *provided* that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(h)        No Default or Event of Default shall exist or would result from the initial Credit Extension on the Closing Date or from the application of the proceeds therefrom.

Without limiting the generality of the provisions of <u>Section 9.03</u>, for purposes of determining compliance with the conditions specified in this <u>Section 4.01</u>, the Administrative Agent and each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to such Person unless the Administrative Agent shall have received written notice from such Person prior to the proposed Closing Date specifying its objection thereto.

Section 4.02     Conditions to All Credit Extensions after the Closing Date.

The obligation of each Lender to honor any Request for Credit Extension or any request to amend an existing Letter of Credit (which amendment does not extend its maturity date or increase the principal amount) on and after the Closing Date, is subject to satisfaction (or waiver) of the following conditions precedent:

(i)     The representations and warranties of each Loan Party set forth in Article V and in each other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; *provided* that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(ii)     No Default or Event of Default shall exist or would result from such proposed Credit Extension or from the application of the proceeds therefrom.

(iii)     The Administrative Agent and, if applicable, the relevant L/C Issuer shall have received a Request for Credit Extension in accordance with the requirements hereof.

(iv)     the Interim Order or the Final Order, as the case may be, shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal, in each case, in a manner adverse to the Lenders.

(v)     all "second day orders" (collectively, the "**Second Day Orders**") approving on a final basis any first day orders intended to be entered on or prior to the date of entry of the Final Order shall have been entered by the Bankruptcy Court, shall be reasonably acceptable to the Administrative Agent (acting at the direction of the Required Lenders) and shall be in full force and effect.

(vi)     with respect to any Request for Credit Extension that is delivered on or after the date which is thirty (30) days following the Petition Date, the Final Order shall have been signed and entered by the Bankruptcy Court (and the Administrative Agent and the Lenders shall have received a true an complete copy of such Final Order), and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Required Lenders (and solely with respect to terms and provisions affecting the rights, duties, obligations, benefits, privileges, protections, indemnities and immunities of the Administrative Agent, the Administrative Agent).

Each Request for Credit Extension submitted by the Borrowers after the Closing Date shall be deemed to be a representation and warranty that the conditions specified in <u>Sections 4.02(i)</u> and <u>(ii)</u> have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

Each Borrower and each of the Subsidiary Guarantors party hereto represent and warrant to the Administrative Agent and the Lenders at the time of each Credit Extension (to the extent required to be true and correct in all material respects for such Credit Extension pursuant to Article IV) (it being understood that the following representations and warranties shall be deemed made with respect to any Foreign Subsidiaries only to the extent such concept exists under applicable Law) that:

Section 5.01    Existence, Qualification and Power; Compliance with Laws.

(a)    Each Loan Party and each Restricted Subsidiary (i) is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation, organization or formation (to the extent such concept exists in such jurisdiction), (ii) subject to the entry of the Orders and the terms thereof, has all requisite corporate power, limited liability power or other organizational power and authority to (A) own or lease its assets and carry on its business as currently conducted and (B) in the case of the Loan Parties, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (iii) is duly qualified and in good standing (to the extent such concept exists in such jurisdiction) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business as currently conducted requires such qualification, (iv) subject to the terms of the Orders entered by the Bankruptcy Court, is in compliance with all applicable Laws (including the United States Foreign Corrupt Practices Act of 1977, as amended), orders, writs and injunctions and (v) subject to the terms of the Orders entered by the Bankruptcy Court, has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted, including without limitation any required under applicable Healthcare Laws (collectively, "Healthcare Permits"); except in each case referred to in clause (i) (other than with respect to the Borrowers), (ii)(A), (iii), (iv) or (v), to the extent that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Neither the Borrowers nor any Restricted Subsidiary, nor any officer, director, manager, employee or any other personnel of any Borrower or any Restricted Subsidiary has now, or in the past three (3) years has, been (i) subject to a corporate integrity agreement with the United States Department of Health and Human Services Office of the Inspector General or a similar agreement (e.g., deferred prosecution agreement) with any other Governmental Authority; (ii) has been convicted of any violation of any applicable Healthcare Laws; or (iii) has been convicted of or, to the actual knowledge of any Responsible Officer of any Loan Party, investigated, for any violation of applicable Healthcare Laws or any applicable Law, fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, or obstruction of an investigation, in each case of clauses (i), (ii) and (iii) except as would not reasonably be expected to result in a Material Adverse Effect.

(c)    The Borrowers and their Restricted Subsidiaries have not in the past three (3) years, and to the actual knowledge of any Responsible Officer of any Loan Party, no officer, director, manager, or employee of any Borrower has in the past three (3) years, directly or indirectly, been in violation of any applicable Healthcare Laws, made, agreed to make, received or agreed to receive, any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other impermissible payment to any Person, regardless of form, whether in money, property or services, with the specific purpose of (i) obtaining favorable treatment in securing business for or in respect of the Borrowers or any of their Restricted Subsidiaries in violation of applicable Healthcare Laws; (ii) paying for favorable treatment for business secured for or in respect of the Borrowers or any of their Restricted Subsidiaries in violation of applicable Healthcare Laws; or (iii) inducing a referral of an individual to  Borrowers or any of their Restricted

Subsidiaries, in each case of clauses (i), (ii) and (iii) except as would not reasonably be expected to result in a Material Adverse Effect.

(d)     The Borrowers and their Restricted Subsidiaries have been, and are, in material compliance with HIPAA, except where non-compliance with HIPAA, either individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.  The Borrowers and their Restricted Subsidiaries have maintained in effect, for the past three (3) years, a data privacy and security policy that materially complies with HIPAA, except where such non-compliance, either individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.  As of the Closing Date, the Borrowers and their Restricted Subsidiaries have not received written notice, or to the actual knowledge of any Responsible Officer of any Loan Party, written notice, of any claim that any Borrower, any of its Restricted Subsidiaries, or any of their respective contractors or employees, have breached HIPAA with respect to the collection, use or disclosure of Personal Information.

Section 5.02     Authorization; No Contravention.

Subject to the entry of the Orders and the terms thereof, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party (a) have been duly authorized by all necessary corporate or other organizational action, and (b) do not (i) contravene in any material respect the terms of any of such Person's Organization Documents, (ii) result in any breach or contravention of, or the creation of any Lien upon any of the property or assets of such Loan Party (other than as permitted by Section 7.01), or require any payment to be made under any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject or (iii) violate any Law; except with respect to any breach or contravention or payment (but not creation of Liens) referred to in clauses (ii) and (iii), to the extent that such violation, breach, contravention or payment would not reasonably be expected to have a Material Adverse Effect.

Section 5.03     Governmental Authorization; Other Consents.

Subject to the entry of the Orders and the terms thereof, no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, enforcement by the Administrative Agent of its rights under the Loan Documents against, any Loan Party of this Agreement or any other Loan Document, the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, the perfection (if and to the extent required by the Collateral and Guarantee Requirement) or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) filings and registrations necessary to perfect the Liens (or release existing Liens) on the Collateral granted by the Loan Parties in favor of the Secured Parties under applicable U.S. Law, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full force and effect pursuant to the Collateral and Guarantee Requirement), (iii) entry of the Orders and (iv) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.04     Binding Effect.

Subject to the entry of the Orders and the terms thereof, this Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  Subject to the entry of the Orders and the terms thereof, this Agreement and each other Loan Document constitutes a

legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is a party thereto in accordance with its terms, except as such enforceability may be limited by (i) Debtor Relief Laws, (ii) the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (iii) by general principles of equity and principles of good faith and fair dealing and (iv) the effect of foreign Laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries.

Section 5.05    No Material Adverse Effect.

Since the Petition Date, there has been no event, circumstance or change, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

Section 5.06    Litigation.

Except for the Cases and as set forth on Schedule 5.06, (a) there are no actions, suits or proceedings, pending or (b) to the knowledge of any Borrower, there are no actions, suits, proceedings, claims or disputes overtly threatened in writing, in each case of (a) and (b), at law, in equity, in arbitration or before any Governmental Authority, against Holdings, any Borrower or any Restricted Subsidiary or against any of their properties or revenues that have a reasonable likelihood of adverse determination, and such determination, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 5.07    Ownership of Property; Liens.

Each of the Borrowers and each of its Restricted Subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all Real Property necessary in the ordinary conduct of its business, free and clear of all Liens except as set forth on Schedule 5.07 and except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by Section 7.01 and except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.08    Environmental Matters.

Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)    each Loan Party and its respective properties and operations are and have been in compliance with all Environmental Laws, which includes obtaining and maintaining all applicable Environmental Permits required under such Environmental Laws to carry on the business of the Loan Parties;

(b)    the Loan Parties have not received any written notice that alleges any of them is in violation of or potentially liable under any Environmental Laws and none of the Loan Parties nor any Real Property is the subject of any claims, investigations, liens, demands, or judicial, administrative or arbitral proceedings pending or, to the knowledge of any Borrower, threatened in writing, under any Environmental Law or to revoke or modify any Environmental Permit held by any of the Loan Parties;

(c)    there has been no Release of Hazardous Materials on, at, under or from any Real Property or facilities owned, operated or leased by any of the Loan Parties, or, to the knowledge of

any Borrower, Real Property formerly owned, operated or leased by any Loan Party or arising out of the conduct of the Loan Parties, in any case, that could reasonably be expected to require investigation, remedial activity or corrective action or cleanup under Environmental Laws or could reasonably be expected to result in the Borrowers or any other Loan Party incurring liability under Environmental Laws; and

(d)       there are no existing facts, circumstances or conditions arising out of or relating to the operations of the Loan Parties or Real Property or facilities owned, operated or leased by any of the Loan Parties or, to the knowledge of any Borrower, Real Property or facilities formerly owned, operated or leased by the Loan Parties that could reasonably be expected to result in the Borrowers or any other Loan Party incurring liability under Environmental Laws.

Section 5.09       Taxes.

Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, the Borrowers and the Restricted Subsidiaries (i) have timely filed all federal and other material tax returns required to be filed by them, and (ii) have paid all Taxes levied or imposed upon them or their properties, income, profits or assets, that are due and payable (including in their capacity as a withholding agent), except those (x) which are being contested in good faith by appropriate actions diligently conducted and for which adequate reserves have been provided in accordance with GAAP, or (y) for which nonpayment is permitted or required by the Bankruptcy Code.  As of the Closing Date, there is no proposed Tax deficiency or assessment known to any Loan Parties against the Loan Parties or their Restricted Subsidiaries that, if made would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  As of the Closing Date, no written adjustment relating to any such returns and involving a material amount of tax has been proposed or otherwise assessed by a taxing authority, and there are no pending audits, proceedings or actions related to the assessment or collection of taxes against any Loan Party that would, individually or in the aggregate, in each case, reasonably be expected to have a Material Adverse Effect.

Section 5.10       ERISA Compliance.

(a)       Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance in form and operation with its terms and with the applicable provisions of ERISA, the Code and other applicable federal or state Laws.

(b)       (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) neither any Loan Party, Restricted Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due but not delinquent under Section 4007 of ERISA); (iii) neither any Loan Party, Restricted Subsidiary nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 of ERISA with respect to a Multiemployer Plan; and (iv) to the knowledge of the Borrowers, neither any Loan Party, nor any ERISA Affiliate has engaged in a transaction that would be subject to Sections 4069 or 4212(c) of ERISA; except, with respect to each of the foregoing clauses of this Section 5.10(b), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.11       Subsidiaries; Equity Interests.

As of the Closing Date (after giving effect to the Transactions), no Loan Party has any Subsidiaries other than those specifically disclosed on <u>Schedule 5.11</u>, and all of the outstanding Equity Interests owned by the Loan Parties (or a Subsidiary of any Loan Party) in such Subsidiaries have been validly issued and

are fully paid and all Equity Interests owned by a Loan Party (or a Restricted Subsidiary of any Loan Party) in such Subsidiaries are owned free and clear of all Liens except (i) those created under the Collateral Documents and (ii) any Lien that is permitted under Section 7.01.

Section 5.12    Margin Regulations; Investment Company Act.

(a)    Each Borrower is not and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings or drawings under any Letter of Credit will be used for any purpose that violates Regulation U of the Board of Governors of the United States Federal Reserve System.

(b)    None of the Borrowers or any Guarantor is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 5.13    Disclosure.

No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party concerning Holdings, the Borrowers, their Restricted Subsidiaries or the Transactions on or prior to the Closing Date (other than projected financial information, *pro forma* financial information, budgets, estimates, other forward looking statements and information of a general economic or industry nature) to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole and as supplemented contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading.  With respect to the Budget, projected financial information and *pro forma* financial information, the Borrowers represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time such information was furnished to the Lenders (it being understood that (i) such Budget, projected financial information and *pro forma* financial information are not to be viewed as facts or a guarantee of performance and are subject to significant uncertainties and contingencies many of which are beyond your control and (ii) no assurance can be given that any particular financial projections will be realized, and that actual results during the period or periods covered by any such Budget, projected financial information and *pro forma* financial information may differ from the projected results, and such differences may be material).

Section 5.14    Labor Matters.

Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any Borrower or any of its Restricted Subsidiaries pending or, to the knowledge of the Borrowers, overtly threatened in writing and (b) each Borrower and each of its Restricted Subsidiaries have not been, in the past three (3) years, in violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters.

Section 5.15    Intellectual Property; Licenses, Etc.

The Borrowers and the Restricted Subsidiaries own, license or otherwise possess the right to use (free and clear of all Liens, except for the Liens permitted by Section 7.01) all of the intellectual property rights, including without limitation, trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, licenses, technology, software, know-how database rights, design rights, works of authorship, trade secrets, all registrations and applications related to any of the above, and other intellectual

property rights (collectively, "**IP Rights**") that are necessary for the operation of their respective businesses as currently conducted, except to the extent the absence of such IP Rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  To the knowledge of each Borrower, the operation of the respective businesses of the Borrowers and the Restricted Subsidiaries as currently conducted does not infringe upon any IP Rights held by any Person except for such infringements, individually or in the aggregate, that would not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any IP Rights is pending or, to the knowledge of any Borrower, overtly threatened in writing against any Loan Party or any of the Restricted Subsidiaries, that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 5.16 [Reserved].

Section 5.17 [Reserved].

Section 5.18 USA Patriot Act, FCPA and OFAC.

(a) To the extent applicable, each of Holdings, the Borrowers and their  Subsidiaries is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (ii) the USA Patriot Act, solely for purposes of <u>Section 4.01</u> to the extent a breach or violation of the representation in this clause (ii) would reasonably be expected to result in a Material Adverse Effect.

(b) No part of the proceeds of the Loans will be used by Holdings or their  Subsidiaries for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(c) None of Holdings, the Borrowers or any Subsidiary will knowingly use the proceeds of the Loans or otherwise knowingly make available such proceeds to any Person, for the purpose of financing the activities of any Person currently the subject of any U.S. sanctions program administered by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC"), except to the extent licensed or otherwise approved by OFAC.

Section 5.19 Cases; Orders.

(a) The Cases were commenced on the Petition Date in accordance in all material respects with applicable Laws and notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and, when applicable, the Final Order, and (ii) the hearing for the entry of the Final Order (provided that notice of the final hearing will be given as soon as reasonably practicable after such hearing has been scheduled).

(b) After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Cases having first priority Liens (subject to Section 8(b) of the Interim Order) in respect of the Facilities, with respect to all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject only to payment of any Claims secured by valid, enforceable, and non-avoidable Liens that

(A) are in existence on the Petition Date, (B) are either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by Section 546(b) of the Bankruptcy Code and (C) the Carve Out.

(c)     After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order (as applicable), the Obligations will be secured by a valid and perfected first priority Lien (subject to Section 8(b) of the Interim Order) on all of the Collateral of the Debtors, subject to Liens permitted under Section 7.01.

(d)     The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Administrative Agent's consent (acting at the direction of the Required Lenders), modified or amended in a manner adverse to the Lenders.  The Loan Parties are in compliance in all material respects with the Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order).

## ARTICLE VI.
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation (other than contingent indemnification obligations as to which no claim has been asserted) hereunder which is accrued and payable shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (unless the Outstanding Amount of the L/C Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to the applicable L/C Issuer or such Letter of Credit has been deemed reissued under another agreement reasonably acceptable to the applicable L/C Issuer (including, for the avoidance of doubt, the assumption of by New OpCo (as defined in the Restructuring Support Agreement) in accordance with the Restructuring Support Agreement), then from and after the Closing Date, Holdings (solely in the case of Sections 6.04, 6.05, 6.08, 6.11 and 6.13) and each Borrower shall, and shall cause each of its Restricted Subsidiaries to:

Section 6.01     Financial Statements.

Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)     [Reserved];

(b)     within forty-five (45) days after the end of each of each fiscal quarter of each fiscal year of the Administrative Borrower, a consolidated unaudited statement of financial condition of the Administrative Borrower and its Subsidiaries as at the end of such fiscal quarter and the related (i) consolidated unaudited statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (ii) consolidated unaudited statements of cash flows for such fiscal quarter and for the portion of the fiscal year then ended, all in reasonable detail and certified by a Responsible Officer of the Administrative Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Administrative Borrower and its Restricted Subsidiaries in accordance with GAAP, subject only to normal year-end adjustments and the absence of footnotes, along with a customary management's discussion and analysis describing the results of operation of the Administrative Borrower and its Subsidiaries;

(c)    within thirty (30) days after the end of each of each fiscal month of each fiscal year of the Administrative Borrower (other than any fiscal month that coincides with a fiscal quarter end), (i) consolidated unaudited statements of income or operations of the Administrative Borrower and its Subsidiaries for such fiscal month and for the portion of the fiscal year then ended and (ii) consolidated unaudited statements of cash flows of the Administrative Borrower and its Subsidiaries for such fiscal month and for the portion of the fiscal year then ended, all in reasonable detail and certified by a Responsible Officer of the Administrative Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Administrative Borrower and its Restricted Subsidiaries in accordance with GAAP, subject only to normal year-end adjustments and the absence of footnotes, along with a customary management's discussion and analysis describing the results of operation of the Administrative Borrower and its Subsidiaries.

(d)    No later than by 5:00 p.m. Eastern time on the fourth (4th) Business Day of the fourth full calendar week after the Petition Date, and by not later than 5:00 p.m. Eastern time on each fourth (4th) Business Day of each fourth calendar week thereafter (such four-week period, the "**Budget Reporting Period**"), a Budget covering the 13-week period beginning on the first Business Day of the week in which it is delivered.  Each Budget delivered after the Closing Date shall be subject to the consent of the Required Lenders and no such Budget shall be effective as the Approved Budget until so approved; provided, further that Administrative Agent and the Lenders (i) shall have no duty to monitor such compliance, (ii) with respect to the Administrative Agent, shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget and (iii) understand that the line items in the Approved Budget for payment of interest, expenses and other amounts to the Administrative Agent and the Lenders shall be estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Order regardless of whether such amounts exceed such estimates. Any proposed changes to the Approved Budget shall be subject to the written consent of the Required Lenders. For the avoidance of doubt, any reference to "written consent" hereunder shall include consent granted by email; and

(e)    No later than by 5:00 p.m. Eastern time on the fourth (4th) Business Day of the fourth full calendar week after the Petition Date, and by not later than 5:00 p.m. Eastern time on each fourth (4th) Business Day of every second week thereafter, a Budget Variance Report.

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b), (e) and (f) of this Section 6.01 may be satisfied with respect to such applicable financial information by furnishing the applicable financial statements of Holdings (or any direct or indirect parent(s) of Holdings if the Borrowers and their Restricted Subsidiaries are combined or consolidated in the financial statements of such parent(s)); provided that, with respect to clauses (A) and (B), (i) to the extent such information relates to Holdings (or a parent thereof), such information is accompanied by unaudited consolidating information that explains in reasonable detail the differences between the information relating to Holdings (or such direct or indirect parent(s) thereof), on the one hand, and the information relating to the Borrowers and their consolidated Restricted Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such materials are, to the extent applicable, accompanied by a report and opinion of any independent registered public accounting firm of nationally or regionally recognized standing or any other independent registered public accounting firm approved by the Administrative Agent (acting at the direction of the Required Lenders) (such consent not to be unreasonably withheld, delayed, denied or conditioned), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any qualification or any qualification as to the scope of such audit.

Any financial statement required to be delivered pursuant to Section 6.01(a), (b) or (c) shall not be required to include purchase accounting or recapitalization accounting adjustments relating to the Transactions or any other acquisition to the extent it is not practicable to include any such adjustments in such financial statement.

Section 6.02    Certificates; Other Information.

Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    promptly after the same are available and to the extent feasible not later than two (2) days prior to the filing thereof (other than in exigent circumstances in which case as soon as practicable), all pleadings, motions, applications and any other documents to be filed by or on behalf of the Loan Parties and any other written reports given to the U.S. trustee and to any official committee relating to the operations, business, assets, properties or financial condition of the Loan Parties;

(b)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which any Borrower or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(c)    [reserved];

(d)    [reserved];

(e)    [reserved]; and

(f)    promptly, such additional information regarding the business, legal, financial or corporate affairs of the Loan Parties or any of their respective Restricted Subsidiaries, or compliance with the terms of the Loan Documents, as the Administrative Agent (acting at the direction of the Required Lenders) or any Lender through the Administrative Agent may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01 and Section 6.02 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Administrative Borrower (or any direct or indirect parent of the Administrative Borrower) posts such documents, or provides a link thereto on the website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrowers' behalf on the Platform, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (x) upon written request by the Administrative Agent (acting at the direction of the Required Lenders), the Administrative Borrower shall deliver paper copies of such documents (which may be electronic copies delivered via electronic mail) to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent (acting at the direction of the Required Lenders) and (y) the Administrative Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the

Administrative Agent and maintaining its copies of such documents.  Notwithstanding anything to the contrary in this <u>Section 6.02</u>, none of the Borrowers or any of the Restricted Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

Each Borrower hereby acknowledges that (a) the Administrative Agent may, but shall not be obligated to, make available Borrower Materials to the Lenders by posting such Borrower Materials on the Platform and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive Material Non-Public Information, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  Each Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrowers shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any Material Non-Public Information (although it may be sensitive and proprietary) with respect to the Borrowers or their securities for purposes of United States federal and state securities laws (*provided*, *however*, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in <u>Section 10.08</u>); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."  Notwithstanding the foregoing, the Borrowers shall be under no obligation to mark the Borrower Materials "PUBLIC."

Section 6.03          Notices.

Promptly after a Responsible Officer of the Administrative Borrower has obtained actual knowledge thereof, notify the Administrative Agent (which will promptly thereafter furnish such notice to each Lender):

(a)          of the occurrence of any Default or Event of Default;

(b)          of the occurrence of an ERISA Event which would reasonably be expected to result in a Material Adverse Effect;

(c)          of the filing or commencement of, or any written overt threat or written notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority against any Borrower or any Restricted Subsidiary that would reasonably be expected to be adversely determined and, if so determined, would reasonably be expected to result in a Material Adverse Effect, other than, in each case, in connection with or arising from the Cases; or

(d)          of any violation by any Loan Party or any of their respective Restricted Subsidiaries of any Environmental Law which would reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this <u>Section 6.03</u> shall be accompanied by a written statement of a Responsible Officer of the Administrative Borrower (x) that such notice is being delivered pursuant to

Section 6.03(a), (b), (c) or (d) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrowers have taken and propose to take with respect thereto.

Section 6.04     Payment of Taxes.

Pay, discharge or otherwise satisfy, as the same shall become due and payable in the normal conduct of its business, all its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (a) any such Tax is being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with GAAP, (b) the failure to pay or discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (c) nonpayment is permitted or required by the Bankruptcy Code.

Section 6.05     Preservation of Existence, Etc.

(a)     Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization, and

(b)     take all reasonable action to maintain all rights, privileges (including its good standing where applicable in the relevant jurisdiction), permits, approvals, licenses and franchises material to the ordinary conduct of its business,

except, in the case of clause (a) or (b), to the extent (i) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (except in the case of clause (a) with respect to the Borrowers) or (ii) pursuant to any transaction permitted by Article VII.

Section 6.06     Maintenance of Properties.

Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material tangible properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted.

Section 6.07     Maintenance of Insurance.

Maintain with insurance companies that the Borrowers believe (in the good faith judgment of management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrowers and the Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons.  Not later than 60 days after the Closing Date (or 60 days after the date any such insurance is obtained, in the case of insurance obtained after the Closing Date), each such policy of insurance (other than business interruption insurance (if any), director and officer insurance, worker's compensation insurance and other insurance customarily excluded) shall as appropriate (i) name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interest may appear or (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Secured Parties, as loss payee thereunder.

Section 6.08       Compliance with Laws.

Comply with the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property, except if the failure to comply therewith would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and other than in connection with or arising from the Cases (whether stayed or not stayed).

Section 6.09       Books and Records.

Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP and which reflect all material financial transactions and matters involving the assets and business of a Borrower or a Restricted Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

Section 6.10       [Reserved].

Section 6.11       Additional Collateral; Additional Guarantors.

At the Borrowers' reasonable expense, subject to the limitations and exceptions of this Agreement, including, without limitation, the provisions of the Collateral and Guarantee Requirement, the Orders and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders) to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(a)       upon (w) the formation or acquisition of any new direct or indirect wholly-owned Subsidiary (in each case, other than an Excluded Subsidiary) by any Loan Party or (x) an election by the Borrower to designate a Restricted Subsidiary as a Guarantor pursuant to the definition of Guarantor, the designation in accordance with Section 6.14 of any existing direct or indirect wholly-owned Subsidiary as a Restricted Subsidiary (in each case, other than an Excluded Subsidiary), (y) [reserved] or (z) any Restricted Subsidiary ceasing to be an Excluded Subsidiary:

(i)       within 60 (or such greater number of days specified below) days after such formation, acquisition or designation, or such longer period as the Administrative Agent (acting at the direction of the Required Lenders) may agree in writing:

(A)       cause each such Subsidiary to duly execute and deliver to the Administrative Agent, other than with respect to any Excluded Assets, a Guarantor Joinder Agreement to this Agreement as Guarantors, completed Security Agreement Supplements, Intellectual Property Security Agreements, a counterpart of the Intercompany Note and other security agreements and documents as reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders) and in customary form (consistent with the Security Agreement, Intellectual Property Security Agreements and other security agreements in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

(B)       cause each such Subsidiary (and the parent of each such Subsidiary that is a Guarantor) to deliver any and all certificates representing

Equity Interests (to the extent certificated), intercompany notes (to the extent certificated) and instruments evidencing Indebtedness that, in each case, are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank; and

(C)    take and cause such Subsidiary (and the parent of such Subsidiary that is a Guarantor) to take whatever action (including the filing of UCC financing statements and delivery of stock and membership interest certificates to the extent certificated) as may be required pursuant to the terms of the Loan Documents or as may be necessary in the reasonable opinion of the Administrative Agent (acting at the direction of the Required Lenders) to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and perfected first priority Liens (to the extent required by the Collateral Documents) to the extent required by the Collateral and Guarantee Requirement;

(ii)    if reasonably requested by the Administrative Agent, within sixty (60) days after such request (or such longer period as the Administrative Agent (acting at the direction of the Required Lenders) may agree in writing), deliver to the Administrative Agent customary legal opinions, board resolutions, good standing certificates and secretary's or assistant secretary's certificates;

(iii)    [reserved]; and

(iv)    if reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders), within sixty (60) days after such request (or such longer period as the Administrative Agent (acting at the direction of the Required Lenders) may agree in writing), deliver to the Administrative Agent any other items necessary from time to time to satisfy the Collateral and Guarantee Requirement with respect to perfection and existence of security interests with respect to property of any Guarantor acquired after the Closing Date and subject to the Collateral and Guarantee Requirement, but not specifically covered by the preceding clauses (i), (ii) or (iii) or clause (b) below.

(b)    [reserved].

Section 6.12    Compliance with Environmental Laws.

Except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) comply, and use commercially reasonable efforts to take all reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits; (b) obtain and renew all Environmental Permits necessary for its operations and properties; and (c) in each case to the extent the Loan Parties are required by applicable Environmental Laws, conduct any investigation, remedial, cleanup or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with applicable Environmental Laws.

Section 6.13    Further Assurances.

Promptly upon reasonable request by the Administrative Agent (acting at the direction of the Required Lenders), and as required by and consistent with the provisions of the Collateral and Guarantee Requirement and the Orders, (i) correct any mutually identified material defect or error that may be

discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent (acting at the direction of the Required Lenders) may reasonably request from time to time in order to (x) carry out more effectively the purposes of the Collateral Documents and/or (y) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens (subject to Liens permitted hereunder) intended to be created thereunder, in each case, to the extent required pursuant to the Collateral and Guarantee Requirement.

Section 6.14        [Reserved].

Section 6.15        Milestones.

The Loan Parties shall ensure the satisfaction of the following milestones (collectively, the "**Milestones**" and each, a "**Milestone**"), unless waived or extended with the consent of the Required Lenders or the Administrative Agent (with the written consent of the Required Lenders (which may be by email)):

(a)        entry of the Interim Order approving entry into the Facilities on an interim basis shall occur within three (3) days following the Petition Date;

(b)        entry of the Final Order approving entry into the Facilities on a final basis shall occur within 35 days following the Petition Date;

(c)        entry of an order approving a disclosure statement for a chapter 11 plan of reorganization reasonably acceptable to the Sponsor, the Required Consenting Revolving Credit Facility Lenders and the Required Consenting Term Lenders (the "**Acceptable Plan**") shall occur within 45 days following the Petition Date;

(d)        entry of an order confirming an Acceptable Plan shall occur within 105 days following the Petition Date; and

(e)        the Restructuring Effective Date (as defined in the Restructuring Support Agreement) shall occur within 135 days following the Petition Date.

Section 6.16        Use of Proceeds.

Use the proceeds of the Loans in accordance with the Orders and the Approved Budget (subject to Permitted Variances) to (a) pay fees, interest and expenses associated with the Facilities; (b) provide for the ongoing working capital needs and general corporate purposes of the Debtors during the pendency of the Cases; and (c) fund the costs and expenses of the administration of the Cases.

Section 6.17        Post-Closing Matters.

Cause to be delivered or performed the documents and other agreements set forth on <u>Schedule 6.17</u> within the time frames specified in such <u>Schedule 6.17</u>.

All conditions precedent and representations contained in this Agreement and the other Loan Documents shall be deemed modified to the extent necessary to effect the foregoing (and to permit the taking of the actions described above within the time periods required above, rather than as elsewhere provided in the Loan Documents); *provided* that (x) to the extent any representation and warranty would

not be true because the foregoing actions were not taken on the Closing Date, the respective representation and warranty shall be required to be true and correct in all material respects at the time the respective action is taken (or was required to be taken) in accordance with the foregoing provisions of this Section 6.17 and (y) all representations and warranties relating to the Collateral Documents shall be required to be true immediately after the actions required to be taken by this Section 6.17 have been taken (or were required to be taken) and the parties hereto acknowledge and agree that the failure to take any of the actions required above, within the relevant time periods required above, shall give rise to an immediate Event of Default pursuant to this Agreement.

Section 6.18    Lender Calls.

At the request of the Required Lenders, participate in a conference call with the Lenders to be held at such time as may be agreed to by the Administrative Borrower and the Required Lenders.

Section 6.19    Fiscal Year.

From and after the Closing Date, maintain its fiscal year as in effect on the Closing Date; *provided*, *however*, that the Borrowers may (x) align the dates of such fiscal year of any Restricted Subsidiary whose fiscal year ends on a date other than that of the Borrowers or (y) upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year, and, in the case of this clause (y), the Administrative Borrower and the Administrative Agent (acting at the direction of the Required Lenders) will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 6.20    Transactions with Affiliates.

Not enter into any transaction of any kind with any Affiliate of any Borrower, whether or not in the ordinary course of business, involving aggregate payments or consideration, in any transaction or series of related transactions, in excess of $6,000,000, other than:

(a)    transactions among Holdings, the Borrowers or the Restricted Subsidiaries or any entity that becomes a Restricted Subsidiary as a result of such transaction;

(b)    transactions on terms (taken as a whole) substantially as favorable to such Borrower or such Restricted Subsidiary as would be obtainable by such Borrower or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate (as determined in good faith by the Borrowers);

(c)    the Transactions, the Restructuring Transactions, and the payment of fees and expenses (including the Transaction Expenses) related to the Transactions, the Restructuring Transactions and transactions constituting any Permitted Reorganization;

(d)    the issuance of Equity Interests or equity-based awards to any officer, director, employee, independent contractor or consultant of any Borrower or any Subsidiary or any direct or indirect parent of any Borrower, including in connection with the Transactions;

(e)    the payment of indemnities and other expenses pursuant to a Sponsor Management Agreement or other arrangement with the foregoing Persons, plus any unpaid indemnities and expenses accrued in any prior year to the extent such fee or expense is otherwise permitted to be paid pursuant to this clause (e) in such prior year;

(f)      Restricted Payments permitted under Section 7.06, Permitted Investments (other than by reference to this Section 6.20 or any clause in this Section 6.20), Dispositions permitted under Section 7.05 and mergers permitted under Section 7.04;

(g)      transactions by any Borrower and any Restricted Subsidiary permitted under an express provision (including any exceptions thereto) of this Article VI (other than by reference to this Section 6.20 or any clause in this Section 6.20);

(h)      (i) employment, consulting and severance arrangements between a Borrower and the Restricted Subsidiaries (or any direct or indirect parent of a Borrower) and their respective future, present or former officers, employees, independent contractors, partners and/or consultants, in each case, in the ordinary course of business and (ii) transactions pursuant to any shareholder, employee or director equity plan or stock option plan or any other management or employee benefit plan or agreement, or any equity subscription, co-invest agreement or shareholder agreement, including any arrangement including Equity Interests rolled over or otherwise re-invested by management of any Borrower or any direct or indirect parent company of any Borrower in connection with the Transactions;

(i)      the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of or for the benefit of any future, present or former directors, officers, member of management, independent contractors, partners, employees and consultants of Holdings, a Borrower and its Restricted Subsidiaries (or any direct or indirect parent of a Borrower), in each case, in the ordinary course of business to the extent attributable to the ownership or operation of a Borrower and its Restricted Subsidiaries;

(j)      transactions pursuant to agreements, instruments or arrangements in existence on the Closing Date and set forth on Schedule 6.20 or any amendment thereto or replacement thereof to the extent such an amendment or replacement is not materially adverse to the Lenders (taken as a whole) as compared to the applicable agreement, instrument or arrangement in effect on the Closing Date;

(k)      [reserved];

(l)      payments by a Borrower or any of its Subsidiaries pursuant to any tax sharing agreements with any direct or indirect parent of a Borrower to the extent attributable to the ownership or operation of a Borrower and its Subsidiaries, but only to the extent permitted by Section 7.06(b)(xiv)(b);

(m)      the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of Holdings to any Permitted Holder (or any Affiliates of the foregoing) or to any former, current or future director, manager, officer, employee, independent contractor, partner or consultant (or any Affiliates of any of the foregoing) of a Borrower, any of its Subsidiaries or any direct or indirect parent thereof;

(n)      transactions with customers, clients, joint venture partners, independent contractors, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the applicable Borrower or their Restricted Subsidiaries, in the reasonable determination of the Board of Directors or the senior management of the Administrative Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(o)      payments approved by the majority of the members of the Board of Directors of the applicable Borrower or a majority of the disinterested members of such Board of Directors in good faith;

(p)      the payment of reasonable out-of-pocket costs and expenses relating to registration rights and indemnities provided to stockholders of a Borrower or any direct or indirect parent thereof pursuant to the stockholders agreement or the registration rights agreement entered into on or after the Closing Date in connection therewith or similar equity holder's agreements or limited liability company agreements;

(q)      transactions in which any Borrower or any of the Restricted Subsidiaries, as the case may be, deliver to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to such Borrower or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (b) of this Section 6.20;

(r)      the licensing of trademarks, copyrights or other IP Rights in the ordinary course of business and the non-exclusive licensing of trademarks, copyrights, or other IP Rights;

(s)      the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of any Borrower or any of its Subsidiaries or any direct or indirect parent thereof or any contribution to the capital of any Borrower or any of its Restricted Subsidiaries to the extent otherwise permitted by this Agreement and to the extent such issuance or transfer would not give rise to a Change of Control;

(t)      transactions with the Sponsor in connection with the Transactions and the Restructuring Transactions;

(u)      [reserved];

(v)      [reserved];

(w)      [reserved];

(x)      transactions permitted by the First Day Orders, the Second Day Orders and/or the Approved Budget (subject to Permitted Variances); and

(y)      transactions between any Borrower or any of its Restricted Subsidiaries and any Person, a director of which is also a director of a Borrower or any direct or indirect parent of a Borrower; *provided*, *however*, that such director abstains from voting as a director of the applicable Borrower or such direct or indirect parent, as the case may be, on any matter involving such other Person.

Section 6.21      Bankruptcy-Related Matters.

The Borrower will and will cause each of the Guarantors and their Restricted Subsidiaries to:

(a)      comply in all material respects with the Orders;

(b)      comply in all material respects in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the Interim Order and the Final Order, as applicable, and any other order of the Bankruptcy Court; and

(c)       comply with the Restructuring Support Agreement.

## ARTICLE VII.
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation (other than contingent indemnification obligations as to which no claim has been asserted) hereunder, or any Letter of Credit, shall remain outstanding (unless the Outstanding Amount of the L/C Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to the applicable L/C Issuer or such Letter of Credit has been deemed reissued under another agreement reasonably acceptable to the applicable L/C Issuer (including by assumption by New OpCo (as defined in the Restructuring Support Agreement) in accordance with the Restructuring Support Agreement)), then from and after the Closing Date, each Borrower shall not, and each Borrower shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

Section 7.01       Liens.

Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)       Liens (i) created pursuant to any Loan Document and/or the Orders and (ii) on the Collateral securing all other Secured Obligations;

(b)       Liens existing on the Petition Date (i) that secure Indebtedness or other obligations not in excess of $1,000,000 or (ii) are listed in Schedule 7.01(b);

(c)       Liens for (x) taxes, assessments or governmental charges that are not required to be paid pursuant to Section 6.04 or (y) property taxes on property of any Borrower or any Subsidiary thereof that such Person has determined to abandon (if the sole recourse for such tax, assessment, charge, levy, or claim is to such property);

(d)       statutory or common law Liens of landlords, sub-landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens or other customary Liens (other than in respect of Indebtedness) in favor of landlords, so long as, in each case, such Liens secure amounts not overdue for a period of more than sixty (60) days or if more than sixty (60) days overdue and either (x) are unfiled and no other action has been taken to enforce such Liens, (y) are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP or the equivalent accounting principles in the relevant local jurisdiction or (z) the failure to pay or discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(e)       (i) Liens granted in the ordinary course of business in connection with workers' compensation, health, disability or employee benefits, unemployment insurance and other social security laws or similar legislation or regulation or other insurance-related obligations (including, but not limited to, in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto) and (ii) Liens granted in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Holdings, any Borrower or any of the Restricted Subsidiaries;

(f)　　Liens granted to secure the performance of bids, trade contracts, warranties, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business or consistent with industry practice;

(g)　　[reserved];

(h)　　Liens (i) securing judgments or orders for the payment of money not constituting an Event of Default under Section 8.01(h), (ii) arising out of judgments or awards against any Borrower or any of its Restricted Subsidiaries with respect to which an appeal or other proceeding for review is then being pursued and (iii) notices of *lis pendens* and associated rights related to litigation being contested in good faith by appropriate proceedings for which adequate reserves have been made;

(i)　　leases, licenses, subleases or sublicenses granted to others in the ordinary course of business (or other agreements under which any Borrower or any Restricted Subsidiary has granted rights to end users to access and use any Borrower's or any Restricted Subsidiary's products, technologies or services in the ordinary course of business) which (i) do not materially interfere with the business of the Borrowers and the Restricted Subsidiaries, taken as a whole and (ii) do not secure any Indebtedness for borrowed money;

(j)　　Liens (i) in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business and (ii) on specific items of inventory or other goods and proceeds thereof of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such person to facilitate the purchase, shipment or storage of such inventory or goods in the ordinary course of business;

(k)　　Liens (i) of a collection bank arising under Section 4-208 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and (iii) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and that are customary in the banking industry or arising pursuant to such banking institution's general terms and conditions;

(l)　　Liens (i) on cash advances in favor of the seller of any property to be acquired in any acquisition permitted pursuant to this Agreement, in each case to be applied against the purchase price for such acquisition and (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such acquisition or Disposition, as the case may be, would have been permitted under this Agreement on the date of the creation of such Lien;

(m)　　Liens (i) in favor of a Borrower or a Restricted Subsidiary on assets of a Non-Loan Party or (ii) in favor of any Borrower or any Subsidiary Guarantor on assets of a Restricted Subsidiary;

(n)　　any interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's

or sublicensor's interest under leases, subleases, licenses or sublicenses entered into by any Borrower or any Restricted Subsidiary in the ordinary course of business;

(o)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by any Borrower or any Restricted Subsidiary in the ordinary course of business;

(p)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under <u>Section 7.06</u> or the definition of "Permitted Investments";

(q)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts maintained in the ordinary course of business and not for speculative purposes;

(r)     Liens that are contractual rights of set-off or rights of pledge (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of any Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of any Borrower or any Restricted Subsidiary or (iii) relating to purchase orders and other agreements entered into with customers of any Borrower or any Restricted Subsidiaries in the ordinary course of business;

(s)     Liens solely on any cash earnest money deposits made by any Borrower or any Restricted Subsidiary in connection with any letter of intent or purchase agreement permitted hereunder;

(t)     ground leases in respect of Real Property on which facilities owned or leased by any Borrower or any Restricted Subsidiary are located;

(u)     Liens to secure Indebtedness permitted under <u>Section 7.03(e)</u>; *provided* that (i) such Liens are created no later than 270 days after the acquisition, construction, repair, lease or improvement of the property subject to such Liens, (ii) such Liens do not at any time encumber property (except for replacements, additions and accessions to such property) other than the property financed by such Indebtedness and the proceeds and products thereof and customary security deposits and (iii) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any assets (except for additions and accessions to such assets, replacements and products thereof and customary security deposits) other than the assets subject to, or acquired, constructed, repaired, replaced or improved with the proceeds of such Indebtedness; *provided* that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender; *provided* that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v)     Liens on property of any Non-Loan Party, which Liens secure Indebtedness of any Non-Loan Party permitted under <u>Section 7.03</u> or other obligations of any Non-Loan Party not constituting Indebtedness;

(w)     [reserved];

(x)     (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of

any Real Property that does not materially interfere with the ordinary conduct of the business of the Borrowers and the Restricted Subsidiaries, taken as a whole;

(y)     Liens arising from precautionary Uniform Commercial Code financing statement or similar filings;

(z)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(aa)     the modification, replacement, renewal or extension of any Lien permitted by clauses (b), (u), (v), (aa)s and (gg) of this Section 7.01; *provided* that (i) other than in the case of Liens permitted by Section 7.01(gg) (and any Liens permitted under this clause (aa) which were originally granted under Section 7.01(gg)), in each case to the extent provided in the final proviso of this clause (aa), at the time of such modification, replacement, renewal or extension the Lien does not extend to any additional property, other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien and (B) proceeds, products and accessions thereof, and customary security deposits, and, in the case of Liens permitted by Section 7.01(w) (and any Liens permitted under this clause (aa) which were originally granted under Section 7.01(w)), after-acquired property of the applicable Restricted Subsidiary to the extent the security agreements in place at the time of the acquisition of such Restricted Subsidiary required the grant of such Lien in after-acquired property and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03 (to the extent constituting Indebtedness); *provided* that (w) assets subject to any cross-collateralization of obligations owed to the holder of such Lien shall remain subject to such cross-collateralization, if any Lien (prior to the modification, replacement, renewal or extension thereof) was subject to a lien subordination and intercreditor agreement, such Lien (subsequent to the modification, replacement, renewal or extension thereof) shall be subject to such lien subordination and intercreditor agreement or shall be subject to a substantially similar or more junior lien subordination and intercreditor agreement reasonably satisfactory to the Administrative Borrower and the Administrative Agent (acting at the direction of the Required Lenders); *provided*, *further*, that modifications, replacements, renewals or extensions of Liens permitted by Section 7.01(gg) (and any Liens permitted under this clause (aa) which were originally granted under Section 7.01(gg)), in each case may be secured by after-acquired Collateral of the applicable Loan Party to the extent the security agreements in place at the time of the initial grant of Liens under Section 7.01(gg), as applicable, by such Loan Party required the grant of such Lien in after-acquired Collateral;

(bb)     Liens with respect to property or assets of any Borrower or any Restricted Subsidiary securing obligations in an aggregate principal amount outstanding at any time not to exceed $5,000,000;

(cc)     [reserved];

(dd)     [reserved];

(ee)     Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(ff)    deposits of cash with the owner or lessor of premises leased and operated by any Borrower or any Subsidiary to secure the performance of such Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(gg)    Liens securing the Indebtedness under the Existing Credit Agreement (including, for the avoidance of doubt, all "Secured Hedge Agreements" and "Cash Management Obligations" (each as defined in the Existing Credit Agreement) secured by the "Loan Documents" (as defined in the Existing Credit Agreement));

(hh)    Liens permitted by the First Day Orders, Second Day Orders, the Interim Order, the Final Order and/or Approved Budget (subject to Permitted Variances); and

(ii)Liens granted as

adequate protection by the Bankruptcy Court.

The expansion of Liens by virtue of accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, amortization of OID and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an incurrence of Liens for purposes of this Section 7.01.

For purposes of determining compliance with this Section 7.01, (A) a Lien need not be incurred solely by reference to one category of permitted Liens described in Section 7.01(a) through (ii) above, but is permitted to be incurred in part under any combination thereof and of any other available exemption and (B) in the event that a Lien (or any portion thereof) meets the criteria of one or more of the categories of permitted Liens described in Section 7.01(a) through (ii) above, the Borrowers will, in their sole discretion, be entitled to divide, classify or reclassify, in whole or in part, any such Lien (or any portion thereof) among one or more of such categories or clauses in any manner at any time.

Section 7.02      [Reserved].

Section 7.03      Indebtedness and Disqualified Equity Interests.

Create, incur, assume or suffer to exist any Indebtedness or issue any Disqualified Equity Interest, except:

(a)    Indebtedness under the Loan Documents (including the Orders);

(b)    Indebtedness outstanding on the Petition Date (i) not in excess of $1,000,000 or (ii) listed in Schedule 7.03(b);

(c)    Guarantees by any Borrower and any Restricted Subsidiary in respect of Indebtedness of any Borrower or any Restricted Subsidiary otherwise permitted hereunder; provided that (A) if the Indebtedness being guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guarantee of the Obligations on terms (taken as a whole) at least as favorable to the Lenders as those contained in the subordination of such Indebtedness and (B) any Guarantee by a Loan Party of Indebtedness of a Non-Loan Party shall either constitute a Permitted Investment or a Restricted Investment permitted by Section 7.06;

(d)    Indebtedness of any Borrower or any Restricted Subsidiary owing to any Loan Party or any other Restricted Subsidiary (or issued or transferred to any direct or indirect parent of

a Loan Party which is substantially contemporaneously transferred to a Loan Party or any Restricted Subsidiary of a Loan Party) to the extent (i) constituting a Permitted Investment or a Restricted Investment permitted by Section 7.06 or (ii) not exceeding $2,500,000; *provided* that all such Indebtedness of any Loan Party owed to any Non-Loan Party shall be subject to the Intercompany Note;

(e)        Indebtedness (including Capitalized Leases and Attributable Indebtedness)) and Disqualified Equity Interests incurred or issued by any Borrower or any Restricted Subsidiary to finance (or refinance) the purchase, lease, replacement or improvement of property (real or personal), equipment or other fixed or capital assets, in an aggregate principal amount, together with all other Indebtedness and/or Disqualified Equity Interests incurred or issued and outstanding under this clause (e)(i) at such time, not to exceed $5,000,000, in each case, determined at the time of incurrence;

(f)        Indebtedness in respect of Swap Contracts designed to hedge against any Borrower's or any Restricted Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes and Guarantees thereof;

(g)        [reserved];

(h)        Indebtedness representing deferred compensation or similar arrangements to employees and independent contractors of any Borrower (and any direct or indirect parent thereof) or any Restricted Subsidiary, in each case, incurred in the ordinary course of business;

(i)        Indebtedness consisting of promissory notes issued or incurred by any Borrower or any Restricted Subsidiary to future, present or former employees, directors, officers, members of management, independent contractors, partners, advisors and consultants (and their respective estates, spouses or former spouses) of any Borrower (or any direct or indirect parent thereof) or any Restricted Subsidiary, in each case to finance the purchase or redemption of Equity Interests or other equity-based awards of any Borrower or any direct or indirect parent of any Borrower permitted by Section 7.06;

(j)        [reserved];

(k)        Indebtedness permitted by the First Day Orders, the Second Day Orders, the Interim Order, the Final Order and/or the Approved Budget (subject to Permitted Variances);

(l)        Cash Management Obligations and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, foreign exchange facilities, employee credit card programs and other cash management and similar arrangements in the ordinary course of business (including Treasury Service Agreements) and any Guarantees thereof;

(m)        [reserved];

(n)        Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, incurred in the ordinary course of business or consistent with industry practice;

(o)        obligations in respect of self-insurance and obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations

provided by any Borrower or any Restricted Subsidiary or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with industry practice;

(p)     Indebtedness under the Existing Credit Agreement (including, for the avoidance of doubt, all "Secured Hedge Agreements" and "Cash Management Obligations" (each as defined in the Existing Credit Agreement) secured by the "Loan Documents" (as defined in the Existing Credit Agreement));

(q)     [reserved];

(r)     Indebtedness supported by a Letter of Credit, in a principal amount not to exceed the face amount of such Letter of Credit;

(s)     [reserved];

(t)     [reserved];

(u)     [reserved];

(v)     [reserved];

(w)     [reserved];

(x)     Indebtedness incurred by any Borrower or any Restricted Subsidiary in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance, unemployment insurance or other social security legislation or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance;

(y)     [reserved];

(z)     [reserved];

(aa)     to the extent constituting Indebtedness, customer deposits and advance payments (including progress payments) received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business;

(bb)     Indebtedness incurred by a Borrower or a Restricted Subsidiary in connection with bankers' acceptances, discounted bills of exchange or the discounting or factoring of receivables for credit management purposes, in each case incurred or undertaken in the ordinary course of business on arm's length commercial terms;

(cc)     intercompany Indebtedness incurred in connection with a Permitted Reorganization, so long as intercompany Indebtedness constitutes an Investment permitted pursuant to clause (33) of the definition of "Permitted Investments";

(dd)     other Indebtedness of the Loan Parties in an outstanding principal amount at any time outstanding not to exceed $5,000,000; and

(ee)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (cc) above.

For purposes of determining compliance with this <u>Section 7.03</u>, in the event that an item of Indebtedness or Disqualified Equity Interests (or any portion thereof) at any time, whether at the time of incurrence or issuance or upon the application of all or a portion of the proceeds thereof or subsequently, meets the criteria of more than one of the categories of permitted Indebtedness or Disqualified Equity Interests described in <u>Section 7.03(a)</u> through <u>(dd)</u> above, the Borrowers, in their sole discretion, will classify and may subsequently reclassify all or a portion of such item of Indebtedness or Disqualified Equity Interests (or any portion thereof) in any one or more of the types of Indebtedness or Disqualified Equity Interests described in <u>Section 7.03(a)</u> through <u>(dd)</u> and will only be required to include the amount and type of such Indebtedness or Disqualified Equity Interests in such of the above clauses as determined by the Borrowers at such time; *provided* that all Indebtedness under the Loan Documents incurred on the Closing Date will be deemed to have been incurred in reliance on the exception in clause (a) above. Subject to the preceding sentence, the Borrowers will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in <u>Section 7.03(a)</u> through <u>(dd)</u>.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness or issuance of Disqualified Equity Interests, the Dollar-equivalent principal amount of Indebtedness or Disqualified Equity Interests denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed or first incurred (whichever yields the lower Dollar equivalent), in the case of revolving credit debt; *provided* that if such Indebtedness is incurred, or Disqualified Equity Interests is issued, to extend, replace, refund, refinance, renew or defease other Indebtedness or Disqualified Equity Interests, as applicable, denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount or liquidation preference, as applicable, of such refinancing Indebtedness or Disqualified Equity Interests does not exceed the principal amount or liquidation preference, as applicable, of such Indebtedness or Disqualified Equity Interests, as applicable, being extended, replaced, refunded, refinanced, renewed or defeased, plus the aggregate amount of fees, underwriting discounts, premiums (including tender premiums) and other costs and expenses (including OID, upfront fees or similar fees) incurred in connection with such refinancing.

The accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of OID, and the payment of interest or dividends in the form of additional Indebtedness or Disqualified Equity Interests, as the case may be, of the same class, accretion or amortization of OID or liquidation preference and increases in the amount of Indebtedness or Disqualified Equity Interests outstanding solely as a result of fluctuations in the exchange rate of currencies, will, in each case, not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Equity Interests for purposes of this <u>Section 7.03</u>. The principal amount of any Indebtedness incurred or Disqualified Equity Interests issued to refinance other Indebtedness, if incurred in a different currency from the Indebtedness or Disqualified Equity Interests, as applicable, being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness or Disqualified Equity Interests in denominated that is in effect on the date of such refinancing. The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on the consolidated balance sheet of the Borrowers dated such date prepared in accordance with GAAP.

This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured or (2) senior Indebtedness as subordinated to any other senior Indebtedness merely because it has a junior priority with respect to the same Collateral.

Section 7.04    Fundamental Changes.

Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (other than as part of the Transactions), except that:

(a)    any Restricted Subsidiary may merge, amalgamate or consolidate with (i) a Borrower (including a merger, the purpose of which is to reorganize such Borrower into a new jurisdiction in the United States, any state thereof or the District of Columbia); *provided* that such Borrower shall be the continuing or surviving Person or (ii) one or more other Restricted Subsidiaries; *provided* that when any Restricted Subsidiary that is a Loan Party is merging, amalgamating or consolidating with a Restricted Subsidiary, a Loan Party shall be the continuing or surviving Person;

(b)    any Restricted Subsidiary may liquidate or dissolve or change its legal form if the Administrative Borrower determines in good faith that such action is in the best interests of the Borrowers and the Restricted Subsidiaries and is not materially disadvantageous to the Lenders (it being understood that in the case of any change in legal form, a Subsidiary that is a Guarantor will remain a Guarantor unless such Guarantor is otherwise permitted to cease being a Guarantor hereunder);

(c)    any Restricted Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to a Borrower or to another Restricted Subsidiary; *provided* that if the transferor in such a transaction is a Loan Party, then (i) the transferee must be a Loan Party or (ii) to the extent constituting an Investment, such Investment must be a Restricted Payment permitted by Section 7.06 (other than Section 7.06(b)(xviii)) or a Permitted Investment;

(d)    [reserved];

(e)    [reserved];

(f)    so long as no Event of Default has occurred and is continuing or would result therefrom (solely in the case of a merger, amalgamation or consolidation involving a Loan Party), any Restricted Subsidiary may merge, amalgamate or consolidate with any other Person in order to effect an Investment permitted pursuant to Section 7.06 (other than Section 7.06(b)(xviii)) or a Permitted Investment; *provided* that the continuing or surviving Person shall be a Subsidiary, which together with each other Restricted Subsidiary, shall have complied with the requirements of Section 6.11;

(g)    the Loan Parties and their Subsidiaries may consummate a Permitted Reorganization; and

(h)    so long as no Event of Default has occurred and is continuing or would result therefrom, a merger, consolidation, amalgamation, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05 (other than Section 7.05(e)); and

(i) any Restricted Subsidiary may consummate transactions permitted by the First Day Orders, the Second Day Orders, the Interim Order, the Final Order and/or to consummate the Restructuring Transactions.

Section 7.05    Dispositions.

Make any Disposition, except:

(a) (w) Dispositions of obsolete, damaged, worn out, used or surplus property, whether now owned or hereafter acquired, in the ordinary course of business, (x) Dispositions of property no longer used or useful in the conduct of the business of any Borrower or any Restricted Subsidiary and (y) Dispositions to landlords of improvements made to leased real property pursuant to customary terms of leases entered into in the ordinary course of business;

(b) Dispositions of inventory, goods held for sale and immaterial assets (or in the case of any Captive Insurance Subsidiary, any assets), in each case, in the ordinary course of business;

(c) Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d) [reserved];

(e) Dispositions that otherwise constitute a Permitted Investment, are permitted by Section 7.04 (other than Section 7.04(h)) or otherwise constitute a Restricted Payment permitted by Section 7.06 (other than Section 7.06(b)(xviii)) and Liens permitted by Section 7.01 (other than Section 7.01(l)(ii));

(f) [reserved];

(g) Dispositions of cash and Cash Equivalents;

(h) (i) leases, subleases, licenses or sublicenses (including agreements under which any Borrower or any Restricted Subsidiary has granted rights to end users to access and use any Borrower's or any Restricted Subsidiary's products, technologies or services), in each case in the ordinary course of business and which do not materially interfere with the business of the Borrowers and the Restricted Subsidiaries, taken as a whole, and (ii) abandonment of intellectual property rights in the ordinary course of business or which in the reasonable good faith determination of the Administrative Borrower are not material to the conduct of the business of the Borrowers and the Restricted Subsidiaries taken as a whole and the abandonment of intellectual property rights which are no longer economically practicable or commercially reasonable to maintain;

(i) foreclosures, condemnations, expropriation, dispositions required by a Governmental Authority or any similar action on assets or casualty or insured damage to assets, including pursuant to Casualty Events;

(j) subject to the Orders and the terms thereof, Dispositions of property; *provided* that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Event of Default has occurred and is continuing), no Event of Default shall have occurred and be continuing or would result from such

Disposition and (ii) with respect to any Disposition pursuant to this clause (j), (x) such Disposition shall be for fair market value and (y) any Borrower or any Restricted Subsidiary shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents; *provided*, *however*, that for the purposes of this clause (j)(ii), the following shall be deemed to be cash: (A) any liabilities (as shown on the Borrowers' most recent balance sheet provided hereunder or in the footnotes thereto) of such Borrower or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the payment in cash of the Obligations, that (i) are assumed by the transferee with respect to the applicable Disposition or (ii) are otherwise cancelled or terminated in connection with the transaction with such transferee (other than intercompany debt owed to the Borrowers or any of its Restricted Subsidiaries) and, in the case of clause (i), for which each Borrower and all of its Restricted Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities, notes or other obligations or assets received by the applicable Borrower or the applicable Restricted Subsidiary from such transferee that are converted by such Borrower or such Restricted Subsidiary into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) in connection with the applicable Disposition (provided that such Borrower or such Restricted Subsidiary shall have 180 days to so convert), (C) Indebtedness of any Restricted Subsidiary that ceases to be a Restricted Subsidiary as a result of such Disposition (other than intercompany debt owed to any Borrower or any of its Restricted Subsidiaries), to the extent that the Borrowers and each of its Restricted Subsidiaries are released from any guarantee of payment of the principal amount of such Indebtedness in connection with such Disposition and (D) aggregate non-cash consideration received by the applicable Borrower or the applicable Restricted Subsidiary having an aggregate fair market value, taken together with all other non-cash consideration received pursuant to this clause (D) (determined as of the closing of the applicable Disposition for which such non-cash consideration is received) not to exceed $1,000,000 as determined at the time of such applicable Dispositions (net of any such non-cash consideration subsequently converted into cash and Cash Equivalents);

(k)    to the extent allowable under Section 1031 of the Code (or comparable or successor provision), any exchange of like property (excluding any boot thereon permitted by such provision) for use in any business conducted by the Borrowers or any of the Restricted Subsidiaries that is not in contravention of Section 7.07;

(l)    Dispositions or discounts, without recourse of accounts receivable or notes receivable in connection with the collection or compromise thereof in the ordinary course of business or the conversion of accounts receivable to notes receivable in the ordinary course of business;

(m)    [reserved];

(n)    any swap of assets in exchange for services or other assets in the ordinary course of business of comparable or greater value or usefulness to the business of the Borrowers and the Subsidiaries as a whole, as determined in good faith by the Administrative Borrower;

(o)    [reserved];

(p)    [reserved];

(q)    the unwinding of any Swap Contract or Treasury Services Agreement;

(r)    the lapse or abandonment in the ordinary course of business of any registrations or applications for registration of any immaterial IP Rights;

(s)     Dispositions permitted by the First Day Orders, the Second Day Orders and/or the Approved Budget (subject to Permitted Variances);

(t)     Dispositions by any Loan Party of any wholly-owned Restricted Subsidiary of the type described in clauses (d) and (e) of the definition of Excluded Subsidiary to the extent consisting of contributions or other Dispositions of Equity Interests in other Subsidiaries of the type described in clauses (d) and (e) of the definition of Excluded Subsidiary to such wholly-owned Restricted Subsidiary;

(u)     [reserved];

(v)     Dispositions set forth on Schedule 7.05;

(w)     any Disposition in connection with a Permitted Reorganization;

(x)     any Disposition necessary to consummate the Restructuring Transactions; and

(y)     any Borrower and any Restricted Subsidiary may (i) convert any intercompany Indebtedness to Equity Interests otherwise permitted hereunder, (ii) discount, write off, forgive or cancel any intercompany Indebtedness or other obligation owing by any Borrower or any Subsidiary Guarantor to a Restricted Subsidiary that is not, in each case, a Loan Party or to another Loan Party, (iii) settle, discount, write-off, forgive or cancel any Indebtedness owing by any present or former consultants, managers, directors, officers, employees of Holdings, any Borrower or any Subsidiary or any of their successors or assigns, in the ordinary course of business, or (iv) surrender or waive contractual rights and settle, release, surrender or waive contractual or litigation claims, in the case of clause (iv), in the ordinary course of business.

Section 7.06     Restricted Payments.

(a)     (w) Declare or pay any dividend or make any payment or distribution on account of any Borrower's or any of its Restricted Subsidiaries' Equity Interests (in each case, solely in such Person's capacity as holder of such Equity Interests), including any dividend, payment or distribution payable in connection with any merger, amalgamation or consolidation other than (A) dividends or distributions by a Borrower payable solely in Equity Interests (other than Disqualified Equity Interests) of such Borrower or (B) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend, payment or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a wholly-owned Subsidiary, a Borrower or a Restricted Subsidiary receives at least its pro rata share of such dividend, payment or distribution in accordance with its Equity Interests in such class or series of securities, (x) purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of a Borrower, including in connection with any merger, amalgamation or consolidation, in each case held by Persons other than a Borrower or a Restricted Subsidiary, (y) make any voluntary principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case, prior to any scheduled repayment, sinking fund payment or maturity, any Junior Financing entered into after the Petition Date, other than Indebtedness permitted under Sections 7.03(d) and (z) make any Restricted Investment (all such payments and other actions set forth in clauses (w) through (z) above being collectively referred to as "**Restricted Payments**").

(b)     The provisions of Section 7.06(a) will not prohibit:

(i)     [reserved];

(ii)     [reserved];

(iii)    [reserved];

(iv)    [reserved];

(v)     [reserved];

(vi)    Restricted Payments permitted by the First Day Orders, the Second Day Orders and/or the Approved Budget (subject to Permitted Variances);

(vii)   payments made or expected to be made by any Borrower or any of its Restricted Subsidiaries in respect of withholding or similar taxes payable by or with respect to any future, present or former employee, director, officer, member of management, independent contractor, partner, advisor or consultant of a Borrower or any of its Restricted Subsidiaries or any direct or indirect parent company of a Borrower and any repurchases of Equity Interests deemed to occur upon, in each case, exercise, vesting, or settlement, as applicable, of stock options, warrants or similar rights if such Equity Interests represent a portion of the exercise price of such options, warrants or similar rights or required withholding or similar taxes;

(viii)  [reserved];

(ix)    [reserved];

(x)     [reserved];

(xi)    [reserved];

(xii)   [reserved];

(xiii)  [reserved];

(xiv)   the declaration and payment of dividends or distributions by a Borrower or any of its Restricted Subsidiaries to, or the making of loans or advances to, any of their respective direct or indirect parent companies in amounts required for any direct or indirect parent company to pay, in each case without duplication,

(A)  general corporate, administrative, compliance or other operating (including, expenses related to auditing or other accounting matters and director indemnities, fees and expenses) and overhead costs and expenses of any direct or indirect parent of the Borrowers to the extent such costs and expenses are attributable to the ownership or operation of the Borrowers and the Restricted Subsidiaries, including the Borrowers' and the Restricted Subsidiaries' proportionate share of such amount relating to such parent company being a public company;

(B)  (x) fees and expenses (other than taxes), required to maintain its corporate, legal and organizational existence and (y) distributions to such direct or indirect parent's equity owners in proportion to their equity interests sufficient to allow each such equity owner to receive an amount at least equal to the aggregate amount of its out-of-pocket costs to any unaffiliated third parties directly attributable to creating (including any incorporation or registration fees) and maintaining the existence of the applicable equity owner and legal

and accounting and other costs directly attributable to maintaining its corporate, legal, or organizational existence and complying with applicable legal requirements, so long as attributable to the operations of the Borrowers and their Restricted Subsidiaries and such expenses are incurred in the ordinary course of business;

(C)   for any taxable period for which any Borrower and/or any of its Subsidiaries are members of a consolidated, combined or unitary tax group for U.S. federal, state, local or foreign income or similar tax purposes of which such direct or indirect parent company is the common parent (a "**Tax Group**") or for which any Borrower is a partnership or disregarded entity for U.S. federal income tax purposes owned directly (or indirectly through pass through entities) by one or more parent companies that are corporate entities ("**Corporate Taxpayers**"), the portion of the relevant federal, state, local or foreign income or similar taxes (as applicable) of such Tax Group or such Corporate Taxpayers for such taxable period that is attributable to the income of the applicable Borrowers and/or its Restricted Subsidiaries; provided that in each case the amount of such payments with respect to any taxable period does not exceed the amount that the applicable Borrowers and/or its Restricted Subsidiaries would have been required to pay in respect of such relevant federal, state, local or foreign taxes for such taxable period if, for all taxable years ending after the Closing Date, the applicable Borrowers and Restricted Subsidiaries had paid such taxes as a separate consolidated, combined or unitary group separately from any such parent company (or, if there are no such Restricted Subsidiaries, on a separate company basis) (assuming for purposes of this proviso that any such applicable Borrowers and/or Restricted Subsidiaries that is a partnership or disregarded entity for U.S. federal income tax purposes is treated as a corporation that is included in a consolidated, combined or unitary tax group of which the Borrower is the parent for U.S. federal income tax purposes);

(D)   customary salary, bonus, severance, expense reimbursement and other benefits payable to, and indemnities provided on behalf of, any future, present or former employees, directors, officers, members of management, independent contractors, advisors, partners and consultants of any direct or indirect parent company of a Borrower and any payroll, social security or similar taxes thereof;

(E)   [reserved];

(F)   [reserved]; and

(G)   payments made or expected to be made by Holdings, any Borrower or any of the Restricted Subsidiaries in respect of withholding or similar Taxes payable by or with respect to any future, present or former employee, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) and any repurchases of Equity Interests in consideration of such payments including deemed repurchases in connection with the exercise of stock options;

(xv)   Restricted Payments consisting of a Permitted Reorganization;

(xvi)   [reserved];

(xvii)   [reserved];

(xviii)   to the extent constituting Restricted Payments, the Borrowers and the Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 7.01, 7.03 (other than 7.03(d)), 7.04 (other than 7.04(a), 7.04(c)(ii) or (f)), 7.05 (other than 7.05(d)(ii) or (e)) or 6.20 (except transactions described in clauses (a), (b), (f), (g), (j), (n), (o), (q), (s), (w), (y) and (z) of such Section);

(xix)   [reserved];

(xx)   [reserved];

(xxi)   AHYDO Payments with respect to Indebtedness of any direct or indirect parent of the Borrowers and its Restricted Subsidiaries permitted under Section 7.03;

(xxii)   the declaration and payment of Restricted Payments by the Borrower to any direct or indirect parent of the Borrower in amounts required for any such direct or indirect parent (or such parent's direct or indirect equity owners) to pay, to the extent constituting Restricted Payments, amounts that would be permitted to be paid directly by the Borrower or its Restricted Subsidiaries under Section 6.20 (except transactions described in clause (o) of such Section);

(xxiii)   Restricted Payments of earn-out obligations and other contingent consideration obligations in connection with Permitted Investments;

(xxiv)   payments made or expected to be made by Holdings, any Borrower or any of the Restricted Subsidiaries in respect of withholding or similar Taxes payable by or with respect to any future, present or former employee, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) and any repurchases of Equity Interests in consideration of such payments including deemed repurchases in connection with the exercise of stock options; and

(xxv)   [reserved].

(c)   [Reserved].

(d)   For the avoidance of doubt, this Section 7.06 shall not restrict the making of any "AHYDO catch-up payment" with respect to, and required by the terms of, any Indebtedness of any Borrower or any Restricted Subsidiary permitted to be incurred under Section 7.03 hereof.

For purposes of determining compliance with this Section 7.06, in the event that a proposed Restricted Payment or Investment (or any portion thereof) at any time, whether at the time of declaration or payment, purchase, redemption, defeasance or other acquisition or retirement, or at the time of the making thereof, or subsequently at a later time, meets the criteria of more than one of the categories described in Section 7.06(b)(i) through (xxiv) or is entitled to be made pursuant to Section 7.06(a) and/or one or more of the categories described in the definition of Permitted Investment, the Administrative Borrower, in its sole discretion, will be entitled to classify and may subsequently reclassify such item of (or any portion thereof) (based on circumstances existing on the date of such reclassification) among such clauses in Section 7.06(b)(i) through (xxiv), Section 7.06(a) and/or one or more of the categories contained in the definition of Permitted Investments, and will only be required to include the amount and type of such Restricted Payment or Investment in such of the above clauses as determined by the Administrative Borrower at such time.  The Administrative Borrower will be entitled to divide and classify a Restricted Payment or Investment in more than one of the types described in Section 7.06(b)(i) through (xxiv), Section 7.06(a) and/or one or more of the categories contained in the definition of Permitted Investments.

Section 7.07        Change in Nature of Business.

Engage in any material line of business substantially different from those lines of business conducted by the Borrowers and the Restricted Subsidiaries on the Closing Date or any business or any other activities reasonably related, complementary, synergistic, similar, incidental, corollary or ancillary thereto (including related, complementary, synergistic, similar, incidental or ancillary technologies) or reasonable extensions, developments or expansions thereof.

Section 7.08        [Reserved].

Section 7.09        Burdensome Agreements.

Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of:

(a)        any Non-Loan Party to make Restricted Payments to any Loan Party; or

(b)        any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Secured Parties with respect to the Obligations or under the Loan Documents; *provided* that the foregoing clauses (a) and (b) shall not apply to Contractual Obligations which:

(i)        (x) exist on the Petition Date and (to the extent not otherwise permitted by this Section 7.09) are listed in Schedule 7.09 and (y) any permitted modification, replacement, renewal, extension or refinancing thereof so long as such modification, replacement, renewal, extension or refinancing does not materially expand the scope of such Contractual Obligation (as determined in good faith by the Borrowers);

(ii)        are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Restricted Subsidiary;

(iii)        comprise restrictions pursuant to Indebtedness of a Non-Loan Party which is permitted by Section 7.03 and which does not apply to any Loan Party;

(iv)        are customary restrictions that arise in connection with (x) any Lien permitted by Sections 7.01(k), (l), (p), (q), (r)(i), (r)(ii), (s) and (ee) and relate to the property subject to such Lien or (y) any Disposition permitted by Section 7.04 or 7.05 and relate solely to the assets or Person subject to such Disposition;

(v)        are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures constituting Permitted Investments or otherwise permitted under Section 7.06 and applicable solely to such joint venture;

(vi)        are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to the property financed by such Indebtedness and the proceeds and products thereof;

(vii)    are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the property interest, rights or the assets subject thereto;

(viii)    comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Section 7.03(a), (e) (other than Disqualified Equity Interests or Preferred Stock) and (n) to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

(ix)    are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Borrower or any of its Restricted Subsidiaries;

(x)    are customary provisions restricting assignment of any agreement; *provided* that if such agreement is not entered into in the ordinary course of business, the granting, perfection, validity and priority of the security interests of the Secured Parties is not impaired in any material respect by such restriction;

(xi)    are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(xii)    arise in connection with cash or other deposits permitted under Section 7.01 or the definition of Permitted Investments, and limited to such cash or deposits;

(xiii)    comprise restrictions imposed by any agreement governing Indebtedness entered into on or after the Closing Date and permitted under Section 7.03; and

(xiv)    are restrictions that will not materially impair the Borrower's ability to make payments under this Agreement and the other Loan Documents (as determined in good faith by the Borrowers);

*provided,* that (x) the priority of any preferred Equity Interests in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock and (y) the subordination of (including the application of any standstill requirements to) loans or advances made to the Borrower or any Restricted Subsidiary that is a Guarantor to other Indebtedness incurred by the Borrower or any Restricted Subsidiary that is a Guarantor shall not be deemed to constitute such an encumbrance or restriction.

Section 7.10    Additional Bankruptcy Matters.

Without the Required Lenders' prior written consent, neither the Borrower nor any Restricted Subsidiary thereof will:

(a) subject to the terms of the Interim Order or the Final Order, as applicable, and Section 11.14, incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claim of the Administrative Agent or the Lenders against the Debtors (other than the Carve Out);

(b) assert or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against the Administrative Agent or the Lenders;

(c) subject to the terms of the Interim Order or the Final Order, as applicable, object to, contest, delay, prevent or interfere with in any manner the exercise of rights and remedies by the Administrative Agent or the Lenders with respect to the Collateral following the occurrence of and during the continuance of an Event of Default (provided that any Loan Party may contest or dispute whether an Event of Default has occurred); or

(d) seek, consent to, or permit to exist, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Interim Order, the Final Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Interim Order, the Final Order or any of the other Loan Documents.

Section 7.11    Budget Variance.

As of any Variance Testing Date, for the immediately preceding Variance Testing Period, the Borrower shall not allow the aggregate disbursements (excluding disbursements in respect of amounts which corresponding to the figures across from the line items in the Approved Budget with the headings Carrier Payments, Vendor Payments and Commissions, in each case, during such Variance Testing Period) made by the Debtors during such Variance Testing Period to be greater than 20% of the aggregate disbursements set forth for the Debtors in the Approved Budget for such Variance Testing Period (or such greater percentage as reasonably consented to in writing by the Required Lenders, which written consent of the Required Lenders may be provided in the form of an email); provided, further, that the Borrower may carry forward budgeted but unused disbursements set forth in the Approved Budget for a Variance Testing Period for use during the subsequent Variance Testing Periods and, to the extent that the Required Lenders do not approve the Budget in accordance with Section 6.01(d), any subsequent Variance Testing Period until the Budget has been approved in accordance with Section 6.01(d). Additional variances, if any, from the Approved Budget shall be subject to the reasonable written consent of the Required Lenders. For the avoidance of doubt, any reference to "written consent" hereunder shall include consent granted by email.

Section 7.12    [Reserved].

Section 7.13    Modifications of Terms of Junior Financing.

Amend, modify or change in any manner adverse in any material respect to the interests of the Lenders, as determined in good faith by the Borrowers, any term or condition of any Junior Financing Documentation in respect of any Junior Financing or in violation of any applicable intercreditor agreement or subordination agreement without the consent of the Administrative Agent (acting at the direction of the Required Lenders)  (which consent shall not be unreasonably withheld, delayed, denied or conditioned) unless such amendment, modification or change is made in connection with a refinancing permitted by Section 7.03.

**ARTICLE VIII.**
**EVENTS OF DEFAULT AND REMEDIES**

Section 8.01    Events of Default.

Any of the following events referred to in clauses (a) through (l) from and after the Closing Date shall constitute an event of default (an "**Event of Default**"):

(a)    *Non-Payment*.  Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or unpaid reimbursement obligation of any drawn

Letter of Credit, or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)     *Specific Covenants*.  A Borrower or fails to perform or observe any term, covenant or agreement contained in any of (i) Section 6.03(a), (ii) Section 6.05(a) (solely with respect to the Borrowers) or (iii) Article VII; or

(c)     *Other Defaults*.  Any Loan Party fails to (i) deliver the items required by Section 6.01(d) and such failure continues for five (5) days after the date such items were required to be delivered or (ii) perform or observe any other covenant or agreement (not specified in Section 8.01(a), (b) or (c)(i) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after written notice thereof from the Borrowers or the Administrative Agent; or

(d)     *Representations and Warranties*.  Any representation, warranty or certification made or deemed made by any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be incorrect in any material respect when made or deemed made, and such incorrect representation or warranty (if curable as determined by the Borrowers in good faith) shall remain incorrect for a period of thirty (30) days after written notice thereof from the Administrative Agent to the Borrowers; or

(e)     *Cross-Default*.  Any Borrower or any Restricted Subsidiary (A) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness incurred following the Petition Date (other than Indebtedness hereunder) having an aggregate outstanding principal amount of not less than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness incurred following the Petition Date, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any other default thereunder by the Borrowers or any of its Restricted Subsidiaries), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required and beyond the applicable grace period, if any, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem all of such Indebtedness to be made, prior to its stated maturity; *provided* that this clause (B) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property securing such Indebtedness, if such sale or transfer is permitted hereunder, (ii) any Indebtedness if (x) the sole remedy of the holder thereof in the event of the non-payment of such Indebtedness or the non-payment or non-performance of obligations related thereto or (y) sole option is to elect, in each case, to convert such Indebtedness into Qualified Equity Interests and cash in lieu of fractional shares, (iii) in the case of Indebtedness which the holder thereof may elect to convert into Qualified Equity Interests, such Indebtedness from and after the date, if any, on which such conversion has been effected; and (iv) any breach or default that is (I) remedied by Holdings, the applicable Borrower or the applicable Restricted Subsidiary or (II) waived (including in the form of amendment) by the required holders of the applicable item of Indebtedness, in either case, prior to any termination of the Commitments or the acceleration of Loans pursuant to this Section 8.01(e); or

(f)     *The Cases; Bankruptcy Matters*.

(i)     any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or the filing of any motion by a Loan Party seeking approval to dismiss or convert any of the Cases, or any equivalent change or filing in any pending foreign proceedings involving a Loan Party, in each case without the prior written consent of the Required Lenders;

(ii)     a trustee or an examiner with enlarged powers is appointed in the any of the Cases without the prior written consent of the Lenders in their sole discretion, or the Bankruptcy Court shall have entered an order providing for such appointment;

(iii)     Holdings or any of its Subsidiaries, or any person claiming by or through any Holdings or any of its Subsidiaries, with Holdings' or any Subsidiary's consent, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any of the Lenders relating to the Facilities;

(iv)     the entry of any order of the Bankruptcy Court granting, or there shall arise or otherwise be granted (i) any claims or charges, other than in respect of the Facilities or as otherwise permitted under the applicable Loan Documents or the Orders, including those entitled to superpriority administrative expense claim status in any Case pursuant to Section 364(c)(1) of the Bankruptcy Code that are *pari passu* with or senior to the claims of the Administrative Agent and the Lenders under the Facilities, except as otherwise provided in the Loan Documents, or there shall arise or otherwise be granted by the Bankruptcy Court any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out), or (ii) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests provided for herein securing the Obligations hereunder, except, in each case, as expressly provided in the Loan Documents or in the Order then in effect (but only in the event specifically consented to by the Required Lenders (or the Administrative Agent with the consent of the Required Lenders)) and except as otherwise provided in the Loan Documents;

(v)     the Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Loan Parties which have a value in excess of $5,000,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Loan Parties or their estates (taken as a whole);

(vi)     an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order without the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders), or a Loan Party shall apply for the authority to do so;

(vii)     the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date) shall cease to be in full force and effect, shall have been revoked, remanded, amended, modified, vacated, reversed, stayed or rescinded, in the case of modification or amendment, without prior written consent of the Required Lenders (or the Administrative Agent with the consent of the Required Lenders, or with

respect to the rights, duties, obligations, benefits, privileges, protections, indemnities and immunities of the Administrative Agent, the Administrative Agent);

(viii)    an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by the Administrative Agent or any of the Lenders of any amounts received in respect of the Obligations;

(ix)    an order shall have been entered by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code;

(x)    any of the Loan Parties shall fail to comply in any material respect with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date);

(xi)    (x) an order in the Cases shall be entered charging any of the Collateral (as defined herein and in the Existing Credit Agreement) under Section 506(c) of the Bankruptcy Code against the Lenders or the lenders under the Existing Credit Agreement, without the prior written consent of the Required Lenders, (y) the commencement of any other actions, directly or indirectly, by the Debtors that challenges the rights and remedies of the Administrative Agent or the Lenders or (z) the commencement of any other action or challenge, directly or indirectly, by the Debtors in any of the Cases or inconsistent with any of the Loan Documents or the Orders;

(xii)    any order shall be entered which dismisses any of the Cases of the Debtors and which order does not provide for termination of the Commitments and indefeasible payment in full in cash of the Obligations under the Loan Documents (other than Cash Management Obligations and contingent indemnification obligations not yet due and payable) and continuation of the Liens with respect thereto until the effectiveness thereof, or any of the Loan Parties and their Subsidiaries shall seek, support or fail to contest in good faith the entry of any such order;

(xiii)    any Loan Party or any Subsidiary thereof shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination, impairment or other challenging of the Claims and Liens granted to secure the Obligations or any other rights granted to the Administrative Agent and the Lenders in the Orders or this Agreement or (ii) any relief under Section 506(c) of the Bankruptcy Code with respect to any Collateral;

(xiv)    any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations;

(xv)    without the consent of the Required Lenders, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any pre-petition agent, trustee or lender that is inconsistent with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date);

(xvi)    without the Required Lenders' consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Loan Party or any of its Subsidiaries of any

-111-

motion or other request with the Bankruptcy Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Administrative Agent's and the Required Lenders' consent or to obtain any financing under Section 364 of the Bankruptcy Code other than the facility hereunder unless such motion or order contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby;

(xvii)    any corporate action, proceeding or step (or other analogous procedure) is taken in any jurisdiction (i) in relation to a moratorium of Indebtedness (except pursuant to the Cases), winding up, dissolution, administration or reorganization of any Debtor; or (ii) to appoint a trustee, examiner, receiver, administrative receiver, administrator, liquidator or other similar officer in respect of any of the Debtors or their assets, in each case, except as approved by the Required Lenders; or

(xviii)    without the Required Lenders' consent (and, in the case of clause (3) below, the Administrative Agent's consent), any Loan Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (1) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any Collateral, whether senior, *pari passu* or subordinate to the Administrative Agent's liens and security interests; (2) to obtain any financing under Section 364 of the Bankruptcy Code other than the facility hereunder unless such motion or order contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby or (3) to modify or affect any of the rights of the Administrative Agent, or the Lenders under the Orders or the Loan Documents, by any order entered in the Cases; or

(xix)    without the consent of the Administrative Agent (acting at the direction of the Required Lenders), the Restructuring Support Agreement; or

(g)    *Licenses.* Any Borrower or any Restricted Subsidiary has its insurance brokerage license revoked by any Governmental Authority or regulatory authority, the result of which would reasonably be expected to have a Material Adverse Effect; or

(h)    *Judgments.* Except for any order fixing the amount of any claim in the Cases, there is entered against any Borrower or any Restricted Subsidiary a final judgment or order for the payment of money (other than with respect to judgements stayed by the Cases) in an aggregate amount exceeding the Threshold Amount (to the extent not paid or covered by independent third-party insurance or indemnity as to which the insurer or indemnitor has been notified of such judgment or order and has not denied coverage thereof) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(i)    *Invalidity of Loan Documents.* Any material provision of any Loan Document, at any time after its execution and delivery and for any reason (other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or as a result of acts or omissions by the Administrative Agent or any Lender or the satisfaction in full of all the Obligations), ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document or the validity or priority of a Lien as required by the Collateral Documents on a material portion of the Collateral; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document

(other than as a result of repayment in full of the Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Loan Document other than in accordance with its terms; or

(j)      *Change of Control*.  There occurs any Change of Control as a result of clause (b) of the definition thereof; or

(k)      *Collateral Documents*.  Any Collateral Document after delivery thereof pursuant to Section 4.01, 6.11 or 6.13 shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction not prohibited under this Agreement) cease to create a valid and perfected Lien, with the priority required by the Collateral Documents on such security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01, (x) except to the extent that any such perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the action or inaction of the Administrative Agent or any Lender and (y) except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(l)      *ERISA*.  (i) An ERISA Event occurs which has resulted or could reasonably be expected to result in liability of a Loan Party or an ERISA Affiliate in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under any Multiemployer Plan which has resulted or could reasonably be expected to result in liability of a Loan Party or an ERISA Affiliate in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect; or

(m) *Carrier Contracts*.  Any contract with an insurance carrier to which the Borrower or any Restricted Subsidiary is party is terminated for cause, the result of which would reasonably be expected to have a Material Adverse Effect;

*provided*, that any Event of Default under the Loan Documents, other than (x) an Event of Default under Section 8.01(a) or (f) or (y) any Event of Default which cannot be waived without the written consent of each Lender directly and adversely affected thereby, shall be deemed not to be "continuing" (and shall be deemed to be "cured") if the events, acts or conditions that gave rise to such event of default have been have remedied or cured (including by notice, payment, taking any action or omitting to take any action) or have ceased to exist and the Borrowers are otherwise in compliance with the Loan Documents; *provided*, that the foregoing shall not be applicable with respect to any default or Event of Default if the Borrowers knowingly and willfully fails to give timely notice to the Administrative Agent and the Lenders of such default or Event of Default required to be given under the Loan Documents.

Section 8.02      Remedies Upon Event of Default.

Subject to the terms of the Orders, upon the occurrence of and during the continuance of an Event of Default, and delivery of a written notice (with a copy filed with the Bankruptcy Court) (the date of delivery of such notice, the "**Termination Date**") by the Administrative Agent (acting at the direction of the Required Lenders) to the Debtors, any Committee, and the U.S. trustee of on the occurrence of an Event of Default (the "**Event of Default Occurrence**"), the automatic stay shall terminate solely to the extent necessary for one or more (without limitation) of the following to occur to the extent elected by the Administrative Agent (acting at the direction of the Required Lenders):

(a)      the Obligations shall be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Lenders;

(b)      the Commitments shall be terminated or reduced to the extent any Commitments remain outstanding, and any further Commitments shall be restricted,

(c)      the Facilities shall be terminated with respect to any future liability or obligation of the Secured Parties, but, for the avoidance of doubt, without affecting any of the Liens or the Obligations, and

(d)      any other right or remedy may be exercised with respect to the Collateral;

provided, however, that (i) in the case of the termination of the use of Cash Collateral pursuant to clause (a) above, unless, in the case of an Event of Default Occurrence, such Event of Default Occurrence is cured by the Debtors, as determined by the Required Lenders, prior to the expiration of five (5) Business Days following the Termination Date, and (ii) in the case of the enforcement of Liens securing the Obligations or other remedies with respect to the Collateral pursuant to clause (d) above, the Administrative Agent (acting at the direction of the Required Lenders), shall first file a motion with the Bankruptcy Court seeking emergency relief to exercise such remedies on at least five (5) Business Days' written notice seeking an emergency hearing before the Bankruptcy Court (a "**Stay Relief Hearing**") and the Loan Parties agree not to object the shortening of notice of such Stay Relief Hearing.

Upon the Maturity Date and following the giving of five (5) Business Days' notice to the Debtors and other applicable parties ("**Remedies Notice Period**"), the Administrative Agent shall have relief from the automatic stay and may (and at the direction of the Required Lenders shall) setoff against deposits and financial assets of the Loan Parties (other than customary excluded accounts), foreclose on all or any portion of the Collateral located in the United States or otherwise exercise remedies against the Collateral located in the United States permitted by applicable non-bankruptcy law. During the Remedies Notice Period, the Loan Parties and any statutory committee shall be entitled to an emergency hearing before the Bankruptcy Court. Unless the Bankruptcy Court orders otherwise during the Remedies Notice Period, the automatic stay, as to the Lenders and the Administrative Agent, shall be automatically terminated at the end of such notice period and without further notice or order.

Section 8.03      Application of Funds.

(a)      Subject to the Interim Order and the Final Order, at any time that the provisions of Section 8.03(b) below do not apply, and except as may be otherwise provided in any intercreditor agreement, after the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Administrative Agent (acting at the direction of the Required Lenders) in the following order (to the fullest extent permitted by mandatory provisions of applicable Law):

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses, amounts owed pursuant to Erroneous Payment Subrogation Rights and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III payable to the Administrative Agent in its capacity as such);

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under <u>Section 10.04</u> and amounts payable under <u>Article III</u>), ratably among them in proportion to the amounts described in this clause *Second* payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and L/C Borrowings, ratably among the Secured Parties in proportion to the respective amounts described in this clause *Third* payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans and L/C Borrowings (including to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit), ratably among the Secured Parties in proportion to the respective amounts described in this clause *Fourth* held by them;

*Fifth*, to the payment of all other Obligations that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

*Last*, the balance, if any, after all of the Obligations have been paid in full (other than contingent obligations not then due and owing), to the Borrowers or as otherwise required by Law.

## ARTICLE IX.
## <u>ADMINISTRATIVE AGENT AND OTHER AGENTS</u>

Section 9.01    Appointment and Authority.

(a)    Each of the Lenders and L/C Issuers hereby irrevocably designates and appoints Wilmington Savings Fund Society, FSB to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto including (but not limited to) the execution and delivery of the Loan Documents to which the Administrative Agent is a party and the performance of duties as expressly stated thereunder. The provisions of this <u>Article IX</u> (other than this <u>Section 9.01</u>, <u>Section 9.06</u> (solely with respect to the removal and consent rights of the Borrowers set forth therein), <u>Section 9.09</u>, <u>Section 9.10</u> and <u>Section 9.11</u>) are solely for the benefit of the Administrative Agent, the Lenders and each L/C Issuer and no Loan Party shall have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary, principal-agency or trustee relationship arising under agency doctrine of any applicable Law and no implied covenants, functions, responsibilities, duties, obligations, liabilities or other implied (or express) obligations shall be read into this Agreement or any other Loan Document. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties. It is understood and agreed that any right to take (or decline to take) or any power or authority granted, assigned or delegated to the Administrative Agent hereunder shall be taken or exercised, as the case may be, by the Administrative Agent (or any co-agents, sub-agents or attorneys-in-fact designated by the Administrative Agent in accordance with the terms of the applicable Loan Document).

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders and the L/C Issuers hereby irrevocably appoints and authorizes the

Administrative Agent to act as the agent of such Lender and the L/C Issuers for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article IX and Article X (including the second paragraph of Section 10.05), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents as if set forth in full herein with respect thereto.  Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to (i) execute any and all documents (including releases) with respect to the Collateral (including any intercreditor agreement and any amendment, supplement, modification or joinder with respect thereto) and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by the Administrative Agent shall bind the Lenders and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

(c)     Each Lender and L/C Issuer acknowledges and agrees that this Article IX, Sections 10.04 and 10.05 and any other rights, privileges, protections, immunities and indemnities in favor of the Administrative Agent hereunder apply to any and all actions taken or not taken by the Administrative Agent pursuant to the foregoing authorization.  Upon request by Administrative Agent at any time, the Required Lenders (or such other number or percentage of Lenders as shall be necessary hereunder, or as Administrative Agent shall believe in good faith are necessary) shall confirm in writing Administrative Agent's authority to release any Collateral pursuant to this Agreement, any Collateral Document, or any other Loan Document..

Section 9.02     Rights as a Lender.

Any Lender that is also serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Lender (if any) serving as the Administrative Agent hereunder in its individual capacity.  Any such Person serving as the Administrative Agent and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to any Lender.  The Lenders acknowledge that, pursuant to such activities, the Administrative Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall be under no obligation to provide such information to them.

Section 9.03     Exculpatory Provisions.

Notwithstanding any provision to the contrary elsewhere in this Agreement or in any other Loan Document, the Administrative Agent shall not have any duties, responsibilities or obligations to the Lenders, the L/C Issuers or the Loan Parties except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)      shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)      shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may (i) expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law or (ii) be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; *provided further* that (i) the Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive in writing such advice or concurrence of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Sections 10.01</u> and <u>8.02</u>)) as it deems appropriate, (ii) if Administrative Agent so requests, it shall first be indemnified and provided with adequate security to its sole satisfaction (including reasonable advances as may be requested by the Administrative Agent) by the Lenders against any and all liability and expenses that may be incurred by it by reason of taking or continuing to take any directed action and (iii) Administrative Agent may seek clarification or further direction, and shall be entitled to request and receive written instructions from the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02<u>)</u> prior to taking any such directed action and may refrain from acting until such clarification or further direction or written instructions have been provided;

(c)      shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of their Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity;

(d)      shall not be liable to the Lenders for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Sections 10.01</u> and <u>8.02</u>) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and nonappealable judgment (which shall not include any action taken or omitted to be taken in accordance with the foregoing clause (i) for which Administrative Agent and its Related Parties shall have no liability).  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice describing such Default is given to the Administrative Agent by the Borrowers, a Lender or the L/C Issuer; and

(e)      shall not be responsible to the Lenders or have any liability for or have any duty to ascertain or inquire into or monitor (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report, statement or other document referred to, provided for, or delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, the use of proceeds of the Loans, or the occurrence or possible occurrence of any Default, (iv) the execution, validity, enforceability,

effectiveness or genuineness, collectability or sufficiency of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, preservation, perfection maintenance or continuation of perfection, or priority, sufficiency or protection of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or whether the Collateral is owned by the Loan Parties, is cared for, insured or maintained, or has been encumbered, (vi) the satisfaction of any condition set forth in Article IV or elsewhere, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or the inspection of the properties, books or records of any Loan Party or any Affiliate thereof, or (vii) the financial condition or business affairs of any Loan Party or any other Person liable for payment of any Obligations; and

(f)      shall not be responsible for or liable for any failure or delay in performing any act or fulfilling any duty, obligation or responsibility hereunder or under any other Loan Document, in each case, arising out of or caused, directly or indirectly, by any occurrence beyond its control (including, without limitation, any act or provision of any present or future law or regulation or governmental authority; any act of God or war; earthquakes; fires; floods; civil or military disturbances; local or national disturbance or disaster; any act of terrorism; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility.

It is understood and agreed by each Secured Party that the Administrative Agent shall not have any liability for any determinations made by it under Section 8.03, in each case except to the extent resulting from the gross negligence or willful misconduct of the Administrative Agent (as determined by a court of competent jurisdiction in a final and non-appealable decision).  Each Secured Party also agrees that the Administrative Agent may (but shall not be required to), at any time and in its sole discretion, and with no liability resulting therefrom, petition a court of competent jurisdiction regarding any application of Collateral in accordance with the requirements hereof, and the Administrative Agent shall be entitled to wait for, and may conclusively rely on, any such determination.

Nothing in this Agreement or any other Loan Document shall require Administrative Agent or its Related Parties to expend or risk any of their own funds or otherwise incur any liability, financial or otherwise, in the performance of any of their duties or in the exercise of any rights or powers hereunder or under the Loan Documents.  In no event shall Administrative Agent be responsible or liable for any incidental, special, indirect, punitive or consequential loss or damage of any kind whatsoever (including loss of profit) irrespective of whether such Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

Section 9.04      Reliance                  by               the             Administrative Agent. Τηε Αδμινιστρατιϖε Αγεντ σηαλλ νοτ βε ρεσπονσιβλε φορ ορ ηαϖε ανψ δυτψ το ασχερτ αιν ορ ινθυιρε ιντο, ανδ σηαλλ βε εντιτλεδ το ρελψ υπον, σηαλλ βε φυλλψ προτεχτεδ ιν ρελψινγ ανδ σηαλλ νοτ ινχυρ ανψ λιαβιλιτψ φορ ρελψινγ υπον, ανψ ρεσολυτιον, νοτιχε, ρεθυεστ, χερτι φιχατε, αφφιδαϖιτ, λεττερ, φαχσιμιλε, τελεχοπψ, τελεξ ορ τελετψπε μεσσαγε, χονσεντ, στατεμεν τ, ινστρυμεντ, ωριτινγ, ορδερ ορ οτηερ δοχυμεντ (ινχλυδινγ ανψ ελεχτρονιχ μεσσαγε, Ιντερνετ ο ρ ιντρανετ ωεβσιτε ποστινγ ορ οτηερ διστριβυτιον) βελιεϖεδ βψ ιτ ιν γοοδ φαιτη το βε γενυινε α νδ το ηαϖε βεεν σιγνεδ, σεντ ορ οτηερωισε αυτηεντιχατεδ βψ τηε προπερ Περσον ορ Περσονσ. Τηε Αδμινιστρατιϖε Αγεντ αλσο μαψ ρελψ υπον ανψ στατεμεντ μαδε το ιτ οραλλψ ορ βψ τελεπ ηονε ανδ βελιεϖεδ βψ ιτ το ηαϖε βεεν μαδε βψ τηε προπερ Περσον, ανδ σηαλλ νοτ ινχυρ ανψ λ ιαβιλιτψ φορ ρελψινγ τηερεον. Ιν δετερμινινγ χομπλιανχε ωιτη ανψ χονδιτιον ηερευνδερ το τηε

μακινγ οφ α Λοαν, ορ τηε ισσυανχε, εξτενσιον, ρενεωαλ ορ ινχρεασε οφ α Λεττερ οφ Χρεδιτ, τη
ατ βψ ιτσ τερμσ μυστ βε φυλφιλλεδ το τηε σατισφαχτιον οφ α Λενδερ ορ τηε Λ/Χ Ισσυερ, τηε Αδ
μινιστρατιωε Αγεντ μαψ πρεσυμε τηατ συχη χονδιτιον ισ σατισφαχτορψ το συχη Λενδερ ορ τηε
Λ/Χ Ισσυερ υνλεσσ τηε Αδμινιστρατιωε Αγεντ σηαλλ ηαωε ρεχειωεδ ωριττεν νοτιχε το τηε χον
τραρψ φρομ συχη Λενδερ ορ τηε Λ/Χ Ισσυερ πριορ το τηε μακινγ οφ συχη Λοαν ορ τηε ισσυανχ
ε, εξτενσιον, ρενεωαλ ορ ινχρεασε οφ συχη Λεττερ οφ Χρεδιτ.  Τηε Αδμινιστρατιωε Αγεντ μαψ χ
ονσυλτ ωιτη λεγαλ χουνσελ (ωηο μαψ βε χουνσελ το τηε Βορροωερσ), ινδεπενδεντ αχχουνταντ
σ ανδ οτηερ χονσυλταντσ ορ εξπερτσ σελεχτεδ βψ ιτ, ατ τηε εξπενσε οφ τηε Βορροωερσ, ανδ ση
αλλ βε εντιτλεδ το ρελψ, σηαλλ βε φυλλψ προτεχτεδ ιν ρελψινγ, ανδ σηαλλ νοτ βε λιαβλε φορ α
νψ αχτιον τακεν ορ νοτ τακεν βψ ιτ ιν αχχορδανχε ωιτη τηε αδωιχε ανδ στατεμεντσ οφ ανψ συ
χη χουνσελ, αχχουνταντσ, χονσυλταντσ ορ εξπερτσ.

Section 9.05        Delegation of Duties.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent.  The Administrative Agent and any such co-agents, sub-agents and attorneys-in-fact may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this <u>Article IX</u>  and all other rights, privileges, protections, immunities, and indemnities granted to Administrative Agent hereunder and under the Loan Documents shall apply to any such co-agent, sub-agent or attorney-in-fact and to the Related Parties of the Administrative Agent and any such co-agent, sub-agent or attorney-in-fact as provided for herein as well as activities of the Administrative Agent.  The Administrative Agent shall not be responsible to the Lenders for the negligence or misconduct of any co-agents, sub-agents or attorneys-in-fact except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such co-agents, sub-agents or attorneys-in-fact.

Section 9.06        Resignation of the Administrative Agent.

The Administrative Agent may at any time give notice of its resignation to the Lenders, the L/C Issuer and the Borrowers upon twenty (20) days' written notice to such Persons.  Upon receipt of any such notice of resignation or removal, the Required Lenders shall have the right to appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders and the L/C Issuer (if applicable), appoint a successor Administrative Agent with the consent of the Required Lenders (including receipt of the consent by the Borrowers); *provided* that if the Administrative Agent shall notify the Borrowers and the Lenders that no qualifying Person has accepted such appointment, then such resignation or removal shall nonetheless become effective in accordance with such notice and (a) the resigning Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the L/C Issuer (if applicable) under any of the Loan Documents, the resigning Administrative Agent shall continue to hold such collateral security (including any collateral security subsequently delivered to such Administrative Agent) until such time as a successor Administrative Agent is appointed) (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Loan Document, including any action required to maintain the perfection of any security interest) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and the L/C Issuer (if applicable) directly, until such time as the Required Lenders appoint a successor Administrative Agent as

provided for above in this <u>Section 9.06</u>.  Upon the acceptance of a successor's appointment as the Administrative Agent hereunder and delivery of collateral security in the possession of the resigning Administrative Agent to such successor Administrative Agent (to the extent that possession thereof perfects a Lien thereon under the UCC of any jurisdiction), such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the resigning (or resigned) Administrative Agent, and the resigning Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this <u>Section 9.06</u>) without any other or further act or deed on the part of such retiring Administrative Agent or any of the other parties to this Agreement or any holders of the Loans.  The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor.  After the resigning Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this <u>Article IX</u> and <u>Sections 10.04</u> and <u>10.05</u> and all other rights, privileges, protections, immunities and indemnities granted to Administrative Agent hereunder and under the Loan Documents, shall continue in effect for the benefit of such resigning Agent, its co-agents, sub-agents and attorneys-in-fact and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the resigning Administrative Agent was acting as such Administrative Agent.

Section 9.07    Non-Reliance on the Administrative Agent and Other Lenders.

Each Lender and the L/C Issuer expressly acknowledges that neither the Administrative Agent nor any of its Related Parties have made any representations or warranties to such Lender or L/C Issuer and that no act by Administrative Agent or its Related Parties hereafter taken, including any review of the affairs or property of any Loan Party or any Affiliate of any Loan Party or any acceptance or consent to any such review, shall be deemed to constitute any representation or warranty by Administrative Agent or any of its Related Parties to any Lender or L/C Issuer as to any matter, including as to whether its Related Parties have disclosed material information in their possession.  Each Lender and the L/C Issuer acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender and the L/C Issuer also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 9.08    No Other Duties, Etc.

Anything herein to the contrary notwithstanding, the Administrative Agent shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender or the L/C Issuer hereunder.

Section 9.09    Administrative Agent May File Proofs of Claim; Credit Bidding.

In respect of the Cases or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuer and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuer and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuer and the Administrative Agent under Sections 2.03(h) and (i), 2.09, 10.04 and 10.05) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the L/C Issuer to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuer, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09, 10.04 and 10.05.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or the L/C Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or the L/C Issuer to authorize the Administrative Agent to vote in respect of the claim of any Lender or the L/C Issuer or in any such proceeding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale or foreclosure or acceptance of Collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Laws. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles or utilize an existing acquisition vehicle owned by the Lenders to make a bid, (ii) to adopt or amend documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in clauses (a) through (j) of Section 11.01 of this Agreement), (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without

the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

Section 9.10    Collateral and Guaranty Matters.

Each Lender hereby agrees, and each holder of any Note by its acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Collateral Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Administrative Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, to take any action with respect to any Collateral or Collateral Documents which may be necessary to create, perfect and maintain perfected security interests in and liens upon the Collateral granted pursuant to the Collateral Documents. Each of the Lenders and the L/C Issuer irrevocably authorizes the Administrative Agent (acting at the direction of the Required Lenders):

(a)    to enter into and sign for and on behalf of the Lenders, as Secured Parties, the Collateral Documents for the benefit of the Lenders and the other Secured Parties;

(b)    to automatically release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than (A) contingent indemnification obligations and (B) the expiration or termination of all Letters of Credit (other than Letters of Credit that are Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the applicable L/C Issuer or a deemed reissuance under another facility as to which other arrangements satisfactory to the applicable L/C Issuer shall have been made), (ii) at the time the property subject to such Lien is Disposed or to be Disposed (to a Person that is not a Loan Party) as part of or in connection with any Disposition (other than a lease or grant of a license by any Loan Party) permitted hereunder or under any other Loan Document, (iii) subject to Section 10.01, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders, (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to clause (d) below, (v) in accordance with any intercreditor agreement, or (vi) if the property subject to such Lien constitutes Excluded Assets;

(c)    (i) to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to another Lien permitted under Section 7.01(c), (d), (g) or (u) or other Lien subject to the requirements of Section 10.01(g) or (i), to the extent (x) required by the holder of, or pursuant to the terms of any agreement governing, the obligations secured by such Liens, (y) having priority by operation of law or (z) otherwise permitted to be senior to the Liens of the Secured Parties under this Agreement and (ii) to enter into subordination or intercreditor agreements with respect to Indebtedness to the extent the Administrative Agent is otherwise contemplated herein as being a party to such intercreditor or subordination agreement; and

(d)        to release any Guarantor from its obligations under this Agreement (including the Guaranty) (x) pursuant to Section 11.09 or (y) pursuant to any Order.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.10.  In each case as specified in this Section 9.10, the Administrative Agent will (and each Lender irrevocably authorizes the Administrative Agent to), at the direction of the Required Lenders and at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment, Lien and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by the Borrowers or any of its Restricted Subsidiaries in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

Section 9.11        [Reserved].

Section 9.12        Withholding Tax Indemnity.

To the extent required by any applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  If the Internal Revenue Service or any other authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective), such Lender shall, within 10 days after written demand therefor, indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Loan Parties pursuant to Section 5.01 and without limiting or expanding the obligation of the Loan Parties to do so) for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.12.  The agreements in this Section 9.12 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other Obligations.  For the avoidance of doubt, the term "Lender" shall, for purposes of this Section 9.12, include any L/C Issuer.

Section 9.13        Indemnification by the Lenders.

The Lenders agree to indemnify the Administrative Agent (or any Affiliate thereof) and each other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) (to the extent not reimbursed by the Borrowers or any other Loan Party

and without limiting the obligation of the Borrowers to do so), ratably according to their respective Pro Rata Shares in effect on the date on which indemnification is sought under this Section 9.13 from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including at any time following the payment of the Term Loans) be imposed on, incurred by or asserted against the Administrative Agent (or any Affiliate thereof) in any way relating to or arising out of this Agreement, any of the other Loan Documents or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent (or any Affiliate thereof) under or in connection with any of the foregoing; IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE, provided that (a) no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent arising from the Administrative Agent's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable judgement and (b) no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.13. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its Pro Rata Share of any costs or expenses (including reasonable and documented out-of-pocket fees and expenses of counsel) incurred by the Administrative Agent in connection with the preparation, syndication, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement any other Loan Document, or any document contemplated by or referred to herein; provided, further, that the failure of any Lender to indemnify or reimburse the Administrative Agent shall not relieve any other Lender of its obligation in respect thereof. If any indemnity furnished to the Administrative Agent for any purpose shall, in the opinion of the Administrative Agent, be insufficient or become impaired, the Administrative Agent may call for additional indemnity or advance of funds and cease, or not commence, to do the acts indemnified against until such additional indemnity or advance of funds is furnished.  The agreements in this Section 9.13 shall survive the resignation or removal of the Administrative Agent, or the resignation of an L/C Issuer the replacement of any Lender, the termination of this Agreement, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 9.14        Certain ERISA Matters.

(a)        Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, that at least one of the following is and will be true:

(i)        such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Commitments,

(ii)        the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable, and the conditions of such exemption have been satisfied, with respect to such Lender's entrance into, participation in,

administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, such Lender and the Borrowers, provided that the Borrowers shall not unreasonably withhold their consent.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrowers or any other Loan Party, that:

(i)    none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto),

(ii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Letters of Credit, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)    no fee or other compensation is being paid directly to the Administrative Agent or any of its Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Letters of Credit, the Commitments or this Agreement.

(c)    The Administrative Agent hereby informs the Lenders that it is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Letters of Credit, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans, the Letters of Credit or the Commitments for an amount less than the amount being paid for an interest in the Loans, the Letters of Credit or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

Section 9.15    Erroneous Payments.

(a)    If the Administrative Agent notifies a Lender, the L/C Issuer, any other Secured Party or any Person who has received funds on behalf of the foregoing (any such Lender, the L/C Issuer, any other Secured Party, or other recipient (and each of their respective successors and assigns) a "**Payment Recipient**" ; *provided*, that "Payment Recipient" shall not include Holdings or any of its Subsidiaries) that the Administrative Agent has determined in its reasonable discretion (whether or not after receipt of any notice under immediately succeeding underline clause (b)) that any funds (as set forth in such notice from the Administrative Agent)  received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, the L/C Issuer, such other holder of Obligations or other Payment Recipient on its behalf)  (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**") and demands in writing the return of such Erroneous Payment (or a portion thereof); *provided*, that, without limiting any other rights or remedies (whether at law or in equity), the Administrative Agent may not make any such demand under this clause (a)(y) with respect to an Erroneous Payment unless such demand is made within five (5) Business Days of the date of receipt of such Erroneous Payment by the applicable Payment Recipient, such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender, the L/C Issuer or such other holder of Obligations shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter (or such later date as the Administrative Agent may, in its sole discretion, specify in writing), return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Administrative Agent, in its sole discretion)  in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.  A notice of the Administrative Agent to any Payment Recipient under this underline clause (a) shall be conclusive, absent manifest error.

(b)      Without limiting clause (a), each Payment Recipient hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender, the L/C Issuer or such other Secured Party, or other such recipient otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(i)      (A) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)      such Payment Recipient shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one (1) Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 9.13(b).

(c)      Each Lender, the L/C Issuer and each other Secured Party authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender, the L/C Issuer or such other Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender, the L/C Issuer or such other holder of Obligations from any source, against any amount the Administrative Agent has demanded to be returned under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(d)      In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding clause (a), from any Lender or the L/C Issuer that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "**Erroneous Payment Return Deficiency**"), upon the Administrative Agent's notice to such Lender or L/C Issuer at any time, then effective immediately (with the consideration therefor being acknowledged by the parties hereto), (i) such Lender or the L/C Issuer shall be deemed to have assigned its Loans (but not its Commitments) of the relevant class with respect to which such Erroneous Payment was made (the "**Erroneous Payment Impacted Class**") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment  Impacted Class, the "**Erroneous Payment Deficiency Assignment**") (on a cashless basis and such amount calculated) at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption (or, to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to a Platform as to which the Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender or the L/C Issuer shall deliver any promissory notes evidencing such Loans to the Borrower or the Administrative Agent (but the failure of such Person to deliver any such Notes shall not affect the effectiveness of the foregoing assignment), (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender or the L/C Issuer, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning

Lender or assigning L/C Issuer shall cease to be a Lender or the L/C Issuer, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender or assigning L/C Issuer, (iv) the Administrative Agent and the Borrowers shall each be deemed to have waived any consents required under this Agreement to any such Erroneous Payment Deficiency Assignment, and (iv) the Administrative Agent will reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment.  The Administrative Agent may, in its discretion, but subject to Section 11.06, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender or the L/C Issuer shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender or the L/C Issuer (and/or against any recipient that receives funds on its respective behalf).  For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender or the L/C Issuer and such Commitments shall remain available in accordance with the terms of this Agreement.  In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated subject to Section 9.15(e), the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Lender, the L/C Issuer or such other holder of Obligations under the Loan Documents with respect to each Erroneous Payment Return Deficiency (the "**Erroneous Payment Subrogation Rights**").

(e)    The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender, to the rights and interests of such Lender, as the case may be) under the Loan Documents with respect to such amount (the "**Erroneous Payment Subrogation Rights**") (provided, that the Loan Parties' Obligations under the Loan Documents in respect of the Erroneous Payment Subrogation Rights shall not be duplicative of such Obligations in respect of Loans that have been assigned to the Administrative Agent under an Erroneous Payment Deficiency Assignment) and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrowers or any other Loan Party, provided that this Section 9.14 shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrowers relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; *provided*, further, that for the avoidance of doubt, immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrowers for the purpose of making such Erroneous Payment.

(f)    To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)    Each party's obligations, agreements and waivers under this Section 9.15 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender or the L/C Issuer, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

(h)    Notwithstanding anything to the contrary in this Agreement or in any Loan Document, none of Holdings, the Borrower or their Restricted Subsidiaries shall have any liability with respect to this <u>Section 9.15</u>.

**ARTICLE X.**
**<u>MISCELLANEOUS</u>**

Section 10.01        Amendments, Etc.

Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders) and the Borrowers, the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that (i) no amendment, waiver or consent shall, unless in writing and signed by each L/C Issuer in addition to the Lenders required above, directly and adversely affect the rights or duties of such L/C Issuer under this Agreement or any Letter of Credit Request relating to any Letter of Credit issued or to be issued by it; *provided*, *however*, that this Agreement may be amended to adjust the mechanics related to the issuance of Letters of Credit, including mechanical changes relating to the existence of multiple L/C Issuers and increase the L/C Sublimit, with only the written consent of the Administrative Agent (acting at the direction of the Required Lenders), L/C Issuer and the Borrowers; and (ii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, directly and adversely affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders (it being understood that any Commitments or Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Required Lenders or Required Class Lenders)), except that (x) the Commitment of any such Defaulting Lender may not be increased or extended, the rate of interest on any Loans of any Defaulting Lender may not be reduced and the principal amount of any of such Loans may not be forgiven, in each case without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each directly and adversely affected Lender that by its terms materially and adversely affects any Defaulting Lender to a greater extent than other affected Lenders (or, if there are no such affected Lenders (other than such affected Lenders which are Defaulting Lenders), Lenders of the same Class) shall require the consent of such Defaulting Lender.

Notwithstanding anything in this Agreement or any Collateral Document to the contrary, the Administrative Agent (acting at the direction of the Required Lenders) may grant extensions of time for the satisfaction of any of the requirements described in the definition of "Collateral and Guarantee Requirement" under <u>Sections 6.11</u> and <u>6.17</u> or any Collateral Document in respect of any particular Collateral or any particular Subsidiary if it determines that the satisfaction thereof with respect to such Collateral or such Subsidiary cannot be accomplished without undue expense or unreasonable effort or due to factors beyond the control of Holdings, the Borrower and the Restricted Subsidiaries by the time or times at which it would otherwise be required to be satisfied under this Agreement or any Collateral Document.

Notwithstanding anything to the contrary contained in <u>Section 10.01</u>, if at any time after the Closing Date, the Administrative Agent and the Borrowers shall have jointly identified (x) an obvious ambiguity, error, omission or defect, (y) any ambiguity, error, omission or defect of a technical or immaterial nature

or (z) any incorrect cross reference or similar inaccuracy, in each case, in any provision of the Loan Documents, then the Administrative Agent (acting at the direction of the Required Lenders) and the Borrowers shall be permitted to amend such provision.

Section 10.02      Notices and Other Communications; Facsimile Copies.

(a)      Notices; Effectiveness; Electronic Communications.

(i)      Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (C) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(A)                      if to a Loan Party, the Administrative Agent or, the L/C Issuer(s), to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a written notice to the other parties; and

(B)                      if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a written notice to the Borrowers, the Administrative Agent or the L/C Issuer(s).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (C) below shall be effective as provided in such subsection (C).

(C)                      Electronic Communications.  Notices and other communications to the Lenders and the L/C Issuers hereunder may be delivered or furnished by electronic communication (including e-mail, FpML messaging and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender or the L/C Issuers pursuant to Article II if such Lender or any L/C Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or a Loan Party may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement) and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; *provided* that, for both clauses (i) and (ii), if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication may be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(b)      The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.   NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Loan Parties, any Lender, the L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrowers' or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party (or its representatives); *provided*, *however*, that in no event shall any Agent Party have any liability to the Loan Parties, any Lender, the L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(c)      Change of Address, Etc.  Any Loan Party, the Administrative Agent, or the L/C Issuer may change its address, electronic mail address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, electronic mail address, facsimile or telephone number for notices and other communications hereunder by written notice to the Borrowers, the Administrative Agent or the L/C Issuer.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain Material Non-Public Information.

(d)      Reliance by Administrative Agent, L/C Issuer and Lenders.  The Administrative Agent, the L/C Issuer and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) which such Person believes in good faith to have been given by or on behalf of the Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrowers shall indemnify the Administrative Agent, the L/C Issuer, each Lender and the Related Parties of each of them (other than any Excluded Affiliate of the L/C Issuer, such Lender and such Related Parties) from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrowers in the absence of gross negligence or willful misconduct of such Person, as determined by a final non-appealable judgment of a court of competent jurisdiction.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 10.03     No Waiver; Cumulative Remedies.

No failure by any Lender, the L/C Issuer or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.   The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders and the L/C Issuer; *provided*, *however*, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) the L/C Issuer  from exercising the rights and remedies that inure to its benefit (solely in its capacity as L/C Issuer) hereunder and under the other Loan Documents,[reserved], (c) any Lender from exercising setoff rights in accordance with Section 10.09 (subject to the terms of Section 2.13), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and *provided*, *further*, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 10.04     Attorney Costs and Expenses.

The Borrowers agree, solely using the proceeds of the Loans, to pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication, execution, delivery and administration of this Agreement and the other Loan Documents, and any amendment, waiver, consent, forbearance or other modification of the provisions hereof and thereof (including, for the avoidance of doubt, in connection with any Default or Event of Default), and the consummation and administration of the transactions contemplated hereby and thereby, including Attorney Costs (which in the case of Attorney Costs for the Administrative Agent, shall be limited to Ropes & Gray LLP, as counsel to the Administrative Agent), and, if reasonably necessary, one local counsel in each relevant jurisdiction (which may include a single special counsel acting in multiple jurisdictions) material to the interests of the Administrative Agent and the Lenders and (b) from and after the Closing Date, to pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the performance of duties under the Loan Documents and the enforcement or protection of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and in the case of (i) all respective Attorney Costs (in the case of the Administrative Agent, limited to Attorney Costs of one external counsel) and one local counsel in each relevant jurisdiction, and (ii) fees and expenses related to any other advisor or consultant, which shall include reasonable and documented out-of-pocket fees and expenses related to any insurance consultant and any environmental consultant to the Administrative Agent to the extent consented to by the Borrowers; *provided* that, solely with respect to the Lenders, any such amounts paid or reimbursed pursuant

to this Section 10.04 shall not exceed $1,500,000 in the aggregate. The agreements in this Section 10.04 shall survive the resignation of the Administrative Agent, the termination of this Agreement, the termination of the Aggregate Commitments and repayment, satisfaction or discharge of all other Obligations. All amounts due under this Section 10.04 shall be paid within 30 days following receipt by the Lenders of an invoice relating thereto setting forth such expenses in reasonable detail; *provided* that, with respect to the Closing Date, all amounts due under this Section 10.04 shall be paid on the Closing Date solely to the extent invoiced to the Lenders two Business Days prior to the Closing Date. For the avoidance of doubt, this Section 10.04 shall not apply to Taxes, except any Taxes that represent costs and expenses arising from any non-Tax claim.

   Section 10.05  Indemnification by the Borrowers.

   The Borrowers shall, solely using the proceeds of the Loans, indemnify and hold harmless the Administrative Agent and the Lenders and their respective Affiliates and controlling Persons, and their respective directors, officers, employees, agents and other representatives of each of the foregoing and their respective successors and permitted assigns (but excluding any Excluded Affiliates and Disqualified Lenders) (collectively the "**Indemnitees**") from and against any and all actual losses, claims, damages, liabilities and expenses (including Attorney Costs, but limited in the case of legal fees and expenses to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if reasonably necessary, one local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interests of the Lenders, and solely in the case of an actual conflict of interest, one additional counsel in each relevant jurisdiction to the affected Indemnitees similarly situated) (and in the case of other consultants and advisors, solely the fees and expenses of such persons approved by the Lenders) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Commitment, Loan or Letter of Credit or the use or proposed use of the proceeds therefrom including any refusal by an L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, (c) any actual or alleged presence or Release of Hazardous Materials at, on, under or from any property or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any Environmental Liability of the Loan Parties or any Subsidiary, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (a "**Proceeding**") and regardless of whether any Indemnitee is a party thereto or whether or not such Proceeding is brought by the Borrowers or any other person and, in each case, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities and expenses resulted from (v) in the case of the Administrative Agent or any of its Related Indemnified Persons, the gross negligence or willful misconduct of the Administrative Agent or its Indemnitees (as determined by a final non-appealable judgment of a court of competent jurisdiction), (w) in the case of a Lender or any of its Related Indemnified Persons, the gross negligence, bad faith or willful misconduct of such Indemnitee or of any of its Related Indemnified Persons, as determined by a final non-appealable judgment of a court of competent jurisdiction, (x) other than with respect to the Administrative Agent and its Related Indemnified Persons, a material breach of any obligations under any Loan Document by such Indemnitee or of any of its Related Indemnified Persons, as determined by a final non-appealable judgment of a court of competent jurisdiction, (y) any dispute solely among Indemnitees other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under any Facility and other than any claims arising out of any act or omission of the Borrowers or any of their Affiliates or (z) settlements effected without the Lenders' prior written consent (which consent shall

not be unreasonably withheld, delayed or conditioned), but if settled with Lenders' written consent, or if there is a final judgment against an Indemnitee, the Borrowers shall indemnify and hold harmless such Indemnitee to the extent and the manner set forth above. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement (except for direct (as opposed to indirect, special, punitive or consequential) damages resulting from the gross negligence or willful misconduct of such Indemnitee, as determined in a final and non-appealable judgment of a court of competent jurisdiction, nor shall any Indemnitee, Related Indemnified Person, Loan Party or any Subsidiary have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Loan Party, in respect of any such obligations, liabilities, losses, damages, penalties, demands, actions, judgments, suits, costs, disbursements, claims or expenses incurred or paid or required to be paid by an Indemnitee to a third party (including another Indemnitee)). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated. All amounts due under this Section 10.05 shall be paid within thirty (30) days after written demand therefor (together with backup documentation supporting such reimbursement request); *provided*, *however*, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of this Section 10.05. The agreements in this Section 10.05 shall survive the resignation or removal of the Administrative Agent, or the resignation of an L/C Issuer the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations. Each Indemnitee shall promptly notify the Borrowers upon receipt of written notice of any claim or threat to institute a claim; *provided* that any failure by any Indemnitee to give such notice shall not relieve the Borrowers from the obligation to indemnify such Indemnitee in accordance with the terms of this Section 10.05. For the avoidance of doubt, this Section 10.05 shall not apply to Taxes, except any Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, prepayments, suits, costs, expenses and disbursements arising from any non-Tax claims.

Section 10.06        Payments Set Aside.

To the extent that any payment by or on behalf of the Borrowers is made to the Administrative Agent, the L/C Issuer or any Lender, or the Administrative Agent, the L/C Issuer or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent,  the L/C Issuer or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and the L/C Issuer severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect (*provided* that for the purposes of this Section 10.06, if the Federal Funds Rate is less than zero, it shall be deemed to be zero hereunder). The obligations of the Lenders and the L/C Issuer under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 10.07        Successors and Assigns.

(a)        The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrowers may not (except as permitted by Section 7.04) assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and (ii) any Lender may assign or otherwise transfer any of its rights or obligations hereunder to existing Lenders and their Affiliates (excluding any portfolio company of the Sponsor) without the consent of any other party hereto; *provided*, *however*, that notwithstanding the foregoing, no Lender may assign any of its rights or obligations hereunder to (i) any Person that is a Defaulting Lender or (ii) a natural Person.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)        Assignments shall be subject to the following additional conditions:

(i)        except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than an amount of $1,000,000, and shall be in increments of an amount of $1,000,000, in excess thereof unless the Administrative Agent (acting at the direction of the Required Lenders) otherwise consent; *provided* that such assignments shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(ii)        the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption either manually or via an electronic settlement system acceptable to the Administrative Agent;

(iii)        the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire; and

(iv)        the Assignee shall execute and deliver to the Administrative Agent and the Administrative Borrower the forms described in Sections 3.01(d) and 3.01(e) applicable to it as well as all required KYC documentation.

(c)        Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(b), from and after the effective date specified in each Assignment and Assumption, (1)  the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and (2) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits and subject to the obligations of Sections 3.01, 3.04, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Note, the Borrowers (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e).

(d)      The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders under the Facility, as applicable, and the Commitments of, and principal amounts (and stated interest amounts) of the Loans, L/C Obligations (specifying the Unreimbursed Amounts), L/C Borrowings and the amounts due under Section 2.03, owing to each Lender under such Facility, as applicable, pursuant to the terms hereof from time to time (each, a "**Register**").  The entries in the applicable Register shall be conclusive, absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the applicable Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  Each Register shall be available for inspection by the Borrowers, the Administrative Agent and any Lender (solely with respect to the information as it relates to such Lender), at any reasonable time and from time to time upon reasonable prior written notice.  No Assignment and Assumption shall be effective unless recorded in the applicable Register.  This Section 10.07(d) and Section 2.11 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(e)      Any Lender may at any time sell participations to any Person, other than Holdings or any of its Subsidiaries, a natural person or a Defaulting Lender (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in L/C Obligations) owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents.  Subject to Section 10.07(f), the Borrowers agree that each Participant shall be entitled to the benefits and subject to the obligations of Sections 3.01 and 3.04 to the same extent as if it were a Lender (subject, for the avoidance of doubt, to the limitations and requirements of those Sections applying to each Participant as if it were a Lender and provided that any documentation required to be provided under Section 3.01(d) shall be provided solely to the participating Lender) and had acquired its interest by assignment pursuant to Section 10.07(c).  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; *provided* that such Participant also shall be subject to Section 2.13 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest amounts) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**").  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  The portion of any Participant Register relating to any Participant or SPC requesting payment from the Borrowers or seeking to exercise its rights under Section 10.09 shall be available for inspection by the Borrowers or any other Person only to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)        A Participant shall not be entitled to receive any greater payment under <u>Sections 3.01</u> or <u>3.04</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Administrative Borrower's prior written consent.  A Participant shall not be entitled to the benefits of <u>Section 3.01</u> unless such Participant complies with <u>Sections 3.01(a)</u>, <u>(d)</u>, <u>(e)</u>, <u>(f)</u> and <u>(h)</u> as though it were a Lender (it being understood that the documentation required under <u>Section 3.01(d)</u> shall be delivered solely to the participating Lender and, at the time such participant has made a claim under <u>Section 3.01</u>, as necessary to substantiate a claim for additional amounts pursuant to <u>Section 3.01</u>).

(g)        Any Lender may, without the consent of the Borrowers or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender to a Federal Reserve Bank or to any central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)        Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Administrative Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof and (iii) such SPC and the applicable Loan or any applicable part thereof, shall be appropriately reflected in the Participant Register.  Each party hereto hereby agrees that (i) an SPC shall be entitled to the benefit of <u>Sections 3.01</u> and <u>3.04</u> (subject to the requirements and the limitations of such Sections), but neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrowers under this Agreement except, in the case of <u>Section 3.01</u>, to the extent that the grant to the SPC was made with the prior written consent of the Administrative Borrower (not to be unreasonably withheld or delayed; for the avoidance of doubt, the Administrative Borrower shall have a reasonable basis for withholding consent if an exercise by an SPC immediately after the grant would result in materially increased indemnification obligation to the Borrowers at such time), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the Lender hereunder.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrowers and the Administrative Agent (acting at the direction of the Required Lenders) and with the payment of a processing fee of $3,500 (which fee may be waived or reduced by the Administrative Agent (acting at the direction of the Required Lenders), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(i)        Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this

Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(j)     Notwithstanding anything to the contrary contained herein, any L/C Issuer may, upon thirty (30) days' notice to the Borrowers and the Lenders, resign as an L/C Issuer; *provided* that on or prior to the expiration of such 30-day period with respect to such resignation, the relevant L/C Issuer  shall have identified a successor L/C Issuer reasonably acceptable to the Borrowers willing to accept its appointment as successor L/C Issuer; in which case the resigning L/C Issuer , (x) shall not be required to issue any further Letters of Credit hereunder, and (y) shall maintain all of its rights as L/C Issuer with respect to any Letters of Credit issued by it prior to the date of such resignation.  In the event of any such resignation of an L/C Issuer, the Required Lenders shall be entitled to appoint  a successor L/C Issuer hereunder.  If an L/C Issuer resigns as an L/C Issuer, it shall retain all the rights and obligations of an L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as an L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Lenders to make Loans or fund risk participations in Unreimbursed Amounts pursuant to Section 2.03(c)).

Section 10.08     Confidentiality.

Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its Affiliates and its and its Affiliates' officers, directors, employees, legal counsel, independent auditors, professionals and other experts or agents, in each case other than Excluded Affiliates of such Lender (collectively, "**Representatives**") who need to know such Information (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and agree to keep such Information confidential and the Administrative Agent and the Lenders shall be principally liable to the extent any confidentiality restrictions set forth herein are violated by one or more of its Representatives); (b) to the extent required or requested by any Governmental Authority or self-regulatory authority having or asserting jurisdiction over such Person (including any Governmental Authority regulating any Lender or its Affiliates), *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will promptly notify the Administrative Borrower prior to any such disclosure by such Person (other than at the request of a regulatory authority as part of a regulatory examination) unless such notification is prohibited by law, rule or regulation; (c) to the extent required by applicable Laws or regulations or by any subpoena or order of any court or administrative agency or in any pending legal or administrative proceeding or similar legal process, *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Administrative Borrower in advance of any such disclosure by such Person (except with respect to any routine audit or examination conducted by bank accountants or regulatory authority exercising routine examination or regulatory authority) unless such notification is prohibited by law, rule or regulation; (d) to any other party to this Agreement; (e) subject to an agreement containing provisions at least as restrictive as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Administrative Borrower), to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or any Eligible Assignee or potential Lender invited to be an Additional Lender (except, in each case, to the extent the Administrative Borrower has declined to consent to such assignment), any pledgee referred to in Section 10.07(g), or any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to the Borrowers and their obligations; (f) with the written consent of the Administrative Borrower; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08 or other obligation of confidentiality owed to the Borrowers  or any of their respective Affiliates; (h) to any rating agency when required by it on a customary basis and after consultation with the Administrative Borrower (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information

relating to Loan Parties and their Subsidiaries received by it from such Lender); (i) in connection with the exercise of any remedies hereunder, under any other Loan Document or the enforcement of its rights hereunder or thereunder; (j) to the extent that such information is independently developed by the Administrative Agent or its Affiliates (other than any Excluded Affiliates of such Lenders) so long as not based on information obtained in a manner that would otherwise violate this Section 10.08; (k) for purposes of establishing a "due diligence" defense; (l) to a Person (other than a Person to whom the Administrative Borrower has affirmatively declined to consent to an assignment) that is an investor or prospective investor or financing source of the Lenders, or (m) to a Person that is an investor or prospective investor (other than a Person to whom the Administrative Borrower has affirmatively declined to consent to an assignment) in a securitization or other financing, separate account or commingled fund so long such investor or prospective investor agrees that its access to information regarding the Loan Parties and the Loans and Commitments is solely for purposes of evaluating an investment in such securitization or other financing, separate account or commingled fund and who agrees to treat such information as confidential. In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Administrative Agent and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments, and the Credit Extensions; provided that such Person is advised and agrees to be bound by the provisions of this Section 10.08.

For purposes of this Section, "**Information**" means all information received from, or on behalf of, any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof, their respective businesses and their respective Affiliates and their Affiliates' directors, officers, employees, trustees, investments advisors or agents, other than any such information that is available to the Administrative Agent (in such capacity) or any Lender (in such capacity) on a non-confidential basis prior to disclosure by any Loan Party or any Subsidiary thereof other than as a result of a breach of this Section 10.08.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include Material Non-Public Information, (b) it has developed compliance procedures regarding the use of Material Non-Public Information and (c) it will handle such Material Non-Public Information in accordance with applicable Law, including United States federal and state securities Laws. The provisions of this paragraph shall not affect any Borrowers' obligations under the last paragraph of Section 6.02.

Section 10.09     Setoff.

Subject to the terms of the Orders, in addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates (and the Administrative Agent, in respect of any unpaid fees, costs and expenses payable hereunder) is authorized at any time and from time to time, without prior notice to the Borrowers, any such notice being waived by the Borrowers (on its own behalf and on behalf of each Loan Party and each of its Subsidiaries) to the fullest extent permitted by applicable Law, after obtaining the written consent of the Administrative Agent (acting at the direction of the Required Lenders), to set off and apply any and all deposits (general or special, time or demand, provisional or final but excluding escrow, payroll, petty cash, trust and tax accounts) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates or the Administrative Agent to or for the credit or the account of the respective Loan Parties against any and all Obligations owing to such Lender and its Affiliates or the Administrative Agent hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not the Administrative Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness; *provided* that in the event that any

Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.19 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the L/C Issuer(s), and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. Each Lender agrees promptly to notify the Administrative Borrower and the Administrative Agent after any such set off and application made by such Lender; *provided* that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Administrative Agent and each Lender under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent and such Lender may have at Law.

Section 10.10    Interest Rate Limitation.

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.11    Counterparts; Electronic Execution of Assignments and Certain Other Documents.

This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by facsimile, .pdf or other electronic means of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document. The Administrative Agent may also require that any such documents and signatures delivered by facsimile, .pdf or other electronic means be confirmed by a manually signed original thereof; *provided* that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile, .pdf or other electronic means.

The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including, without limitation, Assignment and Assumptions, amendments or other modifications, Committed Loan Notices, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; *provided* that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it. Without limiting the generality of the foregoing, each Borrower hereby (i) agrees that, for all purposes, including without limitation, in

connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the Lenders and the Loan Parties, electronic images of this Agreement or any other Loan Documents (in each case, including with respect to any signature pages thereto) shall have the same legal effect, validity and enforceability as any paper original, and (ii) waives any argument, defense or right to contest the validity or enforceability of the Loan Documents based solely on the lack of paper original copies of any Loan Documents, including with respect to any signature pages thereto. The Loan Parties assume all risks arising out of the use of digital signatures and electronic methods to submit communications, including without limitation the risk of a Person acting on unauthorized instructions, and the risk of interception and misuse by third parties.

Section 10.12    Integration.

This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  Subject to Section 10.20 in the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; *provided* that the inclusion of supplemental rights or remedies in favor of the Administrative Agent or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 10.13    Survival of Representations and Warranties.

All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations as to which no claim has been asserted, in any such case, not then due and payable) or any Letter of Credit shall remain outstanding (unless the Outstanding Amount of the L/C Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit reasonably satisfactory to the applicable L/C Issuer or such Letter of Credit has been deemed reissued under another agreement acceptable to the applicable L/C Issuer (including if assumed by New OpCo (as defined in the Restructuring Support Agreement) in accordance with the Restructuring Support Agreement).

Section 10.14    Severability.

If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions; *provided* that the Lenders shall charge no fee in connection with any such amendment.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this Section 10.14, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent (acting at the

direction of the Required Lenders) or the L/C Issuer, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 10.15    GOVERNING LAW.

(a)    EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED, EXCEPT IN THE CASE OF ANY COLLATERAL DOCUMENT AS OTHERWISE PROVIDED IN SUCH COLLATERAL DOCUMENT, IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT. EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AGENT AT ITS ADDRESS FOR NOTICES AS SET FORTH HEREIN. THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH PARTY HERETO HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

THIS  SECTION  10.15  SHALL  SURVIVE  THE  RESIGNATION  OF  THE ADMINISTRATIVE AGENT, THE REPLACEMENT OF ANY LENDER, THE TERMINATION OF THIS AGREEMENT, THE TERMINATION OF THE AGGREGATE COMMITMENTS AND REPAYMENT , SATISFACTION OR DISCHARGE OF ALL OTHER OBLIGATIONS.

Section 10.16    WAIVER OF RIGHT TO TRIAL BY JURY.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY

OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.   THIS <u>SECTION 10.16</u> SHALL SURVIVE THE RESIGNATION OF THE ADMINISTRATIVE AGENT, THE REPLACEMENT OF ANY LENDER, THE TERMINATION OF THIS AGREEMENT, THE TERMINATION OF THE AGGREGATE COMMITMENTS AND REPAYMENT, SATISFACTION OR DISCHARGE OF ALL OTHER OBLIGATIONS.

Section 10.17    Binding Effect.

This Agreement shall become effective when (i) it shall have been executed and delivered by the Loan Parties and each other party hereto and (ii) the Administrative Agent shall have been notified by each Lender and L/C Issuer that each such Lender and L/C Issuer has executed it and thereafter shall be binding upon and inure to the benefit of the Loan Parties, the Administrative Agent and each Lender and their respective successors and assigns, in each case in accordance with <u>Section 10.07</u> (if applicable) and except that no Loan Party shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted hereby.

Section 10.18    USA Patriot Act.

Each Lender that is subject to the USA Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrowers that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name, address and tax identification number of such Loan Party and other information regarding such Loan Party that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the USA Patriot Act.  This notice is given in accordance with the requirements of the USA Patriot Act and is effective as to the Lenders and the Administrative Agent. Each Loan Party shall, promptly following a request by the Administrative Agent, provide all documentation and other information that the Administrative Agent or any Lender reasonably requests which is required in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and pursuant to the Beneficial Ownership Regulation.

Section 10.19    No Advisory or Fiduciary Responsibility.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent are arm's-length commercial transactions between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and each Lender each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for each Loan Party or any of their respective Affiliates, or any other Person and (B) neither the Administrative Agent nor any Lender has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan

Documents; and (iii) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and neither the Administrative Agent nor any Lender has any obligation to disclose any of such interests to the Loan Parties or any of their respective Affiliates.  To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.20    [Reserved].

Section 10.21    Acknowledgment and Consent to Bail-In of EEA Financial Institutions.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(1)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(2)    the effects of any Bail-In Action on any such liability, including, if applicable:

(a)    a reduction in full or in part or cancellation of any such liability;

(b)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(c)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 10.22    Acknowledgement Regarding Any Supported QFCs.

To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Contracts or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**" and each such QFC a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC

Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this Section 10.22, the following terms have the following meanings:

(i)    "**BHC Act Affiliate**" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

(ii)    "**Covered Entity**" means any of the following:

(A)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b)

(B)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(C)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

(iii)    "**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

(iv)    "**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

## ARTICLE XI.
## GUARANTEE

Section 11.01    The Guarantee.

Each Guarantor hereby jointly and severally with the other Guarantors guarantees, as a primary obligor and not as a surety, to each Secured Party and their respective successors and permitted assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of (i) the Bankruptcy Code after any bankruptcy or insolvency petition under the Bankruptcy Code and (ii) any other Debtor Relief Laws) on the Loans made by the Lenders to, and the Notes held by each Lender of, the Borrowers, and all other Obligations from time to time owing to the Secured Parties (such obligations being herein collectively called the "**Guaranteed Obligations**").   The Guarantors hereby jointly and severally agree that if the Borrowers or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, upon written

demand, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 11.02    Obligations Unconditional.

The obligations of the Guarantors under Section 11.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrowers under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, to the extent permitted by applicable Law irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full).  Without limiting the generality of the foregoing, to the extent permitted by applicable Law, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(i)    at any time or from time to time, without notice to the Guarantors, to the extent permitted by Law, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii)    any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted (including incurring any increase or decrease in the principal amount of the Guaranteed Obligations or the rate of interest or the fees thereon).

(iii)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or except as permitted pursuant to Section 11.09, any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(iv)    any Lien or security interest granted to, or in favor of, an L/C Issuer or any Lender or the Administrative Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(v)    the release of any other Guarantor pursuant to Section 11.09.

The Guarantors hereby expressly waive (to the fullest extent permitted by Law) diligence, presentment, demand of payment, protest and, to the extent permitted by Law, all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrowers under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations.  The Guarantors waive, to the extent permitted by Law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrowers and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee.

This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrowers or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and permitted assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and permitted assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

Section 11.03    Reinstatement.

The obligations of the Guarantors under this Article XI shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrowers or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 11.04    Subrogation; Subordination.

Each Guarantor hereby agrees that until the payment and satisfaction in full of all Guaranteed Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and the expiration and termination of the Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 11.01, whether by subrogation or otherwise, against the Borrowers or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. Any Indebtedness of any Loan Party to any Non-Loan Party permitted pursuant to Section 7.03(b) or (d) shall be subordinated to such Loan Party's Obligations evidencing such Indebtedness.

Section 11.05    Remedies.

The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrowers under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.02) for purposes of Section 11.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrowers and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrowers) shall forthwith become due and payable by the Guarantors for purposes of Section 11.01.

Section 11.06    Instrument for the Payment of Money.

Each Guarantor hereby acknowledges that the guarantee in this Article XI constitutes an instrument for the payment of money, and consents and agrees that any Lender or the Administrative Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Section 11.07      Continuing Guarantee.

The guarantee in this Article XI is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 11.08      General Limitation on Guarantee Obligations.

In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor (other than Holdings or the Borrowers) under Section 11.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 11.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the liability under this Guaranty and the right of contribution established in Section 11.10) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 11.09      Release of Guarantors.

If, in compliance with the terms and provisions of the Loan Documents, (i) any Subsidiary Guarantor ceases to be a Restricted Subsidiary of a Loan Party in a transaction permitted hereunder, (ii) unless the Borrowers has otherwise requested that such Excluded Subsidiary shall be a Subsidiary Guarantor, any Subsidiary Guarantor becomes an Excluded Subsidiary or (iii) the Borrowers request release of any Guarantor which was elected by the Borrowers, but was not required, to become a Guarantor (any such Subsidiary Guarantor referred to in clause (i), (ii) or (iii), a "**Released Guarantor**"), such Released Guarantor shall, upon the consummation of the related transaction, be automatically released from its obligations under this Agreement (including under Section 10.05 hereof) and the other Loan Documents, including its obligations to pledge and grant any Collateral owned by it pursuant to any Collateral Document and, in the case of a sale of any of the Equity Interests of the Released Guarantor to a Person that is not a Loan Party, the pledge of such Equity Interests to the Administrative Agent pursuant to the Collateral Documents shall be automatically released, and, so long as the Borrowers shall have provided the Administrative Agent such certifications or documents as the Administrative Agent shall reasonably request (acting at the direction of the Required Lenders), the Administrative Agent shall take such actions as are necessary to effect each release described in this Section 11.09 in accordance with the relevant provisions of the Collateral Documents; *provided*, that (x) no such release shall occur, and no such Subsidiary Guarantor shall constitute a Released Guarantor, if the sole purpose of the transaction resulting in such Subsidiary Guarantor ceasing to be a Restricted Subsidiary of a Loan Party or becoming an Excluded Subsidiary is to avoid the Guarantee in this Article XI and (y) in the case of any Subsidiary Guarantor that becomes an Excluded Subsidiary as a result of a transaction the effect of which is that such Subsidiary is no longer a wholly-owned Subsidiary, upon giving effect to such transaction, the Investment of the Loan Parties in such Subsidiary shall be deemed a de novo Investment as at that time.

When all Commitments hereunder have terminated, and all Loans or other Obligations hereunder (other than contingent indemnification obligations as to which no claim has been asserted) have been paid or satisfied in full, and no Letter of Credit remains outstanding (except any Letter of Credit the Outstanding Amount of which the Obligations related thereto has been Cash Collateralized or for which a backstop letter of credit reasonably satisfactory to the applicable L/C Issuer has been put in place or such Letter of Credit has been deemed reissued under another agreement reasonably acceptable to the applicable L/C Issuer), this Agreement and the Guarantees made herein shall automatically terminate with respect to all

Obligations, except with respect to Obligations that expressly survive such repayment pursuant to the terms of this Agreement.

Section 11.10    Right of Contribution.

Each Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Subsidiary Guarantor hereunder which has not paid its proportionate share of such payment.  Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of Section 11.04.  The provisions of this Section 11.10 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Administrative Agent, the L/C Issuer and the Lenders, and each Subsidiary Guarantor shall remain liable to the Administrative Agent, the L/C Issuer and the Lenders for the full amount guaranteed by such Subsidiary Guarantor hereunder.

Section 11.11    Keepwell.

Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guaranty in respect of any Swap Obligations (*provided*, *however*, that each Qualified ECP Guarantor shall only be liable under this Section 11.11 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 11.11, or otherwise under this Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section 11.11 shall remain in full force and effect until the payment in full and discharge of the Guaranteed Obligations.  Each Qualified ECP Guarantor intends that this Section 11.11 constitute, and this Section 11.11 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 11.12    Independent Obligation.

The obligations of each Guarantor hereunder are independent of the obligations of any other Guarantor, any other party or the Borrowers, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not action is brought against any other guarantor, any other party or the Borrowers and whether or not any other guarantor, any other party or the Borrowers be joined in any such action or actions.

Section 11.13    Collateral; Grant of Lien and Security Interest.

(a) Pursuant to, and otherwise subject to the terms of, the Orders and in accordance with the terms thereof and subject to the Carve-Out, as security for the full and timely payment and performance of all of the Obligations, the Loan Parties hereby, pledge and grant to the Secured Parties, a security interest in and a Lien on all of the Collateral.

(b) Notwithstanding anything herein to the contrary all proceeds received by the Administrative Agent and the Lenders from the Collateral shall be subject to the Carve Out.

Section 11.14    Priority Applicable to DIP Credit Bid Amount.

(a)    Upon entry of the Interim Order or Final Order, as applicable, and subject to the terms thereof and the Carve Out, pursuant to Bankruptcy Code Sections 364(c)(1), 503 and 507, all of the

Obligations shall constitute allowed superpriority administrative expense claims ("DIP Superpriority Claims"), which DIP Superpriority Claims in respect of the Obligations shall rank superior to all other claims (other than the Carve Out); *provided* that

(i)    notwithstanding anything to the contrary in this Interim Order or the DIP Documents, upon the occurrence of a Termination Date (as defined in the Restructuring Support Agreement) under the Restructuring Support Agreement with respect to the Consenting Term Lenders (as defined in the Restructuring Support Agreement) for the following reasons, each after delivery of a termination notice by the Required Consenting Term Lenders (as defined in the Restructuring Support Agreement) as set forth in the Restructuring Support Agreement:

(1)    the breach in any material respect by the Consenting Sponsor (as defined in the Restructuring Support Agreement) of any provision of the Restructuring Support Agreement that (a) is adverse to the Consenting Term Lenders and (b) remains uncured for seven (7) business days after such terminating Consenting Term Lenders transmit a written notice in accordance with the Restructuring Support Agreement;

(2)    the breach in any material respect by a Company Party (as defined in the Restructuring Support Agreement) of any provision of the Restructuring Support Agreement that (i) is adverse to the Consenting Term Lenders and (ii) remains uncured for seven (7) Business Days after such terminating Consenting Term Lenders transmit a written notice in accordance with the Restructuring Support Agreement;

(3)    upon (a) a filing by any of the Company Parties or the Consenting Sponsor of any motion, objection, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance, subordination, or recharacterization of, the Term Loan Claims (as defined in the Restructuring Support Agreement), the Revolving Credit Facility Claims (as defined in the Restructuring Support Agreement), and/or the liens securing any such claims or asserting any other claim or cause of action against and/or with respect to any such claims, liens, any Consenting Term Lender or any Agent (as defined in the Restructuring Support Agreement) under any of the relevant debt documents (or if the Company Parties or Consenting Sponsor support any such motion, application, or adversary proceeding commenced by any third party) or (ii) the entry of an order by the Bankruptcy Court, if sought by any of the Company Parties or the Consenting Sponsor, providing relief adverse to the interests of any Consenting Term Lender or any Agent with respect to any of the foregoing claims, causes of action, or proceedings;

(4)    in the event that (i) the Lender becomes a Defaulting Lender pursuant to this Agreement or the Lender otherwise fails to comply with its funding obligations under this Agreement (subject to any cure period under this Agreement), (ii) the Consenting Sponsor or the Lender fail to comply with its funding obligations provided in the Restructuring Support Agreement (including the Restructuring Term Sheet), or (iii) the DIP Credit Bid Amount at any time exceeds the amount of funding provided under the Facilities, and the Lender (or Holdings (as defined in the Restructuring Support Agreement) on behalf of the Lender) does not agree, within ten (10) business days of receiving notice of such condition, to provide funding necessary to pay additional costs that fall within the definition of the DIP Credit Bid Amount;

(5)    to the extent sought pursuant to a motion or application by any Company Party or the Consenting Sponsor, and solely to the extent not consented to by the Required Consenting Term Lenders, the entry of an order by the Court (a) dismissing any of the Chapter 11 Cases, (b) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (c) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (d)

terminating or shortening exclusivity under section 1121 of the Bankruptcy Code, (e) rejecting the Restructuring Support Agreement, or (f) vacating or modifying any order regarding the DIP Facility or cash collateral in manner that is not consistent with the Restructuring Support Agreement and the Restructuring Term Sheet, *provided* that such Termination Date may occur on the date the Consenting Sponsor files any motion or application seeking such relief without the prior consent of the Required Consenting Term Lenders;

(6)      unless the Company Parties consummate a third-party sale of substantially all of the Company Parties' assets acceptable to the Required Consenting Term Lenders, any of the Company Parties (without the consent of the Required Consenting Term Lenders) (a) withdraws the Plan (as defined in the Restructuring Support Agreement), (b) publicly announces their intention not to support the Restructuring Transactions (as defined in the Restructuring Support Agreement), (c) files, publicly announces, or executes a definitive written agreement with respect to an Alternative Restructuring Proposal (as defined in the Restructuring Support Agreement), or (d) agrees or indicates a material commitment to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document from or to a Company Party) or publicly announces its intent to pursue an Alternative Restructuring Proposal (as defined in the Restructuring Agreement);

(7)      upon the occurrence of any Event of Default hereunder pursuant to which the Lender has exercised remedies in accordance with the terms hereof; or

(8)      unless the Company Parties consummate a third-party sale of substantially all of the Company Parties' assets acceptable to the Required Consenting Term Lenders, following delivery of notice by the Company Parties pursuant to Section 8.02 of the Restructuring Support Agreement, the board of directors, board of managers, or such similar governing body of any Company Party determines, in good faith, after consulting with outside counsel, (a) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable law or (b) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal,

<u>then</u> the amount of DIP Obligations equal to the DIP Credit Bid Amount (as defined in the Restructuring Support Agreement) and all fees and interest accrued under the DIP Facility shall be fully subordinated to all Existing Credit Agreement Obligations and the Liens securing the Obligations shall be fully subordinated to the liens securing the Existing Credit Agreement Obligations; *provided* that the DIP Agent Fees shall remain senior, and in no event subordinated, to the Existing Credit Agreement Obligations and the Liens securing the Obligations notwithstanding the occurrence of a DIP Subordination Event (as defined below);

(ii)      notwithstanding anything to the contrary in the Interim Order or the Loan Documents, upon the occurrence of a Termination Date under the Restructuring Support Agreement for the following reasons:

(1)      the Plan (as defined in the Restructuring Support Agreement) is not substantially consummated by the Restructuring Effective Date Milestone (as defined in the Restructuring Support Agreement) (unless such Milestone (as defined in the Restructuring Support Agreement) has been waived, modified, extended, or otherwise amended by the Company Parties and the Required Consenting Stakeholders in writing (which may be via email from counsel)); *provided* that the right to terminate the Restructuring Support Agreement under Section 12.01(d) thereof shall not be available if the failure of such Milestone to be achieved is caused by, or resulted from, any act, omission, or delay, directly or indirectly, on the part of the Consenting Term Lenders in violation of their obligations under the Restructuring Support Agreement;

(2)      the entry of an order by the Bankruptcy Court (i) dismissing the Chapter 11 Cases, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in a majority of the Chapter 11 Cases of the Company Parties;

(3)      if any of the Orders are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended in a manner not reasonably acceptable to the Required Consenting Term Lenders; or

(4)      the Bankruptcy Court enters any order authorizing the use of cash collateral or postpetition financing that is not in form and substance reasonably acceptable to the Required Consenting Term Lenders;

then the amount of Obligations equal to 50% of the DIP Credit Bid Amount and all fees and interest accrued under the Facilities (other than the DIP Agent Fees) shall be fully subordinated to all Existing Credit Agreement Obligations and the Liens securing such amount of Obligations (other than the DIP Agent Fees) shall be subordinated to the liens securing the Existing Credit Agreement Obligations, and the remaining amount of the Obligations (other than the DIP Agent Fees) shall remain DIP Superpriority Claims secured by the Liens but will be reduced on a dollar-for-dollar basis by the amount of the Sponsor True-Up Obligation (as defined in the Restructuring Support Agreement) outstanding at such time (each of clauses (i) and (ii), a "**DIP Subordination Event**").

(b)      Subject to Section 5.19, the Priming Liens shall prime all of the Liens securing the Existing Credit Agreement Obligations, but the Liens so created as described in clause (a) above shall be subject valid, perfected, enforceable and unavoidable Liens existing as of the date the Cases are filed.

(c)      The Liens to be granted by the Bankruptcy Court on the Collateral shall cover all such property of the Loan Parties (now or hereafter acquired and all proceeds thereof), including property or assets that do not secure the Prepetition Indebtedness except as expressly excluded under the Security Agreement.

(d)      All of the Liens described herein with respect to the Collateral shall be effective and perfected as of the date of entry of the Interim Order and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements financing statements or other notices or agreements, the taking of possession or control or any other action.

Section 11.15      Grants, Rights and Remedies.

The Liens and security interests and the administrative priority and Lien priority specified above hereof may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the Orders and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Administrative Agent and the Lenders hereunder and thereunder are cumulative; provided that to the extent of conflict the applicable Order controls.

Section 11.16      Orders Control.

The Loan Parties, the Administrative Agent and the Lenders hereby agree that in the event of any express conflict between this Agreement and the Orders, the Orders shall control in all respects.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**BENEFYTT TECHNOLOGIES, INC.**, as the Borrower

By: _____
    Name:
    Title:

**DAYLIGHT BETA PARENT CORP.**, as Holdings

By: _____
    Name:
    Title:

[Signature Page to Debtor-in-Possession Credit Agreement]

**SUBSIDIARY GUARANTORS:**

[_____]


By:      _____
Name:
Title:

**[_____]**, as Administrative Agent

By: _____
      Name:
      Title: